**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **THOMAS BARTLETT WHITAKER,** | § | |
| | § | |
| **PETITIONER,** | § | |
| **V.** | § | **CASE NO. 4:10-MC-293** |
| | § | |
| **RICK THALER, DIRECTOR,** | § | |
| **TEXAS DEPARTMENT OF** | § | |
| **CRIMINAL JUSTICE,** | § | |
| **INSTITUTIONAL DIVISION,** | § | |
| | § | |
| **RESPONDENT.** | § | |

---

**PETITION FOR WRIT OF HABEAS CORPUS OF A PERSON IN STATE CUSTODY**

---

TO THE HONORABLE KEITH P. ELLISON, UNITED STATES DISTRICT JUDGE:

**HISTORY**

On March 5, 2007, a Fort Bend County, Texas, jury found Thomas Whitaker guilty of capital murder.  On March 8, 2007, the jury answered Texas' "special issues" at punishment in a manner that required the imposition of the death penalty.  On June 24, 2009, the TCCA denied Thomas Whitaker's direct appeal. *State v. Whitaker* 286 S.W.3d 355 (Tex.Crim.App. 2009).  On June 30, 2010, the TCCA denied Thomas Whitaker's post conviction claims for a writ of habeas corpus.

**JURISDICTION**

This court has personal jurisdiction pursuant to 28 U.S.C. § 2241(d) because Thomas Whitaker was convicted in a Ft. Bend County, Texas district court.  Subject matter jurisdiction is conferred by 28 U.S.C. § 2254.

## FACTS

On December 10, 2003, Thomas Whitaker, his roommate (Chris Brashear), and a neighbor (Steve Champagne) carried out a plan to murder Thomas Whitaker's father, mother and younger brother.[1]  *See, Whitaker,* 286 S.W.3d, at 357-359.  As related by the Texas Court of Criminal Appeals, Thomas Whitaker deceived the family into believing that he was about to graduate from Sam Houston State College and they went out to dinner to celebrate. *Id.*  When the Whitakers returned to their home in Sugar Land, Texas, Brashear shot and killed Thomas Whitaker's mother and brother, and wounded Thomas Whitaker's father. *Id.*  Brashear shot Thomas Whitaker in the left bicep in order to create the appearance that Thomas Whitaker had been ambushed.  Brashear then fled the scene with Champagne who was waiting outside in a getaway car. *Id.*  Since at least 2000, Appellant had planned with several other individuals, at different times, to murder his family.  He made at least one attempt to murder his family before December 10, 2003.  *Id.*

Thomas Whitaker soon came under suspicion but denied involvement. *Id.*  Kent Whitaker retained Dan Cogdell and Jimmy Ardoin to represent his son. *Id.*  In June of 2004, after Cogdell informed him that Fort Bend County investigator Marshall Slot was convinced Thomas Whitaker was responsible for the murders, Thomas Whitaker stole ten thousand dollars from his father and fled to Mexico. *See, id.*  In September of 2005, the FBI learned of his whereabouts.  The Mexican police arrested Thomas Whitaker and extradited him to stand trial for capital murder in Fort Bend County, Texas.  *Id.*

Cogdell resumed his representation of Thomas Whitaker.  However, the evidence that Thomas Whitaker had orchestrated the murder of his mother and brother was significant.  Brashear and Champagne had confessed and had agreed to tape numerous conversations with

---

[1] Norman Kent Whitaker ("Kent") is the father; Kevin Whitaker is the brother, and Patricia Whitaker is the mother.

Thomas Whitaker.  The State recovered physical evidence corroborating Brashear's and Champagne's statements.  Cogdell, therefore, concentrated on developing a punishment phase defense and retained psychologist Dr. Jerome Brown to provide expert assistance.  *See, Exh.* 'A' (*Affidavit of Dan Cogdell*).

Cogdell also sought to negotiate a life sentence.  To this end, Cogdell proposed what he called a "proffer" to Assistant District Attorney Fred Felcman.  *See, id.*  These negotiations were handled very informally, consisting principally in a chance meeting with Felcman in a local store.  *Id.*  Nonetheless, according to Cogdell, the sides agreed that Thomas Whitaker would provide a written statement describing his role in the offense and taking responsibility for the crime; in return, Felcman supposedly assured the defense that the Ft. Bend County District Attorney's Office would not seek the death penalty.  Cogdell maintained that Felcman told him he wanted a factual account unleavened with *mea culpas. See, id.*

Ardoin drafted Thomas Whitaker's statement based on attorney-client interview notes and presented the statement to Felcman.  *Exh.* 'B' (*Affidavit of Jimmy Ardoin*).  However, Thomas Whitaker did not review or approve it. (31 RR 257-258.)  According to Cogdell, Felcman accepted the document, but then told him that it showed insufficient remorse for the State to agree to a life sentence.  *Exh.* 'A'.  Contrary to Codgell's claim, Felcman maintained in post conviction proceedings that there was no proffer agreement, and that the Fort Bend County District Attorney made the decision to seek death.  *Exh.* 'C' (*Affidavit of Fred Felcman*).  After the negotiations for a life sentence broke down, Cogdell resigned.  With guilt-innocence a foregone conclusion, Kent Whitaker retained Randy McDonald ("trial counsel') to investigate and put on a punishment phase defense.

Trial counsel was faced with defending a client who had committed a bizarre crime that would typically require a psychological explanation.  Kent Whitaker implored trial counsel to have his son examined by a psychiatrist and agreed to pay the costs. *Exh.* 'D' (2009 *Affidavit of Norman Kent Whitaker*).  Trial counsel was also aware that Thomas Whitaker had a history of mental health and emotional problems serious enough to warrant professional intervention.  Trial counsel knew that Cogdell had hired Dr. Jerome Brown to treat Thomas Whitaker, and he knew that Dr. O'Rourke had treated Thomas Whitaker in 1997. *Exh.* 'E' (Affidavit of Randy McDonald).  However, trial counsel did not retain a mental health professional, although both the American Bar Association and State Bar of Texas Guidelines stress that having qualified mental health experts involved in the defense of a capital trial is essential whenever the defendant has a history of serious mental illness.  *2006 State Bar of Texas Guidelines and Standards for Texas Capital Counsel,* §10.1(B)(1)(c),  11.7(F)(2);[2] *2003 American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* ("2003 ABA Guidelines").

Trial counsel's 2009 affidavit states that he conferred with Dr. O'Rourke; however, it does not describe the content of any communications between trial counsel and the mental health experts who evaluated Thomas Whitaker before trial. *Exh.* 'E'.  According to post-conviction counsel, David Schulman, trial counsel's file did not contain notes of trial counsel's communications with the mental health experts or copies of Dr. O'Rourke's report or Dr. Brown's report.  Therefore, in state post-conviction proceedings, Thomas Whitaker contended that trial counsel had provided ineffective assistance of counsel at the punishment phase because

---

[2] *See, also, id.*, at §3.1(A)(2)("The defense team should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments.").

he did not investigate or present mitigating psychological evidence. *Original Application for Post Conviction Writ of Habeas Corpus* ("OAPCW"), at 5-30.

Thomas Whitaker has a significant history of serious mental illness. Before trial, Drs. Jerome Brown and Brendan O'Rourke made Axis I diagnoses that included mental diseases of psychotic proportions with an etiology antedating the capital offenses. *See, Exh.* 'F' (1997 *Report of Dr. Brendan O'Rourke*; *Exh.* 'G' (2005 *Report of Dr. Jerome Brown*). However, trial counsel failed to retain a mental health expert or a mitigation expert, and he tried the capital murder case against Thomas Whitaker without the assistance of co-counsel or and investigator. Thomas Whitaker's psychological problems persisted over time with no indication of malingering. *Exh.* 'H' (2009 *Report of Dr. Kit Harrison*).

## CLAIMS FOR RELIEF

### CLAIM ONE

### IN VIOLATION OF DUE PROCESS, THE STATE, UNDER THE PRETENCE OF ENGAGING IN PLEA NEGOTIATIONS, PROCURED A PROFFER THAT IT USED TO PREPARE ITS PUNISHMENT PHASE CASE AND TO CROSS EXAMINE THOMAS WHITAKER

The plea bargaining process, including the negotiation phase, is marked by both the interests of justice and standards of good faith. *United States v. Valencia*, 985 F.2d 758, 761 (5th Cir. 1993) (citing *Santobello v. New York*, 404 U.S. 257, 262-263 (1971)). In addition to the requirement of honesty, a State's counsel cannot act in a vindictive manner without offending the Constitution. *North Carolina v. Pearce*, 395 U.S. 711 (1969). In Thomas Whitaker's case, the state violated due process by using the ruse of the plea bargaining process to get evidence it was not entitled to obtain or use.

Thomas Whitaker's former attorneys, Dan Cogdell and James "Jimmy" Ardoin, were approached by prosecutor Felcman while they were in a retail store in Sugar Land, Texas.

Felcman proposed to the two attorneys that negotiations would be enhanced by the submission by the defense of what came to be known as "the proffer", a statement of the facts of the offense, detailing Thomas Whitaker's involvement in a strictly factual manner.  According to Cogdell and Ardoin, Felcman stressed that there should be no embellishment of the factual statement with mention of remorse or contrition.  In exchange for a satisfactory proffer, Cogdell and Ardoin were told that the State would remove the death penalty as a punishment option.

Ardoin interviewed Thomas Whitaker and wrote a multi-paged document describing Thomas Whitaker's role in the murders.  Cogdell presented the document to Felcman as a "proffer" in return for a life sentence.  The proffer was rejected as unsatisfactory because, according to Cogdell and Ardoin, there were no statements of Thomas Whitaker's remorse within it.  Thereafter, the State retained the document for use at trial.

The State's subterfuge surfaced during Kent Whitaker's guilt-innocence phase testimony. The lead prosecutor baited Kent Whitaker into mentioning the proffer by asking him why Thomas had not confessed upon returning from Mexico where he had fled:

> A. (Kent Whitaker) There was no confession. There was a proffer offered
> to the District Attorney's office a year and, what, three or four months ago.
>
> Q. (Mr. Felcman) Uh-huh. You know, of course, that proffer was
> absolutely inadmissible, and I could not have used it for any purposes.
> You understand that?
>
> A. No, I didn't understand that.
>
> Q. Okay.

25, RR, at 105

While acknowledging that the proffer was covered by Rule 410 of the Texas Rules of Evidence, the prosecutor proceeded to query Kent about the proffer as though Kent had opened the door to this issue.

Q. (Mr. Felcman) So, the remorse or repentance that my office received was -- let me ask you this: Did the Defendant prepare that, or did one of Dan Cogdell's partners prepare that?

A. (Kent Whitaker) I don't even think it was a partner. I found out much later -- in my visit with you, what, six weeks ago, that was at the time I found out that Bart had not written the proffer, and that you were offended by the tone of it, and that was when I knew that Jimmy -- I can't think of his last name -- anyway, one of Dan's junior assistants, I'd heard had written that up.

Q. There was no legal repentance, there was nothing. There was legal maneuvering on your son's part. Am I correct on that?

A. What?

Q. He -- he repented to you, but he didn't put his neck on the line about this case, correct?

A. As I understand it, it would have been -- Dan would not have allowed him to.

Q. Uh-huh.

A. I think that the problem broke when Dan and you did not seem to realize that Bart was trying to confess to this.

In post conviction proceedings, the State argued that Felcman was justified in using the document precisely because Kent Whitaker had brought the proffer up.[3]  However, the attempted justification only compounds the misconduct.  Kent Whitaker was the State's witness, and he had not been declared adverse.  The State, therefore, manipulated its own witness into mentioning the proffer so it could use the document to impeach him regarding the critical issue of Thomas Whitaker's remorse.

The misconduct reached its zenith during the State's cross-examination of Thomas Whitaker at the punishment phase.  The State asked Thomas Whitaker, after he had been given the opportunity to read the proffer, if he could name one fact in the proffer that would lessen his

---

[3] Findings of Fact and Conclusions of Law ("FFCL"), Finding #95.

"moral blameworthiness" (RR Vol. 32, P.260).    Because Ardoin, acting on Felcman's instruction, had omitted all statements of remorse or acceptance of responsibility, the State was able to use the proffer to great effect to create the appearance that Thomas Whitaker lacked remorse and was merely manipulating the legal system to his advantage.

Q. You also mentioned something about a proffered statement. Remember that?

A. I -- yes, sir.

MR. FELCMAN: May I approach him, Judge?

THE COURT: You may.

Q. (BY MR. FELCMAN) Don't read this out loud to the jury. Do not read it out loud to the jury, but read this to yourself.

A. (Reading.)

Q. Is that true?

A. I did not write that.

Q. You didn't write it?

A. No. I -- I wanted to write the proffer. That was some confusion between me and Mr. Cogdell at the time when initially -- I guess it was your office that suggested that if we wrote the proffer, we could all end this. It was my impression that I would write this admission of guilt.

Q. It wasn't my suggestion.

A. I'm sorry?
Q. Your father poured his heart out to me, and I saw no remorse on your part.

A. I didn't actually write that. The one that I wrote was in my cell, and it did have remorse. It was really how I felt at the time, and I didn't -- I was under the impression that I was going to be giving that copy to Mr. Cogdell, and then I find out -- I guess I didn't see him for a few weeks. I found out the next time that I talked to him that a proffer had been rejected. I was very confused, because it was my understanding that I would be writing it myself.

8

Q. The proffer that presented -- that you didn't even have anything to do with. You understand how insulting that is to somebody that has to listen to the father plea, and I see no remorse on the Defendant?

A. Yes, extremely insulting. I knew it would be, if it had been done that way. I wouldn't have agreed to that at all. I was very upset about that.

32 RR, 258.

In sum, the prosecutor manipulated Mr. Whitaker's attorneys into providing a proffer under TRE 410 that, at the State's urging, was stripped of expressions of remorse or acceptance of responsibility. The State then baited it own witness, Kent Whitaker, into mentioning the proffer and used the ruse of "opening the door" to severely impeach the punishment phase defense that depended entirely on these two witnesses. Relief should be granted, and a new punishment phase ordered.

## CLAIM TWO

## TRIAL COUNSEL WAS CONSTITUIONALLY INEFFECTIVE

*Strickland v. Washington*, 466 U.S. 668 (1984), set forth the legal principles that govern ineffective assistance of counsel claims. A defendant must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. *Id.,* at 687. To establish deficient performance, he must demonstrate that counsel's representation "fell below an objective standard of reasonableness." *Id.*, at 688. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct." *Wiggins v. Smith,* 539 U.S. 510*,* 521 (2003). Instead, the Court has "emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Id.* (quoting Strickland, 466 U.S., at 688). After demonstrating that counsel performed deficiently, a defendant must show that counsel's failures prejudiced his defense. *Strickland*, 466 U.S., at 692. To establish prejudice, a

"defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*., at 694.   In assessing prejudice, the reviewing court reweighs the evidence in aggravation against the totality of available mitigating evidence.  *Wiggins,* 539 U.S., at 534.  The totality of the evidence includes "both that adduced at trial, and the evidence adduced in the habeas proceeding[s]." *Williams*, 529 U.S., at 397-398 (emphasis added).

Straightforward application of seminal Supreme Court decisions establishes that Thomas Whitaker's attorneys' performance did not conform to reasonable professional norms.  As in *Strickland* and *Wiggins*, the deficient performance allegation in this case "stems from counsel's decision to limit the scope of their investigation into potential mitigating evidence." *Wiggins*, 539 U.S., at 421 (citing Strickland, 466 U.S., at 673).  The Supreme Court cautioned that, in assessing counsel's performance, strategic decisions of counsel must be afforded deference. *Strickland*, 466 U.S., at 681.  However, the Court also stressed that deference is owed only if counsel's decision were based upon a reasonable investigation.  *Id.,* at 691.

