# EXHIBIT "A"

CAUSE NO. 42969

| | | |
|---|---|---|
| EX PARTE | § | IN THE 400th DISTRICT COURT |
| | § | |
| | § | OF |
| | § | |
| THOMAS BARTLETT | § | |
| WHITAKER | § | FORT BEND COUNTY, TEXAS |

### AFFIDAVIT OF DAN LAMAR COGDELL

STATE OF TEXAS                    }

COUNTY OF HARRIS               }

Before me the undersigned authority, on this day personally appeared Dan Lamar Cogdell who, after being by me duly sworn, deposed on his oath and stated as follows:

My name is Dan Lamar Cogdell. I am over the age of 18 and am mentally capable of making this affidavit. I am an attorney at law, licensed to practice in the State of Texas, and have held Bar Number 04501500 since I was licensed on November 5, 1982. I have engaged, almost exclusively, in the practice of criminal law since that time. The facts in this affidavit are from my own personal knowledge.

I am familiar with the facts and circumstances of the case of Mr. Bartlett Whitaker as an attorney in a professional capacity. I am a friend of Mr. Whitaker's uncle, Bo Bartlett. We remain good friends. I have also known Kent Whitaker, Bartlett Whitaker's father, for almost as many years and consider him a friend as well.

I first became acquainted with Bartlett Whitaker during the time I represented him after he had burglarized several public schools while a high school student. When Patricia and Kevin Whitaker were killed, and it became somewhat apparent that Mr. Whitaker was being viewed as a suspect, Kent Whitaker, his father, retained me to represent his son. There was a great deal of public attention on this case in the media and both Kent Whitaker and Thomas Bartlett Whitaker wished my professional assistance. I agreed to represent Mr. Whitaker in this matter. I did so with the understanding that should the Bartlett family become opposed to my continuing representation at some point in the future; I could withdraw from the case as long as it was not to the detriment of my client. I would not, of course, either violate the attorney-client privilege or in any way

engage in conduct which was not in the best interest of Bartlett Whitaker's legal interest. Bartlett Whitaker fully understood and agreed to this proviso. Accordingly, I undertook, along with my assistant, James Madison "Jimmy" Ardoin III, representation of Mr. Whitaker in this case.

In the early stages of my representation of Mr. Whitaker, we did not (of course) engage in plea negotiations. This was true for a variety of reasons. First and foremost, no charges had been filed. In the early stages of my representation, Mr. Whitaker was (in my opinion) a suspect but it was not a certainty that he (or anyone else) would be charged in this matter. Indeed, charges were not filed until well after a year following my assuming responsibility for Mr. Whitaker.    Secondly, Mr. Whitaker steadfastly maintained his innocence at that point. It was only later (after he fled to and returned from Mexico following the filing of charges against him) that he made admissions of guilt to me, that any negotiations were attempted. By the time of Mr. Whitaker's return, the case against him was fairly set-at least as to guilt or innocence. The co-defendants had, by that point, cut deals with the State and had agreed to testify against him. Indeed, by this point in time, the co-defendants had made very detailed statements describing not only their roles but that of Whitaker which were both externally and internally consistent. Simply put, by the time Whitaker was "returned" to the States from Mexico the evidence against him was, in my opinion, overwhelming (at least as to the guilt-innocence phase).

I did believe that, based upon the consistent positions of both the Bartlett and Whitaker families, that there was a real possibility that the death penalty could be avoided. After all, these families were the real "victims" of the offense and both were adamantly opposed to the imposition of the death penalty. At the request of Bartlett Whitaker (and based upon our belief of what was in his best interest in attempting to avoid the death penalty) we began negotiations with the goal of obtaining life sentences. I believed, based on my experience, that the facts of the case, the timing of the commission of the offense as well as the "law and order" climate within the community, that a death sentence could be a very likely result of a trial on the merits.    Our negotiations were primarily conducted with Fred M. Felcman, Assistant District Attorney for Fort Bend County.

During this period of time, Mr. Ardoin and I were approached while in public by Mr. Felcman. Felcman stated that he would consider removing the death penalty as a possible option only if we would submit a "proffer" of evidence which would be supplied by Mr. Whitaker, in his words, as to his involvement with the offenses alleged and the details thereof. It was specifically stated by Felcman that statements of remorse or contrition on the part of Whitaker were to be avoided and that the proffer should include only the facts, truthfully stated. Upon this representation, and in reliance on the good faith of Mr. Felcman in making the offer, we approached Mr. Whitaker and he agreed to

supply such a proffer as desired by Mr. Felcman.  Of course, this statement was to be
expressly protected by Rule 410 of the Texas rules of Evidence and would be
inadmissible against him in the event the case was not resolved by agreement.  Of course,
it should also be mentioned that (as the State was already in possession of the details of
the offense which had previously been provided to them by the co-defendants), I believed
that providing this information was in Mr. Whitaker's best interests.  Relying upon the
protection of Rule 410 and on the good-faith of the prosecutor, Mr. Felcman, the decision
was made to provide such a statement in the hopes of persuading the State not to seek the
death penalty.

        My associate, Mr. Ardoin, worked with Mr. Whitaker, using his words, and wrote
out a multi-page document which we had printed.  When we presented the document to
Mr. Felcman he acted "upset" that it did not contain "any mention of remorse" on Mr.
Whitaker's part.  Of course, this reaction by Felcman came as a complete surprise to us as
we were specifically told by him not to include any discussion of remorse.  Felcman used
the absence of any display of remorse or sorrow as a basis to "reject" the proffer and the
State continued to pursue the death penalty.  Given that the document had been secured
with the specific admonition that remorse be avoided within the document, and its
absence was the reason for its rejection, we became concerned that Mr. Felcman had no
intentions of not pursing the death penalty and we were simply being "played".  I recall
(after Felcman continued to pursue the death penalty despite the submission of the
proffer) being told by Felcman that "the only way I will agree not to pursue the death
penalty is if Bo Bartlett comes to my office and begs me not to pursue the death penalty".
It is my understanding that Bo Bartlett then did exactly that ("beg" Felcman not to pursue
the death penalty).

        Again, despite complying with this specific request, the State continued to
indicate that it would pursue the death penalty.  At some point, my efforts at plea
negotiations ceased.  The tension between me and Felcman was fairly specific at this
point.  I was angry at Felcman (as I had done exactly as he had asked in terms of
providing the proffer as directed) and I felt some specific resentment towards me by him.
I had concerns that either Felcman was so acrimonious towards me that my presence was
actually a deterrent towards resolving the case or that he never had any intention of not
pursuing the death penalty, or both.

        Shortly after this I was approached by and spoke with Mr. Whitaker's uncle, Bo
Bartlett.  Bartlett expressed to me the family's desire that I not continue as Mr.
Whitaker's attorney.  Given our prior agreement in this regard, I discussed the request
with Mr. Whitaker who agreed with that decision.  To be frank, my efforts to resolve the
case had failed and I believed that (in addition to respecting the desires of the family)
another lawyer might be better able to convince the State to abandon the death penalty.  I

believed that my withdrawal would provide another lawyer (who had not been involved in the negotiations detailed above) the opportunity for resolution short of trial which was in the best interests of the client. I refunded any unearned fees to Kent Whitaker and attempted to assist in the transition of the case over to the attorney who would replace me.

Discussions were had with regard to my associate, Jimmy Ardoin, continuing on the case with another, more experienced trial lawyer taking the lead. Eventually a list of three attorneys in whom I had confidence was provided to Kent Whitaker. Randy McDonald was eventually hired.

I had several conversations with Mr. McDonald prior to and following his taking over representation of Mr. Whitaker. I reviewed with him all the details of the history of the case and my dealings with Felcman. I explained to him my understanding of the desire of not only Kent Whitaker to have the State not seek the death penalty, but a parallel desire on the part of the Bartlett family. I communicated my desire to assist in any way I could, as well as my belief that Kent Whitaker had not only an incredible love for his son but sufficient financial resources to assist Mr. McDonald as needed in the defense.

I told Mr. McDonald of what I knew about the facts of the case. I also told him of a statement I had heard made by an ex-supervisor of Mr. Whitaker (when Whitaker was working in a nearby restaurant) wherein it was asserted that Mr. Whitaker "was a homosexual". I had also relayed that comment to Whitaker himself during the period of my representation of him and he strongly denied that it was true. I knew that the family did not perceive Mr. Whitaker as a homosexual. I informed Mr. McDonald that I had confronted Mr. Whitaker with this information and that he had, in fact, denied being homosexual. I do not know what, if any efforts, Mr. McDonald made to determine if the statement made to me was correct and, if it was, what effect that information would have had on the trial of the case.

Lastly, it is my considered opinion that the trial of this cause had to be about either some form of mitigation or an absence of future dangerousness or a combination of both. Practically speaking, there was virtually no doubt as to Whitaker's guilt or as to the facts and circumstances of the crime. The facts of the case were, suffice it to say, horrific as Whitaker had (on more than one occasion) plotted the deaths of his father, mother and brother and had eventually been instrumental in having both his mother and his brother killed. Those facts and circumstances, without some form of explanation for those actions, would very likely lead a jury in that community to assess the death penalty.

FURTHER AFFIANT SAYETH NOT.



Dan Lamar Cogdell

Sworn to and subscribed before me the undersigned authority on this the 15th day of April 2009.

Rosalinda G. Nuñez
Notary Public, State of Texas

ROSALINDA G. NUNEZ
NOTARY PUBLIC, STATE OF TEXAS
COMMISSION EXPIRES:
MAY 4, 2010

# EXHIBIT "B"

No. 42969

| | | |
|---|---|---|
| EX PARTE | § | IN THE 400th DISTRICT COURT |
| | § | OF |
| THOMAS BARTLETT WHITAKER | § | FORT BEND COUNTY, TEXAS |

### AFFIDAVIT OF JAMES MADISON ARDOIN III

STATE OF TEXAS            }

COUNTY OF HARRIS                }

Before me the undersigned authority, on this day personally appeared James Madison Ardoin III, who, after being by me duly sworn, deposed on his oath and stated as follows:

My name is James Madison Ardoin III. I am over the age of 18 and am mentally capable of making this affidavit. I am an attorney at law, licensed to practice in the State of Texas. I have held Bar Number 24045420 since I was licensed on November 5, 2004. I have engaged, almost exclusively, in the practice of criminal law since that time. The facts in this affidavit are from my own personal knowledge.

I am familiar with the facts and circumstances of the case of Thomas Bartlett Whitaker, having been brought into the case in my professional capacity by Dan Cogdell, an attorney with whom I am associated. I first became acquainted with Mr. Whitaker through that employment.

As a part of that representation, I had several conversations with Mr. Whitaker. After Mr. Cogdell withdrew from representation, attempts were made to continue my representation but the decision was made to continue with Mr. Randy McDonald as Mr. Whitaker's only attorney.

Mr. Cogdell did not engage in plea negotiations at the beginning of the representation since Mr. Whitaker steadfastly maintained his innocence. It was only later, after Mr. Whitaker went to and returned from Mexico, that any negotiations were attempted. By the time of Mr. Whitaker's return, the case against him was fairly set, at least as to

**Affidavit of James Madison Ardoin III - Page 1 of 3** _____ (initials)

guilt or innocence as the co-defendants had been co-operating with the State and would be providing significant evidence against Mr. Whitaker.

We began negotiations with the goal of obtaining life sentences because it was believed, based on Mr. Cogdell's experience, the facts of the case, the timing of the commission of the offense as well as the law and order climate within the community, that a death sentence would be the probable result of a trial on the merits. Our negotiations were primarily conducted with Fred M. Felcman, Assistant District Attorney for Fort Bend County.

During the course of those negotiations, Mr. Cogdell and I were approached while in a public place by Mr. Felcman who stated that he would consider removing the death penalty as a possible option only if we would submit an acceptable "proffer of evidence" which would be supplied by Mr. Whitaker, in his words, as to his involvement with the offenses alleged. It was specifically stated by Mr. Felcman that statements of remorse or contrition were to be left out of the proffer and that the proffer should include only the facts, truthfully stated. Upon this representation, and in reliance on the good faith of Mr. Felcman in making the offer , we approached Mr. Whitaker and he agreed to supply such a proffer as desired by Mr. Felcman. Of course, the proffer would be protected by a Rule 410 agreement and would not be admissible against Mr. Whitaker in the event the case was not resolved by a plea agreement

I worked with Mr. Whitaker in preparing the document, using his words, and produced a multi-paged document which we then had printed. When we presented the document to Mr. Felcman, he was upset, and rejected the proffer as the basis for a life sentence offer, because it "did not contain any mention of remorse" on Mr. Whitaker's part.

