# EXHIBIT "H"

FROM :CLINICAL PSYCHOLOGY CENTER        FAX NO. :7137893517          Apr. 17 2009 09:04AM P1

## Kit W. Harrison, Ph.D.

### & ASSOCIATES

NEUROPSYCHOLOGY
FORENSIC PSYCHOLOGY

CLINICAL PSYCHOLOGY CENTER
510 BERING DRIVE, SUITE 200
HOUSTON, TEXAS 77057

(713) 961-1112 (713) 961-5202 *FAX*

March 30, 2009

Mr. David A. Schulman
P.O Box 783
Austin, Texas 78767                    STRICTLY CONFIDENTIAL

*Re: Thomas Bart Whitaker; Criminal Trial Cause No. 42,969; The State of Texas vs. Thomas Bartlett Whitaker; In the District Court of Fort Bend County, Texas 400th Judicial District; Summary of Findings of Forensic Psychological Examination.*

Dear Mr. Schulman:

This is a brief summary of the findings arising out of my review of the documents provided, including my forensic evaluation of defendant as noted.   Mr. Whitaker had asked for my opinion, if possible, as to why the murders occurred and this encapsulates my response to him and addresses each of the 17 mitigating circumstances I had addressed with counsel at our lunch meeting.  Mr. Kent Whitaker and Thomas Whitaker executed releases authorizing this information to be forwarded to you, but I do not have such a release yet to forward the information to other co-counsel or to other entities. Please obtain additional authorization from the patient and Mr. Whitaker before re-releasing this information in that I have not reviewed all of these findings with either of them.

Thomas Whitaker is a 29 year old male who was evaluated January 9, 2009 while housed at the Texas Dept. of Criminal Justice Polunsky facility in Livingston, Texas.   He received a clinical interview of approximately 4 hours, mental status examination, and a battery of neuropsychological testing consisting of the Wechsler Adult Intelligence Scale-Third Ed.   (WAIS-III), Eye-Hand Dominance Test, Finger to Nose Test, Boston Dyspraxia Test, Speech Rating Scales, Reitan Aphasia Screening Test, Trails A & B, Motor Programming, Motor Inhibition, Stroop Color-Word Test, Rey's 15-Item Memory Test, Timed Sustained Attention Test (TSAT), Seashore Rhythm Test, Bender Gestalt, Validity Indicator Profile,   Rorschach Test, Thematic Apperception Test (TAT), projective drawings, and the Millon Clinical Multiaxial Inventory 3rd Ed. (MCMI-III). Testing took approximately 3 hours to complete.  The following is a summary of findings from the evaluation.   His father, Mr. Kent Whitaker, was interviewed on November 14,

FROM :CLINICAL PSYCHOLOGY CENTER        FAX NO. :7137893517        Apr. 17 2009 09:04AM P2

2008 for approximately 3 hours with a telephone .5 hour follow-up interview on February 23, 2009. His former fiancé was interviewed for two hours on February 11, 2009.

There were many remarkable findings relative to the forensic history and evaluation of this young man. Most prominent in the clinical picture was a tormented irrational self-concept and personal self-identity dating back to early childhood. Likely demonstrating early manifestations of social impairments most resembling several features suggestive of early Asperger's Disorder, Thomas was bright intellectually but absorbed in excessive reading (hyperlexia) and had very thin boundaries between fantasy and reality, a problem which exists to this day. He would assume the identities of fictional characters in elementary school, many of them dark misfits, a persona which rang resonant with his emerging social anxieties and adjustment problems. He had trouble with eye-to-eye gaze, hypersensitivity to tactile stimulation and was uncomfortable with reciprocal expressions and affection. Laughter was often inappropriate. His childhood prominently lacked an inner identity of an integrated, competent, and loved child. Thomas had the unusual and restricted range of interests which accompanies aspects of the autism spectrum, and was primarily subjectively out of social context, but also objectively out of context with family and peers. He was drawn to a rich inner fantasy world and became increasingly feminine in his interests, speech, and behavior when he was 6 or 7 years old he had a romantic interest in a male peer and one day kissed him in secret. In the meantime, Thomas perceived that he resided in an affluent and image-oriented family and community—he simply did not fit into an upscale suburban polo-shirt community, he said. His father would put a spray of dollar bills on his bedroom door so that if he talked like a boy that day he would get one dollar. There was intolerable pressure, both internally and externally, to be something he was not.

Thomas' younger brother, Kevin, was macho, athletic, seemed to strive to entire mainstream school life but academics and intellectualism were a struggle for him. Thomas resented his brother for many reasons, but his brother was a boy in all ways, and Thomas liked to read. He liked to shop, primp, and was very socially anxious, but was sarcastic, negativistic, and angry at the same time. Engaging in intense social comparison, Thomas realized he could act like his brother, act the way his parents wanted him to be, and that he could experience a dual life.

Another reason Kevin was not like him was because there had been an increasingly deepening fracture in the nuclear and extended family between the Whitaker side of the family (father) and the mother's side of the family, the Bartletts. Thomas was acutely aware of open conflict and acrimony of long duration between his father and his mother's parents, in all aspects of life. Dualism became a family trait as underlying resentments and polarization of family identity culminated in Thomas witnessing his parents investing more and more time and money in concealing family issues. As the first born and oldest offspring to that family feud, much of the psychological angst became infused and internalized in him. Even his birth name was a vain attempt to achieve continuity and unity between the two families, he believed. Thomas Bartlett Whitaker— even his name

Page 3 of 6
Confidential
State of Texas vs. Whitaker

was a lie, he concluded. He so hated that he was also a Bartlett inside and shared his
mother's and brother's genetic curse, much more like a Whitaker (his father) in many
ways, and so much unlike his brother and mother (Bartletts), that he lacked any ability to
nullify the conflict, make peace with his inner self, or rationalize or intellectualize the
problem away. Thomas became increasingly enthralled with the delusional idea that if
you became someone else, acted like someone else, he could achieve inner fulfillment
and self-acceptance. Disavowing his Bartlett genes, he began informing peers in high
school that he was adopted. Increasingly out of touch with reality, paranoid, and
delusional he began informing closer friends that he was in training for military
intelligence operations and was in training for a unique government program which
identified gifted children for training as a spy. He starting having ideas of reference that
he would never be free to be himself in the Sugarland, Texas as a Bartlett or a Whitaker
in an expanding culture of narcissism. He began hating his brother, mother, and to a
lesser degree, his father. Father seemed oblivious to his deepening feelings of alienation,
psychotic thinking, and oppositional behavior. Conformity to the family image was the
only important value left in his family, he perceived. No one really understood him at
that time in high school. He dated a few girls, including a love interest, Lynne Brace, in
high school who personally observed Thomas' decline in functioning. Affectionate and
romantic at first, Thomas attended to her needs while simultaneously experiencing
grandiose and delusional thinking. She loved him and thought he could provide a future,
both financially and emotionally. Thomas' mother did not like Lynne because she was
not feminine enough, was not socialite material, and did not like to wear make up. She
was not a prom queen.

After high school he became more reclusive, bizarre, and reckless. He started affiliating
with unusually dark misfits, "computer nerds, and weird people." She evidenced an
increasing relegation to the social fringes accompanied by frank lying and latent interests
in homosexual relationships, she stated. She confronted him about cheating on her with
both men and women. He had a certain charisma about him which attracted men and
women, she said. Thomas noted that while taking methamphetamine he felt more
competent and socially adept. Thomas' sexual performance significantly declined as he
was increasingly involved with various male roommates in college and afterwards,
culminating in erectile dysfunction. As Thomas became increasingly disorganized
within, his parents provided more of the unearned trappings of wealth: A condominium
on Lake Conroe, expensive cars, and a Rolex for "graduation" from Sam Houston State
University, which was a also ruse, on the night of the killings.

One persona was superficially appropriate and the other dark, confused, and conflicted.
Never realizing such could ever work for him, he experienced increasing inner turmoil
and upheaval, self-loathing, and increasingly desperate attempts to appear normal. In the
meantime he experienced increasing paranoia fearing the ridicule, hating the perceived
rejection he encountered at every life's turn.

In college Thomas made "segues" to party in Dallas under an alter ego, "Sebastian Cole,"

FROM :CLINICAL PSYCHOLOGY CENTER        FAX NO. :7137893517        Apr. 17 2009 09:05AM P4

and further assumed a dual lifestyle in response to faltering adult functioning and tormenting conflicts about identity, both personal and sexual. Cole was a fictional character he had read about as a child who was a con artist and could manipulate others easily. During this period of time he was deepening a problem with substance abuse, which exacerbated his delusional thinking, which consisted of the belief that if he was never born from his family, he would have a normal and happy life. He concluded if he had not been born, or could otherwise erase his genetic past, he could at least have a chance of happiness someday. The added benefit would be that if his family was eliminated he would also inherit a lot of money. The accumulative net result of this type of thinking amounts to "autistic cleansing" of two decades of dysfunctional intrapsychic, intrafamilial, and interfamilial acrimony.

He had many discussions with his roommate at Baylor University, Justin, a later co-conspirator, about eliminating his family for psychological and economic benefits. During this time a romantic issue emerged in the relationship with Justin which caused some panic and distress for Thomas around the time of the murders. There were later allegations that Thomas was possibly in a sexual liaison with a male roommate at Lake Conroe. The other man was the shooter, Chris Brashear. His fiancé confronted Thomas about this after she saw significant changes in his behavior and intimate relations with her.

There is ample evidence that insurmountable and intra-punitive personality dynamics became psychotically projected onto his family of origin. Thomas' finance described the home as compulsive, unloving, and lacking nurturance, and was instead focused on external trappings. She reported after Thomas had burglarized the school, Ms. Whitaker refused to grocery shop in the entire Sugarland region out of humiliation.

Additionally, with regard to problem-solving and executive functioning, Thomas demonstrates many problems, both social and psychological, associated with being affiliated with third-generation wealth.

Although Thomas had many of the benefits of a rather homogeneous suburban community during the formative years, the lack of many aspects of an urban environment with its relatively widely diverse cultural and socioeconomic demographics contributed to his perception of a ubiquitous culture of narcissism. Thus, he lacked outlets to alternative demographics which may have diffused many of his early social and psychosexual problems and provided a greater inner cohesion, reducing subjective panic.

The public school system had many opportunities to identify Thomas as an at-risk child and assemble a special educational program, or alternative services under Sec. 504 of the Texas Education Agency (TEA), to address his insidious social and defiant attitudes and behaviors. A psychological evaluation conducted by the school would have revealed many of his emerging issues with delusional content of thought and diminishing coping. Instead, the school system expelled Thomas absent an assessment of his needs,

FROM :CLINICAL PSYCHOLOGY CENTER          FAX NO. :7137893517          Apr. 17 2009 09:05AM P5

Page 5 of 6
Confidential
State of Texas vs. Whitaker

potentially depriving him of his rights to a free and appropriate public education.

While attempting in vain to keep Thomas in Clements High School, the parents engaged the services of a psychologist who evaluated him and his needs. A psychological test of Thomas, performed by a retained psychologist on September 17, 1997, revealed "this man is experiencing the clinical symptoms of a delusional (paranoid) disorder." The report narrative discussed the benefits of medication which would "modulate the threshold and intensity of reactivity." Thomas never received any benefit from antipsychotic medications which are well known for their efficacy in managing such symptoms. The doctor testified at the time of trial that the test was designed for adults and Thomas was 17 years of age at the time, thus the validity was questionable. In my opinion, the test had typical accuracy for which the test is well-known and describes with uncanny detail, Thomas' state of mind at that time. Had the school performed appropriate testing they would have likely found the same details or they already knew of his problems and failed to address them with any number of appropriate eligibilities for services, such as "student with an emotional disturbance," or any other number of eligibilities. Instead, he got no diagnostic help or treatment. It is public policy to identify at-risk children as early in the educational process as possible.

Although there was much concern for Kevin and his history of attention-deficits, including a thorough treatment program through the Tarnow Center in Houston, Texas, the psychotic brother escaped scrutiny, perhaps because he got good grades in school. That Thomas attended a more strict religious educational program at Fort Bend Baptist Academy was like jumping from the pot into the fire for him psychosocially, encountering a tighter spectrum of oppressive and non-responsive culture there than he had experienced at Clements High School.

Thomas sustained two closed head injuries, one in 1999 with no loss of consciousness and the other in 1995 while playing sports with loss of consciousness. There is a poverty of information about what impact these mild brain injuries had on Thomas, although there is no significant evidence of organic impairment on present testing. He had peripheral nerve damage on the left arm due to an injury while working out in the prison. He was otherwise reported to be in good health.

*Formal Diagnostic Impressions*

| | |
|---|---|
| AXIS I | Delusional Disorder, Mixed Type |
| | Mood Disorder NOS |
| | |
| AXIS II | Personality Disorder NOS |
| | With Paranoid, Narcissistic, and Antisocial Features |

FROM :CLINICAL PSYCHOLOGY CENTER      FAX NO. :7137893517      Apr. 17 2009 09:06AM  P6

Page 6 of 6
Confidential
State of Texas vs. Whitaker

| AXIS III | Peripheral Neuropathy (Traumatic) |
| | Serial Concussion-TBI |

| AXIS IV | Problems with Primary Support, Incarceration |
| | Medical and Psychiatric Oversight; R/O Educational Neglect |

| AXIS V | Global Assessment of Functioning (GAF) |

| | Current | 40 |
| | Past Year | 35 |
| | Offense | 25 |

Thomas is in his 29th year of life demonstrating a psychotic disorder and has yet to obtain appropriate medical management. Treatment is immediately indicated with a combination of antipsychotic medication and mood elevators as recommended by his psychiatric physician. That these murders were motivated solely by greed is not supported whatsoever.

Individual and group psychotherapy would be the indicated treatment for psychological manifestations of the diagnosis in order to achieve integration of core self-identity and reversal of distorted reality and chronic thinking errors.

This information is of the type that a jury typically requires and relies upon while opining on punishment phase after a violent crime.

If you have any questions concerning this narrative please do not hesitate to ask. Thank you for allowing me the opportunity to participate in this interesting review.

Sincerely,

Kit W. Harrison, Ph.D.

# GROUP
# EXHIBIT "I"

STATE OF TEXAS:

COUNTY OF FORT BEND:



TO ANY PEACE OFFICER:

G R E E T I N G S:

YOU ARE HEREBY DIRECTED TO SERVE WITH SUBPOENA THE FOLLOWING PERSON: DR. O'ROURKE AND/OR CUSTODIAN OF RECORDS, 2825 WILCREST #520, HOUSTON, TEXAS, 77042;  TO PRODUCE;

**CERTIFIED COPIES OF ANY AND ALL PATIENT RECORDS, WRITINGS, NOTES, DIAGNOSIS CONCLUSIONS, INFORMATION, VISITATION SESSIONS, PERSONAL HISTORIES, FOR ANY AND/OR ALL OF THE FOLLOWING PERSONS: KEVIN WHITAKER; WHITE/MALE; DOB: 03-19-1984; TDL#: 18344452 AND PATRICIA WHITAKER; WHITE/FEMALE; DOB: 01-07-1952; TDL#: 06073819.**

TO APPEAR AND TESTIFY AS A WITNESS BEFORE THE GRAND JURY OF THE 268TH DISTRICT COURT OF FORT BEND COUNTY, TEXAS ON THE 2ND FLOOR OF THE FORT BEND COUNTY COURTHOUSE, RICHMOND, TEXAS, ON **JANUARY 5, 2003 AT 9:00 A.M.**  THIS SUBPOENA IS ISSUED PURSUANT TO ARTICLE 20.11 OF THE TEXAS CODE OF CRIMINAL PROCEDURE, AS AMENDED.

**YOU ARE NOT TO DISCLOSE THE EXISTENCE OF THIS DIRECTIVE. ANY SUCH DISCLOSURE COULD IMPEDE THE INVESTIGATION BEING CONDUCTED BY THE SUGAR LAND POLICE DEPARTMENT AND THEREBY INTERFERE WITH THE ENFORCEMENT OF THE LAW.**

***YOU MAY COMPLY WITH THIS SUBPOENA BY PROVIDING THE AFORESAID MENTIONED INFORMATION/RECORDS TO DET. M. SLOT, SUGAR LAND POLICE DEPARTMENT, 1200 HWY. 6, SUGAR LAND, TEXAS, 77478; TELEPHONE NUBMER: 281-275-2543; FAX NUMBER: 281-275-2646.