*Strickland*'s prejudice prong may be satisfied by claims taken individually.  However, even if the harm caused by any single given claim is not material, the cumulative harm of multiple errors may require relief and must be considered.  *Kubat v. Thieret*, 867 F.2d 351, 370 (7th Cir. 1989); *Gonzalez v. McKune*, 247 F.3d 1066 (10th Cir. 2001) ("Faced with established errors at trial, a court must consider the cumulative impact of those errors in light of the totality of the evidence properly presented to the jury.").  In Thomas Whitaker's case, relief is warranted on claims taken individually.  When the cumulative effect of counsel's errors are evaluated, habeas relief is unquestionably required.

I.   **TRIAL COUNSEL'S FAILURE TO INVESTIGATE A MITIGATION DEFENSE DEPRIVED THOMAS WHITAKER OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.**

    A.   **TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND SPONSOR A MITIGATION DEFENSE WAS DEFICIENT.**

In a capital case, "the defense team should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments." *See,* State Bar of Texas Guideline 3.1 (A)(2); *and see*, ABA Guideline 4.1 (A)(2).  "Attorneys have an obligation to explore all readily available sources of evidence that might benefit their client . . .," and counsel who has access to defendant's medical records "ha[ve] a professional obligation to do an in-depth investigation into their client's deep-seated psychiatric problems." *Brown v. Sternes*, 304 F.3d 677, 693-698 (7th Cir. 2002).

Trial counsel admits that he "deliberately determined" not to investigate mitigating evidence of any sort, including evidence of mental illness and emotional problems. *Exh.* 'E'. Trial counsel failed to retain a mental health expert, and counsel failed to obtain necessary mental health records and reports, including the 2005 report of Dr. Brown.  Trial counsel received a copy of Dr. O'Rourke's 1997 report; however, he failed to consult with Dr. O'Rourke regarding her findings, and failed to consult with another expert who could explain the significance of Dr. O'Rourke's findings.

Trial counsel compounded his failure to investigate by attempting to evaluate Thomas Whitaker's mental health unassisted by a mental health professional.  *See, Exh.* 'A', at 10.  As a result, trial counsel failed to comprehend that Thomas Whitaker suffered from an Axis I mental illness that included delusional thinking with serious symptoms of emotional disturbance. Instead, trial counsel misdiagnosed Thomas Whitaker with personality disorders – antisocial personality disorder and narcissistic disorder – that he did not have.

Trial counsel was not strapped by time or by limited resources.  Trial counsel concedes that, in fact, Thomas Whitaker's father, Kent, would have funded a psychological investigation. *Exh.* 'E'.  Kent Whitaker confirms that he was anxious to have his son evaluated by a mental health professional and would have provided additional funding.  *Exh.* 'D'.

## B.   TRIAL COUNSEL DID NOT HAVE A STRATEGIC REASON FOR IGNORING MITIGATING PSYCHOLOGICAL EVIDENCE.

In post conviction proceedings, trial counsel justified his failure to develop a mitigation defense based on psychological evidence because he felt a preliminary inquiry indicated that such punishment phase defense would be fruitless or inadvisable.  According to trial counsel,

> [a]fter having a discussion with Dr. O'Rourke, who also was the psychologist for Kent Whitaker, I made the determination that I would not be pursuing the third issue in the capital murder theme of mitigation and that any testimony from a psychologist would be, not only harmful, but would allow the State to bring forth evidence attempting to show that Bart Whitaker did not have a conscious, was narcissistic, and therefore, could not be remorseful for the acts that he committed. As a trial strategy, early on, after my conversations with Bart and my understanding of the other records regarding his psychological state, I made a deliberate determination that I would not be pursuing the mitigation issue in this case.

*Exh.* 'E'.

However, this underscores the trial counsel's deficient performance.

### 1.   Trial counsel's failure to investigate was the product of his misunderstanding a basic difference between consulting and testifying experts.

In *Soria v. State*, 933 S.W.2d 46, 56 (Tex. Crim. App. 1996), the TCCA held that "when the defendant initiates a psychiatric examination and based thereon presents psychiatric testimony on the issue of future dangerousness, the trial court may compel an examination of appellant by an expert of the State's or court's choosing and the State may present rebuttal testimony of that expert based upon his examination of the defendant."  In *Lagrone v. State*, 942

12

S.W.2d 602 (Tex.Crim.App.,1997), the TCCA expanded *Soria*, holding that if a defendant expresses an intent to challenge the future dangerousness special issue with psychological testimony, the trial court can order that the defendant submit to an examination by an expert selected by the State.  However, *Lagrone* also held that if the defense ultimately decides not to sponsor psychological testimony, the State cannot put on adverse psychological findings. Instead, it is limited to rebutting the defenses theory. *See, Lagrone*, 942 S.W.2d  609–612 (defendant's presentation of psychiatric testimony on future-dangerousness is a "limited" waiver of Fifth Amendment rights entitling State to compel defendant to an examination by State's psychiatric expert for rebuttal purposes "provided, however, that the rebuttal testimony is limited to the issues raised by the defense expert").

*Lagrone's* holdings shows that trial counsel's belief that by retaining a mental health expert he would open the door to compulsory psychological examinations by State experts, and to the inevitable use of adverse findings at trial, rests on a fundamental misunderstanding of firmly established law.  Furthermore, since Kent Whitaker was funding the case, trial counsel did not have to file a motion in open court asking the court to appoint an expert, which would reveal his intention to explore a mitigation defense based on psychological testimony.  Dr. Brown, in fact, examined Thomas Whitaker in 2005 without the dire consequences that trial counsel feared. However, because trial counsel failed to take rudimentary steps to gather records, he, too, was unaware of Dr. Brown's report.

> **2.     Trial counsel did not reasonably conclude from his limited inquiry that a mental health defense would be fruitless.**

On November 9, 2006, approximately 100 days before guilt-innocence began, the Fort Bend County Clerk issued a subpoena *duces tecum* for Dr. O'Rourke to testify at trial and to disclose Thomas Whitaker's psychological records.  These records included Dr. O'Rourke's

report and analysis of his performance on the MCMI-II test. *Exh.* 'I' (Subpoena).  On December 21, 2006, the State served the subpoena on Dr. O'Rourke. *Id.*  The State provided trial counsel with a copy of the 1997 report, *Exh.* 'J' *(Affidavit of Assistant D.A., Jeff Strange),* at 2, and Dr. O'Rourke's notes reflect that she scheduled a conference with trial counsel for January 15, 2007, in order to discuss her testimony. *Group Exh.* 'K'.  At trial she confirmed that she spoke "once" with trial counsel by phone. 31 RR 25.

Documents that Dr. O'Rourke disclosed in response to the State's November 9, 2006, subpoena contradict trial counsel's post-conviction claim that he learned through his lone conference with Dr. O'Rourke that Thomas Whitaker only suffered from anti-social and narcissistic disorders.  Dr. O'Rourke turned over copies of notes that she created in preparation for possible interrogation by the prosecution and testimony, as a witness at trial.  Dr. O'Rourke's pre-trial review of her 1997 psychological evaluation of Thomas Whitaker confirmed that Thomas Whitaker did **not** meet criteria for having an antisocial personality disorder and it confirmed that Thomas Whitaker did not satisfy the numerous factors on the "psychopathy check list."  *Group Exh.* 'K'.  Dr. O'Rourke's disclosures also show that in preparing to deal with Thomas Whitaker's prosecutors, Dr. O'Rourke consulted the DSM-IV for Children and Adolescents and highlighted the following statements about diagnosing personality disorders in youths and young adults:

> • The DSM-IV criteria for personality disorders require a lifelong pattern of experiences and features. Children (especially younger children) simply haven't lived long enough to attain this standard.
>
> • When personality disorder diagnoses are made in adolescents, they tend to be unstable.
>
> • Changing diagnostic criteria promote uncertainty in the diagnostic process.

• In fact, as personality disorder diagnoses fall out of favor (consider the case of passive-aggressive personality disorder), even less stability in this diagnostic process can be assumed.

• Many teenagers and adults qualify for several personality disorders; [but]

• According to the DSM, the best validated personality disorder, Antisocial Personality Disorder, cannot be diagnosed before the age of 18.

*Group Exh.* 'K'.

The argument that Dr. O'Rourke's 2006-07 review notes are inconsistent with her 1997 report cannot be made.  In her 1997 report, Dr. O'Rourke warned that "further professional observation [of Thomas Whitaker] and care are appropriate" because of the presence of an underlying mental illness with psychotic symptoms, which lead to, and was exacerbated by, drug use. *Exh.* 'F'.  Dr. O'Rourke's recommendation made it obvious that additional investigation into Thomas Whitaker's psychological history and condition was necessary, rather than something trial counsel could forego.  However, trial counsel purposely failed to investigate mitigating psychological evidence.

Finally, in 2011, Dr. O'Rourke addressed trial counsel's 2009 allegation that he made a strategic decision after consulting with her. *Exh.* 'L' (2011 Affidavit of Dr. Brendan O'Rourke). According to Dr. O'Rourke, trial counsel talked with her briefly on one occasion.  The communication was too short, as she recalls, for her to explain the 1997 results. *Id.*  However, she definitely did not tell trial counsel that she had diagnosed Thomas Whitaker with narcissistic disorder or antisocial disorder. *Id.*  Dr. O'Rourke states that, instead, she would have informed trial counsel that these diagnoses could not be made in adolescence. *Id.*  Dr. O'Rourke would also have informed McDonald that the results of her 1997 tests indicated that Thomas Whitaker was suffering from an Axis I mental illness that included delusional thinking.  *Id.*

Two things follow.  **First**, reasonable counsel would have realized that before trial the State had discovered Dr. O'Rourke's narrative discussion of Thomas Whitaker's possible personality disorders and that it would try to introduce findings that appeared adverse either through Dr. O'Rourke or other witnesses; reasonable counsel would have retained a mental health expert in order to counter the State's slanting of this evidence, and provide mitigating psychological testimony about Thomas Whitaker's serious mental illness.  **Second**, the assertions made in post-convictions proceedings that trial counsel strategically decided not to investigate a mitigation defense in order to prevent the State from discovering and presenting harmful psychological evidence are *post hoc* fabrication.

### 3. Trial counsel's alleged strategy of demonstrating that Mr. Whitaker was not a future danger does not excuse his failure to investigate mitigating psychological evidence.

Trial counsel had **no** reason to believe his strategy of defending Thomas Whitaker against the death penalty (by proving he was not a future danger through the testimony of Thomas Whitaker's father, uncle and Thomas Whitaker, himself) would prevail.  According to trial counsel, that strategy would not succeed if the State knew of Thomas Whitaker's alleged personality disorders. *Exh.* 'E'.  However, the State had discovered the very psychological evidence that trial counsel feared showed "antisocial [behavior], as well as being without conscious or empathy for others in a narcissistic way." *Id.*  Furthermore, trial counsel knew that the State had the evidence he says he feared revealing because it procured Dr. O'Rourke's files through a subpoena and gave trial counsel a copy of it.

Ultimately, the Court excluded Dr. O'Rourke's testimony, pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and Rule 702 of the Texas Rule of Evidence on the ground that the MCMI-II was not a valid test to give to the 17 year old Thomas Whitaker.  31

RR 8-26 (*Daubert* hearing).   However, the fact that Dr. O'Rourke's 1997 results were inadmissible does not excuse trial counsel's decision not to investigate mitigating psychological evidence that *would be* admissible.   Indeed, it underscores the deficiency of trial counsel's decision not to investigate a psychological defense.

On the one hand, trial counsel did not know before trial that the convicting court would exclude Dr. O'Rourke's 1997 report.   In order to counter harmful inferences and present mitigating psychological evidence, trial counsel should have retained a mental expert in case the trial court admitted MCMI-II.   On the other hand, if one assumes that trial counsel had good reason to believe that the Court would exclude Dr. O'Rourke's testimony, he still should have investigated a mitigation defense based on psychological evidence.   Had trial counsel investigated and developed admissible testimony, such as Dr. Brown's or Dr. Harrison's findings and opinions, he would have been able to present expert testimony that the State could not rebut with the MCMI-II that Dr. O'Rourke administered in 1997.

### C.    TRIAL COUNSEL'S DEFICIENT PERFORMANCE WAS PREJUDICIAL.

#### 1.    The findings of Dr. Kit Harrison mitigate against the death penalty.

During state habeas proceedings, Dr. Kit Harrison administered a battery of psychological tests and conducted extensive interviews of Thomas Whitaker, his former fiancé and his father. *Exh.* 'H', at 1.   Dr. Harrison's examination revealed several clinical problems dating back to early childhood, which had not been addressed by counselors or other mental health professionals.   According to Dr. Harrison,

> There were many remarkable findings relative to the forensic history and evaluation of this young man.   Most prominent in the clinical picture was a tormented irrational self-concept and personal self-identify dating back to early childhood.   Likely demonstrating early manifestations of social impairments most resembling several features suggestive of early Asperger's Disorder.

17

*Id.*, at 2.

As had Dr. O'Rourke and Dr. Brown, Dr. Harrison also remarked on Thomas Whitaker's losing contact with reality.  Dr. Harrison found that while still in high school, Thomas Whitaker became "increasingly out of touch with reality, paranoid, and delusional". *Id.,* at 3.  Thomas Whitaker, according to Dr. Harrison, was alienated from a suburban culture that he believed was self-indulgent. *Id.*  Dr. Harrison remarked that Thomas Whitaker "experienced increasing inner turmoil and upheaval, self-loathing, and increasingly desperate attempt to appear normal." *Id.,* at 3.

Dr. Harrison also corroborated Dr. Brown's findings that after high school Thomas Whitaker's mental condition deteriorated further.   Dr. Harrison's interview of Thomas Whitaker's fiancé resulted in the finding that Thomas Whitaker "became more reclusive, bizarre, and reckless." *Id.*  Dr. Harrison calculated that at the time of the offense Thomas Whitaker's "global assessment of functioning" ("GAF") score was 25 out of 100. *Id.,* at 6.  At this level (21-30), Thomas Whitaker's behavior was "considerably influenced by delusions or hallucinations OR serious impairment, in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends)." *See, Diagnostic and Statistical Manual of Mental Disorders IV*, at 34.

### a.    Dr. Harrison's findings refute the State's argument that Mr. Whitaker manipulated and deceived others because he felt superior.

Dr. Harrison's forensic analysis is diametrically opposed to the State's penalty phase evidence, and to trial counsel's *post*-trial justifications for "deliberately determin[ing]" not to put on a mitigation defense.   The prosecution sponsored evidence that Thomas Whitaker manipulated and deceived Dr. O'Rourke into sending misleading recommendations to Clement

High School in an effort to get Thomas Whitaker re-instated. *Id.,* at 31 RR. Through Thomas Whitaker's educational counselor, Lynne Ayres, the State sponsored evidence that Thomas Whitaker was grandiose, deceptive, and narcissistic. Ayres testified that Thomas Whitaker bragged that he, like Atlas, could carry the entire world on his shoulder and could manipulate his teachers into giving him whatever grade he wanted. 31 RR, at 74. The State emphasize that Ayres found the interview she conducted with Thomas Whitaker in 2002 very disturbing, *id.,* at 49, because, in her view, Thomas Whitaker considered himself as a criminal and thought like one. *Id.,* at 49-50. Finally, through Ayres, the State introduced testimony that Thomas Whitaker was callous and narcissistic:

> Q. Did he ever tell you whether he thought there was any point to having a social relationship with people?
>
> A. Yes. He said he did not feel that there was a point to have social relationships.
>
> ***
>
> Q. When you talked about his relationships with others, did he ever use the phrase he has no interest in relationships with friends, girlfriend or family?
>
> A. Yes.
>
> Q. In regard to his attitude about himself, did he ever say no one needs to help him, he can do it, and he can do things because he does everything well?
>
> A. Yes.
>
> Q. Did you reach a conclusion that the Defendant was very impressed with himself?
>
> A. Yes.
>
> Q. To such an extent that you were disturbed by this interview, were you not?
>
> A. I was.