This abrupt turnabout was totally unexpected and for it to be the reason the proffer was rejected and the death penalty remained an option, was beyond belief. Given that the document had been secured with the specific admonition that remorse should be avoided within the document, we were stunned when we learned that its absence was the

**Affidavit of James Madison Ardoin III - Page 2 of 3** _____ **(initials)**

reason for its rejection.    Following this interchange, the plea negotiations ceased.

Shortly after this Mr. Cogdell was approached by and spoke with Mr. Whitaker's uncle, Bo Bartlett, who expressed to him the family's desire that he not continue as Mr. Whitaker's attorney.   Given the prior agreement in this regard, the request was discussed with Mr. Whitaker who was neither surprised nor angry, nor did he object.   My active involvement with the case was terminated at this time.

**FURTHER AFFIANT SAYETH NOT.**

_____
James Madison Ardoin III

Sworn to and subscribed before me the undersigned authority on this the 15th day of April 2009.

_____
Notary, State of Texas

ROSALINDA G. NUNEZ
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
MAY 4, 2010

Affidavit of James Madison Ardoin III – Page 3 of 3 _____ (initials)

# EXHIBIT "C"

NO. 42,969

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | FORT BEND COUNTY, TEXAS |
| | § | |
| THOMAS BARTLETT WHITAKER | § | 400TH JUDICIAL DISTRICT |

## AFFIDAVIT OF FRED M. FELCMAN

Before me the undersigned authority, on this day personally appeared Fred M. Felcman who, after being duly sworn, deposed on his oath the following

"My name is Fred Felcman. I am the first assistant district attorney of Fort Bend County, Texas. I, along with Jeff Strange, were the attorneys representing the State in the capital murder trial of Thomas Bart Whitaker aka Bart Whitaker. I have been practicing law for over 30 years with a heavy emphasis on criminal law, although I am not board certified. I have lived in Fort Bend County my entire life, except for college and law school, and am well acquainted with the make-up and values of the county. I started out in the DA's office in 1976, went into private practice in 1981, and came back as first assistant in 1991. I have tried numerous death penalty cases, the first being in 1978.

The writ is frivolous, consisting of tabloid gossip and no legal significance. Based upon the defendant's actions before and after the murders, the defendant's psychological profile prior to the murders, and now the defendant's website, it would require an absurd or ridiculous conclusion that the defendant Whitaker does not meet the standards for the imposition of the death penalty.

Appellate counsel should have filed an "Anders brief" but because he failed to do so, I must now answer some of the comments or complaints by appellate counsel but I will be brief. Simply stated, the defendant was convicted and received the death

ı–

penalty because of the defendant and nothing else - the evidence gathered by detectives Marshall Slot and Billy Baugh, along with myself and ADA Jeff Strange, met the burden of proving the defendant's guilt and easily established the criteria for the defendant to receive the death penalty. Both Dan Cogdell and Randy McDonald realized this and knew that the only avenue available was to use any negotiations as a defense to receiving the death penalty. I , Jeff, Dan, and Randy knew the evidence showed the defendant with prior criminal background; showed a defendant capable of massive manipulation and deceptions of all person he associated with, including professional psychologists and attorneys; showed psychological evaluations that warned psychologists of severe narcissism and/or sociopathy; and showed a narcissistic personality that used people as tools, with absolutely no remorse for his actions or empathy for his victims. The evidence showed that the only person who wasn't duped by the defendant prior to the murders, was a Ms. Ayers, who was afraid to meet with the defendant after one counseling session due to a severe "Atlas complex".

Dan and Randy never outright told me that "plea-negotiations" would be the defense in this matter - not the evidence or the law but the willingness of the defendant to accept life sentences, but over the course of time, it became clear. Even though negotiations are not admissible under the Texas Rule Evid 410, it seemed inevitable that the desires of Kent Whitaker that the State not seek the death penalty would come in and from that, the offer by the defendant to plead to life. I was friendly, courteous and respectful toward Dan Cogdell while he was on the case and didn't feel any animosity toward him when he withdrew.  Why Dan thought our relationship was "acrimonious" and why this is the reason he withdrew is baffling to me. Although I do not have personal knowledge of what he told Kent Whitaker, the book by Kent Whitaker says the only reason Dan withdrew was because of his friendship with Tricia's side of the family. Dan told Jeff and myself that his relationship with the Bartlett family was also the reason Dan withdrew; he never

2-

mentioned any other reason. I thought it was a wise thing for Dan to withdraw because he expressed the conflict he felt due to his closeness to Tricia and her side of the family - I was relieved when Dan withdrew because that issue would now be moot. I just recently went to one of Dan's parties in December of 2008 with associate Judge Ruiz - I had a very friendly and warm talk with Dan, met his wife who gave me a hug after Dan told her I was the prosecutor on the Whitaker case, and had an enjoyable time at the party. Dan even said he understood the decision by District Attorney John Healey to seek the death penalty. Not at any time did I ever sense any anger or animosity whatsoever, and that is why I am puzzled by Dan's affidavit. The only thing I can think of is that at one time Dan told me he personally thought that the defendant was remorseful, but that was before Marshall Slot received the monitored phone calls of the defendant - and now Dan maybe embarrassed that he said such a thing, but that is pure speculation on my part. The phone call occurred on the anniversary of the murders and was made by the defendant to his father - instead of being remorseful as was being portrayed to me, the defendant called his father to gripe that his attorney Dan Cogdell had told him that the offer would be a number of years, not life or death; that they were not paying money for some public defender, that the Mr. Ardoin, Dan's associate was being pushed around by the State; and that the "big guns" needed to come into play. Of course, after that, any illusions the defendant was casting about being remorseful dissipated into the wind. Whether Dan told the defendant that an offer for a term of years was forthcoming meant little to me as the phone call was the defendant's choice, not Dan's - it merely showed that any opinion about the defendant being remorseful was wrong (on the stand, the defendant thought the number of years may be around 90 - how he came up with that number, who knows). The phone helped reveal some of the defendant's personality and was played for the jury.

The public meeting Mr. Cogdell sets out in his affidavit was accidental. After lunch, the prosecutors go to some store on shop for about 15 minutes. We went to

"Best Buy" and I saw Dan and Jimmy. We talked about the case since it was set for that day. I believe Dan said something about how despicable the actions of the defendant were but that he believed the defendant to have some remorse. My opinion was different and that true remorse is not negotiated but comes from within. That was the entire conversation and it lasted five minutes at the most. I never asked for nor told Dan that if the defendant confessed, the District Attorney would not seek the death penalty. That is easily born out because no mention/complaint was ever made about a supposed deal. Even after the receipt of a "proffered statement" was there any mention of a supposed deal. I had never heard of a "proffered statement" before and it doesn't exist in Texas except the general rule that "plea-negotiations" are not admissible in Texas and that includes any statements made in the course of. The letter could have been called "Here's Our Version but Don't Use It" and it would have had as much significance as the legal sound of "proffered statement"; since the defense has named the letter such, I have used that title. Simply stated, the "proffered statement"given to me was of absolutely no legal detriment to the defendant - it wasn't even signed. I called Detective Marshall Slot the day I received the letter, who drove over to get a copy - he told me the facts were wrong in it. I did not know for certain until trial that Dan or his associate had prepared it. Both Kent Whitaker's book and the testimony elicited from the defendant state that Dan did not consult with the defendant before sending me the letter.

I met Randy McDonald about the same time as Dan withdrew, and Mr. McDonald was exactly as his reputation was recited in the father's book - intelligent and experienced. He never misled me or engage in unnecessary legal maneuvers. Mr. McDonald knew that the evidence was overwhelming in favor of the defendant receiving the death penalty and he engaged in sincere negotiations with the only asset he had in his favor - Kent Whitaker's desire that the death penalty not be sought. Patricia Whitaker's side of the family would also express their desire but it was less emphatic. Despite the rules of evidence not allowing such testimony, Jeff and I

4--

promised Mr. McDonald, Mr. Whitaker and Mr. Bartlett that they could express their desires before the jury. This decision was both objective and subjective. Pragmatically I knew without it being presented, a jury may feel deceived in not knowing and appellate procedure being what it is on death penalty cases, it would be an complaint on appeal as I would be depriving Mr. McDonald of his only real defense or argument to assess life. However, also pragmatically, any opinion asking for a life sentence would be worthless unless the person conceded that the defendant killed his family and I could use that to prove the defendant's guilt. Sympathetically, I felt for Kent Whitaker and he needed to have the chance to speak his feelings and it was solely for Mr. Whitaker that Jeff and I agreed - however, I felt the defendant had so easily deceived Kent Whitaker over the years that his request would not aid the jury in answering the "death penalty" questions.

All conversations with Kent Whitaker and Bo Bartlett that Jeff, Marshall, Billy and I had were relayed to District Attorney John Healey. Mr. Healey and Jeff also met with Mr. Bartlett without me being present. After all conversations, Mr. Healey determined that the evidenced warranted the seeking of the death penalty. We then went to trial.

Mr. McDonald told the jury in his opening statement that the jury would find out that a trial was unnecessary, i.e., the defendant was willing to plead guilty and serve a life sentence. The statement was consistent with the defense by Mr. McDonald. The appellate attorney complains that the "proffered statement" should not have been used by the State but fails to appraise the court that the rules of evidence do not prevent its use once the subject of "negotiations" is presented. Under the defensive theory, which was sound legal strategy in face of the evidence, the "proffered statement" would be a plus for the defendant, e.g., I tried to confess but my attorney Dan Cogdell screwed-up, which is what the defendant and father said from the stand. (Page 227) However, there were two major problems with this argument - A Christmas card the defendant sent me and the defendant's background.

A few weeks before trial, the defendant, without knowledge of Randy McDonald, sent me a Christmas card wishing me a Merry Christmas and asking that I set aside the nastiness I see in my profession and concentrate on my family. The defendant also threw in how he was a lost soul and had found his way home. There was no mention of his family or simple statement of sorrow in killing them, just a cryptic message from the defendant. The card was placed into evidence to show the manipulative way the defendant speaks and to show he could have conveyed "remorse" if he so wanted. Also, by this time, the defendant's history of lies, deceit, avarice, and violence was well documented and had come back to haunt him with the verdict of death.

The appellate attorney also makes a complaint that Mr. McDonald failed to use a psychologist/psychiatrist in the defense of Bart Whitaker, supposedly to show something meaningful. The defendant's website also gripes about this failure. However, the defendant had already been treated/examined by psychologist Brendan O'Rourke. In 1997, after the defendant committed multiple burglaries of schools, the defendant's family had the defendant examined by by Dr. O'Rourke. Dr. O'Rourke administered the "Millon Multi-Axial Clinical Inventory" test, with the test results being the defendant had a "narcissistic" personality with an over-inflated sense of importance, and was a person easily provoked and may express sudden and unanticipated brutality; the final paragraph warned the psychologist that the defendant was extremely manipulative and any dealings with the defendant should be guarded. Dr. O'Rourke ignored these results and wrote a glowing letter to the school about how the defendant had "self-corrected" and should be allowed back in school. Of course, Dr. O'Rourke was absolutely wrong because the defendant continued to engage in fraud, culminating in the murder of his family. I sought to introduce these findings and the letter but Mr. McDonald was successful in keeping out the test results. However, the letter was still admissible and I placed Dr. O'Rourke on the stand to show how easily the defendant fooled and/or manipulated

a supposed expert into writing such a beneficial letter. If Mr. McDonald had attempted to use any psycho-babble in his defense, the test would have come in as rebuttal, along with any evaluations from psychologists/psychiatrists to rebut any defense. (As a note, due to television's interest in the case, e.g., "48 Hours, Oprah Winfrey. 20/20", the State now has two psychiatric/psychologist's opinions that the defendant is, of course, a narcissistic sociopath. Also, it now seems the appellate psychologist Kit Harrison believes the "Millon" diagnosis of the defendant was valid - i.e., the defendant is a narcissistic sociopath who is dangerous - but in some sort of strained psychological logic that this is somehow mitigating.)

It is difficult to list the many contrary statements the defendant has said about his feelings or emotions. The appellate psychologist is just reiterating one of the defendant's fabrications, to-wit: I didn't feel loved. Of course, this is just a lie by the defendant to manipulate sympathy. During the trial, the defendant admitted that he told Ms. Ayers he felt like "Atlas" and didn't need anyone but then said that was a lie to cover his feelings of inadequacy and but now in his website, he again proclaims his superiority by stating his opinion of everyone else being a dunce, evil, etc. Recently on the defendant's website, the defendant has a new rationalization for his personality - I am so sensitive I had to disconnect from the world because of the world's violence, i.e.; how could a caring person not disconnect in view of the horrors committed by the world's population, and why can't you understand I am so emotional that I had to kill my family. ("I feel everything. Too much. I get overloaded and only then, do I withdraw. No one ever noticed I never ate my dinner when I was younger when we watched the news at the table"). Thus, all the defendant does is change his strategy/reason/rationalization/feelings to some form of "psychobabble" for killing his family and deny it was some mundane or pedestrian scheme to get money or cover his lies about school.