WITNESS MY SIGNATURE THIS _29_ DAY OF DECEMBER A.D., 2003.

THE HONORABLE BRADY G. ELLIOTT
JUDGE, 268TH DISTRICT COURT
FORT BEND COUNTY, TEXAS

ASSISTANT DISTRICT ATTORNEY
FORT BEND COUNTY, TEXAS

[X] RECEIVED THIS WRIT ON THE _30th_ DAY OF _December_ , 2003 AND
[X] PERSONALLY SERVED THE NAMED WITNESS _Kristina Schuster_
[ ] RETURNED THE SAME UNSERVED BECAUSE_____

[ ] _____

_____

PEACE OFFICER EXECUTING PROCESS

THE STATE OF TEXAS

V.

_____

IN THE DISTRICT COURT

FORT BEND COUNTY, TEXAS

268th JUDICIAL DISTRICT

### AFFIDAVIT

Before me, the undersigned authority, personally appeared  BRENDAN  O'ROURKE , PhD

who being by me duly sworn, deposed as follows:

My name is  BRENDAN  O'ROURKE , PHD .  I am of sound mind,

capable of making this affidavit, and personally acquainted with the facts herein stated:

I am the custodian of records of  BRENDAN  O'ROURKE , PHD .  Attached

hereto are  118  pages of records from  PATRICIA WHITAKER (48 pages) AND KEVIN WHITAKER (70 pages)

These said  118  pages of records are kept by  BRENDAN  O'ROURKE , PHD

in the regular course of business, and it was the regular course of business of  BRENDAN O'ROURKE PHD

_____ for an employee or representative of  BRENDAN O'ROURKE , PHD

_____, with knowledge of the act, event, condition, opinion, or

diagnosis, recorded to make the record or to transmit information thereof to be included in such

record; and the record was made at or near the time or reasonably soon thereafter.  The records

attached hereto are the original or exact duplicates of the original.

_____
AFFIANT

SWORN TO SUBSCRIBED before me on the  5th  day of  JANUARY ,  2004

My Commission Expires:

MARSHALL SLOT
MY COMMISSION EXPIRES
November 4, 2007

_____
NOTARY PUBLIC

*12/21/06  2:10pm*
*M requesting details*
*(3rd charge)*

**SUBPOENA**

**THE STATE OF TEXAS**
**VS**
**THOMAS BARTLETT WHIT**

*Feb 12*

CAUSE NO. **42,969**

**TO ANY PEACE OFFICER OF THE STATE OF THE TEXAS, OR ANY**
**YEARS OLD AND NOT A PARTICIPANT IN THE PROCEEDINGS - GI**

You are hereby commanded to summon

**DR. BRENDON O'ROURKE PH.D.**
**2825 WILCREST, STE. 520**
**HOUSTON, TX 77042**

to be and personally appear **February 12, 2007** at                      , before the Honorable **400TH** District Court of Fort Bend County, Texas to be held within and for said County at the courthouse thereof, in Richmond, Texas, to testify and speak the truth on behalf of the State in the above styled and numbered cause, now pending in said Court, and to remain there from day to day, and from term to term, until discharged by said Court.   The above named witness is further commanded to produce at said time and place above the following books, papers, documents or other tangible things:

**PLEASE BRING ALL RECORDS RELATING TO THE DIAGNOSIS AND TREATMENT OF PATIENT, THOMAS BARTLETT WHITAKER, D.O.B. 12/31/79.**

Herein Fail Not, and make due return, showing how you have executed the same.

Please contact **JEFF STRANGE (281) 341-3781** of the District Attorney's Office, upon receipt of this subpoena.

NOTICE TO OUT OF COUNTY WITNESSES: "A DISOBEDIENCE OF THIS SUBPOENA IS PUNISHABLE BY A FINE NOT EXCEEDING FIVE HUNDRED DOLLARS TO BE COLLECTED AS FINES AND COST IN OTHER CRIMINAL CASES."

Witness my official signature at Richmond, on **November 9, 2006.**

DISTRICT CLERK GLORY HOPKINS

# EXHIBIT "J"

Cause No. 42969

| | | |
|---|---|---|
| EX PARTE | § | IN THE 400TH DISTRICT COURT |
| | § | |
| | § | OF |
| | § | |
| THOMAS BARTLETT WHITAKER | § | FORT BEND COUNTY, TEXAS |

<u>AFFIDAVIT OF JEFFREY THOMAS STRANGE</u>

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF FORT BEND | § |

BEFORE ME, The undersigned authority, on this day personally appeared Jeffrey Thomas Strange, who, after being by me duly sworn, deposed on his oath and stated as follows:

My name is Jeffrey Thomas Strange. I am over 18 years of age and am mentally capable of making this affidavit. I am an attorney licensed in the State of Texas to practice law since May 4, 1990. My bar number is 19355650. I have been board certified in Criminal Law since 2000 and have been employed as an Assistant District Attorney in Harris, Cameron and currently, Fort Bend Counties. I have been counsel in over 200 criminal jury trials.

I am one of the prosecutors, along with First Assistant District Attorney Fred Felcman, assigned to prosecute Thomas Bartlett (Bart) Whitaker. My involvement with the case began approximately January 2005 when I began assisting Sugar Land Police with their investigative efforts.

Obviously, the Court will have to make its own conclusions regarding defense counsel Randy McDonald's effectiveness. However, I would like to state that I have known Randy McDonald since 1990 when I started practicing law. I know him to also be board certified in criminal law. My impressions of Mr. McDonald are that he has always been a highly competent attorney and that his reputation in the local legal community is that he is a highly competent criminal attorney. Nothing about my experience with Mr. McDonald during the time we spent resolving the Whitaker case has changed my opinion of him.

Reading Mr. Cogdell's affidavit surprised me in several regards. It was my understanding that when Mr. Cogdell felt it necessary to withdraw as Bart Whitaker's attorney, Mr. McDonald was retained by the Whitaker family on his recommendation. I do not remember whether I learned this from a conversation with Mr. McDonald or Kent Whitaker but I do remember the conversation.

1

I was the prosecutor assigned to work with Mr. McDonald during the discovery process before jury selection. Mr. McDonald was provided either digital or hard copies of the following: the entire Sugar Land Police Department's offense report regarding the murders including all supplements, all photographs taken by law enforcement officers, all witness statements, recorded or written, all video taken by law enforcement agents, and copies of all lab reports. There were a number of third party consent calls conducted by Sugar Land Police between cooperating witness Adam Hipp and Thomas Bartlett Whitaker. Mr. McDonald was provided copies of these recordings. The state obtained an order to tap the cellular phones of Co-defendants Chris Brashear and Steven Champagne, Mr. McDonald was provided copies of all intercepted conversations. Mr. McDonald was provided copies of Thomas Bartlett Whitaker's counseling records with Lynn Ayers and Psychiatrist Dr. Brendan O'Rourke who performed the Million Multi-Axial Clinical Inventory Test on Mr. Whitaker in 1997 following his arrest for burglary of a building. If my memory also serves me correctly Mr. McDonald was also provided photocopies of Thomas Bartlett Whitaker's prior burglary case reports in which he was ultimately placed on deferred adjudication.

Due to the massive nature of the police investigation copies of a number of documents and records were kept in approximately 8 three ring binders. Many documents contained therein were irrelevant to the prosecution of the case; for example, the victim Kevin Whitaker's school records etc. Mr. McDonald was provided unlimited access to these materials and visited our office and spent time reading them on several occasions. I requested that Mr. McDonald paperclip any document he deemed helpful so I could provide him a copy. I remember Mr. McDonald had me copy some of the documents for him however I do not remember exactly what I copied and provided Mr. McDonald.

Several weeks before the trial of the case I went to the Sugar Land Police Department and checked out all of the physical evidence collected in the case as well as the evidence log sheets generated by S.L.P.D. Mr. McDonald, on a couple of occasions, met me in our conference room, wearing rubber gloves, to observe and inspect all physical evidence collected. Occasionally Mr. McDonald had relevant questions regarding the chain of custody or testing of evidence. I remember on a couple of occasions having to get back with Mr. McDonald after visiting with police or a lab tech to accurately answer a question he had. Mr. McDonald further met with the lead detectives, Marshall Slot and Billy Baugh and had the opportunity to ask questions to clear up any issues unresolved by the offense reports. 1 short, Mr. McDonald had duplicates or access to all of the information that Fred and I had available to us. In my presence Mr. McDonald was diligent in his discovery efforts. The questions he asked me indicated a full grasp of the evidence confronting Mr. Whitaker and at no time did I consider Mr. McDonald unprepared to represent Mr. Whitaker.

During a pre-trial conversation with witness Rudy Rios I was informed that while hiding in Mexico Bart Whitaker had assisted Mexican police when a small stream flooded, possibly saving a life. As this was a death penalty case this was deemed relevant mitigating evidence and thus was provided to Mr. McDonald immediately. Due to the

difficulty of corroborating this evidence and the obviously difficulty to produce any such witnesses for court I put this information before the jury during Mr. Rios' direct examination during the guilt/innocence stage of the trial. Though this information was later determined to be untrue, it was deemed appropriate to put before the jury because of the context of the case and the consequences, and the favorable working relationship we had developed with Mr. McDonald.

I would next like to address the allegations of prosecutorial misconduct alleged in the Petitioner's Application. I was not present during the conversation that Mr. Felcman, Mr. Cogdell, and Mr. Ardoin apparently had at a Best Buy store. I could not imagine any circumstance where Mr. Felcman would have committed the office to a position without discussing it with the elected District Attorney, John Healey and myself who was co-counsel at the time of the conversations. I participated in two formal meetings with Mr. Cogdell that included the District Attorney; Mr. Felcman was present for only one of the meetings I believe. At no time was anything represented to Mr. Cogdell in my presence. The meetings were simply an opportunity to hear Mr. Cogdell's position and answer any questions that he may have.

At no time was a plea offer of life imprisonment seriously discussed in my presence with Mr. Cogdell nor do I know of any such discussions. Mr. Cogdell's position simply was the death penalty was inappropriate because of the wishes of the Whitaker and Bartlett families. At no time was there any discussions of Bart Whitaker's mental health issues nor, more importantly, did Mr. Cogdell ever represent that Bart Whitaker would ever accept a life sentence on a capital murder charge. After meeting with Mr. Cogdell and speaking with Fred about his contacts with Dan we came to the conclusion that Mr. Cogdell was attempting to get us to take the death penalty "off the table" so he could then start negotiating for a period of years on a possible murder plea.

We also met with Kent Whitaker and Bo Bartlett on at least a couple of occasions before we ultimately decided to seek the death penalty. Mr. Bartlett clearly had no love lost for Bart Whitaker. He stated that he did not want us to seek the death penalty to avoid the pain it would put his family through and the embarrassment a trial would bring. Kent Whitaker spent a lot of time telling us how Bart had truly changed while in was in Mexico and incarcerated in the Fort Bend County Jail. As we were aware of Bart Whitaker's history of chameleon-like manipulation, and his controlling relationship with his father we were obviously skeptical.

From the time Bart Whitaker was arrested in Mexico we felt he posed a potential danger to his father, Kent Whitaker, and his co-defendants, Steven Champagne, and Chris Brashear. Additionally, we discussed the possibility that Bart Whitaker would attempt to have someone recently released from jail harm Fred or myself.

Fred Felcman never discussed obtaining a "proffer of evidence" in my presence until he was given the document by defense counsel. Fred repeatedly stated to Mr. Cogdell during our discussions that he would like to see some sign that Bart Whitaker had changed or showed some legitimate, genuine remorse. This was based on our

3

conversations with Kent Whitaker. During one conversation I remember Fred stating that if he (Bart Whitaker) felt so bad about his crime he would have confessed or words to that effect. I believe this is where the proffer of evidence came from. I remember when Fred told me about receiving the proffer of evidence that he was somewhat surprised as he did not expect it coming. I did not expect it either.

Reading the proffer it was clear that it had been prepared by Mr. Cogdell's office and did not reflect the words of Bart Whitaker. It appeared they drafted it to make us feel sorry for him. I understand that no competent attorney would have their client prepare a document that could be used as evidence in a death penalty case. The fact the document proffered no real information is evidence that defense counsel had no expectation that the "proffer" was dispositive of anything.

Dan Cogdell has always been honorable in my dealings with him and I know him to be a first-rate attorney. I believe he came into our negotiations believing Fred Felcman and myself were less sophisticated than the prosecutors he regularly works with in Harris County, where his practice is located. At no time did he ever suggest that his client would plead to Capital Murder in exchange for a life sentence. I believe the proffer of evidence was his attempt to "finesse" Fred's legitimate concerns about his client and possibility that he posed a future danger. We fully understood that Mr. Cogdell was just doing his job protecting and representing his client in a capital murder case where the death penalty was being seriously considered. The document had no evidentiary value nor did it influence our decision to seek or not seek the death penalty

After we announced our decision to seek the death penalty Mr. McDonald met with Mr. Felcman, Mr. Healey, and myself and told us that Bart Whitaker would plead guilty to Capital Murder in exchange for a life sentence. This was the first time that anyone told us that Bart Whitaker would plead to anything. We subsequently visited with Kent Whitaker and Bo Bartlett to again discuss the issue and consider their points of view but obviously did not change our minds.

The decision to seek the death penalty against Bart Whitaker was made by the District Attorney, John Healey, as the law requires. John invited and considered Fred and my positions. We also thoroughly discussed what we anticipated the evidence would show at trial. After a couple days of discussion John told us he wanted to sleep on it and informed us the next day that he thought is was appropriate to seek death. The proffer of evidence was never a serious topic of discussion, if it was mentioned at all. If anything, Mr. McDonald's straightforwardness bought his client some good will that made our decision to seek death more difficult.

There was nothing inappropriately considered in our decision to seek the death penalty against Bart Whitaker. The decision was thoughtfully made after a careful discussion of the facts of the case and appropriate equitable considerations. The wishes of the Bartlett and Whitaker families were discussed and thoughtfully considered. We thought we had a strong guilt/innocence case and that we could in good faith prove the three relevant special issues beyond a reasonable doubt.

4

Briefly addressing the Petitioner's allegations that Mr. McDonald was ineffective in failing to present a mitigation defense based upon Mr. Whitaker's alleged mental health issues. In short, as a matter of trial strategy, this is exactly what we wanted him to do. We had access to reports prepared by Dr. Brenden O'Rourke and Lynn Ayers that had been provided to us by the Sugar Land Police Department. Obviously both reports had not been prepared in anticipation of capital litigation and both reports bolstered our position that Bart Whitaker posed a future danger. Dr. O'Rourke performed the afore-mentioned Million Multi-Axial Clinical Inventory Test on Whitaker which we attempted to introduce in evidence before the jury as evidence of his future danger. As the record indicates Mr. McDonald was able to suppress its introduction.

Had Mr. McDonald attempted to introduce evidence of Bart Whitaker's mental condition we would of course, had our own expert evaluate Whitaker for use in our rebuttal case during the punishment phase. The submitted petition is rife with speculation about what the results of an evaluation would have been. It is also my belief that a litigant can find an expert witness to provide evidence under Rule 702 that will come up with any conclusion the litigant wants them to reach. However, there is no reason to conclude that subsequent appropriate evaluations would have revealed a different result that the conclusions reached by Ms. Ayers and Dr. O'Rourke.

In my professional opinion spending the juries time listening to experts discuss Whitaker's mental condition would have weakened the effect of one of the victims and the brother of another victim pleading for Whitaker's life. Paid expert witnesses as the Court is aware are a mixed bag. If the expert's testimony before the jury strained credibility it is likely that the person who paid for the testimony, Kent Whitaker, also would have lost credibility.

In this case, in this jurisdiction, Mr. McDonald's trial strategy was not unreasonable. Both Kent Whitaker and Bo Bartlett are likeable decent men whom the jury related to. They had logical, articulable reasons why Bart Whitaker should not be executed. As this is a very religion oriented community and Kent Whitaker's story of forgiveness and redemption made the jury's decision heartbreaking, most had tears in their eyes when they returned to the courtroom to deliver their verdict. Attempting to mitigate Bart Whitaker's conduct with retained, "pop psychology" would have lessened that effect.