Q. Did you ever use the phrase "narcissistic" when you talked about him?

A. I did.

*Id.*

Dr. Harrison's professional analysis, however, undermines the State's depiction of Thomas Whitaker as manipulative and narcissistic.  Instead, Dr. Harrison found that Thomas Whitaker was experiencing "increasing inner turmoil and upheaval, self-loathing and increasingly desperate attempts to appear norm."   *Exh.* 'H', at 3.   Rather than being a supremacist, Thomas Whitaker was increasingly paranoid, feared ridicule, and felt others were rejecting him. *Id.*   Referring to Dr. O'Rourke's 1997 analysis, Dr. Harrison found that the "psychological test of Thomas, performed by a retained psychologist on September 17, 1997," "revealed [that] this man is experiencing the clinical symptoms of a delusional (paranoid) disorder." *Id.,* at 5.

> **b.    Dr. Harrison's expert findings rebut the State's primary punishment phase theory that Thomas Whitaker murdered his family for money.**

Because trial counsel's failed to retain a mental health expert, the State was freed from facing a rebuttal witness, and was at liberty to portray Thomas Whitaker as a self-indulgent, spoiled young man who murdered his family because he was greedy.  However, mental illness played a far more important role than venality.  As Dr. Harrison found,

> Thomas is in his 29th year of life demonstrating a psychotic disorder and has yet to obtain appropriate medical management. Treatment is immediately indicated with a combination of antipsychotic medication and mood elevators as recommended by his psychiatric physician. That these murders were motivated solely by greed is not supported whatsoever.

*Exh.* 'H', at 5.

      **c.**     **Dr. Harrison's finding that Thomas Whitaker would benefit from medication and therapy rebutted the State's contention that Mr. Whitaker's drive to murder his family made him an unstoppable killer.**

The State emphasized throughout the trial that Thomas Whitaker, through extraordinary force of will and power of persuasion, had managed to convince several groups of his peers to murder Thomas Whitaker's entire family. Thomas Whitaker was portrayed as the mastermind of the scheme and the master manipulator. The repeated attempts on his parents' and brother's life, according to the State, showed that Thomas Whitaker's murderous intentions were unquenchable. According to the State,

> "[I]t doesn't matter whether you treat this Defendant with kindness, as Mr. Kent Whitaker does. It doesn't matter if you're the ideal father. If in his mind somewhere along the line he perceives it different, you are now in danger. And not only that, there's nothing you can do to stop it. Listen to me, there's absolutely nothing you can do to stop it until he's in his grave."

32 RR, at 69.

In closing, trial counsel accurately summarized the critical issue:

> "They [the prosecutors] want to show that, at every stage of the game, that Bart Whitaker is a manipulating individual, that he's smarter than everybody else, that he does this and does that, it's always for his own good, all those things. That's what they want to show you, you know. That would be something that maybe you would consider someone being a continuing threat to society. You know, look at the "M.O," though. How do you deal with other inmates when you have no money, when you have no freedom, when you have nothing to deal, nothing to manipulate with? All that's gone. And he took it away from himself."

32 RR, at 48.

However, because trial counsel did not retain a psychologist to counter the State's obvious strategy of portraying Thomas Whitaker as a cunning sociopath, trial counsel played into the State's hand. Trial counsel's attempt to convince the jury that Thomas Whitaker would be helpless to commit acts of violence because, in prison, "you have no money", "nothing to deal,

nothing to manipulate", was damaging on multiple levels.  First, trial counsel agreed with the

erroneous theory that Thomas Whitaker murdered his family for money.  Second, the State's

rejoinder to the defenses theory that Thomas Whitaker would be helpless once incarcerated was

that Thomas Whitaker did not need to pay assassins or use the threat of retaliation to induce

others to commit murder.  The State argued resources did not matter, because Thomas Whitaker

was capable of convincing not just vulnerable individuals to carry out incredible crimes, but

capable of manipulating attorneys and psychologists:

> He talked seven people –  I'm talking about the five on the murders and the
> two on the burglaries –   to do things with him.  He manipulated a trained
> psychologist, after sessions, to write a letter saying "Don't worry, he won't
> do anything like this again."  He even convinced Lynne Sorsby to marry
> him even after he was a suspect in a capital murder case and had lived a
> double life in college.  This is a good salesman.  And there's a salesman on
> this panel.  This guy could sell ice to an Eskimo.  But he doesn't do those
> things.  He perceives things in a different way.  That's the threat, the
> continuing threat, and it's been shown time and time and time again.  Even
> Lynne Ayres, the educational diagnostician:   "This was a disturbing
> interview," "narcissistic," "he looks at people as tools."

32 RR, at 71-72.

The State argued that Putting Thomas Whitaker in prison would therefore not cut Thomas

Whitaker off from the means ordinarily needed to convince others to carry out his murderous

directives; everyone who opposed him, including the jury and the prosecutors, would still be in

mortal danger:

> That means all of us are in that position now, every one of us.  Jeff, me,
> Marshall, we're the ones who did it.  Sooner or later, he's going to turn
> again, and what happens then?  Do I keep looking over my back for the rest
> of my life, years from now, five years from now?  It doesn't take him long
> to develop this perception that he hates you, somehow you have offended
> him and you deserve to die.

32 RR, at 73.

Lacking psychological assistance, trial counsel was impotent in the face of the State's devastatingly simple argument that Thomas Whitaker's attempt on his father's life showed that he would kill anyone who rubbed him the wrong way.  In fact, as reflected in trial counsel's 2009 affidavit, trial counsel agreed with the State's pop-psychological profile of Thomas Whitaker. Throughout trial counsel's sworn statement, he refers to Thomas Whitaker as a sociopath and a narcissist. *Exh.* 'E'.  Failure to consult a psychologist left trial counsel unable to muster a good faith argument against the State's misinformed psychological caricature of his client.

Dr. Harrison's report, however, dispels the sociopath stereotype that Thomas Whitaker had the indiscriminate drive to manipulate and destroy others, no matter whom.  Dr. Harrison's careful analysis, instead, demonstrates that Thomas Whitaker's anger was focused strictly on his biological family because of the conflicts within the family, which were at the root of emotional problems serious enough to make Thomas Whitaker mentally ill.  As Dr. Harrison explained in his 2009 report,

> Thomas was acutely aware of open conflict and acrimony of long duration between his father and his mother's parents, in all aspects of life. … As the first born and oldest offspring to that family feud, much of the psychological angst became infused and internalized in him. Even his birth name was a vain attempt to achieve continuity and unity between the two families, he believed. Thomas Bartlett Whitaker—even his name was a lie, he concluded. He so hated that he was also a Bartlett inside and shared his mother's and brother's genetic curse, much more like a Whitaker (his father) in many ways, and so much unlike his brother and mother (Bartletts), that he lacked any ability to nullify the conflict, make peace with his inner self, or rationalize or intellectualize the problem away.

*Exh.* 'H'.

Furthermore, Dr. Harrison could have explained that Thomas Whitaker's decent into obsessive, delusional hatred of his biological family was not an inexorable process that could no longer be contained.  Rather, Dr. Harrison would have been able to point out that this was a case

where the public school system, "despite many opportunities," failed to identify Thomas Whitaker "as an at-risk child and assemble a special educational program, or alternative services under Sec. 504 of the Texas Education Agency (TEA), to address his insidious social and defiant attitudes and behaviors." *Id.*   Pursuant to a thorough psychological inquiry, Dr. Harrison determined that early intervention by a psychologist would have "revealed many of his emerging issues with delusional content of thought and diminishing coping." *Id.*  However, "instead, the school system expelled Thomas absent an assessment of his needs." *Id.*

Of vital importance, Dr. Harrison could also have refuted the State's insistence that Thomas Whitaker murderous drive was sociopathic and, therefore, unstoppable.  He could have provided readily understandable testimony that Thomas Whitaker would have benefited from modest pharmacological treatment.  Singling out Dr. O'Rourke's report, Dr. Harrison concurred with its "discuss[ion] [of] the benefits of medication which would "modulate the threshold and intensity of reactivity"  that resulted in Thomas criminal conduct. *Id.*  With psychological assistance, trial counsel could have stressed, as Dr. Harrison does, that "Thomas never received any benefit from antipsychotic medications which are well known for their efficacy in managing such symptoms." *Id.*

Because trial counsel failed to retain a psychologist, the State was able to magnify the importance of Thomas Whitaker's very sparse record of juvenile delinquency.  When Thomas Whitaker was a teen, he burglarized several public schools with a group of friends, and stole the schools computer equipment.  The crime involved repelling unarmed into empty buildings.  The group did not wantonly trash or destroy the facilities.  Rather than fencing the equipment, the group put it in storage.  However, the State made a criminal prank, which involved other adolescents (who have not gone on, as far as we know, to commit mayhem) into a manifestation

of sociopathy and a precursor to murder.  Trial counsel was unable to counter this devastating picture.  However, a competent psychologist could have shown that what was needed was counseling and medication.  Instead, Thomas's parents took action that exacerbated Thomas Whitaker's underlying mental health problems, namely, they sent Thomas Whitaker "to a more strict religious educational program at Fort Bend Baptist Academy." *Id.*  As Dr. Harrison explained, this "was like jumping from the pot into the fire for him psychosocially," since he "encounter[ed] a tighter spectrum of oppressive and non-responsive culture there than he had experienced at Clements High School." *Id.*

A psychologist could have also directly countered the State's argument that the murders in this case were the result of inexcusable narcissistic tendencies that Thomas Whitaker cultivated.  According to Dr. Harrison, Thomas Whitaker, rather than being narcissistic and grasping, was repelled and alienated by what he perceived to be a materialistic and narcissistic suburban culture.  *Id.*  Like Dr. Brown (*Exh.* 'F'), Dr. Harrison concluded that the State's contention that these murders were motivated solely by greedy self interest was not supported whatsoever. *Exh.* 'H', at 6.  Similarly, with psychological assistance, trial counsel could have undermined the State's theme that Thomas Whitaker was a spoiled child who repaid the privileges bestowed upon him with murder.

> **2.  Consistent reports of substantial mental problems over time soundly refute the State's speculative notion that psychological testimony would inevitably have harmed Thomas Whitaker.**

The central assumption behind the State's argument that trial counsel cannot be faulted for neglecting to investigate a mitigation defense based on psychological evidence is that psychological testimony could only be harmful.  As State habeas counsel stressed, however, the opposite is true.  Psychologists who have examined Thomas Whitaker have uniformly found

indications that he suffered from a substantial mental illness that included delusional and paranoid thinking.  Furthermore, these results are consistent over time.  Dr. Harrison's findings regarding Thomas Whitaker's Axis I diagnoses in 2009 are consistent with Dr. O'Rourke's findings twelve years earlier, as are their recommendations for intervention with counseling and medication.  Just as importantly, both psychologists discount or defer diagnoses of antisocial and narcissistic disorder.

Dr. Brown's 2005 report and Dr. Diane Mosnik's 2011 report corroborate the central findings made by Dr. O'Rourke and Dr. Harrison, and disprove the State's speculation that psychological testimony would converge on diagnoses harmful to Thomas Whitaker's punishment phase defense.  Based on a clinical interview and the results of objective tests, both psychologists determined that Thomas Whitaker suffered from depression, anxiety, serious problems with personal identity and delusional thinking as a consequence of these issues.  Neither psychologist endorsed diagnoses of narcissistic disorder or anti-social disorder.

On December 2, 2005, 14 months before trial, Dr. Brown conducted a psychological examination of Thomas Whitaker at the Fort Bend County Jail.  *Exh.* 'F'.  The evaluation consisted of "a clinical interview together with the administration of a battery of psychological tests, including the Minnesota Multiphasic Personality Inventory-2, Sixteen Personality Factor Questionnaire, and the Mooney Problem Checklist." *Id.,* at 1.  The psychological test results revealed "high levels of emotional disturbance and intensely felt psychological conflict." *Id.,* at 5.  Dr. Brown determined that Thomas Whitaker was "seriously depressed and is having trouble controlling ideas and thoughts that he experiences as alien and disturbing." *Id.,* at 5.  Crucially, Dr. Brown found that Thomas Whitaker was "endorsing many items suggestive of serious psychopathology."  For example,  Thomas Whitaker harbored "intense feeling of inferiority and

insecurity, and feels guilty about perceived failures," but at the same time, "he [was] suspicious and distrustful of others and avoid[ed] emotional ties." *Id.*

In summary, Dr. Brown concluded that,

> [T]his is a troubled and confused young man who struggles with deep-seated feelings of inferiority and inadequacy. He has never lived up to his potential because he decided at an early age that he must protect himself against any exposure to hurt and rejection by developing a façade of cynicism and pseudo-independence. … As he became more isolated and detached from the world, his plans and ideas became increasingly unreal, fantastic, and peculiar. His violent actions against his family are the culmination of this pathological process, an acting-out of rage against them that had been building for years, while at the same time also serving as a desperate, bizarre plea for the attention he desired but never received. These dynamics and the psychological reasons for this offense do not make it the typical murder-robbery that would qualify for a capital murder prosecution. In this case, the primary motivation was passion rather than profit.

*Id.,* at 5.

After a clinical interview and extensive objective testing, Dr. Mosnik arrived at similar findings.

> As can be seen from the data, there is fundamental agreement between the data from this evaluation and that from prior evaluations in the findings of anxiety disorders, signs of depression, consistent and pervasive identity issues with lack of a sense of self, inner turmoil and distress compounded by suspiciousness, resentment, and a negative misperception of others treatment of him. The constellation of these clinical symptoms has serious psychological consequences, even potentially to delusional proportions, as indicated in early assessments of the client when he was embroiled in the height of his anger and feelings of repression.

> The results of this psychological evaluation, as well as the results of prior psychological evaluations, revealed data to support the presence of significant mental health conditions, disorders that could have been treated successfully pharmacologically, including depression and anxiety, present throughout the client's life beginning in late adolescence. The fact that this relevant data was not appropriately recognized and utilized during the client's trial, or even as mitigating circumstances during the punishment phase, was clearly a disservice to and improper representation of the client. It appeared as though the client's prior attorney felt he could come to his

own conclusions about the presence or absence of any mental health diagnoses the client may or may not have, despite his lack of any professional training in the mental health or medical fields.

*Exh.* 'M', at 18.

Dr. Mosnik goes on to emphasize the serious error in trial counsel's unguided determination that psychological testimony would benefit the state by confirming trial counsel's improper diagnosis of sociopathy and narcissism.

> The results of this psychological evaluation, as well as the results of prior psychological evaluations, revealed data to support the presence of significant mental health conditions, disorders that could have been treated successfully pharmacologically, including depression and anxiety, present throughout the client's life beginning in late adolescence.   The fact that this relevant data was not appropriately recognized and utilized during the client's trial, or even as mitigating circumstances during the punishment phase, was clearly a disservice to and improper representation of the client. It appeared as though the client's prior attorney felt he could come to his own conclusions about the presence or absence of any mental health diagnoses the client may or may not have, despite his lack of any professional training in the mental health or medical fields.

> The literature is replete with discussions of misattributions by the lay public in regards to what certain psychiatric diagnoses represent and what symptoms comprise various mental health diagnoses.   The fact that individuals in the lay public may inappropriately believe that an individual who engages in any criminal act carries a diagnosis of antisocial personality disorder or believe that if someone is motivated by money they are narcissistic, highlights the importance of the need for a proper evaluation to be completed by a trained professional in the mental health field to determine whether or not a mental health condition could have been a contributing factor in any criminal act.

*Id.* at 17.

### 3. Interviews of non-family witnesses attest to Mr. Whitaker's mental problems and emotional turmoil.

In State proceedings, Lynne Soresby provided important evidence regarding Thomas Whitaker's crisis of identity and inner turmoil.  Co-defendant Steve Champagne has recently offered evidence regarding Thomas's alienation from his family and his odd behavior, including

possible multi-substance abuse.  Mr. Champagne's mother has also confirmed Thomas' total estrangement from his family, and the emotional toll these feelings appeared to have, confirming in important respects evidence from Soresby and Champagne, and contradicting the State's allegation that Thomas Whitaker was merely a narcissistic sociopath.