Overall, Bart Whitaker feels himself so vastly superior to everybody that whatever he wants or desires is rightfully his - in his website, the defendant rambles

on about his moral and intellectual superiority and how everyone in the prison system are Gestapo or dunces; the defendant Whitaker even talks of how killing a mosquito in his cell means more to him than the antics of people who oppose him. (The website says that the defendant's proclamations will soon be in Spanish so that more of the world can read the wisdom of Bart Whitaker).

In achieving what he believes is rightfully his, the defendant will tell the person what they want to hear and uses that tool in attempts to further his interests or to achieve his goal.  This manipulation technique of lying and fooling people has been on a scale that is difficult to believe but it has successfully used by the defendant repeatedly – for example: father, I am graduating from college; father, I didn't plan to kill you; father, I didn't do it; father, I changed after being shot; fiancee, I didn't do it and I love you; jury, I am really remorseful and fully responsible; district attorney, I hold no animosity toward you; etc. The most obvious proof of the defendant's ability to manipulate is this – the defendant got three separate groups to engage in three separate conspiracies to murder the Whitakers, and he accomplished it by merely telling the groups what they wanted to hear.

The defendant is now talking differently because he knows his readers/listeners/helpers need to hear different things, to-wit: I was convicted on a "quirk of the law" and was only peripherally involved in the murders; my attorney was a snake and only interested in money; foreman, you committed murder when the jury answered the questions; the guards are stupid; Texas justice is wrong; "fairness" in the American courtroom is an illusion; the assistant district attorney has a "sewer spigot" for a mouth; etc. Even behind bars, the defendant is still successful in manipulating people and the proof is this one simple fact – the defendant has managed to get someone to create a website and transcribe the defendant's notes of self-righteousness, conceit, and absolute lack of remorse, and then publish those on the website – it is almost beyond belief but that is exactly what someone is doing. Somehow this person completely ignores that the defendant was able to hide his

8–

failure to attend college from his family and fiancee; that he engaged in at least three
conspiracies to murder his family; that the defendant was never deterred in his goal
despite having been caught; that he had himself shot to cover the crime; that he
attended his family's funeral with the community without a hint of guilt; that he
attempted bribe a witness while jokingly referring to himself as a mastermind
criminal; that the defendant continued to scheme to kill his father while at the same
time convincing his father he was innocent; that he stole money and fled the country
but not before spending the night at a fancy hotel; etc. The person doing this even
ignores new information about the defendant talking about killing his girlfriend's
family in Mexico. And that is the danger of this defendant - he gets people around
him to forget what he has done and see a false image of the defendant. Indeed, a mere
glance at the relationship between the defendant and his father before the murders
shows that any concession or accommodation given to the defendant, or any refusal
to believe or failure to understand what the defendant is capable of committing, has
dire consequences as the defendant will use these mistakes to further his own goals,
whatever they may be. I believe Dan Cogdell knew this because of the conversations
I had with him but I am not sure; I am far more certain that Randy McDonald was
aware of this and as Kent Whitaker's book details on page 131, Mr. McDonald was
the first person to tell the defendant to quit trying to fool Mr. McDonald.

To illustrate why the writ is mainly gossip and has no legal significance,
appellate counsel has attached an affidavit from the defendant's ex-fiancee, who
states that in addition to be an accomplished liar, the defendant is also a homosexual.
How that is material or relevant is beyond any explanation; it is voyeurism at it's
worse. If the State had sought to introduce an opinion about the defendant's sexual
orientation during the trial, can you imagine the outcry that would have caused. The
trial judge would have never let it in and groups would have been forming because
the core of this affidavit is to show how maladaptive the defendant is, and that
homosexuality is a possible reason for the defendant murdering his family. But

9-

appellate counsel seems to be content to now interject it and hopefully the appellate court will find him in contempt for attaching the affidavit

The appellate counsel also complains that Mr. McDonald failed to present evidence supporting the notion that the defendant didn't deserve the death penalty. This position is not only silly but goes against the reasoning of Furman v. Georgia. The overturning of the death statutes was because the United States Supreme Court wanted factors or issues to be answered by the jury, and not a simple question of whether the defendant s deserved death; by this, a consistency would be established. Appellate counsel appears to want to go back to pre-Furman days.

Finally, what difference does it make whether Jeff or I were nice to Dan Cogdell, or if Dan was mean or abusive or courteous; there is absolutely no due process violation or constitutional violation that has occurred in this case that would somehow question the validity of the judgment. To gripe about who did what during negotiations is silly and especially galling when it was the defense that brought up negotiations during the trial and there was no objection to any of it. The reason plea negotiations are not admissible is because it would prevent earnest negotiations; however, here the negotiations were going to be the defense because it showed supposedly the defendant taking responsibility. But attorneys complaining about how they were treated during the negotiations, as Dan now complains, is far removed from that and would how been totally immaterial to the pleadings and absolutely irrelevant to issues - a trial about punishment for a defendant who murdered his family would have become a trial about attorneys, which seems to be what appellate counsel believes it should be. Indeed, it would has become so ridiculous that appellate counsel believes a defendant can chime in and give an opinion how "duplicitous" the State was in it's dealings, even though it was the defendant and/or Dan and Jimmy who sent an letter with facts that were wrong that was not adopted by the defendant. It is distressing that appellate counsel believes that the federal writ system is for this purpose of gossip and I regret that I had to engage in it because it trivializes the

10-

crime; obscures the fair and error-free trial; diminishes the efforts of Mr. McDonald and Mr. Cogdell in a needless and frivolous manner; and reduces the death of Kevin and Patricia Whitaker, along with Kent Whitaker's suffering, to some side-note event of plea negotiations instead of the trial and legal punishment of the defendant.

I have attached the following to this affidavit:

1. A letter from Randy McDonald;

2. The April 17, 2009 website of the defendant; and

3. The defendant with Kevin Whitaker, one hour before the murders.



Fred M. Felcman

SWORN TO AND SUBSCRIBED BEFORE ME this the 20th day of October, 2009.

YOLIE L. GARCIA
Notary Public, State of Texas
Commission Expires 03-27-2011

Notary, State of Texas

–11–

RANDY MCDONALD, P.C.
ATTORNEY AT LAW
3000 SMITH STREET
HOUSTON, TEXAS 77006

BOARD CERTIFIED CRIMINAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION

PHONE: 713-521-2585
FAX: 713-521-3324

March 13, 2007

John Healey
District Attorney, Fort Bend County
301 Jackson Street
Richmond, TX 77469

Dear John:

I am writing this letter to advise you that I certainly appreciated all courtesies extended to me by the district attorney's office throughout the trial of Bart Whitaker. In particular, Wanda was very helpful in coordinating witnesses as well as keeping the families together throughout the trial.

Obviously, Fred Felchman is a seasoned trial lawyer and did a great job in allowing me to try the case as best I could.

On another note, I think you should know that I watched Jeff Strange, who is already a good lawyer, develop into a great trial lawyer. His opening final argument during the punishment stage was one of the best I had ever witnessed. Not only did he carry the bulk of the State's witnesses, but he did an incredible cross examination of Bo Bartlett and actually allowed the jury to know that Bo Bartlett did not hold anything against the district attorney's office in their decision in this case.

Again, I want to thank your office personnel, especially Wanda, for all the assistance during the trial. I also wanted to let you know, in my humbled opinion, what a great job both Fred and Jeff did.

Yours truly,

Randy McDonald

RAM/lm

# EXHIBIT "D"

No. 42969

| | | |
|---|---|---|
| EX PARTE | § | IN THE 400th DISTRICT COURT |
| | § | OF |
| THOMAS BARTLETT WHITAKER | § | FORT BEND COUNTY, TEXAS |

### AFFIDAVIT OF NORMAN KENT WHITAKER

STATE OF TEXAS                    }

COUNTY OF FORT BEND                    }

Before me the undersigned authority, on this day personally appeared Norman Kent Whitaker, who, after being by me duly sworn, deposed on his oath and stated as follows:

My name is Norman Kent Whitaker. I am over the age of 18 and am mentally capable of making this affidavit. I am the father of Thomas Bartlett Whitaker, the Applicant in the action in which this affidavit is being filed.

I am familiar with the facts and circumstances of the case of Thomas Bartlett Whitaker, as I employed counsel for my son and maintained close contact with all of the attorneys who worked on his case. I first met Dan Cogdell, an attorney who initially represented Thomas, when Dan was a young man, as he was a friend of the Bartletts, my wife's family. My wife and I employed him to represent Thomas following Thomas' arrest for burglary prior to his senior year in high school. When the murders occurred in this case, I turned to him once again. I made it clear to Mr. Cogdell that I would spare no expense to save Thomas from the death penalty and am convinced that he knew and understood that instruction. I did not know or understand that Mr. Cogdell would withdraw from the case if the Bartlett family desired him to do so. Following Thomas' return from Mexico, Dan decided to withdraw given his prior relationship with the Bartlett family. He provided me with a list of attorneys' names and I hired Randy McDonald from that list.

I believed that Thomas, due in part to his history and the evaluations done on him in the past, and due to the facts of the case as they developed, had to be evaluated for psychological problems as there was surely something which had caused him to act in this brutal fashion. I had expressed these thoughts to Mr. Cogdell, and based upon his suggestion Dr. Brown was selected to see Thomas. Nothing came of it as Dr. Brown, due to jail restrictions, was kept from a full evaluation. When Mr. McDonald was hired, I renewed my thoughts, requesting that Mr. McDonald have my son evaluated by a mental health professional as

---

**Affidavit of Kent Whitaker - Page 1 of 3** _____ (initials)

the facts demonstrated in my mind that something was wrong.  I told Mr. McDonald that money was not a stumbling block and that the tests needed to be performed, especially given the facts of the case, which just about everyone had to admit were abnormal, to say the least.  However, each time the subject was broached, Mr. McDonald stated that we would be committing legal suicide by having those evaluations because the State would have access to the reports and, if something negative showed up, the State would see it.  He did not tell me that the State would not necessarily see the reports.  The implication of these conversations was that experts would hurt us more than help.  Mr. McDonald advised me that a battle of psychological experts (ours versus the State's) would confuse the jury and would not be beneficial.  This conversation was repeated each time, amounting to some two or three times, the subject was broached.  Mr. McDonald stated that he also did not need the assistance of a second attorney and no one was, therefore, hired to assist him.  Additionally, there was no mention of a "mitigation specialist."

I am aware that plea negotiations were attempted by both Mr. Cogdell, while he was retained, and by Mr. McDonald after he replaced Mr. Cogdell.  At one point, Mr. McDonald offered for Thomas to plead guilty and receive two life sentences to be served consecutively, but the State did not accept that offer.

There were no mitigation witnesses offered by the defense at trial, not because there were insufficient funds or because it was the desire of the family to not attempt to mitigate the punishment.  It was my desire to have such an investigation performed.  While I was prepared for the results of any such psychological evaluation or investigation, which I very well knew could have painted some of my previous actions, or inactions, as a parent in less than a favorable light, Mr. McDonald did not think that any such investigation would be helpful, despite the earlier diagnosis by Dr. O'Rourke at the time of the burglaries.  I accepted this decision, as I did all others made by Mr. McDonald, because he was the legal expert and I was not.  His experiences were in this area, and mine were not.  While I truly believe that it was a mistake to fail to have Thomas evaluated, and I believed it at the time, I also believed at that time that my experiences, and thus judgments, were not as relevant as Mr. McDonald's and that it was appropriate to accede to his legal decisions.

I testified as a fact witness for the State at the trial and as a defense witness at the punishment phase.  Mr. McDonald did not prepare my testimony for either of these court appearances with me by going over any specific questions he would be asking or that the State would ask.  He told me that it was important to be spontaneous and that preparation would imperil that spontaneity.