I would also like to briefly address the claims that Mr. McDonald's trial strategy was inconsistent or somehow defective. As all parties stipulate, our guilt/innocence case was strong if not overwhelming. Mr. McDonald, in a pre-trial motion, had attempted to keep us from introducing evidence of two prior unsuccessful murder conspiracies in which Bart Whitaker had plotted to kill his family. As the plots were essential the same as the plan of the successful 2003 murders, Judge Vacek properly allowed to present such evidence before the jury.

5

Most of the evidence presented to the jury regarding the prior plots was through the testimony of Adam Hipp, Will Anthony, and Justin Peters. However, all three had participated in the plots and testified only under the promise of immunity from prosecution. Additionally, our main witness to Bart Whitaker's involvement in the successful murder plot was Steven Champagne who also testified under an agreed plea that included his cooperation as a condition. As all of these witnesses were accomplices, under Texas law their testimony needed to be corroborated with some evidence that directly linked Bart Whitaker's involvement in the murders.

Mr. McDonald's trial strategy was clearly to make a legal argument that the accomplice testimony was not sufficiently corroborated to sustain a conviction. Mr. McDonald basically had three choices. To contest our entire case, to plead guilty to the jury then let them decide punishment or to make the legal argument that he did.

Mr. McDonald's strategy allowed him to develop testimony without questioning the veracity of police officers and other witnesses the jury would relate to. Mr. McDonald also had the opportunity to develop the culpability of the accomplice witnesses to make the equity argument he ultimately made during the punishment phase. The State of Texas gave three witnesses immunity on potential charges of conspiracy to commit capital murder and a 15-year agreed sentence to a party to the offense who was guilty of capital murder. All of this was necessary to secure their cooperation in the prosecution of Bart Whitaker. In my professional opinion Mr. McDonald's strategy was reasonable and obvious under the circumstances. A reading of my punishment final argument clearly shows my efforts to preemptively deal with the issue before Randy had a chance to make his argument.

Respectfully submitted,

Jeff Strange

SWORN TO A SUBSCRIBED before me on this the 21st day of MAY 2009.

YOLIE L. GARCIA
Notary Public, State of Texas
Commission Expires 03-27-2011

Notary public, State of Texas

6

# GROUP
# EXHIBIT "K"

Subj:     **Randy McDonald**
Date:     1/4/2007 1:44:32 PM Central Standard Time
From:     kentwhitakernx@yahoo.com
To:       DrORourke@aol.com

Dear Dr. O,
    Randy's office number is 713.521.2585. Let me know if you have any trouble, because I have his cell phone number somewhere and I will look for it.
    Kent
    ps Thanks for seeing me again today!

Do You Yahoo!?
Tired of spam? Yahoo! Mail has the best spam protection around
http://mail.yahoo.com

**✳ DSM-IV Criteria for Antisocial Pers**

pervasive pattern of disregard for
and violation of the rights
of others occurring since 15yo

3 or more:

1. failure to conform to social norms
   w/respect to lawful behaviors
   as indicated by repeatedly
   performing acts that are grounds
   for arrest

2. deceitfulness as indicated by
   repeated lying, use of aliases,
   or conning others for personal
   profit or pleasure

3. impulsivity ~~and aggressiveness~~ or failure to plan ahead
   ~~as indicated by repeated~~
   ~~physical fights or assaults~~

4. irritability and aggressiveness,
   as indicated by repeated physical
   fights or assaults

5. reckless disregard for safety or others

6. consistent irresponsibility, as indicated
   by repeated failure to sustain
   work behavior or honor financial
   obligations

7. lack of remorse as indicated by being indifferent
   to or rationalizing having hurt, mistreated, or stolen
   from another

$ behaviors are
result of another disorder

reasons can't render opinion ➛ on test
conclusions

grandiosity, grabs attention
superiority

in a general setting

Narcissism

effect on Kent — if jury were to give
Bart the death penalty

I can fly
nobody can bring me down

"psychopath / sociopath" — ⬇ in 40's⁺ (?)
tendency goes away

"Bart's prob" → tried so many X's then actually did
it

Bipolar (?)
depressed (?)

difficult or impossible to predict future
behav based on past behav.
[ need to research this ]
prison is a society — would he be dangerous

Standard Error of Measure for MCMI-III

Didn't do a future dangerous assessment
FDA

Doesn't meet

Psychopathy Checklist — 22 elements required
NO                             Charming  NO
NO  Lots of instability        No juvenile criminal behavior
    Impulsive                  Same g.f. for so long

" equivocal data" — could go either way

Personality traits ~~are~~ aren't stable

→ Not a forensic evaluation
only used for ~~treatment~~ planning

7 sins of Memory — Daniel Schacter

don't know
what happened

" Hindsight memory "

we all have a lot of errors in our
thinking related to our bias

whatever your memory is, you're
not going to remember in a
way inconsistent with your
values

- "no markers" for personality disorders

- never expelled from school

I did it to help figure things out

If had been a forensic test wld

→ can be wrong up to
57% of time — computer-generated interpretations
Graham (90?)
MMPI-2

might be true now but doesn't mean true then

send $ to C C I

12/26/06   Phone consult c̄ J. Ray Hays, PhD, JD

Questions to ask:

1. Should I meet c̄ prosecutors?

2. How do I express that I am not an objective, expert witness?

3. What might I expect to be asked?
   — he was in tx c̄ me
   — family brought him in

4. At which points should I refuse to testify, disclose, etc.?
   ★ don't speculate

*his behavior than different teenagers other could I have predicted?*

*"I didn't do c̄ dangerous assessment"*

5. What communication may I have c̄ ~~Bart's~~ Bart's attorney?
   Randy McDonald
   ~~re~~ treating professional) — don't speculate

6. Is there "dual relatshp."?

*MCMI — if appropriate instrument*

7. Juvenile status?

8. Lawyer attend if meet c̄ DA
   c̄ written permission of my client

9.

*early a.m. / late p.m.*   10. "on call" ⎨ let me know approx.
   physically show UP to judge — need to make a living

*or tell any Bart's — had DA's to story trying to get me*

Other causes of long-standing character disturbance include Personali Change Due to a General Medical Condition, in which a medical conditic affects a patient's personality but does not qualify as a personality disordc because it originates in physical disease and may not be pervasive (see Tabl 13.1). A number of Axis I conditions can distort the way a person behaves an relates to others. Such effects are especially likely in the mood disorders (se Chapter 16), the psychotic disorders (see Chapter 15), and cognitive disorder such as dementias (see Chapter 12).

## PROBLEMS WITH DIAGNOSING PERSONALITY DISORDERS IN YOUNG PATIENTS

Although some authorities believe that personality disorders can be reliably di-agnosed in adolescents, few make that claim for children. With the relation-ships among child disorders, adult disorders, and adult personality disorders still not well worked out, the study of childhood personality disorders is yet in its infancy. Several features of personality disorders limit their application to ju-veniles, especially young children:

- The DSM-IV criteria for personality disorders require a lifelong pattern of experiences and features. Children (especially younger children) sim-ply haven't lived long enough to attain this standard.
- When personality disorder diagnoses are made in adolescents, they tend not to be stable.
- Changing diagnostic criteria promote uncertainty in the diagnostic pro-cess.
- In fact, as personality disorder diagnoses fall out of favor (consider the case of passive–aggressive personality disorder), even less stability in this diagnostic process can be assumed.
- Many teenagers and adults qualify for several personality disorders.
- According to DSM-IV criteria, the best-validated personality disorder, Antisocial Personality Disorder, cannot be diagnosed before the age of 18.

Consider the behavioral symptoms that constitute the attention-deficit and disruptive behavior disorders (see Chapter 11). Over the past several decades, it has been well documented that these behaviors often predict pervasive social

lifficulties in later life. (These dif-
iculties will not necessarily be
evere ones, however; nor do they
mply that individuals will con-
tinue to act out in an antisocial
manner. In fact, fewer than half
of teenagers who qualify for a
diagnosis of Conduct Disorder
will eventually be rediagnosed as
having Antisocial Personality Dis-
order.) Nonetheless, it is uncom-
mon for children with conduct
problems to become adults who
have no Axis I or Axis II pathol-
ogy at all. It is also unusual to the
point of rarity for adult personal-
ity disorders to develop from a
background of normal childhood
or adolescent behavior.

Considering all of these fac-
tors, we recommend avoiding
specific personality disorder diag-
noses for all children and for
most adolescents. Rather, we pre-
fer to use the generic criteria for
personality disorders (Table 26.1),
and to indicate on Axis II a level
of uncertainty that avoids label-
ing young patients with pejorative
diagnoses and biasing future
clinicians' judgments about such
patients.

Apart from the difficulty of making personality disorder diagno-
ses in young patients, these disorders offer opportunities in any
patient for confusion with Axis I disorders. Consider the follow-
ing:

- Histrionic Personality Disorder is found in up to half of
  patients with Somatization Disorder; many clinicians con-
  sider them to be nearly synonymous.
- Schizotypal Personality Disorder is often a precursor to
  Schizophrenia, Disorganized Type.
- Asperger's Disorder shares a number of features with Schiz-
  oid and Schizotypal Personality Disorders.
- It is often difficult to draw a line between Paranoid Person-
  ality Disorder and Delusional Disorder.
- For many patients, the line between Conduct Disorder and
  Antisocial Personality Disorder is crossed at the 18th birth-
  day.
- Although they are described as different disorders, the simi-
  larities between Obsessive–Compulsive Personality Disorder
  and Obsessive–Compulsive Disorder are obvious.
- Social Phobia patients often have Avoidant Personality
  Disorder—should they therefore really be considered sepa-
  rately?

As if these issues weren't enough, note also that Cyclothymic
Disorder used to be a personality disorder (in DSM-II); that
Passive–Aggressive Personality Disorder was included in DSM-III
and DSM-III-R, but has been remanded to Appendix B of DSM-IV
to await further study; and that Borderline Personality Disorder,
introduced in DSM-III, is so popular with some mental health
professionals that other clinicians mistrust the diagnosis when-
ever they encounter it. Finally, many patients qualify for multiple
Axis II diagnoses, while some experts in the field believe that
there may ultimately turn out to be literally thousands of person-
ality disorders!

*Further Evaluation of Jim*

The case of Jim (see p. 222) is that of a child who amply met the criteria for
Conduct Disorder. Which, if any, Axis II diagnosis might be appropriate? Read-

# EXHIBIT   'L'

UNITED STATES DISTRICT COURTS
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| THOMAS BARTLETT WHITAKER, | § | |
| Petitioner, | § | |
| v. | § | CASE NO. 4:10-MC-293 |
| | § | |
| RICK THALER, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

STATEMENT OF DR. BRENDAN O'ROURKE

My name is Brendan O'Rourke. I am a psychologist licensed to practice in the Texas with offices at 2825 Wilcrest, Houston, Texas 77042.

In 1997, I treated Thomas Bartlett Whitaker and administered the Millon Clinical Multi-axial Inventory II ("MCMI-II") test. In 2007, I testified at Thomas's trial upon being summoned by the State.

Before executing this affidavit, I reviewed the MCMI-II test results, my testimony and the handwritten notes and typed outline that I drafted before I testified. I also reviewed the affidavit of Thomas defense counsel, Randy McDonald, and the State's Proposed Findings of Fact and Conclusions of Law.

I have been asked by Thomas's current attorney to address the following issues in this statement: (i) the nature of my communication with Mr. McDonald before trial; and (ii) the accuracy of Proposed Findings numbered 32 and 40.

Proposed Finding 32 says Mr. McDonald spoke with me and indicates that Mr. McDonald "determined there was no evidence of retardation or psychological problems other than an indication that Applicant had an antisocial and narcissistic personality" based on our conversation. Proposed Finding 40 states that "Mr. McDonald determined that any testimony from a psychologist would be harmful to Applicant and allow the State to show that Applicant did not have a conscience, was narcissistic, and could not be remorseful."

I remember speaking with Mr. McDonald by telephone before my testimony. The transcript of my testimony mentions a single telephone conversation between myself and Mr. McDonald. As I recall, the conversation was brief. Mr. McDonald was concerned about the results of the Millon test. I do not recall reviewing the test results in detail with Mr. McDonald during this communication, but I believe that I cautioned Mr. McDonald that the test results for Thomas on the Millon test might be harmful.

Page 1 of 2

However, I did not tell Mr. McDonald that "antisocial and narcissistic personality" were definite diagnoses in Thomas' case or that his psychological profile was confined to such traits. The diagnosis of personality disorders should not be made or else should be made with reservations in adolescents, which Thomas was when I examined him. My notes also show that I was prepared to testify that based on the information I had in 1997 a conclusion that Thomas suffered from an antisocial disorder or that he was a psychopath was *not* justified. I also noted that Thomas exhibited narcissistic traits, but I was not prepared to say he suffered from a narcissistic disorder based on my 1997 evaluation, and I would not have told Mr. McDonald otherwise.

The clinical personality pattern for Thomas on the MCMI-II showed elevated scores for narcissistic and anti-social traits. However, the MCMI-II indicated Thomas was having other psychological problems. Under the section entitled "Axis I: Clinical Syndromes" the interpretive report states that "there is reason to believe that this man is experiencing the clinical symptoms of a delusional (paranoid) disorder (e.g., irrational jealousy, ideas of reference)." The section regarding "prognostic and therapeutic implications" states that "it would be advisable to ameliorate this patient's current state of anxiety or hopelessness by the rapid implementation of supportive psychotherapeutic measures or targeted psycopharmacologic medications."

I also did not tell Mr. McDonald it would be of no use to retain a psychologist or present a defense based on a psychological evaluation, nor did I suggest to Mr. McDonald that there would be a consensus amongst psychologists that Thomas did "not have a conscience, was narcissistic, and could not be remorseful." My review of my notes shows that I bulleted the following reasons for withholding a diagnosis of an anti-social disorder or classification as a psychopath:

- No juvenile criminal acts. No markers for personality disorder.
- No setting fires or cruelty to animals
- No evidence of conduct disorder before 15 y/o
- Same girlfriend for two years with hopes of marrying someday
- Good grades and school performance
- No prior expulsions or suspensions.

Because of this social history, the inference made in proposed finding 40 that psychological testimony would invariably establish that Thomas did "not have a conscience, was narcissistic, and could not be remorseful" is not a reasonable one.

If called as a witness, I would testify to the foregoing in a court of law. I hereby swear, affirm and state that the foregoing is true and correct under penalty of perjury pursuant to Title 18 U.S.C. §1746."

DATED: 4/21/11

DR. BRENDAN O'ROURKE

Page 2 of 2

However, I did not tell Mr. McDonald that "antisocial and narcissistic personality" were definite diagnoses in Thomas' case or that his psychological profile was confined to such traits. The diagnosis of personality disorders should not be made or else should be made with reservations in adolescents, which Thomas was when I examined him. My notes also show that I was prepared to testify that based on the information I had in 1997 a conclusion that Thomas suffered from an antisocial disorder or that he was a psychopath was *not* justified. I also noted that Thomas exhibited narcissistic traits, but I was not prepared to say he suffered from a narcissistic disorder based on my 1997 evaluation, and I would not have told Mr. McDonald otherwise.

The clinical personality pattern for Thomas on the MCMI-II showed elevated scores for narcissistic and anti-social traits. However, the MCMI-II indicated Thomas was having other psychological problems. Under the section entitled "Axis I: Clinical Syndromes" the interpretive report states that "there is reason to believe that this man is experiencing the clinical symptoms of a delusional (paranoid) disorder (e.g., irrational jealousy, ideas of reference)." The section regarding "prognostic and therapeutic implications" states that "it would be advisable to ameliorate this patient's current state of anxiety or hopelessness by the rapid implementation of supportive psychotherapeutic measures or targeted psycopharmacologic medications."

I also did not tell Mr. McDonald it would be of no use to retain a psychologist or present a defense based on a psychological evaluation, nor did I suggest to Mr. McDonald that there would be a consensus amongst psychologists that Thomas did "not have a conscience, was narcissistic, and could not be remorseful." My review of my notes shows that I bulleted the following reasons for withholding a diagnosis of an anti-social disorder or classification as a psychopath:

- No juvenile criminal acts. No markers for personality disorder.
- No setting fires or cruelty to animals
- No evidence of conduct disorder before 15 y/o
- Same girlfriend for two years with hopes of marrying someday
- Good grades and school performance
- No prior expulsions or suspensions.