## II.    TRIAL COUNSEL'S FAILURE TO PREPARE HIS PUNISHMENT PHASE WITNESSES DEPRIVED THOMAS WHITAKER OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

"The failure to prepare a witness adequately can render a penalty phase presentation deficient."  *Hamilton v. Ayers*, 583 F.3d 1100 (9th Cir. 2009) (citing *Douglas v. Woodford,* 316 F.3d 1079, 1087 (9th Cir. 2003)).  In *Groseclose v. Bell*, 130 F.3d 1161, 1166 (6th Cir.1997) counsel was found ineffective because he failed to prepare to prepare adequately for mitigation four witnesses.  As matter of course "thorough preparation demands that an attorney interview and prepare witnesses before they testify."  *United States v. Rhynes*, 218 F.3d 310, 319 (4th Cir. 2000) (en banc).  As a result, "[n]o competent lawyer would call a witness without appropriate and thorough pre-trial interviews and discussion." *Id.*  Disbarment has been the fate for incompetent representation that included failure to prepare or interview witnesses. *See,* I*n re Warmington*, 212 Wis.2d 657, 668, 568 N.W.2d 641 (1997) (lawyer disbarred for, among other things, "failing to supervise the preparation of an expert witness"); *In re Wolfram*, 174 Ariz. 49, 847 P.2d 94, 96 (1993) (failure to interview witnesses cited among reasons for suspending attorney).

### A.    TRIAL COUNSEL'S DECISION NOT TO PREPARE PUNISHMENT PHASE WITNESSES WAS DEFICIENT.

In response to the allegation that trial counsel did not prepare Thomas Whitaker for his testimony, trial counsel admits that,

> Regarding the testimony of Kent Whitaker, it is true that I told him that I did not want to tell him what to say, as it would sound rehearsed. I based that statement on the fact that I had seen his statements quoted in the paper as well as heard them in my office when I was having him tell me his life story. I believed that Kent Whitaker honestly believed what he was saying and he honestly wanted the jury to spare his son's life. He also believed that God's will would be done.

*Exh.* 'E', at 8-9.

Trial counsel clarifies how *little* he did to prepare Kent, when he describes what he did to prepare his other punishment phase witness, Bo Bartlett.  In trial counsel's words, "when I presented Bo Bartlett as a witness, I had also discussed with him his testimony much in the same manner as I did with Kent.  I basically told both to tell how they felt in front of the jury." *Id*, at 9.

As trial counsel's affidavit attests, trial counsel did not go over the damaging records of Lynn Ayer with either Bo Bartlett or Kent Whitaker.  Trial counsel failed to inquire into whether Thomas Whitaker thought his son had changed, and failed to prepare him to answer questions regarding his views about the State's decision to seek the death penalty.  Trial counsel also failed to prepare Kent Whitaker to answer the State's sharp cross examination regarding whether he felt betrayed and manipulated by his son, failed to advise him to expect cross examination regarding the privileges and efforts he had made to provide for his child, and failed to prepare him for question regarding his awareness of adverse psychological information in Ayers and Dr. O'Rourke's reports.

Clearly, trial counsel's admissions and the State courts' findings conclusively demonstrate that trial counsel failed to prepare his witnesses for direct examination and failed to provide advice regarding what to expect on cross examination.  The constitutional deficiency of this performance is uncontestable.

**B.      FAILURE TO PREPARE PUNISHMENT PHASE WITNESSES WAS PREJUDICIAL.**

Trial counsel's affidavit and the State court's findings of fact and conclusions of law illustrate the extraordinary harm that counsel's failure to prepare punishment phase witnesses caused.  Trial counsel maintained that his punishment phase strategy was to convince the jury that Thomas was not a future danger. *Exh.* 'E', at 7.  In order for that strategy to work, trial counsel had to convince the jury that Thomas had changed.  The most important witness was Kent Whitaker.

As trial counsel's affidavit makes excruciatingly clear, trial counsel proof depended on Kent Whitaker testifying that he had seen important, fundamental changes in his child's thinking and outlook since his arrest.  However, trial counsel did not even inquire into how Kent would respond on direct or cross to the question regarding Thomas's future dangerousness to society.  Trial counsel did not prepare Thomas Whitaker to explain why he thought his son had changed, or find out if he believed this.  Trial counsel simply told Kent Whitaker to speak from the heart. *Exh.* 'E'.  The devastating effect of trial counsel's failure to discharge basic duties to prepare his most important punishment phase witness is reflected in trial counsel's admission that he was "surprised" when Thomas Whitaker's honestly testified that he did not have any evidence that Thomas would *not* be a future danger to society.[4]

Failure to prepare Kent for the State's cross-examination not only played into the State's hand, it undermined Thomas' own testimony.  The State's theory at punishment was precisely that Thomas was still capable of deceiving his father and capable of deceiving the jury.  Trial

---

[4] Q. Do you have any evidence to contradict that your son is not going to be a continuing threat to society?

A. I can't read his heart, Mr. Felcman. May I comment?

32 RR, at 178.

counsel's opening remarks show that he realized that the State would drum this theory home. *Id.* at 53. The jury could not reasonably conclude that they had better insight than Kent into Thomas' heart, i.e., his intentions and tendencies. With Kent testifying that he had no proof that Thomas would desist from scheming and manipulating others into committing criminal acts of violence, the jury had every reason to conclude that there wasn't any.

Contrary to trial counsel's punishment phase plans, Kent Whitaker actually testified that his motive for asking the jury to spare his son had nothing to do with the future dangerousness issue. Because he had not been given the most basic instructions – that on cross the best policy is to answer straightforwardly without providing any more information than is necessary – Kent Whitaker, without being solicited, explained that he was **not** asking the jury to spare his son because he believed Thomas had changed and would no longer be a threat to others. 32 RR, at 168. Kent testified, instead, that he wanted the jury to give Thomas a chance to accept the Lord. After the State's cross revealed that Kent had no proof that Thomas supposed homicidal tendencies had waned, Kent testified as follows:

> I don't think you understand the basis for my -- my arguing against the death penalty in this case. I am a loving father, don't want my son to die. I admit it. That's, let's call it, a third of it. I want a relationship with my son, even if it's in jail, where I can find out why this happened, but the majority of the reason for my objection to the death penalty is because I can't read his heart. While I believe that the person that came back from Mexico is different from the person who left when he ran away, I don't know that for sure, but the only bottom-line important factor or the single most important thing in my life right now is that my son go to heaven, and if he has not accepted responsibility in his heart for this, if he has not asked the Lord for forgiveness -- I have forgiven him, I forgave whoever was involved, but the important one is the Lord. If he has not done that, I want the jury to give him as much time as possible so that he can reach that conclusion.
>
> *Id.*

32

Trial counsel's affidavit makes clear that trial counsel, because he did not prepare his witnesses, was (i) no more aware of Kent's motives for testifying than the prosecutor, and (ii) had completely different expectations for Kent's testimony. *Exh.* 'E'. Furthermore, this avoidable "surprise" doomed the strategy of contesting the future danger issue with Thomas's testimony that he had undergone a religious renewal or conversion. Indeed, Kent's testimony that the jury should give Thomas as much time as possible to accept the Lord cuts against this grain. Because trial counsel did not prepare his witnesses, or even bother to find out what they would say to obvious cross-examination questions, Thomas was put in the position of having to convince the jury that he was credible after they heard his own fathers doubts about his piety.

According to trial counsel's 2009 affidavit, his secondary goal was to convince the jury to spare Thomas for Kent's sake. *Exh.* 'E'. This required Kent to convince the jury that the seeking the death penalty would not bring closure, but only more pain to the surviving victim of the murders. Trial counsel therefore absolutely had to prepare Kent's response to attempts by the State to use the authority and prestige of the district attorney's office to elicit statements deferential to its charging decision. Trial counsel's surprise is again a testament to his failure to prepare Thomas Whitaker for easily anticipatable questions geared at Kent Whitaker's respect for the State, such as whether he could agree that the State's decision was reasonable or justifiable, rather than mean-spirited or vindictive. Because trial counsel had not prepared Kent trial counsel failed to rehabilitate him on re-direct with testimony about how he had beseeched the prosecutor on bended knee not to seek the death penalty. Instead, it is clear from the state courts' finding of fact that the jury was left with the feeling that Thomas Whitaker would be OK with, rather than devastated by, the death of his son.

**III.    TRIAL COUNSEL'S FAILURE TO OBJECT TO THE STATE'S USE OF THE PROFFER DEPRIVED THOMAS WHITAKER OF HIS SIXTH AMENDMENT RIGHT TO COUNSEL.**

Although Felcman announced at trial that the contents of the proffer that Cogdell and Ardoin had attempted to arrange could not be used for any purpose at trial, counsel failed to object when Felcman proceeded to use the proffer to impeach Kent Whitaker during guilt-innocence with this ill-gotten information.  Trial counsel also failed to object to the use of the document itself until after Felcman had thoroughly cross-examined Thomas Whitaker based upon it.  Failure to object pursuant to TRE 410 was clearly deficient.

Trial counsel's performance was also prejudicial for reasons set forth in Claim One, above.   The prosecutors opening remarks illustrates the materiality of the proffer.   The prosecutor is referring to this document when he argues that,

> I do not know what you will consider true remorse on this. True remorse is, "I did it, and I will suffer whatever consequences come back," not, as a telephone call says, "I thought it would be a set form of years, but now it's life or death." True remorse is saying, "I did it, and I will throw myself and you make the decision." You will not have that type of testimony before you. It will always be negotiations.

32 RR, at 51.

**IV.    TRIAL COUNSEL'S FAILURE TO DEVELOP A COHERENT TRIAL STRATEGY VIOLATED THOMAS WHITAKER'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.**

Trial counsel admitted to the jury that there was no question about Applicant's guilt when he told them there "has never been a need to have this trial," 25 RR, at 56, and that the purpose of the trial was to get a life sentence.  Trial counsel's decision to have Thomas Whitaker refuse to enter a plea, 32 RR, at 197, meant the judge had to enter a "not guilty" plea. Article 27.16(a), C.Cr.P.  It soon became obvious during Felcman's cross-examination of Thomas Whitaker this incoherent position was highly prejudicial:

A. (The Defendant) I don't know. That never entered my mind, sir. I was always under the impression from the very beginning there was no other outcome from this, there could be no other outcome other than a guilty verdict.

Q. (Mr. Felcman) How could there not be another outcome from these ladies and gentlemen when they decide guilty or not guilty?

A. (The Defendant) That was my feeling and the impression that my attorney had given me.

Q. Well, then, what was this, "I refuse to plea" and make the Judge up there enter a plea of not guilty, if you didn't think maybe this jury panel over here may find you not guilty?

A. I don't know. That was not what I wanted to do, but this is all very -- this is all huge to somebody sitting in my chair, when you have an attorney that's been practicing law for 30 years tell you you're not going to do something one way. I listened to him, and I didn't agree with it at the time, and I don't agree with it now, but that was the way it was done.

Q. You don't want to really drag Mr. McDonald into this, do you, that somehow he made you do this?

A. I took his advice, sir, so it was my decision, yes, but it was his very strong decision.

Q. You were in this courtroom when these jurors heard from Mr. McDonald that he's trying to seek justice on this case, did you not?

A. Yes, sir.

Q. But then you refused to plead guilty where you could have just gotten up and said, "Ladies and gentlemen, I did this"?

A. Yes, sir.

32 RR, at 195.

Trial counsel ultimately objected, leading to a bench conference in which he stated:

(Mr. McDonald) I thought we made this really, really, really very clear about this plea. We had a conference call about it, it's available to us. He can't come back here and complain about that. I actually, on the record, entered the plea. He did not. Okay? I argued to the jury the reason I did that. He wants to call it legal maneuvering, and he knows what it is. The bottom

line is, if he enters a plea of guilty, then the accomplice testimony is all that has to be offered. They are seeking the death penalty. I am trying to get life. I am trying to actually get him to plead to life. He would have pled guilty if he'd have given him life, but why are we going over this stuff over and over?

(Mr. Felcman) Because he brought it up on the direct, that it was his idea to do not guilty.

(Mr. McDonald) It was -- he just got through telling you I'm the lawyer. Do you think he knows the law that you would enter a plea?

(The Court) I'm going to sustain the objection.

(Mr. Felcman) Okay, Judge.

(End of bench conference)

*Id.*, at 195-196.

Although the lead prosecutor argued that he was engaged in this line of questioning because Thomas Whitaker "brought it up on the direct, that it was his idea to do not guilty," the reverse actually took place. Shortly after being cross examined about the decision not to plead, Thomas Whitaker testified that "[t]hat was not what I wanted to do " and that his decision was based on McDonald's advice. 32 RR, at 196.

A guilty plea is traditionally taken to be a public acceptance of responsibility and a demonstration of a willingness to accept the consequences. Trial counsel's incoherent strategy prejudiced Thomas Whitaker by depriving him of this most important indication of remorse. The decision to contest guilt-innocence also wasted valuable resources, and needlessly exposed his client, and Kent Whitaker, to impeachment. Trial counsel knew that it was essential to establish the integrity and sincerity of his client. Because trial counsel announced in his opening remarks, 25 RR, 51-58, that the case will be about punishment, an average juror would conclude that Thomas Whitaker contested his guilt in the hopes of prevailing on a legal technicality or by

36

legal trickery.  Putting the jury through a week of unnecessary testimony on guilt-innocence was therefore prejudicial under *Strickland*.

## V.  CUMULATIVE ERRORS OF TRIAL COUNSEL DEPRIVED MR. WHITAKER OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE REPRESENTATION.

### A.  THE DECISIONS OF COUNSEL VIOLATED PROFESSIONAL STANDARD AT EVERY TURN.

As the Supreme Court recently instructed in *Padilla v. Kentucky,* 130 S.Ct. 1473, 1483 (2010), the ABA Guidelines, while not binding, are important for measuring the performance of counsel. *Id.* ("We long have recognized that "[p]revailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable ... .").  The ABA emphasizes that in capital cases, defense attorneys representing defendants with a history of mental illness must obtain all psychological records, consult a mental health expert, and investigate a mitigation defense. *2003 ABA Guidelines* § 4.1 (A)(2), and *Commentary* ("In particular, mental health experts are essential to defending capital cases.").  The ABA standards require co-counsel in capital cases, *id., at* § 4.1(A)(2), and retention of an investigator. *Id., Commentary, A. The Investigator* ("The assistance of an investigator who has received specialized training is indispensable to discovering and developing the facts that must be unearthed at trial.").  ABA standards for far less critical types of cases require counsel to prepare witnesses, let alone key punishment phase witnesses.  Counsel must also object to harmful evidence.  However, Thomas Whitaker's attorney failed in all these respects.

### B.  THE CUMULATIVE ERROR WAS PREJUDICIAL.

If trial counsel makes multiple deficient decisions, the Court should consider the cumulative effect of the errors in order to determine prejudice under *Strickland.  See,* W*illiams v. Quarterman*, 551 F.3d 352, n.3 (5th Cir. 2008).  In this case, the errors set out in sections I-IV,

supra, had a devastatingly synergistic effect.  Collectively, they deprived Mr. Whitaker of all his defenses at the punishment phase.

Counsel deliberately decided not to sponsor a mitigation defense and maintains he concentrated on contesting future dangerousness instead.  Based on this reasoning, counsel failed even to consult with a psychologist about Mr. Whitaker's known mental health and emotional problems.  However, because counsel did not prepare his key punishment phase witnesses, he did not know that their testimony would undermine his strategy for contesting the future danger special issue.

The cumulative effect of counsel's deficient decisions left Thomas Whitaker without any defenses at the punishment phase.  Kent Whitaker could not support counsel's primary strategy of showing that Thomas was no longer a future danger because he had undergone significant changes in outlook and values since the crime.  Kent testified, instead, that he could not look into his son's heart.  Kent then explained, to counsel's needless "surprise", that he was asking the jury to sentence Thomas Whitaker to life in order to give him the greatest opportunity to make changes, implying thereby that he did not believe Thomas had made a meaningful religious conversion.  This undermined counsel's frail hope of convincing the jury that Thomas had undergone a religious transformation.  Finally, counsel's failure to object to the State's use of the proffer meant that even the woeful strategy of expressing remorse was devastated.