I believe that the jury was expecting and, in some cases, wanting, evidence from the defense which would show that the death penalty would not be appropriate.  I believe this for three reasons.  First, Mr. McDonald told me on the date the death penalty was returned that there had been a split with some jurors

---

**Affidavit of Kent Whitaker - Page 2 of 3**          _KW_   (initials)

wanting life, but that the jury foreman had convinced those who were holding out that the death penalty was the only appropriate punishment. This would mean that some jurors believed, at least initially, that death was inappropriate. Second, I have a recollection of seeing the jury foreman on television following the verdict and his stating that my son could not change and will never change, followed by his assessment that Thomas "needs to find God." When coupled with Mr. McDonald's earlier statement, it was evident to me that evidence which would show Thomas' underlying psychological problems and the potential for handling those problems in a secure setting had been missed by the jury. Lastly, some time after the verdict, while having dinner at Sandy McGee's, a restaurant in Richmond, Fort Bend County, Texas, I was approached by a man employed at the restaurant who told me that he had served on the jury and, after initial expressions of sorrow at the situation, that the jury foreman was a dynamic man who had swayed others of the jury from their favoring of life imprisonment by pointing out that the death penalty was appropriate and that "no reason had been shown which would make it [the death penalty] inappropriate."


FURTHER AFFIANT SAYETH NOT.


_Norman Kent Whitaker_
Norman Kent Whitaker

Sworn to and subscribed before me the undersigned authority on this the 15th day of April 2009.


Notary, State of Texas

LAURIE C. DAWSON
My Commission Expires
May 31, 2011

---

Affidavit of Kent Whitaker – Page 3 of 3 _____ (initials)

# EXHIBIT "E"

CAUSE NO. 42,969 HC1

| | | |
|---|---|---|
| EX PARTE | § | IN THE 400TH JUDICIAL |
| | § | |
| THOMAS BARTLETT WHITAKER | § | DISTRICT COURT OF |
| | § | |
| | § | FORT BEND COUNTY, TEXAS |

## AFFIDAVIT OF RANDY MCDONALD

My name is Randy McDonald. I am over the age of eighteen years and have personal knowledge of the facts stated herein.

I have been licensed to practice law in the State of Texas since May 1979 and I am currently, and have always been, in good standing. I am Board Certified in Criminal Law and have been since 1985, being re-certified every five years. I am approved for appointment to represent indigent defendants in capital cases in the Second Administrative District, both first and second chair.

I have been ordered by Judge Vacek to reply to the Writ filed by Thomas Bartlett Whitaker, hereinafter referred to as Bart Whitaker.

I did in fact represent Bart Whitaker at his trial in 2007 in the 400th Judicial Court of Fort Bend County, Texas.

Some time in April or May, 2006, I became aware that the Fort Bend County District Attorney's office was going to seek the death penalty against Bart Whitaker. Dan Cogdell, a lawyer who I used to office with, had spoken to me about helping him select a jury in the event Bart Whitaker's case went to trial. At some point in time (before being retained by Kent Whitaker) negotiations between Dan Cogdell and the Fort Bend County District Attorney's office had broken down. I was called to Dan Cogdell's office to meet Kent Whitaker. It was my understanding that several other lawyers had been interviewing to assist Mr. Cogdell in representing Bart Whitaker. I met Kent Whitaker in Dan Cogdell's office and had a brief discussion with him regarding his son's case. Upon meeting Kent Whitaker, it was clear to me that he believed that his son committed the offense of capital murder and was upset about the fact that the district attorney's office was seeking the death penalty as opposed to a life sentence. Upon meeting Kent Whitaker, I asked him why he thought that his son committed the killings, and he responded that he thought Bart had done it just to see if he could. I informed Kent Whitaker that if that was the case, it would be very difficult to keep Bart Whitaker off of Death Row.

My first contract with Kent Whitaker was drawn up by Dan Cogdell and he set the fee for that. It was my understanding that my job was to make a court appearance and attempt to request that the State not seek the death penalty and obtain a Life sentence. In fact, the first court setting I went to I had a television interview. I told the interviewer that I was there to seek

Page 1 of 12

justice and that justice was not the death penalty for this case.  Kent Whitaker and I felt that justice would not be served if Bart received the death penalty.

I did, in fact, have several discussions with the district attorney's office and two rather lengthy meetings with District Attorney John Healey.  Present at one of those meetings was Assistant District Attorneys Fred Felchman and Jeff Strange.  I discussed with the district attorney's office my proposal to obtain two consecutive life sentences and even more sentences to be stacked and run consecutive if they would withdraw their request for the death penalty.  It became evident in those discussions that the district attorney's office felt like if they did this for Bart Whitaker, then what would they say to the next family regarding seeking the death penalty. This case was unique in that the victim and the victim's family wanted Bart to receive a life sentence, as opposed to the death penalty.  In other cases that I have handled, no victim or victim's family have ever come to the aid of a criminally accused defendant.

Part of my strategy at that time was to make the district attorney's office understand if they proceeded with a trial, it would be a long hard battle; voir dire taking up to two to three months, and the court trial to follow.  I have a great deal experience in voir dire in capital cases. My first capital defense was in 1984, and because of my ability to eliminate jurors, the State offered my client life.  Unfortunately, he refused and did in fact receive the death penalty.  I have taught Trial Advocacy at Bates School of Law with Robert Hirshorn and we taught voir dire techniques.

The meetings with the district attorney's office were an attempted by me to convince the them that, even though the evidence was overwhelming, a death penalty sentence would not necessarily be the end result of a trial, but more importantly, the fact that the trigger man in this case, as well as the getaway driver, were going to make deals and not be subject to the death penalty.  I was also aware of the fact that all of the other co-conspirators in the extraneous attempts to kill the Whitaker family by Bart, would involved no sentencing to any of those individuals as they would obtain immunity both in Fort Bend County as well as from the other counties in which they could be charged.

Part of the theme of the negotiations was to convince the district attorney's office of how unfair it was to prosecute Bart Whitaker for the death penalty when no one in victim's family wanted him to receive the death penalty.  And yet, not prosecute all the other actors that were involved, that ultimately made this offense possible.  This notion was firmly rejected by the district attorney's office of Fort Bend County.

It became obvious to me that we were headed to trial.  I had already obtained the entire discovery, including the offense report, a number of CDs with the voices of all the co-conspirators making statements to the police.  I had received all the witness statements, as well as available to me many records at the district attorney's office including the school records and many other miscellaneous records.

When it became apparent that Dan Cogdell was going to withdraw from the case, he and I drove to the location that Bart had been transferred to in Limestone County.  It was Dan who told him that Dan may become a witness, and would withdraw.  Personally, I believe Dan was

withdrawing because of his closeness and friendships with Bo Bartlett and his sister, the victim in this case. This fact is my opinion offended Kent Whitaker.

Even after the meeting with Bart Whitaker where Dan described that he would withdraw, his withdrawal was not forthcoming for some time. It was apparent that I was the lead attorney regarding making contact with the district attorney's office for plea negotiations.

Because the plea negotiations were not successful, I began to prepare for trial. I listened to all the taped conversations, reviewed offense reports and had many discussions with Kent Whitaker. Several times, Kent Whitaker came to my office and he described his life, childhood, marriage, his raising of Bart and what problems that Bart might have and what type of life that Bart lived. I believed that Kent was very forthcoming about all the information, and as I understood it, he did not understand how Bart had gone so wrong because he had every opportunity in the world.

Kent Whitaker was a religious person and a man of great faith. As the facts were laid out, it became clear that he had forgiven whoever the shooter was prior to discovering that it was in fact his son, Bart Whitaker. I believe that he thought that if he could forgive anybody else for this horrible crime, then he can also forgive his son. During these interviews, I had learned that Dan Cogdell had employed an investigator by the name of P.M. Clinton before charges were filed against Bart Whitaker, and, basically, no information was obtained that would be helpful to the defense of Bart Whitaker. I discussed with Kent Whitaker, the hiring of an investigator, and it was my belief that he did not believe that the hiring of P.M. Clinton had been successful and had been a waste of money. That is not to say that money was an issue in my decision making process of whether to hire an investigator because I was aware that even if Kent Whitaker could not afford to hire a private investigator, that the Court upon filing of an Ex Parte motion that Bart Whitaker was not capable of hiring an investigator, that it would have been incumbent upon Judge Vacek to appoint one for me. The decision I made not to hire an investigator was made because I did not see any useful information that an investigator could supply because the facts were so overwhelming that Bart was in fact, guilty, and this trial would be resolved in the punishment phase of the trial.

In my discussion with Kent and Bart Whitaker, I was never able to obtain any information that would make Bart Whitaker any less blame worthy of committing this offense. Nor was I able to find any mitigating evidence that would allow him to be any less blameworthy. I have read Dr. Harrison's report and do not find that the information that Bart Whitaker was delusional, homosexual and narcissistic to be something that makes him less blameworthy, but I do find it to be something that a jury could consider to make him a future threat.

The third issue in a capital murder scheme in Texas was the issue that evidence of some mental issue or abusive issue or something in the defendant's life that would cause him to be less morally blameworthy could be used. In other words, if he had a disease, mental illness, retardation, or something that would cause a jury to set aside a death penalty case because his conduct would not be his fault. Nowhere in the background with interviews of Kent Whitaker or anybody else make Bark Whitaker any less blameworthy for his conduct. He planned and

participated in three attempts and a final completion of the murder of his mother and brother. He even had himself shot to escape suspicion.

It came to my attention that Dan Cogdell had also employed Dr. Jerome Brown, a well known psychologist in the Harris County Court system as Dr. Brown used to work for the Harris County, county jail. I had a conversation with Dr. Brown once I was the lead lawyer in the case, and expressly asked Dr. Brown to not interview Bart Whitaker anymore.  It was my understanding that Dr. Brown did not interview Bart to the degree that he made any statements to Dr. Brown regarding this case. I am familiar with Dr. Brown and once testified against him in a competency proceeding wherein he believed that the defendant was competent to stand trial. Based on my testimony, the jury found the defendant incompetent, rejecting his testimony. I am aware of the ABA stance on mitigating evidence, and many times when mental retardation or other psychological problems are involved making the defendant less blameworthy, I think it is appropriate to retain such experts so that the jury would have some understanding of a defendant's background. My conversations with Bart Whitaker as well as my conversations with a psychologist, Dr. O'Rourke, indicated to me that there would be no evidence of retardation or psychological testimony other than the fact that Bart had previously tested in 1997, by way of the Millon test, and the results indicated that he had an antisocial and narcissistic personality. My conversations with Bart also indicated that perhaps he had this tendency for anti-social behavior as well as the lack of empathy for the feelings of others and was somewhat, in my opinion, narcissistic. In my opinion none of these qualities would assist the jury in finding he was less blameworthy, but would assist the jury in finding that he would be a continuing threat to society.

After having a discussion with Dr. O'Rourke, who also was the psychologist for Kent Whitaker, I made the determination that I would not be pursuing the third issue in the capital murder theme of mitigation and that any testimony from a psychologist would be, not only harmful, but would allow the State to bring forth evidence attempting to show that Bart Whitaker did not have a conscious, was narcissistic, and therefore, could not be remorseful for the acts that he committed.  As a trial strategy, early on, after my conversations with Bart and my understanding of the other records regarding his psychological state, I made a deliberate determination that I would not be pursuing the mitigation issue in this case, as I found no evidence of mitigation. For the record, money was not an issue; it was simply based on trial strategy, and my conversations with Kent Whitaker about Bart's background and activities as well as my understanding of the complete offense report and statements of witnesses, and my conversations with Dr. O'Rourke. This would, of course, include the records of Tarnow & Associates, Dr. Debra Stokan and Lynne Ayers. I determined that, if I could, I would prevent all this testimony from being before the trier of fact because I thought, as a matter of strategy it would be harmful to Bart Whitaker and harmful to the trial strategy that I believed I would put forth. My strategy was to show that Bart was not a future threat to society, in an attempt to have a least one juror answer the specific question regarding his future dangerousness in a negative way.

At some point in time in the Fall of 2006 it was clear that I was going to be the first chair, even though, in the event of a trial, I was still attempting to negotiate with the State a plea bargain.  The fee structure that I set with Kent Whitaker had increased to approximately $100,000 based on the prior contract that Dan Cogdell drew up and the modification made by me

as the trial attorney.  Throughout the preparation of the trial, I continued to discuss with Bart Whitaker as well as the district attorney's office the possible plea negotiations that we would be willing to do.  Also, because I knew I would be the lead chair in the case, and a final trial fee had not been set, I attempted to find other lawyers that I thought were qualified to assist me in this trial. My fee had been set at $100,000 to be paid in two payments of $45,000 and $55,000.  And that was based on the contract that Dan Cogdell had prepared.  Once it was learned that I would not be second to Dan Cogdell, I did pursue two other board certified criminal lawyers, one of which I had already tried a capital murder with, but both declined to go to Fort Bend County for what would be a rather lengthy voir dire process that would take them out of their practice for up to four months.  I offered both attorneys $75,000.  I discussed this with Kent Whitaker and, even though I did not believe that money was an issue, I was aware of his financial state that he had been bought out for approximately $300,000 from the construction company that he had worked for many years, by Bo Bartlett.  It was my understanding that the other money that I received prior to this was money that had been given to Bart as a gift from his grandmother and was Bart's money that Kent was using.  I actually set a fee of $200,000 that Kent bargained down to $180,000 to which I agreed.  If either of the lawyers had changed their mind about assisting me I would have paid them out of my fee.  The fee was very reasonable considering the time I spent on this case and the amount of time I was in Court.