Because of this social history, the inference made in proposed finding 40 that psychological testimony would invariably establish that Thomas did "not have a conscience, was narcissistic, and could not be remorseful" is not a reasonable one.

If called as a witness, I would testify to the foregoing in a court of law. I hereby swear, affirm and state that the foregoing is true and correct under penalty of perjury pursuant to Title 18 U.S.C. §1746."

_____   DATED: 4/21/11
DR. BRENDAN O'ROURKE

Page 2 of 2

**Brendan O'Rourke, PhD**
**Licensed Clinical Psychologist**
**2825 Wilcrest, Suite 162**
**Houston, TX 77042**
**Phone: 713-266-2261**
**Fax: 713-266-2212**
www.allabouthope.com
**Email: DrORourke@aol.com**

# FAX

To: James Rytting Attorney

From: Brendan O'Rourke, Ph.D

Fax: 713-655-9112          Date: 4/21/11

Phone: 713-655-9111     Pages: 2 + Cover

Re: Thomas Whitaker                          cc:

___X Urgent___ Review _____ Please Comment__X__ Please Reply

If you do not receive all pages, please call 713-266-2261. This transmission may include
confidential material. If you are not the intended recipient, please call 713-266-2261
immediately. Thank you.

James —
So sorry for the delay. As you know
I am loaded with making sure my
current patients receive proper care
as I terminate with them. If this
isn't what you requested pls leave a
voicemail on 713-266-2261.
            Thx,
            Brendan

# EXHIBIT   'M'

**Diane M. Mosnik, Ph.D.**
**Clinical Neuropsychologist**
**Licensed in Texas (#3-1547) & Wisconsin (#2620-057)**
**TEL: 832.483.9732          EMAIL: 4dmosnik@gmail.com**

Forensic Psychological / Neuropsychological Evaluation

June 20, 2011

**RE:** Review and evaluation of records and administration of a psychological examination for determination of psychiatric diagnoses at present and to form an opinion of his mental state and potential clinical diagnoses at and around the time of the offense.

**NAME:**            Mr. Thomas Bartlett Whitaker
**CAUSE No.:**       Criminal Trial Cause No. 42,969; *The State of Texas vs. Thomas Bartlett Whitaker;*
**DATE of BIRTH:**   12/31/1979
**DATE of EXAM:**    05/05-06/2011
**DATES of REVIEW:** 05/01/2011 -- 06/20/2011
**REFERRAL SOURCE:** Defense Atty. Mr. James Rytting

**Evaluation Procedures:** The following documents and records were reviewed as part of this assessment and evaluation:

1. Report from Dr. Kit W. Harrison dated March 30, 2009, and raw data and patient's file Bates numbered KH000039 – KH000115.
2. Report of Dr. Jerome B. Brown dated December 10, 2005.
3. 08-0708 Records from Dr. Brendan O'Rourke.
4. Kelsey-Seybold Clinic Records, numbered KH000266 – KH000484.
5. Emails from The Law Office of David A. Schulman, Bates numbered KH000156 – KH000167.
6. Fort Bend Baptist Academy School Records including grades and health record, Bates numbered KH000176 – KH000264.
7. Volumes 25-31 of reporter's record in Cause record 42,969, *The State of Texas vs. Thomas Bartlett Whitaker.*
8. 08-0220 Fort Bend Baptist Academy records.
9. 08-0208 Clements H.S., Fort Bend I.S.D.
10. 08-0208 Fort Bend I.S.D.
11. 09-0415 Habeas Corpus Application Exhibits.
12. 08-0131 Client Letter to Suzette Ermler.
13. 0000 Undated Suzette Ermler notes on family history.
14. Jails packets 1, 2, 3, and 4.

**Psychological Evaluation.** The following standardized tests were administered to Mr. Whitaker on Thursday & Friday, May 5-6, 2011:

1. Clinical Diagnostic Psychiatric Interview.

2.  M-FAST clinical interview for feigned or exaggerated psychiatric symptoms.
3.  Wechsler Adult Intelligence Scale-IV edition (selected subtests included information, comprehension, vocabulary, figure weights, arithmetic, symbol search & digit symbol coding).
4.  Rey Auditory Verbal Learning Test form 1.
5.  Rey-Osterreith Complex Figure Copy Test with immediate and delayed free recall and recognition memory.
6.  Wisconsin Card Sorting Test.
7.  Neuropsychological Assessment Battery NAB assessment of Attention.
8.  The Awareness of Social Inference Test (TASIT) section 1.
9.  Personality Assessment Inventory.

## Introduction.

Mr. Thomas Bartlett Whitaker was referred for a forensic psychological evaluation by his current counsel, Mr. James Rytting, to determine the status of his mental health at the present time and, if possible, at the time of the offense in December of 2003. At the time of the evaluation, Mr. Whitaker was a 31 year old, right-handed, Caucasian male with a completed high school education and some 2-4 years worth of college credits although he did not meet the necessary requirements for obtaining any advanced degree. He is currently residing on Death Row in the Texas Department of Criminal Justice Polunsky Facility in Livingston, Texas subsequent to a conviction for the orchestration of the capital murder of his family, specifically his mother and younger brother, on December 10, 2003. Mr. Whitaker was interviewed and tested by this examiner in a small room in the Polunsky Facility in Livingston, Texas. The client's attorney was not present during the interview or assessment. Prison guards were located immediately outside of the testing room, but were not present inside the testing room. The client's wrist shackles were removed while ankle shackles remained in place so that he was able to participate fully in the testing procedures.

Prior to beginning the interview and assessment, Mr. Whitaker was advised of the procedures and the purpose of the evaluation and informed of his right to consent or refuse participation in the evaluation. He was informed that the evaluation was being conducted for the purposes of gathering information about his current mental health status and the status of his mental health at the time of the offense in order to determine whether or not he met criteria for a clinical diagnosis at the request of his current attorney, Mr. James Rytting, in order to assist with his defense. He was informed that he would not be provided with any therapy or treatment at any point during the assessment. He was informed that he could choose not to answer any questions or to terminate the evaluation at any time he so chose. Mr. Whitaker was informed that the evaluation would not be confidential and that it would be shared with his attorney, any applicable courts, and potentially other individuals involved in the legal proceedings. Mr. Whitaker agreed to participate in the clinical interview and testing procedures, and was able to state an understanding of the procedures to be completed. The in-person interview, including review of the client's history and prior records, and the administration of the testing procedures required 10 hours of direct contact with the client.

## Relevant Background Information.

Mr. Thomas Whitaker is the oldest child, with one younger brother, born to Kent and Patricia Whitaker. He resided with his family in their home in the Sugarland area, the suburbs of Houston, Texas, until he went away to school after graduating from high school in 1998. He reportedly attended Highlands Elementary School from first to fifth grade, Sugarland Middle

School from sixth through eighth grade, Clements High School from ninth through eleventh grade and Fort Bend Baptist Academy for his senior year. The client reported that he was "the perfect student till high school," receiving straight A's with no disciplinary actions against him. He was reportedly sent away to attend the Baptist Academy because of his involvement in a series of thefts of computers from his high school. His mother worked as a part time teacher. Mr. Whitaker's biological father worked for his wife's family's construction business and was a member of a fundamentalist conservative Baptist Church. The client noted that while growing up they were raised and confirmed in the Methodist Church. During his senior year, he completed the SAT examinations and received a verbal score of 650 and a math score of 580, which fell at approximately the 96th percentile and between the 73-84[th] percentile, respectively. After graduating from high school, Mr. Whitaker attended Baylor University from 1998 – 2001 where he initially resided in the college's dormitory and then in an apartment that he rented with two other male associates he had met at college. In 2001, Mr. Whitaker reportedly transferred his credits to Sam Houston State University because, according to him, Baylor was "not the right place" for him. He stated that he purchased, with his family, a small condominium in Willis near Sam Houston where he reportedly lived while attending classes. He stated that he eventually took in a roommate because the "friend needed a place to stay." The client stated that he got a job working at a country club in the spring of 2003 and that he had been so busy over the summer that he had decided not to return to school in the fall, but to make up classes in the spring instead.

**Substance Use History.**
The client reported that he had his first drink of alcohol at approximately age 15-16, but noted that he didn't drink "much" compared to his friends and others with whom he was associating at the time. He stated that he didn't like to consume alcohol because he didn't like being out of control and "didn't like alcohol too much." However, he stated that when he drank, he typically drank on the weekends with friends and that he tended to drink whatever form of alcohol was available, whether it be vodka, whiskey, or tequila, although he stated that he preferred to drink Scotch, but only one glass. He stated that when he went out with friends he was often the "designated driver" and he wouldn't any consume alcohol. He stated that he did not drink alcohol and use illicit drugs together on the same night. The client reported a history of experimental use of illicit drugs including marijuana, cocaine, oxycontin, amphetamines, LSD, methamphetamine and MDMA (ecstasy). He reported that he never used heroine or injected drugs intravenously. He reported that the age at which he first used any form of illicit drug was at 17 years of age when he first used marijuana and cocaine. He stated that he used marijuana approximately 10 times in total and used cocaine approximately 50-60 times in total. He reported that he used LSD approximately three times and mushrooms one time during high school at approximately age 17. He stated that he used methamphetamine (what he referred to as "crack, meth, ice, glass, or crystal") beginning at age 18 for a total of approximately 20 times. He stated that his drug of "choice" was ecstasy which he began to use at 19 years of age and used "all the time that first two years, all weekends and events for two years—maybe about 75-100 times, it was quite a bit, by far the drug I used more than any other; I kind of lost myself on it. It was opening the door to the person I always wanted to be." He reported that he had always used drugs with friends when they were planning on doing something social and noted that he never used drugs when he was alone unless plans fell through for something that they had planned on doing.

Overall, the client's history of drug use was consistent with experimental drug use rather than a history of regular substance use. His drug use history does not meet criteria for diagnoses of

abuse or dependence for any specific drug nor does he meet criteria for diagnoses of abuse or dependence for alcohol.

**Friendships and Social History.**
Mr. Whitaker reported that his first "best friend" during childhood was a boy named Matt B. who moved away with his family when he was 8 years old. During the remainder of his childhood, he reported that he hung out with a group of five boys all about his same age from his neighborhood during the 1st to 5th grade when he attended the Highlands Elementary School. However, he reported that he felt he was "the odd one out in that group, believe it or not I was the 'good' boy." He stated that the group of boys did some "pretty bad stuff from time to time." He stated that he felt that their pranks were beyond the typical guy activities and were somewhat more "aggressive" than typical for boys that age. He stated that the group was known around the school for being "rowdy." For example, they would shoot golf balls, throw water balloons, and fireworks at cars, dry ice bombs to blow up mailboxes, toilet paper houses, and numerous other pranks, as well as teasing each other; however, he stated that they were not bullies to other kids. The client stated that he was the "skittish one" who absented himself from a lot of their hijinx." However, he stated that when they all entered middle school, he became ostracized from the group because he was more of a "nerd" and took "gifted and talented" classes. He stated that he "wasn't as cool" as they were in middle school, describing himself as a "ghost" in middle school, "mostly I tried to stay out of the way from them." He remained friends with one of the guys, named Matt C. (a different "Matt" than his boyhood friend), stating that "he was the only one who'd be seen with me but it cost him socially and I didn't want him to be someone he didn't want to be." The client reported that another male friend, named Lane, was his only friend during high school, apart from his girl friend, Lynn. He noted that Lane was one of his "true friends" and that they had remained in contact even in college at Sam Houston. He offered that "you could argue in my life I've only had four good, core friends. There's a wall there." Mr. Whitaker reported that he received a call one Saturday morning from his mother, informing him that his two friends had both died on the same night in unrelated events. Matt B. had reportedly been killed by a drunk driver and Lane had died from an accident where he "had slipped on ice going into his fraternity house, bled out on the sidewalk and froze before he was found." The client also noted that his other friend, Matt C., from middle school, had died the following summer in a car accident. After reporting this information to this interviewer, the client stated that when he had been previously asked by Dr. Harrison whether or not he'd ever lost touch with reality, he stated, "I think it was then [after I heard the news of their deaths] that I did." He further stated that when he heard the announcement, his girl friend, Lynn, had commented that he "went flat and never came back from that." "I think that was the catalyst, I went from being angry to numb," Mr. Whitaker said. He further commented that although he had previously already lost his religion, after their deaths he became increasingly angry. He said, "If God exists, I fucking hate Him. I didn't know where to put those feelings of anger on everyone."

The client reported that he never felt that he lacked the abilities or social skills to form friendships, but rather that he was "pushed out" of the group of friends in middle school for his beliefs as he was "an extremely religious and spiritual person" at that time. He stated that he was feeling that "the things [his] body was telling him he wanted were wrong", like "wanting to kiss a girl and smoke a cigarette." He stated that he believed those things to be a sin at that time. He stated that he felt that if he met a certain standard, school, clothing, etc..."I'd feel accepted by them and by my family. Perfection was what was required to get me there. It was a no-win situation for me so I withdrew." The client stated that he was never evaluated for or

Competency Evaluation, RE: T.B. Whitaker                                                                    5

informed that anyone thought he might have Asperger's syndrome. In contrast, he felt that he was able to blend into different social groups in high school and thereafter. As a result of feeling as though he didn't fit in or belong, he began to watch other people constantly in the hope of becoming like them and acting like them. This talent of watching people, he believed, helped him to be able to learn how to fit into any group. "I became good at analyzing people simply by paying attention, a lot of attention, and mimicking others; not consciously," he added, "just dying to please. I know I was looking for acceptance. I got to the point that I was known by a lot of people but not called on Saturday [to do things]. You know how you become part of a group, even if not fully accepted, it's better than none and what I'd had up to that point."

**Dating History.**
Mr. Whitaker stated that he has always had a preference for dating women and that he would not have any problem telling anyone he was homosexual if he was, but he wasn't. He stated that he thinks people may have presumed he was homosexual because of the way he dressed, stating that he had always been very fastidious in his manner of dress and personal hygiene, as well as "careful about class and brands" in order to win acceptance from his mother. He stated that he had experienced sexual dysfunction in the past but felt it had been attributable to his drug use, as "meth was a libido killer." In regards to dating, he was reportedly shy with women for a long time until 17 when he met his first "serious" girlfriend, a girl he described as being "exactly what my mother wanted me to date, totally vapid, no personality whatsoever." He then "fell in love hard" for Lynn B., whom he had always known but then started dating. She was described as the opposite of what his mother wanted him to date. She was a "kind-hearted, trustworthy, decent person." They dated throughout his time in college, from approximately age 17 to 24 when he left for Mexico. They became engaged to be married. Despite his professed love for his fiancé, he acknowledged cheating on her throughout their relationship. "I cheated on her quite a bit, girls at school, girls at work, I don't mean it to sound…whatever…but it was purely sexual relationships, precisely about the physicality of the relationship." Specifically, he reported that he had cheated on her approximately three times per year, but noted that "none of them were one-night stands, they were typically well developed sexual relationships" where they would have sex on a semi-regular schedule. He stated that he believed Lynn had not known about the infidelities, although perhaps "a couple of times expected I was." In his own defense, he stated, "I had another phone, I didn't make any of those rookie mistakes." He reported that he most often visited Lynn in Austin where she lived and kept his life in Waco separate. He further reported, "I've always done that, compartmentalized my life. I was always a slightly different person in each one of those groups. At the time, I thought I was fluid and thought I was good at doing that [fitting in]." "There was a massive difference between the person that I knew I was and the person I showed to everyone else. I was aware of it then. I was an angry, solipsistic [i.e., extreme egocentrism; that the self is the only existent thing] jerk."

Although the client personally denied a history of homosexuality to this examiner, his history does consistently support a poorly established identity and sense of self. Even the client described how he compartmentalized aspects of his identity and inner self in order to fit in with his surroundings and what he believed others in his life, i.e., his family, wanted him to be. Most notably, his long time girlfriend and then fiancé even stated in her affidavit that she had begun to be "suspicious that he might be bi-sexual or homosexual" and wondered if he was with her because she was an acceptable mate. Based on this history, it is certainly possible that the client was either not fully aware of or in denial of his own sexual identity, given the reported amount of inner turmoil he was dealing with.