Importantly, the State courts' findings of fact and conclusions of law confirm (i) that counsel failed in the manner described above and (ii) that in so doing, counsel badly prejudiced his client's opportunity for a life sentence.[5]  Clearly, relief based on ineffective assistance of counsel is warranted.  This Court should order a new punishment phase.

---

[5] For example, *FF&CL # 54, 55, and 56* confirms that trial counsel expected that Kent Whitaker would speak to changes he had seen in Thomas and argue with the prosecutor about his charging decision.  The findings confirm

CLAIM THREE

**THOMAS WHITAKER'S DEATH SENTENCE IS ARBITRARY AND EXCESSIVE, IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, BECAUSE THE PUNISHMENT IS BASED ON UNRELIABLE SPECULATION ABOUT HIS FUTURE BEHAVIOR.**

A.    **By requiring the jury to speculate about a defendant's future dangerousness, the Texas capital sentencing scheme produces inherently arbitrary death sentences and violates the United States Constitution.**

By requiring juries to speculate about a defendant's future dangerousness, the Texas capital sentencing scheme produces inherently arbitrary death sentences for two reasons. First, the alternative sentence of life without parole compels juries to speculate about specific future security risks in prison, a task for which the jury is not competent and which does not bear on a defendant's moral culpability. Second, decades of evidence now confirm that predictions of future dangerousness are inherently unreliable.

1.    **The alternative sentence of life without parole fundamentally alters and compromises the jury's consideration of a defendant's future dangerousness.**

When *Jurek v. Texas*, 428 U.S. 262 (1976) (upholding Texas's use of future dangerousness in its sentencing scheme) and *Barefoot v. Estelle*, 463 U.S. 880 (1983) (permitting the admission of psychiatric testimony about future dangerousness) were decided, most capital defendants would eventually become eligible for parole if sentenced to prison. This is no longer true. Thirty-five U.S. jurisdictions currently permit the death penalty, including thirty-four states and the federal government. Since *Barefoot*, at least twenty-five of the thirty-five – or nearly

---

trial counsel was surprised when Kent Whitaker failed to do this. As Kent Whitaker points out, his "layman's understanding is that you should prepare your witnesses so you are not surprised. I have to keep coming back to this point: What kind of judge would read this finding and think it shows that the attorney was doing his job?" *Exh.* 'N' (2011 Affidavit of Kent Whitaker).

three-quarters, including Texas – have introduced life without parole as a sentence for capital-eligible murder.[6]   The capital sentencing statutes of only nine of those states expressly contemplate a finding of future dangerousness.[7]   *None* of these jurisdictions had an available sentence of life without parole when *Jurek* was decided.[8]   *Jurek* and *Barefoot* were decided in a context that presumed an offender's possible release if he was not sentenced to death.

In this context, both *Jurek* and *Barefoot* relied upon the view that the legal system routinely predicts a person's future dangerousness:

---

[6] *See* Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1987 (codified as amended in scattered sections of 18 U.S.C.); 1993 Ariz. Legis. Serv. ch. 153 (West) (codified as amended at Ariz. Rev. Stat. Ann. § 13-751 (2011)); 2002 Colo. Sess. Laws. 1 (codified as amended at Colo. Rev. Stat. § 18-1.3-1201 (2010)); 1985 Conn. Pub. Acts No. 366 (codified as amended at Conn. Gen. Stat. §§ 53a-35b, -35c, -46a (2011)); 2002 Del. Laws. ch. 424 (codified as amended at Del. Code. Ann. tit. 11, § 4209 (2011)); 1994 Fla. Laws. ch. 228 (codified as amended at Fla. Stat. § 775.082 (2010)); 1993 Ga. Laws 1654 (codified as amended at scattered sections of Ga. Code. Ann. tit. 17 (2010)); 2003 Idaho Sess. Laws ch. 19 (codified as amended at Idaho Code Ann. § 19-2515 (2010)); 1993 Ind. Legis. Serv. P.L. 250 (codified as amended at Ind. Code. § 30-50-2-3 (2010)); 2004 Kan. Sess. Laws ch. 102, repealed by 2010 Kan. Sess. Laws ch. 136 (to be codified in July 2011) (preserving sentence of life without possibility of parole for capital murder); 1998 Ky. Acts ch. 606 (codified at Ky. Rev. Stat. Ann. § 535.025 (West 2010)); 1987 Md. Laws 1048 (codified at Md. Code Ann., Crim. Law §§ 2-303, -304 (2010)); 1984 Mo. Laws S.B. 448 (codified as amended at Mo. Ann. Stat. § 565.020 (West 2010)); 1995 Mont. Laws. Ch. 482 (codified as amended at Mont. Code Ann. § 45-5-102 (2009)); 2002 Neb. Laws 3d Special Sess. L.B. 1 (codified as amended at Neb. Rev. Stat. § 28-105 (2010), invalidated by *State v. Thorpe*, 783 N.W.2d 749 (Neb. 2010)); 1994 N.C. Sess. Laws (1st Extra Sess.) ch. 21 (codified as amended at N.C. Gen. Stat. Ann. § 15A-2002 (West 2010)); 1995 Ohio Laws File 50 (S.B. 2) (codified as amended at Ohio Rev. Code Ann. § 2929.03 (West 2011)); 1987 Okla. Sess. Law Serv. 96 (West) (codified as amended at Okla. Stat. Ann. tit. 21, § 701.9 (West 2011)); 1995 S.C. Acts 83 (1995) (codified as amended at S.C. Code Ann. §§ 16-3-20, 24-13-100 (2010)); 1993 Tenn. Pub. Acts ch. 473 (codified as amended at Tenn. Code Ann. § 39-13-204 (West 2011)); 2005 Tex. Sess. Law Serv. ch. 787 (West) (codified as amended at Tex. Penal Code § 12.31 (West 2009)); 1992 Utah Laws ch. 142 (H.B. 73) (codified as amended at Utah Code Ann. § 76-3-206 (West 2010); 1994 Va. Acts. 2d Special Sess. ch. 2 (codified at Va. Code Ann. § 53.1-165.1 (West 2011)); 2001 Wyo. Sess. Laws ch. 96 (codified as amended at Wyo. Stat. Ann. § 6-2-101 (West 2010)).

[7] Oregon and Texas require a finding of future dangerousness for a death sentence. *See,* Or. Rev. Stat. § 163.150(b) (2009); Tex. Code Crim. Proc. Ann. art. 37.071 (West 2009). In Virginia, a finding of future dangerousness is one of two possible prerequisites. *See,* Va. Code Ann. § 19.2-264.4(c) (2010). In Idaho, Oklahoma, and Wyoming, future dangerousness is a statutory aggravating factor. *See,* Idaho Code Ann. § 19-2515(9) (2010); Okla. Stat. Ann. tit. 21, § 701.12 (West 2011); Wyo. Stat. Ann. § 6-2-102(h). In Colorado, Maryland, and Washington, the lack of future dangerousness is a statutory mitigating factor. *See,* Colo. Rev. Stat. § 18-1.3-1201(4)(k) (2010); Md. Code Ann., Crim. Law § 2-303(h)(2)(vii) (2010); Wash. Rev. Code § 10.95.070 (2010).

[8] For the adoption of life without parole by Colorado, Idaho, Maryland, Oklahoma, Texas, Virginia, and Wyoming, see *supra* note 1. Oregon and Washington implemented life without parole in 1977, one year after *Jurek*. *See, Norris v. Bd. of Parole and Post-Prison Supervision*, 952 P.2d 1037, 1041 (Or. Ct. App. 1998) (explaining passage of statute authorizing life without parole as sentence for aggravated murder); *State v. Frampton*, 627 P.2d 922, 928 (Wash. 1981) (describing sentence of life without parole as part of capital sentencing statute passed in 1977).

40

> The decision whether to admit a defendant to bail, for instance, must often turn on a judge's prediction of the defendant's future conduct.  Any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose.  For those sentenced to prison, these same predictions must be made by parole authorities.  The task that a Texas jury must perform in answering the statutory question in issue is thus basically no different from the task performed countless times each day throughout the American system of criminal justice.

*Barefoot*, 463 U.S., at 897 (quoting *Jurek*, 428 U.S., at 275-76).  In each of these instances, an experienced professional evaluates a person's potential dangerousness *in society at large* to determine whether the person should be imprisoned.

Now that the typical alternative to a death sentence is life without parole, however, a lay jury must speculate about a defendant's future dangerousness *in prison* to determine whether he should be executed.  Because conditions have changed, a capital jury's task in speculating about future dangerousness is no longer like others "performed countless times each day," but is instead highly unusual.  Courts are not typically empowered to evaluate the gravity of security risks inside prison walls.  Indeed, courts often identify themselves as lacking expertise in such matters, deferring instead to prison administrators.  *See, e.g.*, *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003); *O'Lone v. Estate of Shabazz* 482 U.S. 342, 350 (1987); *Turner v. Safley*, 482 U.S. 78, 84-85 (1987); *Taylor v. Johnson*, 257 F.3d 470, 474 (5th Cir. 2001).  As courts are not competent to closely scrutinize asserted current security risks in prison, juries are similarly not competent to predict specific *future* security risks in prison "beyond a reasonable doubt." Tex. Code Crim. Proc. Ann. art. 37.071(2)(c) (West 2011).  Thus, because life without parole is now the typical alternative to a death sentence, prohibiting juries from speculating about future dangerousness would no longer "call into question those other contexts in which predictions of future behavior are constantly made."  *Barefoot*, 463 U.S. at 898.  Rather, it would correct an anomaly in who is empowered to make such predictions, on the basis of what evidence.

Because a finding of future dangerousness now requires the jury to make a highly unusual prediction of specific future security risks in prison, capital sentencing proceedings are increasingly dominated by technical testimony about inmate classification, security procedures, and other minutiae of prison life foreign to jurors. *See, e.g., Coble v. State*, 330 S.W.3d 253, 287-90 (Tex. Crim. App. 2010) (describing extensive sentencing-phase testimony about prisoner classification system and prison assault reporting mechanisms); *Sparks v. State*, 2010 WL 4132769, at *22-23 (Tex. Crim. App. Oct. 20, 2010) (same); *Espada v. State*, 2008 WL 4809235, at *10 (Tex. Crim. App. Nov. 5, 2008) (same); *Prystash v. State*, 3 S.W.3d 522, 528 (Tex. Crim. App. 1999) (describing hypothetical testimony applying prison classification system to defendant). These technical details are relied upon by juries as they speculate about future dangerousness.

It would be problematic for such jury speculation to form the basis for even mundane administrative decisions like cell assignments. It is unconstitutional for such speculation to form the basis for the weightiest moral judgment of all – the decision to punish a fellow citizen by killing him on society's behalf. The finality and severity of the death penalty distinguish it from all other punishments and demand greater reliability in determining whether it is appropriate in a particular case. *See, Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion). Consequently, the Eighth and Fourteenth Amendments prohibit its imposition under "sentencing procedures that create[] a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Gregg v. Georgia*, 428 U.S. 153, 188 (1976).

For three distinct reasons, the requirement that juries predict specific future security risks in prison produces arbitrary death sentences. First, because the issues are so arcane, jurors and trial counsel so unfamiliar with the territory, and the stakes so grave, the risk of error is

unacceptably high.   Even seemingly minor technical mistakes by experienced witnesses can make the critical difference between life and death.   In *Estrada v. State*, 313 S.W.3d 274 (Tex. Crim. App. 2010), for instance, a prison investigator had erroneously testified that a defendant would be eligible to move from G3 to G2 inmate classification status within prison after ten years of incarceration.[9]   *Id*., at 286.   The decisive factor in the jury's death verdict, as it explained in a note to the trial judge, was the possibility that the offender might eventually move to the lower level of classification.   *Id*.   Appellate counsel discovered, however, that the defendant would never be eligible for a less restrictive classification than G3.   *Id.,* at 287.   A death sentence hinged on a technical error about a single provision of the Texas Department of Criminal Justice's inmate classification scheme.   The issue might have been procedurally defaulted, but the state requested a new trial on punishment once the error was discovered.   *Id*., at 288.   But for these unusual circumstances, the defendant might well have been erroneously executed.   Such inherent risk is unacceptable, given the need for "extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, *or mistake*."   *Eddings v. Oklahoma*, 455 U.S. 104, 117-18 (1982) (O'Connor, J., concurring) (emphasis added).

Even if all testimony is accurate, moreover, the conclusions the jury draws from it are inherently unreliable, so the risk of error remains unacceptably high.   Prison administrators may be authorized to adjust an inmate's status in the future to reflect how dangerous they think he is. Yet this possible adjustment is presented to the jury as a reason why the defendant is so

---

[9] The differences between these classifications are: G3 inmates can only be housed in dormitories within the main unit of a prison building, while G2 inmates can be housed in physically separate dormitories; and G3 inmates are restricted from certain vocational training depending on its location.   *See,* Unit Classification Procedure (Revision to October 2003 Inmate Classification Plan), Texas Department of Criminal Justice, July 2005, Attachment 2.00A.

irredeemably dangerous that he should be sentenced to death rather than life in prison.  In other words, the jury is told to execute the defendant, based upon predicted conduct in prison, to prevent an erroneous decision later, based upon actual conduct in prison.  This cruel irony demonstrates that, by requiring juries to speculate about specific future security risks in prison, the Texas capital sentencing scheme requires a less competent authority to make an irreversible decision based upon less evidence.  Consequently, the scheme violates the constitutional requirement that capital sentencing proceedings be *more* reliable than others because "death is qualitatively different" from other punishments.  *Woodson*, 428 U.S. at 305; *see also Lockett v. Ohio*, 438 U.S. 586, 604 (1978).

Second, even if the jury had special competence in these matters, it is hard for anyone to predict future dangerousness in a high-security prison environment based on a defendant's experiences outside prison.  The psychiatric community widely acknowledges that "predictions of violence concerning settings very different from those in which violence has occurred in the past will be highly subject to error."  Thomas R. Litwack & Louis B. Schlesinger, *Assessing and Predicting Violence: Research, Law and Applications*, in *Handbook of Forensic Psychology* 205, 214 (Irvin B. Weiner & Allen K. Hess eds., 1987).  Risk factors for violence in prison differ from risk factors for recidivist violence in wider society.  Past violence and the severity of the offense that put a person in prison do not correlate strongly with prison violence. *See,* Brief of Amicus Curiae American Psychological Association in Support of Appellant at 20, *United States v. Fields*, 483 F.3d 313 (5th Cir. 2004) (No. 04-50393), available at http://www.apa.org/about/ offices/ogc/amicus/fields.pdf (citing Jack Alexander & James Austin, *Handbook for Evaluating Objective Prison Classifications* 25 (Nat'l Inst. of Corrs. 1992)).  Indeed, "[t]o the contrary, there is counter-intuitive evidence that inmates who have committed more serious offenses in the

community and thus face longer sentences have more favorable prison adjustments."  Mark D. Cunningham et al., *An Actuarial Model for Assessment of Prison Violence Risk Among Maximum Security Inmates*, 12 Assessment 40, 42 (2005).  Violent behavior outside of prison is an inadequate foundation even for actuarial predictions of violence in prison.  It is surely not reliable enough to serve as the basis for a judgment beyond a reasonable doubt that a particular defendant will probably commit future acts of violence in prison.

Third, even if a jury's speculation about specific future security risks in prison were reliable, it would fail the constitutional requirement that a death sentence reflect the particular defendant's moral culpability.  Defendants may be sentenced to death if and only if they are sufficiently morally culpable.  *See, Roper v. Simmons*, 543 U.S. 551, 568 (2005) (only those with "extreme culpability" eligible for capital punishment); *Atkins v. Virginia*, 536 U.S. 304, 316 (2002) (prohibiting execution of mentally retarded persons because they are "categorically less culpable").  This culpability must be determined by an individualized assessment of the particular offender.  *Enmund v. Florida*, 458 U.S. 782, 798 (1982); *Lockett*, 438 U.S. at 600.