It became apparent that this case would proceed to trial and the trial date being set for the later part of January, 2007.  All through the months of July, August, September, October, November and December, I was constantly preparing for trial, reviewing the massive hours of taped conversations.  It seemed like everything in this case was tape recorded by the investigating officers.  Also, a massive offense report (well over 1000 pages).  I would daily review something in preparation for trial.  However, I still had hope that if I could make jury selection hard on the district attorney's office, they would eventually accept our plea negation offer for consecutive life sentences.

In December, 2006, I received a call from Assistant District Attorney Fred Felchman indicating that Bart Whitaker had sent him a Christmas card.  Felchman felt like Bart Whitaker was asking to speak with him and Bart had made some innuendo or threat to Fred's family.  At first, I thought he was joking because Bart Whitaker had been instructed to not have any contact with any individuals.  As far as I knew, even his conversations with his dad were no longer taking place on the phone.  If they spoke on the phone they would not talk about anything to do with the case.  It became apparent to me that this cemented in Felchman's mind that this case would not ever end in a plea bargain.  Because of the Christmas card that Bart sent to the prosecutor (certainly, without advising me or his Dad) set the tone of the prosecution.  Up until that point, I truly believed that I would be able to cause lengthy litigation to occur before a jury was selected and, ultimately, receive a plea bargain.

After the Christmas card was sent to the prosecutor by the defendant, I felt like this case was going to trial.  Most voir dires I have done on previous capital cases, I had done exclusively and not allow my second chair to handle voir dire.  The reason for this is that I felt like I had to speak to every perspective juror that eventually became a juror and one does not know who is going to be a juror until after talking with the potential juror and getting a feel for him/her.  The allegations that I was not effective for not hiring an investigator, a mitigation expert or

psychologist, or second chair, in my opinion are not founded. Each decision I made, I made with a certain trial strategy and for reasons that were ultimately put into place at trial.

Regarding the Court staff saying I told them I was tired is absolutely correct. I told them on a daily basis that I was tired. The staff always treated me well, but I knew they were friends with the prosecutor and were not sympathetic to Bart Whitaker. My thought was that maybe the State would think I was tired and I would be able to get that one juror I was looking for. The truth is selecting a jury in these cases on a daily basis is a difficult and stressful situation, but not one that I have not gone through many times. Frankly, I enjoy the voir dire process of a capital murder more than any part of the trial. Be certain, at no time, because of my alleged fatigue was I ever unable to continue in the manner which applied to the theory of the case. Also, as part of the strategy, I never revealed that Bart would testify. I knew that Fred thought that the only way that Bart would receive a Life sentence would be if he testified. I tried to keep them off-balance as to my theory of the case that Bart was not a continuing threat to society.

Regarding the allegation that Bart was considered the second chair, it would be my statement that is not true. Clearly, during the voir dire process, I would talk to Bart regarding the prospective jurors. Mainly, I asked Bart with each perspective juror I thought I would select, if he felt like he could talk to this person. If he did not feel like he could talk to this person, we did not put this person on the jury. Several of the jurors were very religious and Bart was very helpful regarding scripture that I could cite to see how they felt about the scriptures. I probably did mention to Bart that this would be a good time to have second chair and that would only apply in the case where I was equivocating on whether or not to select a juror. The only juror that I can recall equivocating about turned out to be the foreman of the juror. It was opinion that the juror could be the type of person that would be strong whichever way he went. He was from West Texas, an EMT and a person who saved lives. He was also the only person on the juror who had previous jury experience. At this point in time, I wish that I had not selected him as a juror because I think he was in fact the one that convinced the other jurors not to vote to give Bart Whitaker life. And, yes, it is always nice to have a second opinion, but many times, when you have a trial strategy and it is not aligned with the other person's trial strategy, you can become equivocating on these jurors and not get a good feel for them and make mistakes in jury selections. One of the reasons that I had only two death penalty verdicts (one verdict being reversed and resentence to Life after a second trial) is because of my ability to select a jury.

The trial strategy in this case was to get as many jurors as we could to sympathetic to the religious beliefs and the forgiveness offered by Kent Whitaker and Bo Bartlett and their belief that Bart should not receive the death penalty. Also a part of that strategy would be to show how unfair it was for Bart Whitaker to be the only one to receive the death penalty with all the other co-defendants either receiving immunity, fifteen years, and the shooter, Life. Ultimately, I believe with the exception of the foreman, we did have a good jury to consider this case. In my discussions, whether true or untrue, with the jury after the trial, I was told that at one time, they were six/six regarding the first issue. My trial strategy was to at least have one hold out and Bart would receive a Life sentence. The theory presented at trial was that this was his one case and he had been obsessed with committing this crime until it was complete. Once the crime was complete, he offered no threat to anybody as he had no tools to convince people to commit other crimes. Ultimately, this was rejected by the jury, and they answered the first issue "yes".

**Page 6 of 12**

Part of the trial strategy was that we wanted to appear before the jury as taking responsibility for our actions because the evidence was overwhelming in that regard. However, one of the issues the State still had to prove was that the accomplice testimony evidence had to be corroborated. Also, as a trial strategy, I wanted to hear all the bad information up front, separating the guilt/innocence stage and the punishment stage. I reasoned that if Bart Whitaker ever plead guilty, the guilty plea itself would corroborate some of the testimony and it would be unnecessary for the jury to hear about the previous attempts at the guilt/innocent stage. In other words, on a plea of guilty, the State would only offer evidence sufficient to find him guilty of the capital murder. Then at the punishment stage, bring all these witnesses to let the jury know at that point in time how many attempts Bart had made. I did not want the jury to hear that testimony at the same time I was offering testimony from the family to spare Bart's life. As a trial strategy, I did not want to plead guilty. At no time did I discuss with Bart Whitaker entering a plea of guilty, unless there would have been a specific performance of a plea bargain. However, I came upon a strategy wherein we could under Article 26.12 of the Code of Criminal Procedure, where we could simply not enter a plea and the Judge would enter a plea of not guilty for us. I reasoned that the jury would not actually hear Bart Whitaker say "not guilty". Therefore, when he did testify, which was always going to be the case, he would not have to explain why he had pleaded not guilty. During the testimony, this somewhat backfired, as the State attempted to made a big deal about Bart not taking responsibility. I do not think this had anything to do with the jury's verdict. It was a trial strategy for Bart to not ever have to say before the jury that he was "not guilty". I do know that Bart would have pleaded guilty in the event a plea bargain was offered. The strategy was meant to accomplish separation in the Trial from his bad act and the punishment evidence from his family. It is also the reason I did not cross Kent in the guilt/innocence stage. My belief is that the State called him as the fact witness to get his pleas of mercy and the fact that Bart had changed before the jury and before the jury heard of the bad acts committed by Bart.

Regarding Ken Whitaker's statement that I said Bart was as good as any second chair, I probably made that statement. It was my way of encouraging Kent about Bart's participation in the trial. One needs to remember, Bart is a very smart person, unfortunately, very manipulative. Bart does have a way of looking at people and determining how he could use their feelings and determine whether they are lying about their feeling. Bart was useful. But the question proposed to him was "is this a person that you feel like you can talk to?" In other words, is this a person you can convince that you are in fact remorseful and not a threat because this was a onetime event for you and you are deserving of a Life sentence? Other than that, and the scriptures, Bart's participation in the voir dire was somewhat limited.

Regarding statements made in the affidavits by Bart and Kent Whitaker concerning the preparation for trial, at all times, my conversations with Bart Whitaker were in preparation of his testimony. One of the problems that Bart Whitaker's testimony presented was that he was believed by the prosecution to be a very manipulative individual. In my opinion, that belief is justified. My first conversations with Bart, it appeared to me that he was attempting to manipulate me in the common scheme and method that he manipulated individuals to participate in this offense with them by simply stating what they wanted to hear. I attempted to assist Bart by playing to his strength which is brilliant memory regarding certain individuals. Most of the

discussions with Bart were not putting words in his mouth, but trying to indicate to him how he could show himself to be a person with feelings and that he was not manipulative as the State was saying. Every conversation that I had with Bart Whitaker had something to do with him being able to convey these feelings. During the voir dire process, every day at some point in time I would have more conversations regarding his testimony. Clearly, if I was asking about if you could talk to this person regarding your feelings about this offense, and would sometime select that person as a juror, would indicate that we were constantly talking about his testimony. It is true that I would never put words into his mouth because I feel like that jury would see through that as phony. Bart is who he is. The way he represents things can only be done in his way. There were many hours of conversations with Bart regarding his testimony. Unfortunately, Bart would continue his manipulative ways and would try to see how I felt about the fact that he wanted to be an assassin after fleeing to Mexico, that of the people he hated the most was his Mother as opposed to his Father. Clearly, all the evidence indicated that he hated his Father the most during the offense, and changed his mind because his father was now helping him. Other statements by Bart were manipulating and raise only posed to test me and for him to figure out if I was really involved in his case. Even before Bart's testimony at trial, I asked him if he was up to it and if he had any questions about what our theory of the case was. He always knew he would testify at trial. I did not believe that a jury would forgive him for these horrendous acts, if Bart did not ask for their forgiveness and show he had changed and accepted his Father's forgiveness as well as forgiving his Father for whatever transgressions he had felt that his Father had made. Bart believed this as well and I believed that he was up for the task of convincing the jury he had changed. Kent believed Bart had changed. One of my concerns was that the jury might look at his father's actions as further proof that Bart was still manipulating his father in order to save his life. There was a long period before Bart was arrested that his father did not believe Bart was involved despite the Police proving the obvious. I believe that Kent could only testify in his own words about how Bart had changed. As you can read from the trial testimony, it appeared that Bart was not successful in convincing the jury that he had true remorse and had in fact changed. The most telling part of the testimony was the cross-examination regarding the Christmas card that Bart had sent Fred Felchman and Bart's explanation of it. I believed that the jury believed that the card was an attempt to manipulate the prosecutor. Therefore, the jury must have believed that Bart was not remorseful nor had he changed.

Since the trial, I have seen Bart Whitaker interviewed on Oprah and he made a statement to the interviewer that he had made to me before. The statement was he looked like a normal person, but he did not have the same feelings as a normal person. Of course, there were other indications of being antisocial, as well as being without conscious or empathy for others in a narcissistic way. Any evidence of that before the trier of fact would absolutely not be mitigating in any way, and would also show that he was a future threat to society. The offering of psychological testimony would only further produce these feelings. In my opinion, Bart would have had no chance of having any issue answered in a negative way to procure the Life sentence.

The coup de gras in my representation of Bart Whitaker was the Christmas card that he sent. He did so one month before trial. I think the Christmas card made it personal for the prosecutor, such that there would never be a plea bargain and Bart was shown, once again, to be manipulative and continue to be manipulative and indicated no change.

**Page 8 of 12**

I reasoned, as a strategy, that the only way we could overcome all the evidence as well as the Christmas card would be in Bart's own explanation of it. And to testify that we did not discuss his testimony would be a completely false statement.

Regarding the testimony of Kent Whitaker, it is true that I told him that I did not want to tell him what to say, as it would sound rehearsed. I based that statement on the fact that I had seen his statements quoted in the paper as well as heard them in my office when I was having him tell me his life story. I believed that Kent Whitaker honestly believed what he was saying and he honestly wanted the jury to spare his son's life. He also believed that God's will would be done.

Kent was called to testify by the State as their first witness. I did not question him at the guilt/innocence under the same theory that I wanted to present all of our side of the evidence at one time after the State had presented all of their most negative evidence at the guilt/innocence stage and have the two separated. Kent was the one that brought the proffer letter into evidence. The proffer letter to me was of no moment, because it was never going to be admissible and never was admissible. In fact, Bart acknowledged on cross-examination that he was not the author of the letter and the contents were not necessarily true, even though the jury did not know what the contents were. It did, however, allow us to get in our plea bargain offers to the State as well as their plea bargain with the other individuals, namely, the shooter, when they were not seeking the death penalty.