**Family Background.**
In regards to his parents' disciplinary style, Mr. Whitaker reported that he was "switched" (i.e., hit with a switch) only one time and that his father had generally taken the stance that "if we talked to Jesus about it and repented for our sins, punishment was not considered, you needed to make amends and rehab." He also added, "I'm sure I was paddled as a child, I don't remember it." "In retrospect, punishment would have been great—let me know they cared enough to make the effort." Mr. Whitaker put forth the belief that his father's family was comprised of intellectuals while his mother's family was comprised of "blue bloods from Memorial." He stated that he believed his mother's family felt she had married down when she married his father. He remarked, "The dynamic had always been apparent to me—Whitaker versus Bartlett. I was 5 years old at my father's parents' home and I had already picked up on my family's dynamic. Dad always sucked up to the family [Bartletts]. I'm the first grandchild given the Bartlett name but looked like a Whitaker. Kevin was a Bartlett and was treated like a Bartlett." He further opined that he was never accepted by the Bartlett's and even though he was the only grandchild given a job at their construction company, he was given the "worst jobs." He stated that he was told that "whatever name was given to me, I wasn't that," reportedly implying to him that the company would not be his and that he didn't fit in there. When asked what it was like for him growing up in his household, he stated, "Because I was so observant, I knew a lot about that dynamic early on. Christmas was superficial; gifts are great, they [the Bartletts] got money, but there was no love in that family at all, but I'll admit to you [this examiner] that for a number of years wanting to be a Bartlett was always on my mind a lot." However, he also stated that wanting to live up to being called "Bartlett" didn't last as he realized the hypocrisy. He stated that he took on a pseudo-arrogance which helped to cover up how inadequate he felt. When this examiner asked 'how' inadequate he felt, he replied, "Totally. Living up to the Bartlett name and what my parents wanted me to be. Same pressure to conform to some ideal, some mold of ideal, then, if I can, I'll really be worthy."

In general, the client repeatedly stated that he felt he was living a double life, trying to be something he was not, with pressure from both sides of his family, his father and his mother, and from a religious background and religious ideals and a background of money with its own expectations. He stated that he didn't show his real self to anyone and compartmentalized his feelings. He reported that he repeatedly denied and buried his own wants and goals for his life for those of his family. He noted that on at least two occasions he had attempted broaching the subject of joining the army to his family, but was talked out of it each time by his family and his fiancé. He reported that he felt like he had no way out, that the two times he had tried to be himself and take his own road, he had "failed" and he felt like to couldn't get away from them [his family]. He stated, "I certainly had a number of delusions—just my place in the world, my nihilistic stance on what life was about. There was going to be one second there that my parents saw me, even if it was at the tip of a gun—but that's in and of itself a delusion." In describing himself, he noted that he was "one persona [that] was superficially appropriate and the other [was] dark, confused, and conflicted." He felt inner turmoil about wanting to live up to his parents' expectations and approval by society itself, but felt his "dark side" was more him, "conflicted, miserable, lonely." He stated that he had always felt lonely, even in a crowded room. Over time, he stated, "I felt like it took more and more effort for me to hold things together, the compartmentalization of my life, what I thought of myself depended on the day, and the stitches that were holding me together were fraying."

**Criminal History.**

Mr. Whitaker reported that he was first arrested at age 17 for stealing computers from a couple of schools over the period of one month.  In discussing the arrest, he stated that he had been the one to initially steal the ring of school keys when he had discovered them unattended at his school one evening while working late on the school newspaper.  He stated that he took the keys to The Home Depot and made a copy of the master key because he "thought it would come in handy."  He stated that he used it [the copy of the master key] to gain access to copies of tests which he used to maintain his grade point average in school.  Later, he stated, he "realized the power, control I had with it [the key]."  He reported that he became friends with two older guys who were going to college and supposedly didn't have computers, so they got the idea to steal two of them from the school.  The client stated, "I didn't take anything for me, it wasn't about me that time, it was for them.  Then it snowballed from there.  We took 10 computers from Clements and then hit two others schools and stole computers and televisions. We came in through the skylights and rappelled down, it was a grand adventure.  We just put the stuff in a storage facility and never talked about selling it, then one of the guys tried to sell one to the son of a cop and he was arrested and ratted everyone else out.  So, I confessed and told them where they could reclaim the computers.  But the thing is I knew we were going to get caught.  I made a decision, this is what I want, my parents are going to notice me.  It wasn't the money, it was the act to me.  It meant nothing to me fiscally.  It was the anticipation of what mummy and daddy would say.  One of the schools was where my mother taught and I had hoped she'd get fired over it, felt it would connect back to her someway or I figured she'd quit out of embarrassment.  I had a lot of anticipation on that; I relished the look on my mother's face when they told her."  In addition to the arrest for the stolen computers, he reported that he had cheated on tests in junior high and high school if he didn't think he would get an 'A' naturally.  He also acknowledged underage drinking and experimental use of illicit drugs, but was never arrested or charged with any legal infractions relating to these behaviors. In addition, he reported that during the 5th grade he had burned money given to him by his father "for behaving in certain ways" which made him "extremely mad."  He went on to say that when attempting to burn the money as a message to his father, he "inadvertently started the field on fire and then "I lied to the police and said I had no idea; but it wasn't intentional.  My parents pretty much didn't care where I was most of the time."  The client specifically denied having any recollection of ever "stealing money and jewelry from neighborhood homes on several occasions" as noted in a previous evaluation.

Despite the fact that the client engaged in a couple of isolated criminal offenses during his adolescent years, he never met diagnostic criteria for conduct disorder.  Specifically, he did not exhibit a "repetitive and persistent pattern of behavior in which the basic rights of others or major age-appropriate societal norms or rules" were violated.  He did not exhibit any aggression or cruelty toward people or animals, he did not engage in physical fights, and he did not bully others.  In fact, when younger and he hung out with a group of male friends who were known to be pranksters, they did not engage in bullying others, but helped other kids who were being bullied by others.  Moreover, he did not engage in the willful destruction of property, and never ran away from home or engaged in any serious violations of rules.  By all reports, apart from the one arrest for the theft of computers, the client was a model citizen who was active in community service and achieved good grades throughout high school.

**Medical and Psychiatric History.**
In terms of his past medical and psychiatric history, the client denied a history of any major medical problems including heart disease, strokes or transient ischemic attacks, seizures, thyroid disease, history of infections such as hepatitis, meningitis or HIV, or diabetes.  He did,

Competency Evaluation, RE: T.B. Whitaker                                        8

however, report that he had experienced "many concussions in [his] life; who knows how many, I was a rambunctious child." He described experiencing at least three isolated potential traumatic brain injuries. According to the client, he was playing street hockey at age 16 when he got hit "pretty hard" in the head in the region of his left temple and saw stars though he didn't pass out at the time; he stated that he vomited and passed out in the morning during his shower and suffered a headache over the next few days. He reported that he was seen by a neighbor who was a physician who checked his pupils and sent him home without sending him to the ER. A medical record (02/19/1996) documented the fact that he had suffered a mild concussion and sustained an injury to his left thumb during that incident; however, there was reportedly no evidence of any neurological deficit at that time. At the age of 19, he reported being involved in some form of illegal, "unsanctioned" karate tournament during which he "got put on the ground from a round-house kick to his orbital region," and also got hit in his right eye and was knocked unconscious for a brief period of time. He noted that he experienced vomiting and a headache afterwards, but did not go to the ER. In his own defense for apparently not going to a doctor to be evaluated, he stated, "At that point in my life, I didn't care; that pain sort of anchored me to this world. It was something real." He did not believe that he had experienced any change in his thinking abilities as a result of the injury. However, he said that since that injury, the eyelashes on his right eye grew back white. Finally, he reported that in 2004 at age 24 while in Mexico, he was attacked and beat-up by a group of 7-8 individuals and was knocked out for "a short period of time but I don't know how long" and "I was extremely disoriented for a period of time after that and was not entirely conscious." Following that episode, he reportedly had "walked around for some 20 minutes" trying to find his keys (which were in his pocket) and find his way home but he wasn't thinking clearly; he then slept the entire next day. Since that reported head injury, he has reportedly suffered from a "continual tic of the trigeminal nerve at the right temple." In addition to the reported head injuries described above, he reported a history of migraine headaches when he was younger, from age 14 to his current incarceration. He stated that he used to take Imitrex to manage the headache pain. Over the past 1 ½ years he has reportedly experienced hypertension for which he is prescribed enalapril maleate (10 mg). He also endorsed the experience of tinnitus which he feels may be the result of attending too many music concerts, raves and listening to loud music. The client did not endorse a history of any other medical problems, with the exception of describing the surgeries on his upper extremity relating to the gunshot wound he received during the offense. He continued to report pain and decreased range of motion in his shoulder and upper extremity. The client was taking no medications, apart from his antihypertensive and Prilosec for heartburn/gastric reflux, at the time of the present interview and assessment.

According to available medical records, the client participated in ten sessions of individual therapy with Dr. Brendan O'Rourke reportedly to deal with the aftermath of the arrest for stealing computers from schools as detailed above. He noted that the client had expressed remorse for his actions and had not engaged in the actions as part of a pattern of criminal misbehavior or lack of respect for others. According to the notes provided by Dr. O'Rourke, at the time he was seeing the client in therapy, he felt the client's "choice of friends and his lack of judgment brought him to a criminal act" but saw "no character disorder, no predictable, lasting pattern" that suggested he would continue to behave in that manner, i.e., criminally. He further noted that clinically, he found "no significant pathology." Dr. O'Rourke stated repeatedly that he had not make a diagnosis of antisocial personality disorder in regards to the client. Although the client reportedly endorsed some items on a psychological test suggestive of behaviors that can be consistent with a diagnosis of antisocial personality disorder if

observed in combination with the rest of the constellation of symptoms and circumstances that define the clinical personality disorder, he was not found to exhibit the full pattern of criteria for the diagnosis. Specifically, the client did not meet criteria for a diagnosis of conduct disorder prior to the age of 15 or at any other point in his adolescence. Moreover, he was 17 years of age at the time he was seeing Dr. O'Rourke in therapy, at which point a diagnosis of antisocial personality disorder could not have been made (as it needs to be made after the age of 18). Additionally, he completed psychological testing in 1997 that revealed that he was experiencing "the clinical symptoms of a delusional (paranoid) disorder."

Additional review of the client's medical records obtained, there was a record that he had completed psychological testing (01/03/2000) with an Alice M. Gates, EdD., at the request of his primary care physician, Dr. Hoyle, for an assessment of his mood and possible deficits in attention following results from his prior meetings with the client in December of 1999. Results of that evaluation indicated that he met criteria for a diagnosis of a Generalized Anxiety Disorder and also Attention-Deficit / Hyperactivity Disorder secondary to a Generalized Anxiety Disorder, inattentive type, and noted that he should be referred to his physician for medication management. Subsequently, his primary care physician wrote the client prescriptions for Adderall 10 mg and then 20 mg, as well as Zoloft for depression and anxiety. The client reported that he took the Adderall but never actually took the Zoloft medication. However, at this time, the client reported that he did not remember having his own prescription for Adderall, but instead thought that he had been using his brother's and his mother's prescriptions for the medication. The client denied ever having participated in any individual therapy for himself, but noted that he did participate in a session or two for his brother and family. The client also acknowledged that he has always had difficulty sleeping and had been previously prescribed Ambien for sleep.

**Review of Records.**
This examiner completed a review of the available records denoted above.

Results of testing completed on January 9, 2009, and the report generated by Dr. Kit Harrison dated March 30, 2009, were reviewed by this examiner. As part of his assessment, Dr. Harrison had the client complete an objective measure of personality and clinical mood symptoms known as the MCMI-III (01/09/2009). Results of that clinical profile indicated that the client met criteria for Axis I diagnoses of a Generalized Anxiety Disorder and Posttraumatic Stress Disorder, as well as demonstrating a depressive personality disorder, self-defeating personality disorder with schizotypal and paranoid features. The results of the clinical profile also indicated a tendency to magnify illness, an inclination to complain or be self-pitying, or feelings of extreme vulnerability associated with acute turmoil. On the basis of the test results, the client was noted to be at risk for becoming depressed and self-demeaning under even moderate levels of distress. He was noted to display disappointment in a chronically unhappy and pessimistic way. His clinical presentation was characterized by a pervasive apprehensiveness, intense and variable moods, prolonged periods of dejection and self-deprecation, and episodes of withdrawn isolation or unpredictable anger. He indicated a longstanding expectation that others will reject or disparage him, which can precipitate profound gloom, self-sabotaging behavior, and irrational negativism. The vacillation in his mood was exhibited between desires for affection, self-destructive acts, fear, and a general numbness of feeling. Despite his apparent longing for acceptance by others, he maintains a safe distance from close psychological involvements, and while retreating defensively, may become engaged in impulsive and self-defeating behaviors. Behind his front of restraint are

intense contrary feelings that occasionally surface as impulsive and angry outbursts toward those he feels have been unsupportive, critical, and disapproving. Although often disconsolate, aimlessly drifting in peripheral social roles, he often finds himself in troublesome situations, occasionally by behaving in an unpredictable, unstable, and edgy manner. Disappointments with others occur as he vacillates between being self-pitying, sullenly withdrawn, and explosively angry. Frequently, these behaviors are interspersed with genuine feelings of guilt and contrition that are mixed with feelings of being chronically misunderstood, unappreciated, and demeaned by others. He may provoke condemnation through persistent melancholy behavior and then accuse others of mistreating him. Having a low sense of self-worth, he may painfully contemplate his pitiful and futile state, but this tendency toward extreme introspection compounds his identity problem. The alienation he feels from others is paralleled by a feeling of self-alienation, which creates a constant undercurrent of fearfulness, sadness, and anger.

In summary, Dr. Harrison noted that the most prominent in the clinical picture was a tormented irrational self-concept and personal self-identity dating back to early childhood. He reported social anxieties and adjustment problems and raised the possibility of a diagnosis of Asperger's disorder. Dr. Harrison ultimately made the clinical diagnosis on Axis I of Delusional Disorder, mixed type, and Mood Disorder NOS, as well as an Axis II diagnosis of Personality Disorder NOS with paranoid, narcissistic, and antisocial features.

Results of the evaluation completed on December 2, 2005, by Dr. Jerome Brown in regards to the endorsement of psychological difficulties indicated problems with self-esteem, family conflicts, emotional turmoil, and confusion about the direction he wanted his life to take and the kind of person he wanted to be. He reportedly indicated that he believed he was not smart enough, did not do anything well, felt inferior, and felt he was a failure. He was bothered by thoughts of suicide and was unhappy much of the time. He felt he was misunderstood by his family and not trusted. He felt no one cared for him and that sometimes life was hardly worthwhile. He also indicated that he was dishonest, lied without meaning to and was too self-centered. The client reportedly stated, "I don't feel my personality is consistent...I guess I just don't feel very concrete any more." The psychological testing completed at the time revealed high levels of emotional disturbance and intensely felt psychological conflict. He was felt to be seriously depressed and to have trouble controlling ideas and thoughts that he experienced as alien and disturbing. He was suspicious and distrustful of others. Dr. Brown indicated that as the client became more isolated and detached from the world, his plans and ideas became increasingly unreal, fantastic, and peculiar. His violent actions against his family were felt to be the culmination of his pathological process, an acting out of rage against them that had been building for years, while at the same time fulfilling a bizarre and desperate plea for the attention he desired but never received.

Results of the MCMI-II completed on an outpatient basis on September 17, 1997, at age 17, revealed that the client was experiencing a severe mental disorder and indicated no unusual test-taking attitude that would render the evaluation invalid. The results indicated an individual with a checkered history of disappointments in his personal and family relationships, with notable deficits in his social attainments, as well as a tendency to self-defeating vicious cycles. He was described as being an egocentric man with an inflated sense of self-importance combined with an intense mistrust of others. He was noted to exhibit provocative and abrasive behavior, an edgy defensiveness, an inclination to misinterpret the actions of others, and a tendency to project malicious motives onto presumed accusers or scapegoats. His arrogant

pride in self-reliance, unsentimentality, and competitive values were felt to hide a deep insecurity about his self-worth and were employed to counteract past humiliation and rejection. Clinical syndromes evident at that time were noted to be a delusional (paranoid) disorder set within a broad context of other problematic characteristics and personality pathologies.  He was also noted to exhibit periods of aggressive behaviors and uncontrollable rages.  He was noted to be experiencing authority conflicts and family discord.  Neither a diagnosis of conduct disorder or antisocial personality disorder was made at that time because the client did not meet criteria for the diagnosis to be made given the results of the psychological testing and his history together.