As the extensive testimony about prison administration makes clear, however, jury speculation about a defendant's future dangerousness in prison is often more about the nature of prison than the nature of the defendant.  In *Estrada*, the jury sentenced the defendant to death because it believed that he would become eligible for a less restrictive inmate classification.  The belief was wrong – but it would have been correct under a previous version of the Texas Department of Criminal Justice's inmate classification plan.  *See Estrada*, 313 S.W.3d, at 287.  Security risks in prison depend upon prison resources, conditions, and management practices.  None of these bear upon the defendant's culpability for his past acts.  The defendant's crime cannot be morally graver simply because the prison system has not been successful in reducing

inmate violence.  If the life-or-death decision turns on prison management techniques, the resulting sentence cannot be a "reasoned moral response to the defendant's background, character, and crime."   *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring).

> **2.    Evidence now confirms that predictions of future dangerousness are inherently unreliable.**

The *Jurek* Court found that predicting future dangerousness, while "difficult," was still possible.  *Jurek*, 428 U.S., at 274.  The *Barefoot* holding that there was no constitutional bar to the admission of psychiatric testimony on future dangerousness similarly relied on the Court's judgment that "[w]e are not persuaded that such testimony is almost entirely unreliable…."  *Barefoot*, 463 U.S., at 899.  In formulating these views, the Court depended upon "first generation" evidence on the reliability of predictions of future dangerousness.  *Cf.* John Monahan, *The Prediction of Violent Behavior: Toward a Second Generation of Theory and Policy*, 1984 Am. J. Psychiatry, at 10.  Now that hundreds of capital defendants have been labeled future dangers by juries over the course of several decades, new evidence uncontrovertibly shows that these predictions are, in fact, "entirely unreliable."

An actuarial study of Texas inmates convicted of capital murder found that the expected rates of violence would be very low for a prisoner convicted of capital murder serving a life sentence with an average duration of forty years.  The overall likelihood of inmate-on-inmate homicide would be only 0.2 percent, and the likelihood of an aggravated assault on a correctional officer would be only 1 percent.  *See* Jonathan R. Sorensen & Rocky L. Pilgrim, *An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendants*, 90 J. Crim. L. & Criminology 1251, 1261, 1264 (2000).  This data not only suggests that bona fide cases of future

dangerousness are infrequent but also that it is virtually impossible to predict future dangerousness in this context with any degree of scientific accuracy.  Because the "base rate" of violence is low – few persons are incarcerated under those conditions, and they commit relatively few acts of violence – it is difficult to predict any *specific* occurrence of violence, for it is difficult to isolate the causal factors that produce violence in the first place.  *See* Brief of Amicus Curiae American Psychological Association in Support of Appellant at 18-19, *United States v. Fields*, 483 F.3d 313 (5th Cir. 2004) (No. 04-50393), available at http://www.apa.org/about/offices/ogc/amicus/fields.pdf.

Empirical research confirms that predictions of future dangerousness wrongly identify non-dangerous defendants as dangerous.  A recent study of a group of capital inmates predicted to be future dangers demonstrated that none had committed homicide in prison, and only 5.2 percent had committed a serious assaultive act.  The overwhelming majority had only minor disciplinary infractions, and over 20 percent had none at all.  *See,* John F. Edens et al, *Predictions of Future Dangerousness in Capital Murder Trials: Is it Time to "Disinvent the Wheel?,"* 29 Law & Hum. Behav. 55, 62-63 (2005).  Indeed, studies of Texas death row inmates' behavior demonstrate that the prediction of future dangerousness was wrong in more than 95 percent of cases.  *See,* Jessica L. Roberts, Note, *Futures Past: Institutionalizing The Re-Examination of Future Dangerousness in Texas Prior to Execution*, 11 Tex. J. C.L. & C.R. 101, 121 (2005).[10]

---

[10] For additional scholarship since *Barefoot* confirming the overwhelming consensus that predictions of future dangerous are grossly inaccurate and produce frequent false positives, see Mark David Albertson, *Can Violence Be Predicted? Future Dangerousness: The Testimony of Experts in Capital Cases,* 3 Crim. Just., Winter 1989, at 18 (describing consensus among experts that predictions are mostly inaccurate); William W. Berry III, *Ending Death by Dangerousness: A Path to the De Facto Abolition of the Death Penalty*, 52 Ariz. L. Rev. 889, 907 (2010) ("The incontrovertible scientific evidence demonstrates that future dangerousness determinations are, at best, wildly speculative."); Stephen P. Garvey, *"As the Gentle Rain from Heaven": Mercy in Capital Sentencing*, 81 Cornell L. Rev. 989, 1031 (1996) ("Unfortunately, our power to predict future dangerousness seems on a par with our power to predict next month's weather."); Steven G. Gey, *Justice Scalia's Death Penalty*, 20 Fla. St. L. Rev. 67, 118 (1992)

One reason why jury "predictions" of future dangerousness produce so many false positives is that they may simply be proxies for jurors' guesswork about a defendant's release from prison.  A study of death penalty jurors has examined the relationship between jurors' beliefs about the available alternatives to the death penalty and their beliefs about the defendant's future dangerousness.  *See,* William J. Bowers & Benjamin D. Steiner, *Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing*, 77 Tex. L. Rev. 605, 659-70 (1999).  Jurors who believed that a defendant might be released from prison in the near future were no more likely to report that the prosecution introduced evidence that the defendant was a future danger, but more likely to find that the defendant *was* a future danger. *Id.,* at 669.  In other words, jurors with earlier estimates of a defendant's release from prison were predisposed to "believe the evidence 'proved'" the defendant's future dangerousness.  *Id.*

This is not necessarily surprising – except that these jurors' estimates of the defendant's possible release date were factually incorrect.  "Hence, jurors who wrongly believe that such an offender would be released in less than ten years may well see him as a greater potential threat to society, as more 'dangerous,' than those who believe release will come only after twenty or more years." *Id.,* at 667.  Requiring juries to predict future dangerousness, then, may allow "mistaken estimates of the defendant's early parole or release from prison [to] be bootstrapped into capital

---

("No jury has the power to ascertain with 100 percent certainty the future actions of the defendant, yet Texas requires the jury to do just that."); Jeffrey L. Kirchmeier, *Aggravating and Mitigating Factors: The Paradox of Today's Arbitrary and Mandatory Capital Punishment Scheme*, 6 Wm. & Mary Bill Rts. J. 345, 371-72 (1998) ("The use of the 'future danger' aggravating factor as a tool for determining who receives the death penalty is highly suspect. … Even ignoring the potential unreliability of testimony from mental health professionals, every first-degree murder defendant reasonably could be found to be a future danger because he has been convicted of murder."); Grant Morris, *Defining Dangerousness: Risking a Dangerous Definition*, 10 J. Contemp. Legal Issues 61, 85 (1999) (explaining mental health professionals' "grave doubt" about predictions of dangerousness); Irene Merker Rosenberg, Yale L. Rosenberg & Bentzion S. Turin, *Return of the Stubborn and Rebellious Son: An Independent Sequel on the Prediction of Future Criminality*, 37 Brandeis L.J. 511, 519 (1998-99) ("a substantial body of literature suggests that prophecy of this sort is a very speculative business, resulting in massive inclusion of persons who would not, in fact, engage in the predicted anti-social behavior"); Christopher Slobogin, *Dangerousness and Expertise*, 133 U. Pa. L. Rev. 97, 110-11 (1984) (describing false positive rates as high as 92 percent).

sentencing by being surreptitiously incorporated into the … judgment of future dangerousness." *Id.*, at 667-68.   The jury's consideration of future dangerousness is not based on reliable information about the particular defendant, but instead serves as a conduit for jurors' prior assumptions – often inaccurate – about the defendant's possible release.

But the most relevant question is not whether *any* defendant, or even some non-trivial percentage of defendants, labeled a future danger later committed an act of violence.   The reliability of a prediction cannot be ascertained by asking whether it is "always wrong." *Barefoot*, 463 U.S., at 901.   After all, if a jury randomly picked defendants' names out of a hat and then "found" that the selected defendants were future dangers, the "prediction" would ultimately appear to be "right" in some cases.   But the prediction itself would have no value and would be considered inherently unreliable.   It would just be a random guess with no factual basis.

The crucial question, therefore, is whether defendants labeled future dangers actually commit future acts of violence at a significantly higher rate than defendants not labeled future dangers.   Comparing these two classes of defendants is the only way to show that the "prediction" offers any more information than an arbitrary, baseless assertion would.   The Constitution demands *heightened* reliability in capital sentencing proceedings.   *See Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).   If a prediction is to form the basis for a death sentence, it must be more accurate than random speculation.   Relying on mere guesswork violates the Constitution's command that "the death penalty be inflicted evenhandedly, in accordance with reason and objective standards, rather than by whim, caprice, or prejudice." *Callins v. Collins*, 510 U.S. 1141, 1144 (1994) (cert. denied) (Blackmun, J., dissenting).

Comparative data show that prisoners labeled future dangers turn out to be no more dangerous than prisoners not labeled future dangers. One study compared the behavior of former death row prisoners who were once judged to be future dangers against the behavior of prisoners convicted of capital murder who received life sentences. When both groups of offenders were among the general prison population, the supposed future dangers "were not a threat to the institutional order" and had a lower rate of assaultive institutional misconduct. In fact, their rate of violent misconduct in prison was lower than the rate among the general prison population as a whole. *See,* James W. Marquart, Sheldon Ekland-Olson & Jonathan Sorensen, *Gazing into the Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases?*, 23 Law & Soc'y Rev. 449, 464 (1989). No evidence shows a significant correlation between predictions of future dangerousness and higher rates of actual future dangerousness.

The inherent unreliability of predictions of future dangerousness may explain why all other judgments of future dangerousness in the legal system are routinely reviewed for continued accuracy. *Barefoot* emphasized that psychiatric testimony can be used in other contexts to determine whether a person poses a threat to others. *See Barefoot*, 463 U.S. at 898. As a result, excluding it from death penalty proceedings would be like "disinvent[ing] the wheel." *Id.,* at 896. Yet capital sentencing is the only context in which a prediction of future dangerousness is irrevocable.

Indeed, ironically, the *Barefoot* Court cited *Addington v. Texas*, 441 U.S. 418 (1979), to note that psychiatrists may evaluate a person's future dangerousness in the context of civil commitment proceedings. *Barefoot*, 463 U.S., at 898. *Addington* required a clear-and-convincing-evidence standard for civil commitment proceedings and endorsed expert psychiatric

interpretation to evaluate whether a mentally-ill person is dangerous. *Addington*, 441 U.S., at

429. Yet *Addington* also observed:

> There is a serious question as to whether a state could ever prove beyond a
> reasonable doubt that an individual is both mentally ill and likely to be dangerous.
> … The subtleties and nuances of psychiatric diagnosis render certainties virtually
> beyond reach in most situations. The reasonable-doubt standard of criminal law
> functions in its realm because there the standard is addressed to specific,
> knowable facts.

*Id.*, at 429-30. *Addington* clearly identified the incompatibility of predicting future

dangerousness with the need for conclusive proof of "specific, knowable facts" in punishing

criminal conduct. This case, cited to support *Barefoot*'s observation that future dangerousness

can be evaluated, actually supports the proposition that it cannot be evaluated with sufficient

accuracy to enable its proof beyond a reasonable doubt. This is, of course, the standard of proof

required by the Texas capital sentencing scheme. Tex. Code Crim. Proc. Ann. art. 37.071(2)(c)

(West 2011).

Since *Jurek* and *Barefoot* were decided, moreover, many states and the federal

government have passed statutes, known as sexually violent predator acts (SVPAs), to expand

civil commitment to violent sex offenders. These statutes require regular reassessment of

committed persons' status,[11] further demonstrating that predictions of future dangerousness must

be continually revisited if they are to be used at all. In upholding the constitutionality of

Kansas's SVPA, the Court noted: "The maximum amount of time an individual can be

incapacitated pursuant to a single judicial proceeding is one year. If Kansas seeks to continue

the detention beyond that year, a court must once again determine beyond a reasonable doubt

that the detainee satisfies the same standards as required for the initial confinement," including a

---

[11] *See, e.g.*, Ariz. Rev. Stat. Ann. § 36-3708 (2011); Cal. Welf. & Inst. Code. § 6605 (West 2010); Fla. Stat. §
394.918 (2010); 725 Ill. Comp. Stat. 207/55 (West 2011); 42 Pa. Cons. Stat. Ann. § 6404 (West 2011). Civil
commitment statutes for mentally-ill persons who pose a danger to themselves or others similarly provide for
periodic review. *See, e.g.*, Tex. Health & Safety Code Ann. § 574.066 (West 2011).

prediction of future dangerousness. *Kansas v. Hendricks*, 521 U.S. 346, 364 (1997). Texas's SVPA similarly requires a biennial examination of committed persons and a biennial review of the prediction of future dangerousness by a judge. Tex. Health & Safety Code Ann. §§ 841.101, 841.102 (West 2011).

The legal significance of periodic review is that these statutes are civil rather than punitive, for they only aim to confine a person until "his mental abnormality no longer causes him to be a threat to others." *Hendricks*, 521 U.S., at 363. But if periodic review is required to determine whether a person is still "a threat to others," then the initial prediction of future dangerousness is *necessarily inadequate* beyond its initial shelf life of one or two years. SVPAs acknowledge on their face that a single prediction of future dangerousness is not reliable enough to justify long-term detention. This widespread acknowledgment of the inadequacy of predictions of future dangerousness was not available when *Jurek* and *Barefoot* were decided, as Washington passed the Nation's first SVPA in 1990. *See,* Nathan James et al., Cong. Research Serv., RL34068, Civil Commitment of Sexually Dangerous Persons 1 (2007).

Indeed, the Texas statute, which is unique in not actually detaining committed persons, acknowledges that a single prediction of future dangerousness is not even reliable enough to serve as the basis for more than two years of outpatient treatment. *See* Tex. Health & Safety Code Ann. § 841.081; *In re Commitment of Fisher*, 164 S.W.3d 637, 642 (Tex. 2005). A fortiori, then, a single prediction of future dangerousness cannot be reliable enough to serve as the basis for a death sentence.

In sum, while the first-generation evidence did not persuade the *Jurek* or *Barefoot* Court that predictions of future dangerousness are inherently unreliable, new evidence indisputably confirms that they are. Death sentences that rely on such predictions, therefore, condemn

defendants to death on the basis of meritless random guesses.  A death sentence based upon a "prediction" of future dangerousness is no less arbitrary than a death sentence based on random lottery – or, for that matter, a mandatory death sentence.  *Cf. Woodson v. North Carolina*, 428 U.S. 280, 303 (1976).  It is particularly problematic that the legal system's *only* irrevocable judgment of future dangerousness is found in capital sentencing proceedings.  The inability to reassess unreliable predictions of future dangerousness further undermines the accuracy of any decision based on them.

> B.    **Thomas Whitaker's death sentence, imposed after the jury predicted he would be a future danger, violates the Eighth and Fourteenth Amendments to the United States Constitution because it is excessive and disproportionate.**

Excessive punishments are considered cruel and unusual punishments, prohibited by the Constitution.  *See Furman v. Georgia*, 408 U.S. 238, 279 (1972) (Brennan, J., concurring).  The Eighth Amendment is directed, in part, "'against all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged.'"  *Weems v. United States*, 217 U.S. 349, 371 (1910) (quoting *O'Neil v. Vermont*, 144 U.S. 323, 339-40 (1892) (Field, J., dissenting)).  A form of punishment is unconstitutionally excessive if it 1) does not contribute to the goals of punishment – retribution and deterrence – and is thus a needless infliction of pain and suffering, or 2) is grossly disproportionate to the severity of the crime.  *Coker v. Georgia*, 433 U.S. 584, 592 (1976); *Gregg v. Georgia*, 428 U.S. 153, 173 (plurality opinion).  Thomas Whitaker's death sentence is excessive for two reasons.  First, there is a clear national consensus that Thomas Whitaker's particular crime – killing his mother and brother – does not warrant the death penalty.  Second, when speculation about future dangerousness determines which defendants are sentenced to death, the resulting sentence fails to serve the purpose of either retribution or deterrence.