Unfortunately, when Kent Whitaker testified, it appeared to me that he was trying to appear so honest and neutral, that he did not answer the questions in a way that I anticipated he would answer, especially, regarding Kent's feelings towards the district attorney's office. His testimony appeared as if he was okay with their decision and that he understood their decision. My understanding was that we disagreed vehemently with their decision and thought they were prosecuting this case in an abusive discretion. Also, during Kent's testimony, he had always said to me that he thought Bart had changed and he had been forgiven and Bart should get a Life sentence. Kent's testimony before the jury was he couldn't tell what was in Bart's heart and Bart appeared to have change to him but that Kent did not know whether in fact Bart had changed. That testimony was less than affirming the fact that Bart, in fact, changed. Because of those answers, I limited his testimony to some degree, as I was fearful that he was going to continue the lines of being so overly fair that he was not projecting to the jury what he really, truly believed that Bart had changed and he should get the Life sentence as opposed to the death sentence because he was not a threat to anybody anymore.

When I presented Bo Bartlett as a witness, I had also discussed with him his testimony much in the same manner as I did with Kent. I basically told both to tell how they felt in front of the jury. Bo, in my estimation, did a good job of telling the jury how he (as a representative of the Bartlett family) felt. They wanted Bart's life spared. Bo Bartlett had sponsored the theory that he thought a life sentence was worse than a death sentence and that was the desire that the Bartlett family wanted in this case.

In summary, once I was retained on the case, I prepared a trial strategy in order for just one juror to believe that Bart was not a future threat. We never allowed the State to know he would testify. In fact, we indicated that Bart would not be testifying throughout voir dire. Always, Bart Whitaker was going to testify because I believed that the only way he could possible receive a Life sentence because of the horrendous crime that had been committed and the several attempts to commit the same crime in the past, would be before the jury. The only hope, in my opinion, that Bart could receive a Life sentence, was that the jury believed that after committing this crime, he was not as manipulative, he did have feelings, he did care for his father, and he was very remorseful for his conduct. That coupled with the father's plea for mercy and the forgiveness from the jury, as well as the Bartlett's family request for Life, was our complete case. Any attempt to offer the non-existing mitigating evidence or the psychological testimony, in my opinion, even to this day, would have been only harmful to Bart and helpful to the State in getting the death penalty.

In reviewing all the tactics that I applied, even at this time, I would pursue the same tactics because I do not feel there was any other alternative that would give Bart Whitaker a chance at a Life sentence. I did not feel, on a personal level, that my final argument was as good as it could have been. I, in fact, told Kent Whitaker that on the day of the argument. Not to make excuses, because I was fully prepared to make an argument, and believed that my general reputation was that I am capable of making good arguments, but I believed that the interruptions by the court reporter saying that she could not hear me, while I spoke in a soft voice to the jury, interrupted my train of thought and, sometimes I would not follow through with what I was talking about, or I would go to a different subject. I believed that the jury could hear me and the Court reporter could not hear me and some of the people in the audience could not hear me. The court room was in such a way that caused an echo when you moved from behind the lectern. I have never liked to argue behind a lectern and, therefore, I did not feel like I made the points that I felt like I should have made on my closing argument.

I have since tried a case in that same courtroom to a not guilty verdict, and my argument was always at a high tone. The problem with a capital case is when you are pleading for someone's life, it is not proper to scream at the jury. My personal feeling is that my attempts to speak to them in a soft forgiving voice would have been effective had I not been interrupted and lost my train of thought.

Once again, as far as having a second chair, it would have been nice, but most of the capital voir dires that I have done, I've done independently. Regarding the trial strategy, I really don't know of any other trial strategy that could have been forthcoming in this type of case when the evidence is so overwhelming regarding guilt/innocence and the crime is so horrific to begin with. Even though the trial was stressful with the schedule of Court voir dire of four days a week, I did not feel like I was as tired as portrayed by me to the Court staff, but in fact, was quite energized by the whole process. As a trial lawyer, I truly enjoy being in trial more than anything else. If I had it to do all over again, I still would not hire mitigation expert nor an investigator because neither one would proved valuable to any theory of the case that I could possibly come up with. In fact, I think just the opposite. If I had tried to present some mitigating evidence through psychological testimony if would have been more harmful and less likely that Bart would receive a Life sentence. I believe the difference would be to show, quite the opposite, the

fact that Bart is a manipulating psychopath and has not changed, and probably, not capable of change. That is what I believed the psychological testimony would have shown.

The only trial strategy was in fact to obtain a jury that would ultimately be forgiving and pay attention to the fact, and believe, that this was a onetime event, and since the victim's family wanted Bart to receive a life sentence, that they would answer the question that he was not a continuing threat. With the exception of the foreman of the jury, who I believed persuaded the other jurors that Bart was a continuing threat to society because he was so manipulative based on his testimony and the cross-examination regarding the Christmas card, I believed that we had a good jury. The object for the defense was just to find one juror that believed that and, until just before the verdict, I actually believed that we had been successful in doing so.

Everything that I did in this trial had a strategy and a reason and one could always second guess the strategy and reasons, but, even to this day, I believe that with all my thirty years of trial experience, I would still approach the case the same way. If I had made a better argument by connecting my thoughts, I still believe we might have been successful in obtaining a Life sentence. I still feel that the only way Bart could have received a Life sentence was if he could convince the jury that he had changed, had asked for forgiveness, that he had forgiven, and he no longer had any desires to attempt to manipulate people. Unfortunately, his testimony indicated that he was trying to manipulate the prosecutor weeks before the trial. But, I also believe that if Bart would not have testified that the jury would have been out a short period of time because of the horrendous crime that was committed and they would have imposed the death penalty.

My last comments are directed to the Writ lawyers, shortly after the trial and after their appointment, David Schulman contacted my office with a letter to retrieve my files in this case. I left my files right where they were for an entire year or longer and they never contacted me again until approximately one month before the Writ was filed. They came to my office, which I have since moved because a new person bought the building that I was working in and I moved to a different office. They only reviewed the files at that point in time and scanned them and told me I had made mistakes in the trial and wanted to know whether or not I had thought about the fact that Bart was gay or that he had an extra "Y" chromosome. I don't feel like (1) that is true as Bart denied it and, (2) I don't know what my thoughts are about Bart being gay and how that would have been effective as a mitigation tool. My personal feeling is Bart is A-sexual and sex was only a tool for him. I am not quite sure how that would fit into purposes of finding him not to be a future threat and/or less blameworthy for his crime. They suggested that there was a Dr. Harrison that was going to testify about certain things. I know Dr. Harrison as he was on my barbeque team. I know him personally and I know about his testimony. I would not have hired Dr. Harrison as my expert in this case, had I felt the need to have one. Why didn't they hire an investigator or a mitigation expert to show what I missed? If Bart has an extra "Y" chromosome, did they test him and could it be useful? The Writ lawyers had longer to prepare the Writ than I did the trial. What evidence have they produced indicating a need for an investigator and what mitigating evidence have they produced?

Ultimately, the two Writ lawyers after hiring mitigation experts (Dr. Harrison) and doing exhaustive investigations believed that Bart should have pleaded guilty to this extremely horrific crime and then agreed that he should not be executed because he has (1) delusional thinking, (2)

has multiply personalities, only created to further his narcissistic personality, (3) that he was gay or bi-sexual, and (4) finally, that because he's incapable of controlling this delusional thinking, his life should be spared.  In other words, because he's mentally incapable of conforming his disturbed thinking the jury should find this to be something making him less blameworthy and it is certainly proof that he is not a future threat to society especially based on his past conduct. Realistically, I like my theory of the case better, even now.

Finally, I state under oath that I had a definite trial strategy and then carried it out. Although I personally felt that my closing argument at the punishment phase was not as good as I hoped it would be and for this, I apologize to both Kent and Bart.  I do not feel that any of my trial strategies were unreasonable.  I still feel, to this day, that they were the only options I had in pursuing this very horrific crime.  The fact that six jurors believed, if they did, that Bart would not be a continuing threat, in spite of all the testimony that was presented, is an indication that we did pick a good jury and they were just overcome by the foreman's wishes, never to have Bart in general population and/or on the streets in his lifetime.  Other than putting the foreman on the jury, I thought the jury selection went well, despite not having a second chair, and my overall performance in the case, was a specific and a continuing trial strategy, when in fact the evidence was very overwhelming and Bart Whitaker had nothing to offer as far as any evidence to make him any less blameworthy.  The strategy was the only one I believed had a chance to work. Unfortunately, it did not.

Signed this _21st_ day of September, 2009.

_Randy McDonald_ (signature)

RANDY MCDONALD

BEFORE ME the undersigned authority, this day personally appeared Randy McDonald and by oath stated that the facts herein stated are true and correct.

SWORN TO AND SUBSCIBED before me on this the _21st_ day of September, 2009.

_Lisa McDonald_ (signature)

NOTARY PUBLIC * STATE OF TEXAS

**FILED**

2009 SEP 21 PM 12: 18

_Annie R. Elliott_ (signature)

CLERK DISTRICT COURT
FORT BEND CO., TX

LISA MCDONALD
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
OCT. 1, 2010

Page 12 of 12

# EXHIBIT "F"

MCMI-II

Interpretive Report

Theodore Millon, PhD

ID Number 1234

Male

Age 17

White

Never Married

Outpatient Never Hospitalized

9/17/97

Copyright© 1992 THEODORE MILLON, PhD. All rights reserved.
Published and Distributed Exclusively by National Computer Systems, Inc., Minneapolis, MN.

[ 2.0 / 1.0 / 1.0 ]

MCMI-II reports are normed on patients who were in the early phases of assessment or psychotherapy because of emotional discomforts or social difficulties. Respondents who do not fit this normative population or who have inappropriately taken the MCMI-II for nonclinical purposes may have distorted reports. To optimize clinical utility, the report highlights pathological characteristics and dynamics rather than strengths and positive attributes. This focus should be kept in mind by the referring clinician reading the report.

Based on theoretical inferences and probabilistic data from actuarial research, the MCMI-II report cannot be judged definitive. It must be viewed as only one facet of a comprehensive psychological assessment, and should be evaluated in conjunction with additional clinical data (e.g., current life circumstances, observed behavior, biographic history, interview responses, and information from other tests). To avoid its misconstrual or misuse, the report should be evaluated by mental health clinicians trained in recognizing the strengths and limitations of psychological test data. Given its limited data base and pathologic focus, the report should not be shown to patients or their relatives.

## INTERPRETIVE CONSIDERATIONS

In addition to the preceding considerations, the interpretive narrative should be evaluated in light of the following demographic and situational factors. This 17 year old single white man currently seen professionally as an outpatient, reports his most recent problems as Antisocial Behavior and Marital or Family; difficulties appear to have taken the form of an Axis I disorder of an unspecified duration.

The response style of this patient showed no unusual test-taking attitude that would distort MCMI-II results. The Millon Clinical Multiaxial Inventory - II is designed for use with individuals at least 18 years old. Since this individual is less than 18 years old, the resulting narrative should be interpreted with caution.

Severity of Disturbance: On the basis of the test data it may be assumed that the patient is experiencing a severe mental disorder. Further professional observation and care are appropriate. The text of the following interpretive report should be evaluated with this level of severity in mind. The salience and constancy of the characteristics described may need to be modulated upward based on this level of severity.

## AXIS II: PERSONALITY PATTERNS

The following pertains to those enduring and pervasive characterological traits that underlie this man's personal and interpersonal difficulties. Rather than focus on his more marked but essentially transitory symptoms, this section concentrates on his habitual, maladaptive methods of relating, behaving, thinking, and feeling.

Evidence of a moderate level of pathology exists in the overall personality structure of this man. He likely has a checkered history of disappointments in his personal and family relationships. Deficits in his social

attainments may be notable, as well as a tendency to precipitate self-defeating vicious circles. Earlier hopes may have resulted in frustrating setbacks, and efforts to achieve a consistent niche in life may have failed. Although he usually is able to function on a satisfactory ambulatory basis, he may experience periods of marked emotional, cognitive, or behavioral dysfunction.

This egocentric man has an inflated sense of self-importance combined with an intense mistrust of others. He exhibits provocative and abrasive behavior, an edgy defensiveness, an inclination to misinterpret the actions of others, and a tendency to project malicious motives onto presumed accusers or scapegoats. His arrogant pride in self-reliance, unsentimentality, and competitive values hides a deep insecurity about his self-worth and is employed to counteract past humiliation and rejection. Fearful of domination, he resists external influence and carefully watches to ensure that no one undermines his self-determination and autonomy. Deeply felt resentment is projected outward, precipitating frequent squabbles, antagonism, and personal and family difficulties. He views others as belligerent and antagonistic, thus justifying his defensive aggressiveness. His disputatious demeanor invariably provokes exasperation and animosity in relatives, friends, and coworkers.