**Current Clinical and Behavioral Observations**.

Mr. Whitaker was accompanied to the room within the prison that was to be used for the assessment by three armed prison guards.  He was shackled at the wrists and ankles and wearing standard issue prison coveralls.  After being admitted to the examination room, his wrist shackles were removed, but his ankle shackles remained fastened.  The door to the room was locked from the outside, where prison guards stood watch.  The room was well lit from artificial lighting, barren of decoration, and contained two single chairs and a small table.  This examiner and the client were seated at an angle opposite each other adjacent to the small table.  A large window comprised one of the walls in the room so that the prison guards could fully observe the activity within the room.  Two guards were present at this window and observed the testing procedures throughout the examination.  Despite occasional distractions by the guards, the client was able to attend fairly well to the assessment procedures.  The ambient temperature of the room was cold, which did contribute to some additional distraction during the assessment.

The client was awake, alert, and fully oriented to time and location.  He accurately stated the current month, date and year.  He was able to discuss some current events.  He was also able to accurately report basic personal information, including his date of birth, age, and educational attainment, as well as information about his personal history.

He presented as a Caucasian man of medium stature, appearing approximately 5 feet 10 inches tall, and of medium build.  He appeared fairly healthy in appearance and presented with intact hygiene.  He appeared his stated age.  He reported being right-handed and did not wear reading glasses or hearing aids.  Vision and hearing appeared adequate to complete the testing procedures.  His mood appeared dysphoric, as well as mildly anxious and somewhat guarded and wary, though he appeared to be trying to put forth a good face and seem fine with the situation.  His affect appeared restricted in range, although this may have attributable to the nature of the situation.  His facial expression was flat and there was a definite lack of affective responsiveness, although, again, this could have been, at least in part, engendered by the formal testing situation.  Expressive gestures were limited and he appeared somewhat uncomfortable and exhibited little change in his body posture.  His eye contact was good with no observed difficulty establishing or appropriately maintaining eye contact.  However, his eyes often appeared downcast, though not averted from the examiner.

Spontaneous conversational speech was fluent, without word finding difficulty or the presence of phonemic or semantic paraphasias (incorrect substitutions of one or more sounds in a word; or the use of an incorrect but semantically related, similar word).  However, he did have a tendency to be sesquipedalian, that is, given to using long or more intelligent sounding words.  Unfortunately, he often erred in his use of such a word, placing a word in an inappropriate

context or giving it a different meaning.  He even commented on this tendency, stating that he was working on building his vocabulary.  Conversational speech was otherwise within normal limits in regards to rate, rhythm, prosody, volume, and clarity.  Responses were logical and goal-directed without evidence of tangentiality, loosening of associations, derailment (slipping off one idea onto another), or loss of his train of thought.  During the interview, the client demonstrated no episodes of thought blocking.  There was no evidence of poverty of content of speech or poverty of speech, as his speech was meaningful and responsive.

The client was not observed to experience auditory, visual, or any other type of hallucination during any point of the interview or assessment and he did not endorse the experience of such at any point during the evaluation or at any point in his history.  When asked if he had ever seen anything that he wasn't sure was really there, he described the experience of seeing a "visual aura" that he described as "sort of like a bright blue flash in the periphery" of his vision, similar to "an after-image from a bright light burned into the retina."  He stated that he didn't really know how to describe it as it was a "curious thing."  He noted that it was "always blue, though I don't know why."  He noted that he experienced this phenomenon approximately one time per month, but less frequently than he used to.  He believes it may be related to a lack of sleep.  He noted that he pays attention when he gets them because he then experiences pain; notably he may be describing the experience of a visual aura associated with migraine type headaches.  Following his description of the images, he stated, "I don't mean to imply that I'm having some sort of schizophrenic episode or something, I'm not seeing things, I can't identify them."  He did not endorse experiencing any type of delusional belief or ideas of reference, such as being controlled by any outside force.  He did not endorse or exhibit any indication of grandiose ideas or beliefs that he possessed any special powers or talents or capabilities.

The client was able to discuss the circumstances surrounding his arrest and conviction without reference to any delusional ideas or associated paranoia.  He was fully aware and able to state that he was on death row for "capital murder" for the orchestration of the killing of his mother and younger brother and was able to convey the understanding that he was being punished for the crime he was found guilty of by a jury of his peers.

In regards to his motor functions, his gait was within normal limits and he ambulated unassisted.  No abnormal motor movements were observed during the assessment period.  On testing, he demonstrated good impulse control, but his performance was mildly perseverative and minimally inflexible.  He was cooperative with all of the testing procedures and appeared motivated to perform to the best of his abilities.  Insight into his own thought processes and his current legal situation appeared generally intact.  He denied that he was experiencing any symptoms related to a mental illness or psychiatric disorder.  He was in no way attempting to portray himself as insane, and did not exhibit or endorse any overt psychotic symptomatology.  However, given that his presentation was flat, with limited facial expressiveness or expression of affect, and downcast eyes, he appeared depressed or dysthymic.

## Results of Psychological Examination.
## Cognitive and Personality / Mood Testing.
Results of prior intellectual testing completed by Dr. Harrison January 9, 2009, revealed an overall level of general intellectual functioning falling in the superior range, with equally well developed and consistent performances across tests of verbal and nonverbal abilities.  Current testing revealed a similarly high fund of general knowledge which fell in the superior range for

Competency Evaluation, RE: T.B. Whitaker                                                                13

his age group. However, his ability to provide definitions for vocabulary words fell in the above average range for his age and significantly below his prior superior performance. Possible explanations for this discrepancy include the use of the new version of the Wechsler Adult Intelligence Scale-4th edition compared to the previous administration of the 3rd version, as well as an apparent tendency by the client to use "big" words in his definitions and often using those words incorrectly, thus missing points on words he had previously defined correctly on prior testing. In addition, his performance on a test of the comprehension of social norms and customs fell currently in the average range compared to a previously above average performance on prior testing. Again, possible explanations for this discrepancy include the use of the new version of the Wechsler Adult Intelligence Scale-4th edition compared to the previous administration of the 3rd version, as well as the client's tendency to use "big" words in his explanations and getting side tracked on semi-related information but missing the point of the question and thus missing points on items. His performances on tests of auditory working memory for mentally completing arithmetic story problems fell in the above average range, while performances on tests of processing speed were significantly variable, with his performance on a test requiring incidental learning for the speeded transcription of symbols to digits being consistent with his performance on prior testing and falling within the above average range for his age, but his performance on a test requiring visual search for identified targets amidst foils falling in the average range and significantly below other performances. His performance on a test of novel problem-solving requiring the accurate sorting of cards when provided with only limited verbal feedback on response choices fell in the borderline impaired range and was notable for some difficulty shifting among alternate solution strategies, resulting in a mildly perseverative performance. However, he had no difficulty generating alternate sorting strategies or maintaining cognitive set once established. His performance across a variety of tasks measuring effortful concentration, working memory, and processing speed fell were variable and ranged from the average to above average range for his age, with the exception of an increased number of omission errors on a visual search task during which he adopted a very fast speed that appeared to negatively impact his accuracy and fell in the impaired range. He also demonstrated mild difficulty attending to changes in complex visual scenes (i.e., visual attention to details). In regard to his memory performance, his ability to acquire a 15-item list of semantically-unrelated words, given rehearsal, was average overall, though his initial recall following the first exposure fell in the superior range. He demonstrated a relatively flat learning curve with limited benefit over repetition trials. Immediate and delayed free recalls for the words fell in the average range compared to others his age; however, he appeared to demonstrate some mild interference from being exposed to a distractor list of words, resulting in a loss of retention of some of the words from the original recall list. Recognition memory for the words was intact. His ability to accurately copy a complex geometric design was above average for his age intact spatial organization and attention to details. Immediate and delayed incidental free recalls of the geometric design were also above average for his age, with solid retention of information over time. Recognition memory for the details of the complex design was intact. Results of The Awareness of Social Inference Test which required the client to be able to recognize basic emotions exhibited by other people in video vignettes that depicted a dynamic, realistic portrayal of emotion, incorporating nonverbal cues including facial movement, tone of voice, and gestures that accompany normal emotional displays. Analysis of the client's responses revealed an average ability to recognize the basic emotions shown by other people, including happiness, surprise, revolt, and neutral emotions; however, he demonstrated a low average ability to accurately identify the emotions of sadness and anger, and he demonstrated a mild to moderately impaired ability to accurately identify when a person was exhibiting the emotion of anxiety.

The patient completed an objective questionnaire evaluating a variety of aspects about health, mood, neurobehavioral functioning, and use of alcohol and illicit drugs (PAI). Validity indicators assessing his pattern of responses to test questions revealed that he attended appropriately to the content of test questions. However, there appeared to have been some idiosyncratic responses to particular items that could affect test results. Moreover, there were indications from validity measures that he tended to respond with some amount of defensiveness about particular personal shortcomings as well as a tendency to exaggerate certain problems. Validity indications of negative impression management revealed a pattern of endorsing items that tend to present an unfavorable impression or represent extremely bizarre and unlikely symptoms, which suggests that the overall profile may exaggerate complaints to some degree. It is also possible that these unusual endorsements were the result of confusion about what the question was asking or careless responding, which was a pattern noted in this client's responses. Clinical elevations in this range also often indicate a plea for help, or an extremely negative evaluation of oneself and one's life. Although the response pattern does not render the test results invalid, the interpretive hypotheses should be viewed with this caution in mind, i.e., that responses may over-represent the extent and degree of significant test findings in certain areas.

Despite the possibility of some exaggeration of certain problems, overall, the clinical profile indicated marked distress with a significant impact on functioning. The configuration of scales suggested a person with prominent depression and hostility. He appears to be experiencing an embittered pessimism, with many of the negative circumstances occurring in his life attributed to the shortcomings of others, and he sees little hope that he can change these circumstances. His heightened sensitivity in social interactions has led to significant withdrawal and probably serves as a formidable obstacle to the development of close relationships. Although he appears to harbor considerable anger and resentment, this anger appears as much directed at himself as it is directed at others. However, he reported that his temper is within the normal range and well-controlled without apparent difficulty.

He reported a significantly elevated level of depressive symptomatology, characterized by the affective, cognitive and physiological symptoms of depression, including being plagued by thoughts of worthlessness, hopelessness, and personal failure, as well as feelings of sadness, a loss of interest in normal activities, and a loss of pleasure in things that were previously enjoyed. In addition, he reported experiencing a disturbed sleep pattern that has been present throughout his life, as well as a decreased level of energy, decreased libido, loss of appetite, and psychomotor slowing. With respect to suicidal ideation, the patient reported experiencing intense and recurrent suicidal ideation. Moreover, he endorsed the desire to take action to end his life if certain circumstances occurred, but would not elaborate on whether or not he had an active plan or current intent to hurt or kill himself. Concerns about suicidality and increased risk for suicide are heightened by the presence of a number of features, such as situational stressors, a lack of social support, and social isolation.

The client described experiencing a level of suspiciousness and mistrust in his relations with others that is unusual even in clinical samples. Such a pattern is often associated with prominent hostility and paranoia of potentially delusional proportions. He is likely to be a hypervigilant individual who often questions and mistrusts the motives of those around him. He is extremely sensitive in his interactions with others and likely harbors strong feelings of resentment as a result of perceived slights and insults. He appears to be quick to feel that he

is being treated inequitably and often holds grudges against others, even if the perceived slight was unintentional.  Consistent with the constellation of hypervigilance, suspiciousness, and resentment, he is probably seen by others as being hostile.

In addition, he endorsed experiencing a discomforting level of anxiety and tension, and appears worried to the point that he may be having difficulty concentrating.  He appears to feel a great deal of tension and to have difficulty relaxing.  He also endorsed the experience of overt physical signs of anxiety including trembling hands, irregular or accelerated heart rate, and shortness of breath and/or fatigue.  He is likely to be a fairly rigid individual who follows his personal guidelines for conduct in an inflexible and unyielding manner.  He ruminates about matters to the degree that he may experience difficulty making decisions and perceiving the larger significance of decisions that are made.  Changes in routine, unexpected events, and contradictory information are likely to generate untoward distress for him.  He may fear his own impulses and doubt his ability to control them.  In addition, the client described the experience of a traumatic even in his past that continues to distress him and produce recurrent episodes of anxiety.

In addition to the above noted psychological symptoms, the client described a history of experimental illicit drug use and a number of antisocial character features.  He has a history of antisocial behavior and manifested a conduct disorder during adolescence.  In addition to his past criminal behavior, his behavior is also likely to be reckless and impulsive; he can be expected to entertain risks that are potentially dangerous to himself and to those around him.  Active psychotic symptoms, such as hallucinations or delusions, are not a prominent part of his clinical picture.

A number of aspects of the client's responses suggested noteworthy peculiarities in his thinking and experience.  He is likely a socially isolated individual with few interpersonal relationships that could be described as close and warm, both now and in the past.  He may have limited social skills and his social isolation may help to decrease a sense of discomfort he feels in interpersonal relationships.  The patient reported that he is uncertain and indecisive about many major life issues and has little sense of direction or purpose in his life, both now and in the past.  Although he may view himself as active, outgoing, ambitious, and self-confident, others may perceive him as impatient and somewhat demanding.

The patient's self-concept seems to involve a generally negative self-evaluation that can vary from states of harsh self-criticism and self-doubt to periods of relative self-confidence and intact self-esteem, and will likely depend on current circumstances.  During stressful times, he is prone to be more self-critical and pessimistic, dwelling on past failures and lost opportunities with considerable uncertainty and indecision about his future.  Given this self-doubt, he likely blames himself for setbacks and sees any prospects for future success as dependent on the actions of others.  His interpersonal style is best characterized as remote and self-centered.  He is not likely to be very interested or invested in social relationships, and he may seek to take more from relationships than he gives.  As a result, his relationships are likely to be pragmatic and viewed in terms of their benefit to him rather than as a source of enjoyment in themselves.  He appears to be skeptical of close relationships, preferring to engage in relationships that he can control or perhaps exploit.  He will likely avoid commitment in close relationships if possible.  He believes that he has little or no social support to help him through difficult times in his life.  He sees others as rejecting and uncaring and believes that there is hardly anyone in his environment to whom he can turn for help and this appears to be a

longstanding belief. Of note, the client appears to have a substantial interest in making changes in his life and he appears motivated for potential treatment. He acknowledges important problems and expressed a perception of a need for help in dealing with his problems, as well as a positive attitude toward his responsibility in treatment.

Although the client demonstrated a mild tendency to endorse certain problem areas, his responses were deemed valid for clinical interpretation and were not indicative of an overly exaggerated or malingered profile. There was no indication of overt malingering on cognitive or psychological tests. On formal assessment of his tendency to malinger psychiatric symptoms, his responses fell in the normal range and were not consistent with symptom feigning. His profile is more readily seen in the context of someone who has a very negative self-concept and an inclination to complain. He also has a tendency to misinterpret the actions of others and misconstrue their actions and feelings towards him.

Given these findings, the following are the possible differential DSM-IV diagnoses:
Axis I:        Major Depressive Disorder, Bipolar II Disorder, Posttraumatic Stress Disorder, Generalized Anxiety Disorder
Axis II:       Deferred

**SUMMARY of Current Test Results and Diagnostic Impression.**
In summary, Mr. Whitaker's overall level of general intellectual functioning was estimated to fall between the above average to superior range, based on current and prior testing results. His performances on cognitive testing revealed mild variability across tests assessing attention, effortful working memory, concentration, and processing speed, with performances variably falling in the moderately impaired to the above average range depending on the test. In addition, he exhibited mild difficulty with executive functioning characterized by deficits in novel problem solving with impaired mental set shifting and perseveration (i.e., repetitive responding). In regards to learning and memory, he demonstrated a relatively flat learning curve and subtle interference on a verbal list-learning task, with otherwise intact memory encoding and consolidation, and intact recognition memory for both verbal and visual information. Results of testing of his ability to accurately recognize basic emotions exhibited by others in video vignettes revealed deficits in his ability to accurately identify the emotions of sadness, anger, and anxiety.