**1.      There is a clear national consensus that the specific type of crime Thomas Whitaker committed does not warrant the death penalty.**

The national consensus regarding the appropriate punishment for an individual who has killed at least one parent, as reflected in the overwhelming majority of cases involving similarly-situated defendants, is that such defendants are not deserving of the death penalty.  Because the Eighth Amendment derives its "'meaning from the evolving standards of decency that mark the progress of a maturing society,'" a punishment's excessiveness must be evaluated against objective indicia of public attitudes.  *Atkins v. Virginia*, 536 U.S. 304, 311-12 (2002) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).  Objective factors, such as "public attitudes concerning a particular sentence history and precedent, legislative attitudes, and the response of juries reflected in their sentencing decisions" must form the basis in determining whether a punishment is excessive.  *Coker v. Georgia*, 433 U.S. 584, 592 (1977) (citing *Gregg v. Georgia*, 428 U.S. 153 (1976)); *see also Furman*, 408 U.S. at 278 (Brennan, J., concurring) ("Rejection by society, of course, is a strong indication that a severe punishment does not comport with human dignity.").  While legislative action is a clear measure of the public's attitude toward a particular punishment, "[t]here are measures of consensus other than legislation."  *Kennedy v. Louisiana*, 554 U.S. 407, 433 (2008).  Jury verdicts, plea agreements for sentences less than death, prosecutors' calculated decisions not to seek the death penalty, and "[s]tatistics about the number of executions" also demonstrate society's recognition that a particular punishment is disproportionate to a particular crime or a particular class of offenders.  *Id*.  In Texas, the treatment of offenders similarly situated to Thomas Whitaker reveals a state-wide consensus that 1) individuals who kill at least one parent are almost always not considered a future danger, and 2) prosecutors do not believe the death penalty is appropriate for this specific class of offenders.

In sentencing him to death, Thomas Whitaker's jury unanimously found that Thomas Whitaker "would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. Ann. art. 37.071 (West 2011).  The cases of similarly-situated defendants reveal that judges, juries, and prosecutors do not consider defendants who commit murders similar to the one for which Thomas Whitaker was convicted to be deserving of the harshest penalty.  Undersigned counsel conducted a survey of all fifty states, dating back to 1975, and located approximately ninety-one cases in which an individual murdered at least one parent.  *See, Exh.* 'O'.

Of the twenty-two cases in Texas (not including Whitaker) where the defendant killed at least one parent, a jury imposed a death sentence in only four cases.  *See, Exh.* 'O'.  In one of the four, the case of Michael Yowell, a federal judge overturned the death sentence and ordered a new punishment phase because trial counsel was ineffective.  *See,* Jim Clark, *Lubbock's Yowell Death Penalty Case to be Heard July 6*, KCBD11.com, Apr. 13, 2011, http://www.kcbd.com/story/14439732/lubbocks-yowell-death-penalty-case-to-be-heard-on-july-6.  In another of the four cases in which a death sentence was imposed, the state relied on the testimony of Dr. Gripon, an expert who frequently provides outlandish and speculative testimony that a given defendant will be a future danger based on a cursory review of records. *See Beatty v. State*, 2009 WL 619191 (Tex. Crim. App. Mar.  11, 2009); *Jury Told Beatty Would be Threat to Society*, Tyler Morning Telegraph (Tex.), Aug. 10, 2005, *available at* http://www.mail-archive.com/deathpenalty@lists.washlaw.edu/msg00650.html.  In that case, the defendant was the trigger person, had numerous criminal convictions, and was cited in prison several times for violence toward correctional officers.  Unlike Mr. Beatty, Thomas Whitaker has no violent, adult criminal record, and no history of violence in jail or prison.  These two cases, along with Thomas

Whitaker's, are three of the very few among many with similar facts that resulted in a defendant being sentenced to death.  Justice Brennan likened this occurrence to a "lottery system" and noted that "[w]hen the punishment of death is inflicted in a trivial number of cases in which it is legally available, the conclusion is virtually inescapable that it is being inflicted arbitrarily." *Furman*, 408 U.S. at 293 (Brennan, J., concurring).  Of the twenty-three Texas cases, three were cases in which the jury chose not to impose a death sentence. *See, Exh.* 'O'.  In particular, the facts surrounding the 2003 murders of Rick and Suzanna Wamsley are remarkably similar to the facts in Thomas Whitaker's case. *See Wamsley v. Texas*, No. 2-06-089, 2008 WL 706610 (Tex. App. - Ft. Worth, Mar. 13, 2008) (mem. op.).  In that case, Fort Worth prosecutors sought death against Andrew Wamsley and two others for the brutal stabbing and shooting of Wamsley's parents. *Id*., at *1.  Wamsley and the two female codefendants met on several occasions at an IHOP Restaurant to plot the murders. *See,* Glenna Whitley & Andrea Grimes, *Family Plot*, Dallas Observer News, July 15, 2004, *available at* http://www.dallasobserver.com/2004-07-15/news/family-plot/.  Prosecutors argued that Wamsley's motivation for the murders was the hope of receiving a large inheritance. *See* Rick Halperin, *Texas: Defense Experts Say Wamsley had Personality Disorder*, Mar. 9, 2006, [http://groups.yahoo.com/group/deathpenaltynews/message/14183](http://groups.yahoo.com/group/deathpenaltynews/message/14183).  The jury convicted Wamsley of capital murder and the prosecutor presented evidence that Wamsley tried to have his sister and another key witness killed in attempting to persuade the jury that he was a future danger. *Id*.  Despite this evidence, the jury did not find that Wamsley was a future danger and sentenced him to life. *See Wamsley*, 2008 WL 706610, at *1.  Wamsley's case illustrates the trend in Texas toward finding this class of offenders not to be a future danger.  Simply stated, juries are realizing that individuals who kill their parents are not a future danger because they have no motivation or purpose to harm any other group of persons,

inside or outside of prison.   The Texas Court of Criminal Appeals recently held similarly regarding parents who kill their children.   *See, Berry v. Texas*, 233 S.W.3d 847, 863 n.5 ("Children who kill their parents cannot commit that offense again . . .").

The data also reveals that prosecutors in Texas do not believe that defendants who kill a parent are a continuing threat to society and, thus, deserving of the death penalty.   In the twenty-three Texas cases, the prosecution did not seek death or accepted a negotiated plea in sixteen. *See, Exh.* 'O'.   This data further demonstrates that Thomas Whitaker's death sentence is disproportionate and arbitrary.   For example, twenty-five year old Justin Smith of Matagorda County was charged with capital murder after he killed both of his parents and wrapped their dead bodies in plastic.   *See* Anne Marie Kilday*, Man Suspected of Shooting Parents Captured at Ski Resort*, Houston Chronicle, Jan. 8, 2005, http://www.chron.com/disp/story.mpl/metropolitan /2983947.html.   After the murders, Mr. Smith was seen at a bar playing pool with his father's prized cue, then telling a friend that his father would not find out.   *Id*.   Mr. Smith also lied to authorities about the whereabouts of his parents, then fled the county with his wife and child.   *Id*. After Mr. Smith was finally arrested, he expressed remorse about the killings and ultimately pled guilty to capital murder with an agreed life sentence.   *Id*.   Though Mr. Smith had a prior juvenile record that included charges of burglary and forgery, the prosecutor ultimately offered a plea deal to spare the family further pain and suffering.   *See Capital Murder Defendant Faces 3rd Indictment,* Bay City Tribune (Tex.), July 8, 2006, *available at* http://groups.yahoo.com/group/Texasdeathpenaltynews/message/3837.   Mr. Smith's case is quite similar to Thomas Whitaker's case – both defendants were young men who fled after  the murders for which they were convicted, both expressed remorse, both had prior juvenile records involving non-violent offenses, and in both cases, the family expressed a desire to spare the life

of the defendant despite the pain he caused.  This and the other examples where the prosecutor pled the case or simply decided not to seek death further illustrate the trend toward not seeking the death penalty in cases involving patricide.  Outside of Texas, the results are even more staggering.  Of the sixty-five non-Texas cases where a defendant was charged with killing a parent, a death sentence was imposed in only three cases.  *See, Exh.* 'O'  In one of those cases, Blaine Ross of Florida, the court recently granted a retrial because police interrogators failed to timely give Mr. Ross his Miranda rights.  *See* Todd Ruger, *New Trial for Man Convicted of Killing Parents*, Herald-Tribune (Sarasota, Fla.), May 27, 2010, *available at* http://www.heraldtribune.com/article/20100527/breaking/100529747.  Eric Hanson of Illinois was sentenced to death in 2005 for killing four people, including both his parents.  Because Mr. Hanson was convicted in Illinois where the Governor recently abolished the death penalty, his death sentence will be commuted to life on July 1 of this year.  Ariane De Vogue & Barbara Pinto, *Illinois Abolishes the Death Penalty; 16th State to End Executions*, ABCNews.com, Mar. 9, 2011, http://abcnews.go.com/Politics/illinois-16th-state-abolish-death-penalty/story?id =13095912.  Deondre Staten, the final individual outside of Texas sitting on death row for killing at least one parent, was convicted in California.[12]  Mr. Staten's conviction nineteen years ago represents the last time an offender who killed at least one parent was sentenced to death by a jury (and whose sentence has been upheld) outside of Texas.  Furthermore, in fifty-seven of the sixty-two non-Texas cases, the prosecutor either did not seek the death penalty, or the jury did not impose it.  The data reveals that in California prosecutors and juries overwhelmingly favor life imprisonment over the death penalty for offenders who kill their parents.  For example, in the

---

[12] Deondre Staten was sentenced to death in 1992 for the 1990 murders of both parents.  Staten shot his father and stabbed his mother multiple times, in order to receive financial gain.  *See* Vicki Torres, *Man guilty of Killing Parents for Insurance*, Los Angeles Times, Dec. 5, 1991, *available at* http://articles.latimes.com/1991-12-05/news/ga-790_1_parents-killings-guilty.

case of Lyle and Erik Menendez, both brothers were given life sentences for the 1989 murders of their parents.  *See Menendez Brothers Sentenced to Life in Prison*, N.Y. Times, July 3, 1996, *available at*  http://www.nytimes.com/1996/07/03/us/menendez-brothers-sentenced-to-life-in-prison.html.  The prosecution urged the jury to impose death sentences based on the brutal facts of the crime and the brothers' casual spending spree with their inheritance, but the jury imposed life instead of death.  *Id*.  In 1995, Dana Ewell and Joel Radovcich were convicted in California of murdering Mr. Ewell's parents and sister.  *See* Associated Press, *Son, Friend Convicted of Killing Parents, Sister*, L.A. Times, May 13, 1998, http://articles.latimes.com/1998/may/13/news/mn-49271.  Prosecutors argued that the murders were motivated by Mr. Ewell's desire to inherit the family's fortune. *Id*.  The jury in that case deadlocked on punishment, despite evidence that Ewell and Radovcich carefully plotted to kill Ewell's entire family for an eight million dollar inheritance.  *See People v. Ewell*, No. F0303191, 2004 WL 944479, at *1, 20 (Cal. App. May 4, 2004).  After the jury deadlocked, the prosecutor decided to forego a retrial of the penalty phase, and Mr. Ewell was sentenced to three life sentences.  *Id*.

California juries are not the only juries which regularly choose not to sentence defendants similarly situated to Thomas Whitaker to death.  In 1991, Matthew Heikkila brutally murdered both parents with a sawed-off shotgun and boasted about wanting to kill his girlfriend if he had more bullets.  *See* Jacob Perry, *A Horror That Shocked Bernards Township*, The Bernardsville News, Jan. 28, 2011, http://newjerseyhills.com/bernardsville_news/news/article_f9d972cc-295f-11e0-b242-001cc4c002e0.html.  Prosecutors presented evidence of Mr. Heikkila's various run-ins with the law and chilling threats directed toward his well-respected parents.  *Id*.  The New Jersey jury found Mr. Heikkila guilty of murdering his parents, but opted to impose a life sentence rather than death.  *Id*.

As in Texas, prosecutors around the nation are deciding not to seek death in cases that involve precisely the type of crime committed by Thomas Whitaker. *See, Exh.* 'O'.  For example, Oregon prosecutors decided not to seek the death penalty in the 1997 murders of Henry and Mercedes Niiranen.  *See* Tara Burghart, *Murderer Yearns for Birth Parents*, The Seattle Times, Mar. 19, 2000, http://community.seattletimes.nwsource.com/archive/?date=20000319 &slug=4010728.   Instead, Patrick Niiranen, their adoptive son, received a life sentence for pleading guilty to two counts of aggravated murder and burglary.  *Id*.  In Missouri, prosecutors declined to seek death against Emory Futo in the 1991 shooting and stabbing deaths of Mr. Futo's parents and two brothers.  *See State v. Futo*, 990 S.W.2d 7 (Mo. Ct. App. 1999).  And finally, in Connecticut, Patrick Campbell was given a life sentence for beating his adoptive parents to death with a sledgehammer, then burning their bodies.  *See State v. Campbell*, 617 A.2d 889, 892 (Conn. 1992).  These three examples only represent a small sampling of numerous cases where prosecutors recognize that individuals like Thomas Whitaker, who have murdered at least one parent, are not deserving of the death penalty.

In sum, the data reveals a national consensus that offenders who kill at least one parent are not a continuing threat to society deserving of the death penalty.  Because so few individuals sit on death row for these types of crimes, while other individuals who committed nearly identical crimes are serving lengthy prison sentences, the death penalty is an excessive punishment in these cases.

> **2.** **When future dangerousness determines whether a defendant lives or dies, the resulting death sentence cannot serve the purpose of either retribution or deterrence and is, therefore, excessive.**

"The death penalty is said to serve two principal social purposes: retribution and the deterrence of capital crimes by prospective offenders."  *Gregg v. Georgia*, 428 U.S. 153, 183

(1976) (plurality opinion).  Unless applying the death penalty "measurably contributes to one or both of these goals, it 'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an unconstitutional punishment."  *Enmund v. Florida*, 485 U.S. 782, 798 (1982) (quoting *Coker v. Georgia,* 433 U.S. 584, 592 (1977)).

The jury must decide that a defendant poses a future danger to sentence a person convicted of capital murder to death.  *See* Texas Code Crim. Proc. Ann. art. 37.071 (West 2011). When future dangerousness determines whether a defendant lives or dies, the resulting death sentence primarily serves the purpose of incapacitation, not retribution or deterrence.

First, by definition, basing a punishment on future dangerousness cannot serve the purpose of retribution.  Retribution expresses "society's moral outrage at particularly offensive conduct."  *Gregg*, 428 U.S., at 183.  It is the belief that a wrongdoer deserves to suffer for past acts.  It is inherently unrelated to a person's future conduct.  There can be no retribution for future dangerousness.

Second, a punishment based upon future dangerousness does not deter.  The very idea of predicting future dangerousness assumes that some people are so inveterately dangerous that they will necessarily commit violence even in a high-security prison environment—that  the only way to prevent them from engaging in future violence is to kill them.  This is, in fact, precisely what the State and its witnesses routinely tell sentencing juries.  *See, e.g.*, *Berry v. State*, 233 S.W.3d 847, 863 (Tex. Crim. App. 2007) (prosecutor stating "Some people are just evil"); *Battaglia v. State*, 2005 WL 1208949, at *4 (Tex. Crim. App. May 18, 2005) (psychiatrist testifying that defendant's conscience would not stop him from committing future crimes); *Cook v. State*, 821 S.W.2d 600, 602 (Tex. Crim. App. 1991) (prosecutor stating, "Dr. Grigson told you that the man was impossible to rehabilitate").  Prospective offenders are unlikely to be deterred

by a punishment they cannot receive.  This is why deterring "capital crimes" – not deterring all crimes through some generalized expression of toughness – is a possible purpose of the death penalty.  *Gregg*, 428 U.S., at 183.  The future dangerousness requirement, if taken seriously, means that only inveterately dangerous persons can get the death penalty.  If only inveterately dangerous persons can get the death penalty, then inveterately dangerous persons are the only prospective offenders who might be deterred by it.