His guiding principle is that of outwitting others, exerting power over them before they can exploit him. He believes that only alert vigilance and vigorous counteraction can obstruct the malice of others. Closeness to others, displays of weakness, and willingness to compromise are seen as fatal concessions to be avoided by acting self-assured, cool, and arrogant. He exhibits a willingness to court danger and risk harm and is generally fearless in the face of threats and punitive action. Criticism only reinforces his hostile and suspicious attitudes. Alcoholism or drug difficulties may be prominent. Failures and social irresponsibilities are typically justified by boastful arrogance and frank prevarications.

He may embellish trivial achievements despite the contradictions and occasional ridicule of others. A public posture of self-reliance, self-determination, and hard-boiled strength is displayed for fear that others might recognize his inner insecurity. He is characteristically touchy and jealous, and is inclined to brood and harbor grudges. Easily provoked, he may express sudden and unanticipated brutality. He may lose touch with reality at times, twisting and magnifying the incidental remarks of others into major insults and purposeful slanders. At other times, he may attempt to reconstruct reality to suit his unfulfilled grandiose aspirations. Increasingly, aggressive attitudes may become more a matter of fantasy than of reality, more delusional than acted out. Nevertheless, his desire to provoke fear and intimidate others is deeply felt and stems from a long-standing need to overcome his inner weaknesses and to vindicate real or imagined past injustices.

## AXIS I: CLINICAL SYNDROMES

The features and dynamics of the following distinctive Axis I clinical syndromes are worthy of description and analysis. They may arise in response to external precipitants, but are likely to reflect and accentuate enduring and pervasive aspects of this man's basic personality makeup.

There is reason to believe that this man is experiencing the clinical symptoms of a delusional (paranoid) disorder (e.g., irrational jealousy, ideas of reference) and that this disorder is probably set within a broad

context of other problematic characteristics and personality pathologies. Given his dispositional background, he may exhibit periods of aggressive behaviors and uncontrollable rages. Even when these are moderated successfully by medication, an undertone of surliness and bitterness remains, inclining him to be easily inflamed and unpredictable in his responses to what he perceives as the provocations of others.

For some time, this man probably has been engaged in abusing drugs, legal or street substances or both. Irritable, negative, and hostile in mood, he employs drugs not only to help him unwind his tensions and undo his conflicts but also to serve as a statement of resentful independence from the constraints of social convention and expectation. In addition to freeing him from feelings of ambivalence toward himself and others, drugs liberate him from whatever remnants of guilt he may experience over discharging his less charitable impulses and fantasies. Such defiant and hostile acts are undergirded in part by self-destructive elements. For example, these are evident in the careless disregard he may express in regard to the consequences that drugs can create.

## NOTEWORTHY RESPONSES

The following statements were answered by the patient in the direction noted in the parentheses. These items suggest specific problem areas that may deserve further inquiry on the part of the clinician.

**Interpersonal Alienation**
13. I have little interest in making friends. (True)
32. I protect myself from trouble by never letting people know much about me. (True)
150. I have almost no close ties with other people. (True)

**Emotional Dyscontrol**
26. I tend to burst out in tears or in anger for unknown reasons. (True)

**Self-Destructive Potential**
115. Sometimes I feel like I must do something to hurt myself or someone else. (True)

## PARALLEL DSM-III-R MULTIAXIAL DIAGNOSES

Although the diagnostic criteria utilized in the MCMI-II differ somewhat from those in the DSM-III-R, there are sufficient parallels to recommend consideration of the following assignments. More definitive judgments should draw on biographic, observation, and interview data in addition to self-report inventories such as the MCMI-II.

**Axis I: Clinical Syndrome**
The major complaints and behaviors of the patient parallel the following Axis I diagnoses, listed in order of their clinical significance and salience.

297.10 Delusional (Paranoid) Disorder
305.90 Psychoactive Substance Abuse NOS

### Axis II: Personality Disorders
A deeply ingrained and pervasive pattern of maladaptive functioning underlies the Axis I clinical
syndromal picture. The following personality diagnoses represent the most salient features that
characterize this patient.

301.00 Paranoid Personality Disorder
    with prominent
    Personality traits NOS (Sadistic Personality Disorder)
    and Narcissistic Personality traits

Course: The major personality features described previously reflect long term or chronic traits that are
likely to have persisted for several years prior to the present assessment.

The clinical syndromes described previously tend to be relatively transient, waxing and waning in their
prominence and intensity depending on the presence of environmental stress.

### Axis IV: Psychosocial Stressors Statements
In completing the MCMI-II, this individual identified the following factors that may be complicating or
exacerbating their present emotional state. They are listed in order of importance as indicated by the
client. This information should be viewed as a guide for further investigation by the clinician.

Authority Conflicts; Family Discord

## PROGNOSTIC AND THERAPEUTIC IMPLICATIONS

It would be advisable to attend to and ameliorate this patient's current state of anxiety or hopelessness by
the rapid implementation of supportive psychotherapeutic measures or targeted psychopharmacologic
medications. Once the patient has been adequately stabilized, attention may be directed toward the
long-term goals suggested in the following paragraphs.

This patient is unlikely to be a willing participant in therapy, most probably agreeing to therapy under the
pressure of marital, vocational, or legal difficulties. He may be in trouble as a consequence of aggressive
or abusive behavior on the job or as a result of incessant quarrels and brutality toward his spouse or
children. Rarely does he experience guilt or accept blame for the turmoil he causes. To him, a problem
always can be traced to another person's stupidity, laziness, or hostility. Even when he accepts some
measure of responsibility, he may feel defiance and resentment toward the therapist for trying to point this
out. He also may seek to challenge, test, bluff, and outwit the therapist.

He may seem to be spoiling for a fight, and appear to enjoy tangling with the therapist to prove his
strength and test his powers. He evinces an omnipresent undertone of anger and resentment, a persistent

expectation that the therapist may be devious and hostile. Because these moods and expectancies endure, he may repeatedly distort the incidental remarks and actions of the therapist so that they appear to deprecate and vilify him. He may persist in misinterpreting what he sees and hears, magnifying minor slights into major insults and slanders. These actions demand that the therapist restrain impulses to react with disapproval and criticism. An important step in building rapport with this man is to see things from his viewpoint. Therefore, the therapist must convey a sense of trust and a willingness to develop a constructive treatment alliance. A balance of professional authority and tolerance is necessary to diminish the probability that this man will impulsively withdraw from treatment.

Among specific therapeutic techniques are drugs that may modulate both the threshold and intensity of reactivity. Such changes may minimize the frequency and depth of the patient's hostile feelings and thereby decrease some of the self-perpetuating consequences of his aggressive behavior. Less confrontive cognitive approaches may provide the patient with opportunities to vent his anger; once drained of venom, he may be led to explore his habitual feelings and attitudes, and be guided into less destructive perceptions and outlets than before. Exploratory and insight-oriented procedures are unlikely to prove beneficial unless a thorough reworking of the patient's aggressive strategies seems mandatory. Behavioral methods geared to increase restraint and control may be usefully pursued. As far as group methods are concerned, the patient may intrude and disrupt therapeutic functions. On the other hand, he may become a useful catalyst for group interaction and appear to gain more constructive social skills and attitudes.

## OMITTED OR DOUBLE MARKED ITEMS

The subject did not omit or double mark any items.

**End of Report**

## MILLON CLINICAL MULTIAXIAL INVENTORY - II
### CONFIDENTIAL INFORMATION FOR PROFESSIONAL USE ONLY

ID NUMBER: 1234                                    Questionable Validity
PERSONALITY CODE:   6B 5 6A 8A ** 4 * 7 8B 1 2 + - " 3 ' ' // P ** - * //
SYNDROME CODE:   - ** T * // PP ** - * //
DEMOGRAPHIC:   1234/ON/M/17/W/N/H11/P/AN/MA/----/--/01/----/

| CATEGORY | | SCORE | | PROFILE OF BR SCORES | DIAGNOSTIC SCALES |
|---|---|---|---|---|---|
| | | RAW | BR | 35   60      75      85    100 | |
| MODIFIER INDICES | X | 474 | 85 | | DISCLOSURE |
| | Y | 14 | 67 | | DESIRABILITY |
| | Z | 7 | 52 | | DEBASEMENT |
| CLINICAL PERSONALITY PATTERN | 1 | 23 | 66 | | SCHIZOID |
| | 2 | 18 | 62 | | AVOIDANT |
| | 3 | 13 | 0 | | DEPENDENT |
| | 4 | 41 | 75 | | HISTRIONIC |
| | 5 | 73 | 116 | | NARCISSISTIC |
| | 6A | 51 | 109 | | ANTISOCIAL |
| | 6B | 64 | 116 | | AGGRESSIVE/SADISTIC |
| | 7 | 42 | 70 | | COMPULSIVE |
| | 8A | 43 | 103 | | PASSIVE-AGGRESSIVE |
| | 8B | 20 | 66 | | SELF-DEFEATING |
| SEVERE PERSONALITY PATHOLOGY | S | 17 | 64 | | SCHIZOTYPAL |
| | C | 31 | 67 | | BORDERLINE |
| | P | 60 | 115 | | PARANOID |
| CLINICAL SYNDROME | A | 5 | 37 | | ANXIETY DISORDER |
| | H | 8 | 54 | | SOMATOFORM DISORDER |
| | N | 28 | 56 | | BIPOLAR DISORDER |
| | D | 11 | 29 | | DYSTHYMIC DISORDER |
| | B | 16 | 50 | | ALCOHOL DEPENDENCE |
| | T | 41 | 76 | | DRUG DEPENDENCE |
| SEVERE SYNDROME | SS | 19 | 65 | | THOUGHT DISORDER |
| | CC | 7 | 53 | | MAJOR DEPRESSION |
| | PP | 30 | 89 | | DELUSIONAL DISORDER |

STATE OF TEXAS:

COUNTY OF FORT BEND:

TO ANY PEACE OFFICER:



GREETINGS:

YOU ARE HEREBY DIRECTED TO SERVE WITH SUBPOENA THE FOLLOWING PERSON: DR. O'ROURKE AND/OR CUSTODIAN OF RECORDS, 2825 WILCREST #520, HOUSTON, TEXAS, 77042;  TO PRODUCE;

CERTIFIED COPIES OF ANY AND ALL PATIENT RECORDS, WRITINGS, NOTES, DIAGNOSIS CONCLUSIONS, INFORMATION, VISITATION SESSIONS, PERSONAL HISTORIES, FOR ANY AND/OR ALL OF THE FOLLOWING PERSONS: KEVIN WHITAKER; WHITE/MALE; DOB: 03-19-1984; TDL#: 18344452 AND PATRICIA WHITAKER; WHITE/FEMALE; DOB: 01-07-1952; TDL#: 06073819.

TO APPEAR AND TESTIFY AS A WITNESS BEFORE THE GRAND JURY OF THE 268TH DISTRICT COURT OF FORT BEND COUNTY, TEXAS ON THE 2ND FLOOR OF THE FORT BEND COUNTY COURTHOUSE, RICHMOND, TEXAS, ON **JANUARY 5, 2003 AT 9:00 A.M.**  THIS SUBPOENA IS ISSUED PURSUANT TO ARTICLE 20.11 OF THE TEXAS CODE OF CRIMINAL PROCEDURE, AS AMENDED.

**YOU ARE NOT TO DISCLOSE THE EXISTENCE OF THIS DIRECTIVE.  ANY SUCH DISCLOSURE COULD IMPEDE THE INVESTIGATION BEING CONDUCTED BY THE SUGAR LAND POLICE DEPARTMENT AND THEREBY INTERFERE WITH THE ENFORCEMENT OF THE LAW.**

***YOU MAY COMPLY WITH THIS SUBPOENA BY PROVIDING THE AFORESAID MENTIONED INFORMATION/RECORDS TO DET. M. SLOT, SUGAR LAND POLICE DEPARTMENT, 1200 HWY. 6, SUGAR LAND, TEXAS, 77478; TELEPHONE NUBMER: 281-275-2543; FAX NUMBER: 281-275-2646.

WITNESS MY SIGNATURE THIS _29_ DAY OF DECEMBER A.D., 2003.