Results of the clinical interview, in combination with the results of the objective assessment of his personality character and mood symptoms, as well as the cognitive findings revealing variability in attentional processing and deficits in executive functions as well as a flat learning curve, indicate the presence of significant symptoms of depression, including the affective, cognitive and physiological symptoms associated with a depressive episode, as well as symptoms indicative of anxiety, including primarily the cognitive and affective symptoms associated with anxiety. Overall, these results are consistent with a clinical diagnosis of an anxious depression. He would meet clinical diagnostic criteria for Major Depressive Disorder, likely recurrent given past information, with mixed mood of anxiety. He could also meet criteria for a diagnosis of Dysthymic Disorder as his depressed mood appears to be chronic in nature with episodes of worsening mood. In addition, he also meets criteria for a separate diagnosis of Generalized Anxiety Disorder, although depression appears to be the over-riding emotion currently. Although his current circumstances of incarceration on death row are very likely contributing factors to his currently depressed mood and suicidal ideation, his symptoms, by history, are more longstanding in nature rather than an acute presentation relating solely to his

current circumstances. As part of his psychological presentation, he is hypervigilant, resentful, paranoid, suspicious, and feels persecuted by those around him. He exhibits a poorly established identity and sense of self, with poorly delineated goals or life purpose and, from all reports, appears to have exhibited this lack of identity consistently throughout his life. Given this constellation of symptoms, he is at risk for suicide and it would not be unexpected for him to take some action to harm himself or attempt to end his life if certain circumstances present themselves to him, e.g., that his execution date approaches and other legal attempts to support him fail.

Given his consistent presentation over time of heightened suspiciousness, resentment, chronic beliefs that others are against him, misconstruing the intentions of others, his social detachment, history of a lack of close friends, indifference and emotional detachment, and constricted range of affect indicate the presence of features of paranoid personality disorder or schizotypal personality disorder.

In the past, the client appears to have met criteria for a diagnosis of Acute Stress Disorder relating to the tragic loss of his friends and the events surrounding the shooting of his family and himself. As a result, he would currently meet criteria for a diagnosis of Posttraumatic Stress Disorder.

Based on his presentation and symptom endorsement at this time, in combination with the client's history, he does not meet criteria for a diagnosis of Asperger's Disorder, Schizophrenia, or Schizoaffective Disorder. However, it cannot be determined at this time whether or not the patient held beliefs that could have been severe enough to meet criteria for a diagnosis of Delusional Disorder at or around the time of the offense. There is some indication from prior testing that his beliefs may have been significant enough to meet criteria for a diagnosis of delusional disorder (paranoid) in the past.

For clarification, despite the client's involvement in isolated acts of a criminal nature during adolescence, he did not ever meet criteria for and was never given a diagnosis of conduct disorder in adolescence. Moreover, he does not meet criteria for and has never been given a diagnosis of antisocial personality disorder. Technically, he meets only one of the criteria (needs three or more criteria plus history of conduct disorder), a history of deceitfulness given a history of lying, use of aliases and conning others. Specifically, he has not exhibited a "pervasive pattern of disregard for and violation of the rights of others occurring since the age of 15 years" as required to make the diagnosis. He has not failed to conform to social norms with respect to lawful behaviors as he did not engage in "repeatedly performing acts that are grounds for arrest." He does not have a history of aggressiveness, a history of engaging in physical fights, or exhibition of reckless disregard for safety of self or others. Isolated juvenile acts and pranks do not make a diagnosis of antisocial personality disorder or conduct disorder.

It is well known and accepted medically that clinical diagnoses of depression and anxiety, as well as symptoms of delusional thought patterns and even deficits in executive functioning attributable to concussions, can be treated successfully pharmacologically and/or with psychotherapeutic treatments. Although a number of mental health and medical professionals recommended pharmacological evaluation and treatment early on in late adolescence and early adulthood, the client never followed through with treatment and, according to his perception of his family and his upbringing, he was not and would not have been supported in his pursuit of mental health treatment. Instead, it was suggested that he pursue religious

methods of healing, which instead compounded his own personal identity issues and level of internal stress and turmoil as these recommendations did not fit with his own beliefs.  One can only imagine that if he had received the treatment he needed and been able to divert his inner turmoil and anger, circumstances may have changed dramatically and not led to the ultimate act of killing his family.

**OVERALL GENERAL IMPRESSION.**
It is the opinion of this examiner that Mr. Whitaker is currently suffering from a Depressive Disorder with accompanying Generalized Anxiety Disorder, in addition to significant identity issues and lack of a sense of self, feelings of resentment, persecution, and suspiciousness and mistrust of others.  Overall, these results are very consistent with the findings from prior psychological evaluations dating back to 1997.

Given the findings from the current and prior psychological test data, revealing the client's personality structure comprised of features of suspiciousness and mistrust of others as well as a tendency to misperceive the motives or intentions of others as being negative judgments against him, it appears that the client's mood, characterized by episodes of recurrent depression and generalized anxiety, in combination with ruminative, obsessive, and perseverative thought patterns, contributed to his decision to do away with his family, who had been the sole focus of his inner turmoil and the target of his buried anger.  His history of at least two mild head injuries / concussions may have contributed to the development of mild executive dysfunction observed on current testing.  This impairment of problem solving indicated a pattern of perseverative, or repetitive, responding and difficulty shifting mental set and could certainly have contributed to his apparent difficulty in generating alternate possible solutions to dealing with his perceived lack of support and attention from his family.  As he reported to this examiner, he "tried twice" to follow the goals he wanted to pursue in his life (e.g., joining the service) but "failed."  He appeared unable to generate any way to separate himself or to establish a personal identity separate from his family of origin by any alternative method other than killing his family.

As can be seen from the data, there is fundamental agreement between the data from this evaluation and that from prior evaluations in the findings of anxiety disorders, signs of depression, consistent and pervasive identity issues with lack of a sense of self, inner turmoil and distress compounded by suspiciousness, resentment, and a negative misperception of others treatment of him.  The constellation of these clinical symptoms has serious psychological consequences, even potentially to delusional proportions, as indicated in early assessments of the client when he was embroiled in the height of his anger and feelings of repression.

The results of this psychological evaluation, as well as the results of prior psychological evaluations, revealed data to support the presence of significant mental health conditions, disorders that could have been treated successfully pharmacologically, including depression and anxiety, present throughout the client's life beginning in late adolescence.   The fact that this relevant data was not appropriately recognized and utilized during the client's trial, or even as mitigating circumstances during the punishment phase, was clearly a disservice to and improper representation of the client.  It appeared as though the client's prior attorney felt he could come to his own conclusions about the presence or absence of any mental health diagnoses the client may or may not have, despite his lack of any professional training in the mental health or medical fields.

The literature is replete with discussions of misattributions by the lay public in regards to what certain psychiatric diagnoses represent and what symptoms comprise various mental health diagnoses.  The fact that individuals in the lay public may inappropriately believe that an individual who engages in any criminal act carries a diagnosis of antisocial personality disorder or believe that if someone is motivated by money they are narcissistic, highlights the importance of the need for a proper evaluation to be completed by a trained professional in the mental health field to determine whether or not a mental health condition could have been a contributing factor in any criminal act.

DIAGNOSES:
Axis I      Major Depressive Disorder, recurrent, with mixed mood of anxiety
              comorbid Generalized Anxiety Disorder, Posttraumatic Stress Disorder
Axis II     deferred, rule out paranoid or schizotypal personality disorder
Axis III    history of three mild traumatic brain injuries/ concussions, peripheral neuropathy-traumatic secondary to gunshot wound, hypertension
Axis IV    lack of social support, incarceration on death row with potentially impending execution date
Axis V     GAF= 45 current


Thank you for the referral of this forensic psychological evaluation.



Diane M. Mosnik, Ph.D.
Licensed, Clinical Neuropsychologist

# EXHIBIT   'N'

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **THOMAS BARTLETT WHITAKER,** | ' | |
| | ' | |
| **PETITIONER,** | ' | |
| **V.** | ' | **CASE NO. 4:10-MC-293** |
| | ' | |
| **RICK THALER, DIRECTOR,** | ' | |
| **TEXAS DEPARTMENT OF** | ' | |
| **CRIMINAL JUSTICE,** | ' | |
| **INSTITUTIONAL DIVISION,** | ' | |
| | ' | |
| **RESPONDENT.** | ' | |

## STATEMENT OF KENT WHITAKER

My name is Kent Whitaker. I am the father of Thomas Whitaker. To the best of my knowledge the following is true and correct.

In 2006, I retained Randy McDonald to represent my son. I did so because of Mr. McDonald's reputation and because Dan Cogdell recommended him. The retainer was $180,000.00. Mr. McDonald understood that I would raise additional funds for experts and for co-counsel if needed.

Aware of the evidence against my son, I realized that we did not have any hope for an acquittal. Mr. Cogdell told me so before he withdrew. Mr. Cogdell had tried to arrange a proffer, through which, as I understood it at the time, the Fort Bend District Attorney's Office would not seek the death penalty in exchange for an account by my son of his role in the deaths of my wife Tricia and youngest child, Kevin. Before I hired Mr. McDonald I met with the Assistant District Attorney, Fred Felcman, and begged him, literally on my knees, not to seek the death penalty.

At the time Mr. McDonald took the case, he understood that it was an indefensible case, and that his job was to convince the jury at the punishment phase to sentence Thomas to life in prison. Mr. McDonald told me this himself from the day he took the $180,000.00 retainer.

However, I have read the affidavit that Mr. McDonald submitted supporting the State's Answer to the application for a writ of habeas corpus prepared by the state habeas counsel, David Schulman. This Affidavit shows that Mr. McDonald prepared for guilt-innocence by reviewing the State's file. I know Mr. McDonald did not hire an investigator to interview

witnesses, and he never spoke to me about interviews that he conducted or tried to arrange with witnesses for the State.

I have not seen an itemization of the work that Mr. McDonald put into the Thomas case; however, McDonald's affidavit suggests that he did not put any of the $180,000.00 retainer towards defending my son against the death penalty, or if he did, it was a nominal amount, consisting in, I suppose, the attorney time it took to talk to Thomas, Bo Bartlett (Thomas's maternal uncle) and me, and maybe the attorney time it took to look at the records that the State subpoenaed from Dr. Brendan O'Rourke.

I have read the State's "proposed findings of fact and conclusions of law." Finding numbered **thirty-one (31)** says that I "informed Mr McDonald that Applicant had every opportunity in the world" and that I thought Thomas had done it just to see if he could." I may have made a comment like this, however, it was only as one of many possibilities. I did not seriously believe that this had a high probability of explaining his actions, but not being legally trained I did not know what might be useful to Mr. McDonald in preparing a defense. Since I believed that Mr. McDonald needed every possible thought to create a strong defense in the penalty phase I mentioned it. Mr. McDonald did not make any comment at the time, tell me that I could anticipate the State asking me questions like this, or go over how to respond.

I have to say, I don't understand what this has to do with Mr. McDonald's decisions about whether or not to hire a psychologist. I do feel as if I am being blamed for what Mr. McDonald did not do. I can say categorically that I did NOT try to persuade Mr. McDonald that retaining a psychologist would be a waste. The exact opposite is true.

I pressed Mr. McDonald to have Thomas tested by a psychologist. It was clear to me that there was something wrong with Thomas, and I wanted to know what it was; and so did Thomas. Both Thomas and I on numerous occasions asked Mr. McDonald about retaining a psychiatrist. Thomas told me that he did not understand why the shootings had happened and he wanted to find out what had happened in his mind and would welcome a psychiatrist's testing. I had spoken with Dr. O'Rourke and she had told me that Thomas needed to have a battery of tests. I was willing to fund the testing.

Mr. McDonald told me that if we tested Thomas, the state would have access to it. The specific words he used were that "It would be committing legal suicide." He said that we would be have to hire experts to counter the State's experts and "the jury would be forced to choose between their experts and our experts", and that would create problems for him. Again, "Legal Suicide" was the description. Mr. McDonald did not explain that we could use a consulting expert. I thought that once tested, the results would be available to the State whether we wanted them to be or not. Furthermore, I had already paid for Dan Cogdell to retain Dr. Brown. As I recall the fee was $2,500 to have Dr. Brown interview my son. Thomas could not be bonded out, so that interview had to take place at the Fort Bend County Jail, which means that State could find out about it. I'm afraid Mr. McDonald's reasons for not retaining a psychologist are either fabrications or proof that he did not talk to Dr. Brown or Mr. Cogdell about the testing that had already been done.

Mr. McDonald did not tell me why he objected to Dr. Brown, or discuss Dr. Brown's December 10, 2005, report with me. I was not made aware, until after the trial, that Dr. Brown had tested Thomas or provided Mr. Cogdell with this report. Not knowing of the report, I certainly had no knowledge of what might have been in it. Mr. McDonald's affidavit indicates he fired Dr. Brown.

Mr. McDonald's statement that he instructed Dr. Brown not to interview Thomas leaves the impression that he did not know Dr. Brown had already interviewed and tested Thomas. It seems Mr. McDonald did not speak with Dr. Brown long enough to find out what he had already done, get Mr. Cogdell's file, or talk to Mr. Cogdell about Dr. Brown's findings.

Finding number **thirty-nine (39)** appears to blame me, again, for Mr. McDonald's decisions, and does so in a less than forthright way. I realized that investigating a defense against the murder charges was hopeless; I knew that my son was guilty. However, this finding makes it seem as if I thought investigating a mitigation defense was a waste of time. I was not informed by Mr. McDonald that there was such a thing as a mitigation expert. If I had been I would have raised funds for Mr. McDonald to hire one, or else I would have asked Mr. McDonald to put a portion of the $180,000.00 I had  agreed to pay him towards retaining a mitigation expert.

From my perspective, finding fifty-four **(54)** and **fifty-five (55)** blame me, yet another time, for Mr. McDonald's failures. Finding fifty four suggests that I told Mr. McDonald that I thought my son had changed and that he expected me to say this.    Finding fifty five says that Mr. McDonald judged from statements  picked up by the press that I would ask the jury to spare Thomas's life.

As you might expect, I had my antenna up very high evaluating my son's reactions since his return, and I saw behavior that did lead me to believe that he had changed. I never told Randy that I knew for a fact that Thomas was a changed person. I couldn't possibly know that. What I repeatedly told Randy and others was that I had noticed that Thomas seemed more contrite and open and caring for others' feelings and that I thought those changes were real, but that I could not see into the heart. From the beginning, I have said I don't know if he had changed. For all I knew he might still be trying to deceive us. I felt that Thomas had terribly deceived me and many others in the past. I told  this to Mr. McDonald several times, and I expressed this horrible fear to the press. Randy knew that I would not lie to the jury.

I cannot for the life of me understand how a Court could find that an attorney who relied on statements reported by the papers to figure out what his witness would say at trial was effective. This seems to me to be the height of irresponsibility. Of course, I did ask the jury to spare my son's life. This was obvious. I told McDonald that I got down on my knees to Fred Felcman and asked him not to seek the death penalty.

The dreadful feeling I live with is that I was unable to give the jury a reason to spare my sons life. All I could do was beg, and I couldn't get on my knees like I did in front of Mr. Felcman. I needed so badly to have a report like Dr. Brown's or Dr. Harrison's so that the jury would have a more concrete reason for deciding against the death penalty, but I was relying on

Randy's evaluation and judgement that such a report would be dangerous for our defense. Now that I know more about how the legal system works I refuse to believe that a lawyer can be excused from failing to investigate possible mental illness or other mental problems in a Capital Murder case, especially when it looks like his client was suffering from them - and then limiting his defense to calling a family member to ask the jury to spare the client's life. That does not take a law degree.

Finding number **fifty-six (56)** may the worst. Thomas' state habeas attorney accused Mr. McDonald of not preparing me. In response Mr. McDonald says that he was surprised by my testimony. My layman's understanding is that you should prepare your witnesses so you are not surprised. I have to keep coming back to this point: What kind of judge would read this finding and think it shows that the attorney was doing his job?

Finding number fifty-six is plain wrong, and it continues to blame me. I vehemently disagree with it. I was never "O.K." with the district attorney's decision to seek the death penalty; what I said was that when I tried to view the situation from the position of a neutral citizen I could understand how a District Attorney locked in a contested primary race and prosecuting a high profile murder case involving a son charged with planning the murder of his family could choose to consider pursuing the death penalty. That did not mean that I believed this was the right course. I fought that with all my heart. I have been deeply damaged emotionally and financially by my efforts to fight their decision, which I did for a year and a half leading up to the trial. I spoke privately and publicly on many occasions expressing my disappointment with the district attorney's decision.