But a person is inveterately dangerous *precisely because he cannot be deterred*.  A deterrable person cannot be deemed a future danger beyond a reasonable doubt because, by definition, any threat he may pose could be neutralized by appropriate incentives.  Consequently, the future dangerousness requirement – if it were possible to implement with accuracy – would limit the death penalty to non-deterrable persons.  Because punishments deter persons who could possibly receive them, a punishment reserved for non-deterrable offenders will deter no one.  Consequently, where a finding of future dangerousness is the basis for the death penalty, deterrence cannot be its purpose.

Because basing a death sentence on future dangerousness serves the purpose of neither retribution nor deterrence, incapacitation is the only penological interest it can advance.  But "incapacitation has never been embraced as a sufficient justification for the death penalty." *Spaziano v. Florida*, 468 U.S. 447, 461-62 (1984).  If incapacitation alone could justify the death penalty, then "mandatory death penalty statutes would be constitutional, and, as we have held, they are not." *Id.*, at 478 n.19 (Stevens, J., concurring in part and dissenting in part).

Indeed, if incapacitation could even be the primary justification for the death penalty, there would be no absolute bar to the execution of minors and mentally retarded persons.  These persons may not be executed because they are less morally culpable for their crimes, *see Roper v.*

*Simmons*, 543 U.S. 551, 567 (2005); *Atkins v. Virginia*, 536 U.S. 304, 306 (2002), but their diminished culpability does not necessarily bear on the need to incapacitate them.  Even if a mentally retarded offender could be predicted with total certainty to be extremely dangerous in prison, the Constitution would prevent Texas from executing him.  Incapacitation, therefore, cannot be the death penalty's primary aim.  Yet it *is* the primary aim when future dangerousness is the deciding factor between life and death.  Punishments based on future dangerousness are disproportionate in all circumstances to the underlying offense because they fail the Constitution's requirement that they measurably serve the purpose of retribution or deterrence.

> **C.    Because Thomas Whitaker poses no danger in a prison environment, the jury's determination of future dangerousness was unreliable and false, and the resulting death sentence violates the Constitution**.

Thomas Whitaker has committed no violent acts while incarcerated.  His impeccable disciplinary record demonstrates that he poses no threat to guards or fellow inmates and that he can be counted on to act respectfully and appropriately.  Thomas Whitaker is not an irredeemably violent serial offender; he committed one violent offense under particular circumstances that are no longer applicable.  The jury's prediction that he posed a future danger is plainly inaccurate.

The punishment that depends upon this inaccurate prediction is not the reliable, reasoned determination of culpability that the Constitution demands.  Thomas Whitaker's non-dangerousness offers additional evidence that a sentencing scheme relying on speculation about future dangerousness is inherently arbitrary.  It also means that Thomas Whitaker's sentence is itself based on a factual inaccuracy and should be vacated.  In *Johnson v. Mississippi*, 486 U.S. 578 (1988), for instance, the jury found an aggravating circumstance based on a defendant's prior conviction; when that conviction was reversed after the death sentence had been imposed,

the Court vacated the sentence.  In *Johnson*, later developments revealed that the death sentence was unreliable and arbitrary because it was "predicated, in part, on a … judgment that is not valid now, and was not valid when it was entered…." *Id.,* at 585 n.6.  Thomas Whitaker's sentence is also predicated on an assessment that has been proven invalid.

While awaiting trial, Thomas Whitaker spent time in several detention facilities without incident.  Officials treated him in a fashion inconsistent with the notion that he posed a danger. In fact, he was afforded opportunities reserved for trustworthy inmates.  Thomas Whitaker lived in general population dormitories with low-level offenders, without incident.  He worked in a kitchen with other inmates, behaving irreproachably even as he had access to potentially dangerous equipment.   He was one of a select few inmates who cleaned one facility's administrative offices.  He was routinely shuttled from one facility to another with large groups of inmates.  If jail administrators believed that Thomas Whitaker posed any serious threat while incarcerated, he would have been treated differently.  And if he had he been inclined to commit acts of violence while incarcerated, he had ample opportunity to do so.

In nearly four-and-a-half years on death row, Thomas Whitaker has similarly posed no danger.  Thomas Whitaker devotes his time and energy to self-improvement instead.  He has taken advantage of every opportunity for rehabilitation to which he has access.  He is on track to earn a bachelor's degree and is now a senior in college.  He is an accomplished writer, recently earning a national award.  On his own initiative, he has successfully completed courses in subjects ranging from philosophy to Bible study.  And, most important, he has actively pursued a program of rehabilitation and reconciliation with his father, the surviving victim of his offense.

Thomas Whitaker also demonstrated shortly after his offense that he was fully capable of living non-violently and compassionately in society at large.  Residing in Cerralvo, Mexico,

Thomas Whitaker developed a loving relationship with the Salinas family, whom he met by chance.  Thomas Whitaker lived peaceably and was a valued member of the local community. On one occasion, Thomas Whitaker took it upon himself to work with police to prepare local residents for a major flood; in doing so, he rescued a young child from danger.

Thomas Whitaker's pattern of behavior since his offense conclusively demonstrates that he does not pose a threat of violence to others, particularly in a prison environment.  He is not – and, since his offense, never has been – a "future danger."  Because his sentence is predicated on a factually inaccurate judgment, that sentence is arbitrary and violates the Constitution.

## V.    PRELIMINARY SHOWING THAT THE STATE COURT'S DECISION WAS UNREASONABLE.

In light of the trial counsel's untenable "strategic" decision not to investigate mitigating psychological evidence, the findings adopted by the Texas Court of Criminal Appeals are obviously unreasonable.  For the most part, findings central to the state court's denial of relief on Thomas Whitaker's ineffectiveness claim simply recapitulate the false allegations trial counsel makes in his affidavit.  For example, the TCCA adopted the following:

> 32. Based on his credible affidavit, McDonald spoke with Applicant's psychologist, Dr O'Rourke [Trial counsel Aff. at 4]. McDonald determined there was no evidence of retardation or psychological problems other than an indication that Applicant had an antisocial and narcissistic personality [Trial counsel Aff. at 4].

Dr. O'Rourke's 1997 Axis I diagnoses of delusional disorder and substance abuse falsify the state court's finding that the psychological record only disclosed personality disorders.  Dr. O'Rourke's expert in state habeas proceedings, Dr. Kit Harrison, confirmed Dr. O'Rourke's Axis I findings and referred the convicting court to Dr. O'Rourke's earlier data.

Other findings are about what trial counsel believed and opined in his affidavit and not findings about facts upon which the beliefs rest.  The factual basis of the TCCA's decision, therefore, misses the mark.  This misdirection is evident in findings #33 and #34:

> 33. Based on his credible affidavit, McDonald observed that Applicant had a tendency for anti-social behavior, a lack of empathy for the feelings of others, and was, in McDonald's opinion, narcissistic [Trial counsel Aff. at 4].

> 34. Based on his credible affidavit, McDonald believed that Applicant's psychological qualities-tendency for anti-social behavior, lack of empathy for the feelings of others, and narcissism-would assist the jury in finding Applicant to be a continuing threat to society rather than mitigate against the imposition of the death penalty [trial counsel Aff. at 4].

> 40. Based on his credible affidavit, McDonald determined that any testimony from a psychologist would be harmful to Applicant and allow the State to show that Applicant did not have a conscience, was narcissistic, and could not be remorseful [trial counsel Aff. at 4].

The relevant questions, though, are whether (i) trial counsel conducted a **reasonable investigation** into a mitigation defense, and (ii) made **reasonable** determinations about the evidence pursuant to the investigation.  The state court's finding that trial counsel (a) filed a credible affidavit stating (b) that he made a determination (.i.e., he came to believe) that a psychological investigation would only disclose harmful psychological evidence regarding personality disorders is not responsive to issue (i) or to issue (ii).  The record, on the other hand, does speak to these critical issues and clarifies that trial counsel deliberately decided **not** to investigate a mitigation defense, and, therefore, could not make a reasonable decision about how to use psychological evidence to support such a defense.

Other "findings" are false and they are misleading as well. Finding #35 states that:

> 35. McDonald reasonably determined that indications Applicant was antisocial and narcissistic would support a finding of future

> dangerousness and that psychological testimony would not mitigate
> against the death penalty

One misleading message is that "indications Applicant was antisocial and narcissistic" were the "only psychological" evidence trial counsel could reasonably hope to develop; however, the psychologists who examined Thomas Whitaker before trial reported Axis I diagnoses of a serious mental illness. *See, Exhs.* 'F'-'G'.

A second misleading inference is that trial counsel reasonably believed he could prevent adverse information about Thomas Whitaker's supposed personality disorders from reaching the jury through his "deliberate determination not [to] pursu[e] the mitigation issue in this case." *Trial counsel Aff.,* at 4.  However, besides realizing the State knew of Dr. O'Rourke's 1997 findings, Trial counsel was on notice that the State intended to introduce testimony of Lynn Ayres that Thomas Whitaker was grandiose and "narcissistic" (31 RR 49-50 (*State's opening remarks));* 31 RR 72-76) based on an interview she had memorialized in notes that the State disclosed to trial counsel pre-trial.  *Exh.* 'J', at 2.  Furthermore, the State impeached Kent Whitaker with his knowledge of Ayres report, including her description of narcissistic traits. *Id.,* at 156.  Finally, evidence at guilt-innocence, which the jury was permitted to consider at punishment,[13] included testimony that Thomas Whitaker was "manipulative" and "paranoid." 28 RR 53; 28 RR 96.

The State court's conclusions of law are as defective as the factual findings on which they rest.  The conclusions refer to *Strickland* and consistent in general pronouncements that the standards enunciated in the case are satisfied. *See, Findings of Fact and Conclusions of Law, Conclusions* 1-3.  The central reason for the state court's ultimate decision regarding ineffectiveness of counsel is that the state court concluded that trial counsel had not made any

---

[13] The charge to the jury in a Texas capital case typically states that the jury may consider all the evidence from any part of trial at punishment.

"unprofessional errors." *Id., Conclusions* 5 and 8.  In the alternative, the state court addressed Strickland's materiality prong, but did so in light of clear misstatements of fact.  According to the court, Thomas Whitaker

> failed to prove by a preponderance of the evidence that, but for the omission of the alleged mitigating psychological testimony about Applicant's repressed homosexual tendencies, his being bi-sexual, antisocial, narcissistic, manipulative, incapable of controlling his delusional thinking, multiple personalities, and extra Y chromosome, there is a reasonable probability that Applicant would have been sentenced to life imprisonment.

*Id.*, *Conclusion* 11.

However, Thomas Whitaker did not complain that his genotype was mitigating. Naturally, he did not assert that the traits listed – namely, his sexuality, antisocial and narcissistic traits and manipulative behavior – were in themselves mitigating.  The foci of the complaint were that (1) the jury did not receive an explanation of why he developed these traits; and that (2) the jury did not learn that he needed medical treatment, including therapy that included antipsychotic medication.  Conclusion of law eleven is a complete mischaracterization of the mitigating psychological evidence.  It should be treated, therefore, as an unreasonable factual finding.

On the other hand, Thomas Whitaker's "delusional thinking, and multiple personalities" constitute archetypal mitigating psychological evidence that trial counsel's fictitious strategy of foregoing a mitigation defense deprived the jury from taking into consideration.  Although the diagnoses of Thomas Whitaker's mental illness did not support an insanity defense, they show that near the time of the crime he was suffering from a psychosis that lead to his criminal conduct.  The materiality of the psychological evidence relative to the penalty phase is also reflected in the way it impeached the State's central punishment theories.

## CLAIM FOUR

## DEATH BY LETHAL INJECTION VIOLATES THE EIGHTH AMENDMENT OF THE CONSTITUTION OF THE UNITED STATES

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST., AMEND. VIII.  Mr. Whitaker has been sentenced to die by lethal injection.  This method of administering the death penalty was challenged recently on the ground it constitutes cruel and unusual punishment. *Brown v. Crawford,* 4:05-cv-746 (8th Cir. 2005).  Petitioner requested a stay of execution from the Supreme Court, which was denied. Sup. Ct. No. 04-10165 [05-2310].  However, scientific investigation into the administration of three drug "cocktails" similar to that used in Texas call into question whether the practice is humane. *See, Prisoners 'aware' in executions*, http://news.bbc.co.uk/2/hi/health/4444473.stm.

> Writing in the Lancet, the researchers, led by Dr Leonardis Koniaris, said: "We certainly cannot conclude that these inmates were unconscious and insensate. "However, with no monitoring and with little use of the paralytic agent, any suffering of the inmate would be undetectable." They add: "The absence of training and monitoring, and the remote administration of drugs, coupled with eyewitness reports of muscle responses during execution, suggest that the current practice for lethal injection for execution fails to meet veterinary standards." In an accompanying editorial, the Lancet said: "Capital punishment is not only an atrocity, but also a stain on the record of the world's most powerful democracy. "Doctors should not be in the job of killing."

On Eight Amendment grounds, Thomas Whitaker requests relief from his sentence of death, and leave to supplement his briefing with developing medical and forensic evidence.

## REQUEST FOR RELIEF

WHEREFORE, Thomas Bartlett Whitaker, requests that this Court:

1.      Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death.

2.      Grant him an evidentiary hearing at which he may present evidence in support of the foregoing claims, and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct, in which to brief the issues of fact and of law raised by this petition or such hearing.

3.      Grant a certificate of appealability with respect to any claim that is denied.

4.      Grant leave to brief, through separate pleadings, issues regarding the State courts' satisfaction of standards under 28 U.S.C. § 2254(d) and § 2254(e).

5.      Grant reasonable time to file motions for discovery under Habeas Rule 6.

6.      Grant 90 days to amend this petition.

7.      Grant such other relief as law and justice require.

Respectfully submitted,

HILDER & ASSOCIATES, P.C.

By:      /s/ *James G. Rytting*
Philip H. Hilder
State Bar No. 19620050
James Rytting
State Bar No. 24002883
819 Lovett Boulevard
Houston, Texas  77006
Telephone (713) 655-9111
Facsimile (713) 655-9112
ATTORNEYS FOR PETITIONER

## VERIFICATION

I, James Rytting, state that to the best of my knowledge, the facts alleged in support of the claims in this case are true and correct, under penalty of perjury, as proscribed by Title 18 U.S.C. § 1746; and I hereby sign on behalf of Petitioner, Thomas Bartlett Whitaker.

*/s/ James G. Rytting*
James Rytting

## **CERTIFICATE OF SERVICE**

On June 30, 2011, Respondent was served by ECF with this Amended Petition.


*/s/ James G. Rytting*
James Rytting

# LIST OF EXHIBITS

'A' - 2009 Affidavit of Dan Cogdell

'B' - 2009 Affidavit of James "Jimmy" Ardoin

'C' - 2009 Affidavit of Assistant District Attorney Fred Felcman

'D' - 2009 Affidavit of Norman Kent Whitaker

'E' - 2009 Affidavit of Randy McDonald

'F' - 1997 Report of Dr. Brendan O'Rourke

'G' - 2005 Report of Dr. Jerome Brown

'H' - 2009 Report of Dr. Kit Harrison

'I' - Subpoenas served on Dr. Brendan O'Rourke

'J' - Affidavit of Assistant District Attorney Jeff Strange

'K' - Pre-Trial Notes of Dr. Brendan O'Rourke

'L' - 2011 Affidavit of Dr. Brendan O'Rourke

'M' - 2011 Report of Dr. Diane Mosnik

'N' - 2011 Affidavit of Kent Whitaker

'O' - Excel Spreadsheet