THE HONORABLE BRADY G. ELLIOTT
JUDGE, 268TH DISTRICT COURT
FORT BEND COUNTY, TEXAS

ASSISTANT DISTRICT ATTORNEY
FORT BEND COUNTY, TEXAS

[X] RECEIVED THIS WRIT ON THE _30th_ DAY OF _DECEMBER_____, 2003 AND
[X] PERSONALLY SERVED THE NAMED WITNESS _KRISTINA SCHUSTER_____
[ ] RETURNED THE SAME UNSERVED BECAUSE_____
_____

[ ]  _____

_____
PEACE OFFICER EXECUTING PROCESS

# EXHIBIT "G"

27C



**BROWN, NELSON, FRANK, GILES & ASSOCIATES**
6565 West Loop South • Suite 600 • Houston, Texas 77401 • 713/592-8952 • Fax 713/592-9266
1543 Green Oak Place • Suite 101 • Kingwood, Texas 77339 • 281/852-3828
714 Main • Liberty, Texas 77575 • 409/336-3899 • Fax 409/336-4098
12926 Dairy Ashford • Sugar Land, Texas 77478 • 713/592-8952

December 10, 2005

Mr. Dan Cogdell
Attorney at Law
914 Preston, 2nd Floor
Houston, TX 77002

mailed
12-21-05
sm

Re: Thomas Bartlett Whitaker (DOB: 12/31/79)

Dear Mr. Cogdell:

Mr. Whitaker was seen for psychological evaluation on December 2, 2005 pursuant to your request. It is my understanding that he is presently charged with the criminal offense of capital murder and is awaiting trial. He is accused of masterminding and participating in the murder of his brother and mother and the wounding of his father. The evaluation consisted of a clinical interview together with the administration of a battery of psychological tests, including the Minnesota Multiphasic Personality Inventory-2, Sixteen Personality Factor Questionnaire, and the Mooney Problem Checklist.

Mr. Whitaker was seen for evaluation in an attorney's booth at the Fort Bend County Jail where he is presently incarcerated. Also present was Mr. Jimmy Ardoin, one of his attorneys, who remained throughout the interview. He was presented as a well groomed and well nourished, Caucasian male appropriately dressed in a standard jail uniform. He has a neatly trimmed beard and mustache. Throughout the contact with him he was pleasant, agreeable, and responsive to all evaluation requirements. Because of his high level of cooperation, it is believed that the present results accurately reflect his basic personality characteristics and current psychological functioning.

Mr. Whitaker reported that he was born in Houston and has lived in this area all of his life. He was raised by his natural parents who were still married when the incident in question occurred. He had no siblings other than the brother who was killed. His father, who was also shot during the incident, survived.

Mr. Whitaker graduated from high school in 1998, then attended Baylor University where he completed enough hours to graduate, but did not have the right types of courses to be awarded a degree. In this respect, he reported that he changed majors several times. He last attended in 2002. He reported later in the interview that, after this, he also took some courses at Sam Houston State University and perhaps completed 10 hours. His occupational history includes working as any laborer for his father's construction business and, more recently, as beverage manager at a local country club. He had been working at this

---

Psychological Consultants to Medicine, Law, Business & Education

Jerome B. Brown. Ph.D.     Dennis Nelson. Ph.D.     Bradley L. Frank, Ph.D.     Melissa K. Giles, Ph.D.     Peter Moore. Ph.D.     Allison Moore. Ph.D

Re: T. B. Whitaker

position about one year and three months when the alleged offense occurred. He denied ever being fired from any employment.

Mr. Whitaker was living in his own home at the time his family was attacked. Also living with him was a roommate who paid him rent.

Mr. Whitaker denied ever receiving professional mental health assistance himself, but did recall attending several sessions together with family members regarding his brother who suffers from ADD. He stated that he "never enjoyed it" and would never have sought counseling himself because "I had no issues." He denied ever receiving medication for a nervous or mental disorder. He described his general physical health as good and denied that he was under a physician's care for any medical condition. However, he noted that he was also shot in the left bicep during the incident in question, and that because of this he still has metal fragments in his arm as well as some restricted movement.

As far as his use of illegal chemicals, Mr. Whitaker reported that he has tried a number of them, but has never used them on a regular or frequent basis. He estimated that he has never used any street drug more than three or four times at the most. He has never injected any chemical and has not used illegally obtained prescription medication. His alcohol use was described as a social and occasional only.

Mr. Whitaker reported being arrested once in the past when he was 17 years old. He was convicted of misdemeanor theft after he and some friends stole computers from a school. He received a probated sentence which he successfully completed in two years together with community service. He denied any other arrests.

Mr. Whitaker described his early family life and development as more or less unremarkable and benign on the surface, but as producing considerable unhappiness and feelings of rejection because of the way his parents handled him, especially in comparison to his brother. Although he described them as good providers and as treating him reasonably well, he stated that they "decided I was an independent child" who did not need their attention or affection, with whom they needed to spend little time, and to whom they needed to offer little encouragement. However, he stated that his brother, who had special problems, would be praised for any minor accomplishment ("I usually made straight As, but they only complimented me occasionally. My brother or would make C and they would throw a party.") He went on to complain that "they seemed to deny me as a person... I finally got the picture and I moved on... I stopped seeing them as parents and more as jailers." At the same time to there was not open friction between him and his parents because "I never did anything that required their attention." He denied that he was ever molested, mistreated, or abused by anyone while growing up. He also denied any episodes of violence, mental illness, drug abuse, or police arrests in the family constellation. He stated that

2

Re: T. B. Whitaker

his parents maintained a stable relationship with no separations, adding sarcastically "that would have offended the neighbors." When questioned about this, he stated that his mother was especially concerned about her image in the community, which he believed made her a hypocrite or a phony. He described his father as a "nebbish" who would do anything his mother wanted. He stated that he "never saw much to her" as he was growing up.

In school, Mr. Whitaker was an excellent student who eventually decided to attend Baylor University because he received an honors scholarship there. He denied any disciplinary difficulties, and specifically denied ever being expelled or suspended. In his mid-teens, however, he admitted stealing money and jewelry from neighborhood homes on several occasions, mainly as a "cheap thrill" more than anything else. He denied any problems with bed-wetting, cruelty to animals, or fire-setting. He was involved in some flights with peers, but no more than others. He has never maintained a collection of weapons.

Mr. Whitaker did not deny his guilt with regard to masterminding the attack upon his family resulting in the death of his brother and mother. He could not recall when he first started thinking of doing something like this, but does remember thinking about it "as a theoretical idea" while still in high school. He recalled these fantasies coming up when "I wanted them off my back." In this respect, he reported that they would bother him about coming home when he stayed out late or other minor parenting concerns to which he believed they were not entitled because they had been so uninvolved previously. These ideas continued to blossom throughout his time at Baylor University, an experienced he "hated" because of the "hypocrisy... everybody's fake there." The first couple of years he attended, he earned a 3.4 GPA, but this dropped the last two years because "I stop caring... I became totally numb." He then began to fantasize about earning a living as a drug dealer and living in Mexico, which led him to believe he no longer needed an education. He finally left school "because I got sick of it." During this time he talked about his fantasies of killing his family with a friend who then told police. However, no one believed he was serious and nothing came of it. The fantasies about becoming a drug dealer in Mexico gave him a certain degree of purpose and direction which he otherwise would not have had, and led to his taking the courses at Sam Houston State University because he thought that they might help him accomplish this.

The plan that led to be attack on his parents came together in a more concrete fashion after he met two employees working under him who "had no future... I could give them a future they would never have by themselves." He stated that he began to manipulate them by making their work difficult so they would desire even more a way out. Eventually he was able to impress them enough and they became dependent enough upon him to share his plans and become more specific about what he wanted them to do. He stated that he did not want to hire professionals or something similar because he felt he should be doing it himself. He admitted, however, that the actual incident was executed very poorly,

3

Re: T. B. Whitaker

including the survival of his father. He then stated that "I wasn't as smart as I thought I was."

Roughly six months after the incident, Mr. Whitaker realized that the police were going to discover who committed the crime. He fled to Mexico and stayed there about one year and two months. The first three months he was essentially isolated on a ranch near Monterey during which he had some extremely difficult experiences he had never encountered before. These included intense feelings of guilt, violent nightmares, and a growing realization that "I had completely wasted my life." On December 28, he tried to shoot himself with a pistol, actually pulling the trigger several times, but the weapon did not fire because it was defective. He then began to believe that somehow his life might have purpose, and began to believe that there was "a possibility of God." He left the ranch and found work as a furniture builder's assistant in a small town. He no longer had interest in material things such as nice clothes, but instead enjoyed the simple life he was living at the time. He stated that he found a few friends whom he had no interest in manipulating or using. He was discovered and arrested when he attempted to obtain false identification papers (September 2005).

Mr. Whitaker stated that his father, in spite of what he has done, has continued to be supportive and encouraging. He believes that his father has become a "serious Christian" and consequently, has forgiven him. He stated that he also wants to find God because "I do want to feel cold... I don't want to be a sociopath... I don't know how to progress from where I am."

Estimates of intellectual ability place this individual in the superior range. He also demonstrates the expected level of cognitive flexibility given his/her intellectual capacity. Individuals obtaining these scores are usually able to profit from past experiences and can utilize a counseling process to make constructive behavioral and attitudinal changes.

When given an opportunity to endorse a variety of psychological difficulties, Mr. Whitaker revealed problems with self-esteem, family conflicts, emotional turmoil, and confusion about the direction he wants his life to take and the kind of person he wants to be. More specifically, he believes that he is not smart enough, does not do anything well, feels inferior, and feels that he is a failure. He is bothered by thoughts of suicide and is unhappy too much of the time. He feels misunderstood by his family and not trusted. He feels no one cares for him and that sometimes life is hardly worthwhile. He has a troubled or guilty conscience, and gives too much in to temptation. He also reported that he is sometimes dishonest, lies without meaning to and is too self-centered. He summarized his problems by stating "I don't feel my personality is consistent.... I guess I just don't feel very concrete any more."

The psychological test results reveal high levels of emotional disturbance and intensely felt psychological conflict. He is seriously depressed and is having

Re: T. B. Whitaker

trouble controlling ideas and thoughts that he experiences as alien and disturbing. He is endorsing many items suggestive of serious psychopathology. He harbors intense feelings of inferiority and insecurity, and feels guilty about perceived failures. At the same time, he is suspicious and distrustful others and avoids emotional ties. In spite of his claims that he is adept at manipulating others, he is actually deficient in social skills and is quite limited in his ability to generate positive relationships. Although he is capable of relating to others at a superficial level,, he is uncomfortable with deeper feelings, keeping others at a safe distance in order to avoid exposing his vulnerability and insecurity. He views the world as a threatening and rejecting place, and responds by withdrawing or striking out in anger as a defense against being hurt. He has trouble accepting responsibility for his own behavior, and rationalizes excessively, blaming his difficulties on other people.

From a longer-term point of view, this young man has always been out of touch with his feelings and confused about what he wants. It is likely that his family members were always perplexed by his moodiness and unreliability. What he describes as excitement-seeking behavior has actually served as a diversion from depressed feelings and chronic insecurity. His protective mechanisms do not allow him to seek advice from others. Instead, he prefers to make his own decisions even though he does not have the wisdom or experience for these decisions to be effective.

In summary, this is a troubled and confused young man who struggles with deep-seated feelings of inferiority and inadequacy. He has never lived up to his potential because he decided at an early age that he must protect himself against any exposure to hurt and rejection by developing a façade of cynicism and pseudo-independence. He convinced himself that he could become a manipulator and could use his intelligence and superficial social skills to control others and circumvent the rules to his own needs. To protect himself in this fashion came at a high price, for he never developed the relationship with his family, especially his parents, that he actually desired, and instead pushed them away with increasing anger and disappointment that they were unable to see or to provide for him what he really needed at an emotional level. As he became more isolated and detached from the world, his plans and ideas became increasingly unreal, fantastic, and peculiar. His violent actions against his family are the culmination of this pathological process, an acting-out of rage against them that had been building for years, while at the same time also serving as a desperate, bizarre plea for the attention he desired but never received. These dynamics and the psychological reasons for this offense do not make it the typical murder-robbery that would qualify for a capital murder prosecution. In this case, the primary motivation was passion rather than profit.

Mitigating against further serious violations of the law for this young man include the absence of previous felony convictions, the absence of any arrests since becoming an adult, voluntary avoidance of street drugs, the remorse for his

Re: T. B. Whitaker

actions, his religious searching, his rejection of anti-social attitudes, and the renewed efforts at establishing a meaningful relationship with his father.

I hope this information is a value to you in working with this interesting client. Please do not hesitate to contact me if there are any questions.

Sincerely,

Jerome B. Brown, Ph.D.
Clinical Psychologist

6