I told Randy and everyone else – I actually said this in my testimony – that my greatest concern was that my son would ask God and me for forgiveness, and be saved for eternal life in heaven. The first time I saw him after his arrest he took responsibility for everything that had happened and asked for my forgiveness, which I gave him. I believed it, but I also knew that it was possible he might still be trying to lie to me. I certainly did not know if he had asked God for His forgiveness, which as a Christian, I believe is necessary for acceptance into heaven. I was praying for the jury to give him life in prison so that (if he had not asked God for forgiveness) he would have more time to reach that decision before his death. The most important thing in the world to me is that my son join his Mom, brother, and me in heaven. I did not want the State to kill him before he made that choice; I told him God was in charge and allows things to happen that we cannot understand. This is the statement I gave to the press.

If this finding is an honest one, which I sincerely doubt, it means the courts that adopted it think that I left the jury with the impression that I was indifferent to whether my son was put to death – that I was O.K. with it, and with the impression that I thought my son was capable of killing again. Well, I hired Mr. McDonald so that he jury would not be left with these impressions. This finding shows he failed miserably. It shows he put on a punishment phase defense, through me but without the preparation I needed to succeed, that sent my son to death. This is unspeakably horrible. I should not have to bear being blamed for this especially when counsel admits that he purposefully did not prepare me.

I understand that Mr. McDonald's excuse for not preparing me is that he wanted me to appear spontaneous or unrehearsed. I cannot understand how this passes for a "strategic" decision. Mr. McDonald knew I had been living with this terrible tragedy for years, and that I had made a decision to speak about it publicly. Mr. McDonald knew that I had spoken publicly on many occasions. I was worn out by the ordeal, and I needed the assistance of counsel to prepare me for my testimony.

Finding **fifty-seven** (57) also faults me for not telling Mr. McDonald what questions he should have asked me. One that is obvious from the psychological reports that Dr. Brown and Dr. Harrison prepared is whether I was aware Thomas needed medication. Another is whether I knew that he suffered from mental illness. Another would be to ask if I had tried to get my child psychiatric treatment, or mistakenly thought that a more rigorous religious education was the answer. Apparently, another is whether I truly was OK with the district attorney's decision to seek the death penalty.

I have to keep coming back to the point that I needed help and guidance to effectively argue against giving my son the death penalty. I hired Mr. McDonald to think up the right questions to ask. I also needed to be prepared for cross-examination, not just for what Mr. McDonald would ask on direct. I was pushed into the fire of an experienced District Attorney without any insight from Mr. McDonald about what I might face. Randy was supposed to be the coach, but he sent me in without letting me know what the play was or preparing me for what the other side was going to run at me.

I cannot see how anyone could think that that the hope that the jury would feel I was being spontaneous was worth the risk of putting me on the stand unprepared. Randy did not go over the damaging records of Lynn Ayer with me. He did not prepare me to face questions about whether I felt betrayed and manipulated by his son. He did not warn me to expect cross examination regarding the privileges and efforts my wife and I had made to provide for Thomas, and failed to prepare me for question regarding whether I knew about the negative things Ayers and Dr. O'Rourke's reported. I had no answer to Mr. Felcman's questions about whether I knew Thomas was narcissistic and manipulative or why he was. But I needed to be able to say that Thomas hadn't been given the medication and counseling I now know he needed. Randy, in my view, needed to be able to say that Mr. Felcman was misrepresenting the evidence we have about Thomas' mental health and personality, and I needed the security of knowing he could make this argument.

The last finding that directly talks about me is finding **ninety-five (95)**, which says that "Kent Whitaker, the State's first witness, brought the proffer before the jury during direct examination." I am afraid that this is irresponsible. Finding ninety-five makes it sound if I am the one who allowed the proffer into evidence, against Mr. McDonald's will. However, I was called as the State's first witness. I was subpoenaed, I should add; I did not voluntarily testify for the State. On the stand, I had to answer questions that the State asked me. The State introduced the proffer, not I. Randy's job was to object. I could not.

       If called as a witness, I would testify to the foregoing in a court of law.  I hereby swear, affirm and state that the foregoing is true and correct under penalty of perjury pursuant to Title 18 U.S.C. § 1746."

/S/                                                                         June 28, 2011

_____        DATED: _____

KENT WHITAKER

# EXHIBIT "O"

| State | Year of Crime | Name of Defendant | Age of Defedant | Relationship of Victim | Death Sought? (Y/N) | Defendant's Sentence? (Death or Less Than Death) |
|---|---|---|---|---|---|---|
| Texas | 1998 | Michael Yowell | 28 | Father, mother and grandmother | Y | Death, later overturned |
| Texas | 1975 | Markham Duff- Smith | | Adoptive mother | Y | Death |
| Texas | 2003 | Tracy Beatty | 42 | Mother | Y | Death |
| Texas | 1999 | Carlton Akee Turner | 19 | Adoptive father and mother | Y | Death |
| Texas | 1977 | Mary Lou Anderson | | Father and mother | Y | Death, immediately reduced to 50 year sentence for testimony at accomplice's trial |
| Texas | 2003 | Andrew Wamsley | 19 | Father and mother | Y | less than death - found him not a FD |
| Texas | 1992 | Kristi Koslow | 17 | Step-mother | Y | less than death - found her not a FD |
| Texas | 2004 | Justin Smith | 25 | Father and mother | N | less than death |
| Texas | 1982 | Cynthia Campbell | 26 | Father and mother | unknown | Less than death |
| Texas | 2005 | Brandon Woodruff | 18 | Father and mother | N | less than death |
| Texas | 1992 | Jennifer Yesconis | 21 | Father and step-mother | unclear | less than death |
| Texas | 1992 | Courtney Dunkin | 15 | Step-grandmother/Legal guardian | unclear | less than death |
| Texas | 1999 | Stephanie Barron | 17 | Father and mother | unclear | less than death |
| Texas | 1998 | Krissi Lynn Caldwell | 17 | Mother killed, father seriously wounded | unclear | less than death |
| Texas | 2009 | Erin Caffey | 16 | Mother and 2 brothers | N | less than death |
| Texas | 2000 | David Hisey | 53 | Father and mother | N | less than death |
| Texas | 2006 | ? Lohstroh | 10 | Father | N | less than death |
| Texas | 1999 | Sylvester Hobbs III | 20 | Step-father | unclear | less than death |
| Texas | 1995 | Lance Butterfield | 18 | Father | N | less than death |
| Texas | 1993 | James Michael Roy | 22 | Father | N | Less than death |
| Texas | 1991 | Donna Weisner | | Father | unclear | Not guilty |
| Texas | 2010 | John Shank | 20 | Mother | unclear | NGRI |
| Texas | 2009 | Danish Minhas | under 18 | Mother | N | Not Sentenced yet |
| Texas | 2009 | John W. Rogers | adult | Father | Y | Not sentenced yet |
| Texas | 2009 | ? Nelson (female) | 12 | Father | N | less than death |
| Florida | 2004 | Blaine Ross | 24 | Father and mother | Y | Death - conviction overturned in 2010 |
| Illinois | 2005 | Eric Hanson | 29 | Father, mother, sister and brother-in-law | Y | death (commuted to life) |
| California | 1990 | Deondre Arthur Staten | 24 | Father and mother | Y | death |
| California | 1989 | Joseph Lyle Menendez | 21 | Father and mother | Y | Less Than Death |
| California | 1989 | Erik Menendez | 18 | Father and mother | Y | Less Than Death |
| California | 1993 | Dana Ewell | 21 | Father and mother | Y | less than death |
| California | 1983 | Jim Gordon | 38 | Mother | unclear | Less than Death |

| | | | | | | |
|---|---|---|---|---|---|---|
| Ohio | 2009 | Travis Miller | 27 | Father | N | less than death |
| Ohio | 1993 | Billie Joe Powell | 16 | Father | N | less than death |
| Ohio | 2011 | Rodney Stutzman | 31 | Father and mother | unclear | Not sentenced yet |
| Ohio | 2011 | Joseph McVay | 10 | Mother | N | Not Sentenced yet |
| Washington | 2010 | Per Olaf Johansson | 32 | Father killed, mother and niece injured | N | Not sentenced yet |
| Washington | 2008 | Bryan Kim | 19 (?) | Father and mother | N | less than death |
| Washington | 1983 | Jeannette Murphy | 19 | Father and mother | N | less than death |
| Washington | 2007 | Michele Anderson | 29 | Father, mother, brother, sister-in- | Y | Not sentenced yet |
| Washington | 1991 | Israel Marquez | 17 | Step-father | unclear | less than death |
| Florida | 2007 | Jacob Brighton | 16 | Father and mothjer | N | Not Sentenced yet |
| Florida | 1998 | Steven Etheredge | 15 | Father | N | less than death |
| Florida | 2004 | Christopher Sutton | 25 | Adoptive mother | N | less than death |
| Florida | 2010 | Alexander Crain | 14 | Father and mother | N | Not Sentenced yet |
| Florida | 2008 | Darryl Kenney | 22 | Father | unclear | less than death |
| New York | 2000 | Connie Leung | 17 | Father and mother | N | less than death |
| New York | 2010 | Matthew Taranto | 28 | Father | N | less than death |
| New York | 2010 | Jesse Green | 31 | Father, mother injured | N | less than death |
| New York | 1990 | Roy Rowe | 17 | Step-father | unclear | less than death |
| New York | 1986 | Cheryl Pierson | 16 | Father | N | less than death |
| Minnesota | 2005 | Matthew Niedere | 17 | Adoptive father and mother | N | less than death |
| Arizona | 2009 | Kevin Black | 50 | Step-Father | unclear | less than death |
| Arizona | 2008 | Hughstan Schlicker | 15 | Father | N | less than death |
| Arizona | 2008 | Christian Romero | 8 | Father | N | Less than death |
| Maryland | 2008 | Nicholas Waggoner Browning | 15 | Father, mother and 2 brothers | N | less than death |
| Illinois | 1976 | Patricia Columbo | 19 | Father, mother and brother | unclear | less than death |
| Illinois | 2010 | David Szalonek | 16 | Father | N | Not Sentenced yet |
| Illinois | 1993 | Eric Robles | 17 | Father and mother | N | less than death |
| Illinois | 1994 | Pamela Knuckles | 17 | Mother | N | less than death |
| Illinois | 1994 | Bart Knuckles | 19 | Mother | N | less than death |
| South Carolina | 2011 | ? Lankford | 14 | Father and Great Aunt, Grandmother injured | N | Not Sentenced yet |
| Alaska | 1976 | Vincent Eben | ? | Father and mother | N | less than death |
| Louisiana | 1997 | Ronald Adams | adult | Father and mother | N | less than death |
| Louisiana | 2009 | Michael Singreen | 28 | Father, mother injured | unclear | Not sentenced yet |
| Louisiana | 2007 | Connor Wood | 15 | Father and mother | N | less than death |
| Virginia | 1990 | Jessica Wiseman | 14 | Father and mother | N | less than death |
| Virginia | 1999 | Gary Thorton | 31 | Father and mother | N | less than death |
| Virginia | 1992 | Barbara Mullens | 15 | Mother and Step-father | N | less than death |

| | | | | | | |
|---|---|---|---|---|---|---|
| Virginia | 1992 | Jannaleigh Mullens | 15 | Father and Step-mother | N | less than death |
| Virginia | 1993 | Camellia Lou Fries | 13 | Mother | N | less than death |
| Virginia | 1993 | Stephanie Dawn | 12 | Mother | N | less than death |
| Virginia | 1985 | Elizabeth Haysom | 21 | Father and mother | N | less than death |
| Massachussetts | 2011 | Matthew Worster | 17 | Mother | N | Not sentenced yet |
| Massachussetts | 1997 | Simon Piper | | Mother | N | less than death |
| Massachussetts | after 1975 | Mark Martone | 16 | Father | N | less than death |
| Minnesota | 2003 | Jason MacLennan | 17 | Father | N | less than death |
| Indiana | 1980 | Allen Turner | 19 | Father and mother | unclear | less than death |
| Indiana | 2010 | Kevin Murphy | 48 | Father, mother, and aunt | Y | Not Sentenced yet |
| Missouri | 1990 | Stacey Lannert | 18 | Father | unclear | less than death |
| Missouri | 2010 | David Champ | 11 | Father | N | Not sentenced yet |
| Missouri | 1990 | Christy Lannert | 15 | Father | N | less than death |
| Mississippi | 1994 | Stephen McGilberry | 16 | Mother, step-father, step-sister, and | Y | death, reduced to life after Roper |
| | | Scott Anders | 15 | Father | N | less than death |
| Georgia | 2008 | Anthony Terrell | 17 | Mother, 2 sisters | N | less than death |
| Colorado | 2010 | John Caudle | 14 | Mother and Step-father | N | Not Sentenced yet |
| Colorado | 2007 | Tess Damm | 15 | mother | N | less than death |
| Colorado | 2009 | Jeremiah Raymond Berry | 22 | Father | N | less than death |
| Colorado | 2003 | Thomas Martinez | 38 | Father | N | less than death |
| Colorado | 1998 | Nathan Ybanez | 17 | Mother | unclear | less than death |
| Colorado | 1992 | Jacob Ind | 15 | Mother | N | less than death |
| Colorado | 2004 | Michael Fitzgerald | 16 | Father | N | less than death |
| Colorado | 2004 | Staci Lynn Davis | 13 | Mother | N | less than death |
| Colorado | 1999 | John Engel | 14 | Mother and grandmother | N | less than death |
| Colorado | 1994 | Jenna Smythe | 19 | Mother and young girl | unclear | less than death |
| Colorado | 1988 | Charles Limbrick | 15 | Mother | N | less than death |
| Colorado | 1987 | Richard Mijares | 17 | Mother | N | less than death |
| Colorado | 1986 | Herman Douglas French Jr. | 14 | Mother | N | less than death |
| Colorado | 1986 | Larry Long Jr. | 18 | Mother, brother | N | less than death |
| Colorado | 1983 | Ross Michael Carlson | 19 | Father and mother | unclear | died before trial |

| Colorado | 1983 | Michael Shane Wilkerson | 14 | Mother | N | less than death |
|---|---|---|---|---|---|---|
| West Virginia | 1994 | William Bradford | 43 | Father | N | less than death |
| Maine | 2009 | Perley Goodrich Jr. | 45 | Father, injured mother | N | less than death |
| Maine | 2009 | Ross Morrill | 22 | Adoptive father | N | less than death |
| New Mexico | 2004 | Cody Posey | 14 | Father, step-mother and step-sister | N | less than death |
| Tennessee | 1997 | Nathan Callahan | 15 | Mother and sister | N | less than death |
| Tennessee | 2011 | Adam Johnson | 32 | Father and mother | unclear | Not sentenced yet |
| Tennessee | 2009 | Misty Evans | 25 | Father | N | less than death |
| Tennessee | 2011 | Jeremy Black | 23 | Father | unclear | Not sentenced yet |
| Georgia | 2010 | Fredrick B. Rogers | 24 | Father | unclear | Not sentenced yet |
| Michigan | 2010 | Tia Skinner | 17 | Father and mother | N | Not sentenced yet |
| Florida | 2010 | Jumar Henry | 21 | Mother | Y | Not sentenced yet |
| Florida | 2009 | Gregory Larkin | 37 | Father and mother | unclear | Not sentenced yet |
| Florida | 2011 | Guenevere Hudnall | 19 | Father | unclear | Not sentenced yet |
| California | 2008 | Son Lam Nguyen | 31 | Mother | N | less than death |
| California | 2011 | Jeremy Dwayne Martin | 35 | Father | N | Not sentenced yet |
| Virginia | 2011 | Gbassay Koroma | 18 | Father | unclear | Not sentenced yet |
| Illinois | 2011 | Stephen Cole | adult | Father | N | less than death |
| Illinois | 2010 | James Larry | 32 | Mother, wife, son, 2 nieces | N | less than death |
| Illinois | 2011 | Matthew Nelleson | 20 | Father | N | Not sentenced yet |
| Wisconsin | 2010 | Larry Clark | 59 | Mother | N | less than death |
| South Carolina | 2011 | Landon Thomas Sanders | 17 | Father, another woman | N | Not sentenced yet |