**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| THOMAS BARTLETT WHITAKER, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | H-11-CV-2467 |
| | § | |
| WILLIAM STEPHENS, | § | |
| Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

**<u>MEMORANDUM AND ORDER</u>**

This case is before the Court on Petitioner Thomas Bartlett Whitaker's Amended Petition for Writ of Habeas Corpus (Doc. No. 2), Respondent William Stephens' Motion for Summary Judgment (Doc. No. 6), and Mr. Whitaker's Supplemental Motion for an Evidentiary Hearing (Doc. No. 19). For the following reasons, Respondent's motion for summary judgment is granted, Mr. Whitaker's motion for an evidentiary hearing is denied, and the amended petition is dismissed with prejudice.

## I.    BACKGROUND

The facts of Mr. Whitaker's crime are not in dispute. As summarized by the Texas Court of Criminal Appeals ("TCCA"):

> The evidence shows that [Mr. Whitaker] led his family to believe that he was enrolled in college and was about to graduate. None of this was true. On December 10, 2003, [Mr. Whitaker] and his father, mother and younger brother went out to dinner to celebrate [Mr. Whitaker]'s "graduation." When they arrived home, [Mr. Whitaker]'s roommate ([Christopher] Brashear) was inside, and he

1

shot and killed [Mr. Whitaker]'s mother and brother and wounded [Mr. Whitaker]'s father as they entered the home. [Mr. Whitaker] knew that Brashear was waiting inside the home intending to murder [Mr. Whitaker]'s entire family. He knew that another individual ([Steven] Champagne) was waiting outside in a getaway car. Since at least 2000, [Mr. Whitaker] had planned with several other individuals, at different times, to murder his family. He made at least one unsuccessful attempt to murder his family prior to December 10, 2003. His motive was money.

In June 2004, as the police investigation focused on [Mr. Whitaker], [Mr. Whitaker] stole $10,000 from his father and fled to Mexico where he was apprehended about 15 months later.

* * *

At the punishment phase, [Mr. Whitaker]'s mitigation case was, among other things, that [Mr. Whitaker] was sorry and that neither his father nor members of his mother's side of the family wanted him to be sentenced to death and that these family members had to bear the ordeal of a trial because the State would not accept [Mr. Whitaker]'s offer to plead guilty in exchange for . . . two consecutive life sentences. Emphasizing that the State did not seek the death penalty against the shooter (Brashear), the defense also seemed to suggest that the prosecution unfairly sought the death penalty against [Mr. Whitaker] over issues related to [a] proffer [of guilt made during plea negotiations].

*Whitaker v. State*, 286 S.W.3d 355, 357-58 (Tex. Crim. App. 2009) (footnotes omitted).

The jury found Mr. Whitaker guilty of capital murder. Following the punishment phase evidence, the jury found that there was a probability that Mr. Whitaker would commit criminal acts of violence that would constitute a continuing threat to society, and that the mitigating evidence was not sufficient to warrant a life sentence. Accordingly, the trial court sentenced Mr. Whitaker to death.

2

The Texas Court of Criminal Appeals affirmed Mr. Whitaker's conviction and sentence, *Whitaker v. State*, 286 S.W.3d 355 (Tex. Crim. App. 2009), and denied Mr. Whitaker's application for a writ of habeas corpus, *Ex Parte Whitaker*, No. WR-73421-01, 2010 WL 2617806 (Tex. Crim. App. June 30, 2010).  He filed his original federal petition for a writ of habeas corpus on June 30, 2011, and amended the petition on October 14, 2011.  Respondent moved for summary judgment on September 5, 2013.

## II.    LEGAL STANDARDS

### A.    The Anti-Terrorism and Effective Death Penalty Act

This federal petition for habeas relief is governed by the applicable provisions of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997).  Under the AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Kitchens v. Johnson*, 190 F.3d 698, 700 (5th Cir. 1999).

For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this Court may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly

established [Supreme Court precedent]." *See Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). Under the "contrary to" clause, this Court may afford habeas relief only if "'the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'" *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)), *abrogated on other grounds by Lewis v. Thaler*, 701 F.3d 783, 791 (5th Cir. 2012).

The "unreasonable application" standard permits federal habeas relief only if a state court decision "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 406. "In applying this standard, we must decide (1) what was the decision of the state courts with regard to the questions before us and (2) whether there is any established federal law, as explicated by the Supreme Court, with which the state court decision conflicts." *Hoover v. Johnson*, 193 F.3d 366, 368 (5th Cir. 1999). A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." *Neal v. Puckett*, 239 F.3d 683, 696 (5th Cir. 2001), *aff'd*, 286 F.3d 230 (5th Cir. 2002) (en banc), *cert. denied sub nom. Neal v. Epps*, 537 U.S. 1104 (2003). The solitary inquiry for a federal court under the 'unreasonable application' prong becomes "whether the state court's determination is 'at

least minimally consistent with the facts and circumstances of the case.'" *Id.* (quoting *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997)); *see also Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'").

The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254 (d)(2); *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). The state court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Jackson v. Anderson*, 112 F.3d 823, 824-25 (5th Cir. 1997).

### B.    The Standard for Summary Judgment in Habeas Corpus Cases

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). Insofar as they are consistent with established habeas practice and procedure, the Federal Rules of Civil Procedure apply to habeas cases. *See* Rule 11 of the Rules Governing Section 2254 Cases. In ordinary civil cases, a district court considering a motion for summary judgment is required to construe the facts in the case in the light most favorable to the non-moving party. *See Anderson v.*

*Liberty Lobby*, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor").  Where a state prisoner's factual allegations have been adversely resolved by express or implicit findings of the state courts, however, and the prisoner fails to demonstrate by clear and convincing evidence that the presumption of correctness established by 28 U.S.C. § 2254(e)(1) should not apply, it is inappropriate for the facts of a case to be resolved in the petitioner's favor. *See Marshall v. Lonberger*, 459 U.S. 422, 432 (1983); *Sumner v. Mata*, 449 U.S. 539, 547 (1981); *Foster v. Johnson*, 293 F.3d 766, 777 (5th Cir. 2002); *Dowthitt*, 230 F.3d at 741; *Emery v. Johnson*, 940 F. Supp. 1046, 1051 (S.D. Tex. 1996), *aff'd*, 139 F.3d 191 (5th Cir. 1997). Consequently, where facts have been determined by the Texas state courts, this Court is bound by such findings unless an exception to 28 U.S.C. § 2254 is shown.

## III.   ANALYSIS

Mr. Whitaker's amended petition raises eight claims for relief.  These are addressed in turn.

### A.   Prosecutorial Misconduct

In his first claim for relief, Mr. Whitaker contends that the lead prosecutor, Fred Felcman, solicited a confession in the guise of plea negotiations, and then improperly used that confession against Mr. Whitaker at trial.  Mr. Whitaker argues that this tactic denied him due process.

### 1.    Relevant Facts

The legal merits of Mr. Whitaker's first claim for relief must be addressed in the context of the relevant facts. Many of these facts are disputed.

According to Mr. Whitaker, plea negotiations began when Mr. Whitaker's original trial attorneys, Dan Cogdell and James Ardoin, ran into Mr. Felcman at a local store. According to Mr. Cogdell and Mr. Ardoin, Mr. Felcman stated that he would consider not seeking the death penalty if Mr. Whitaker gave a written statement limited to the facts of the case, with no expressions of remorse or contrition. *See* Cogdell Affidavit, Amended Petition ("Am. Pet."), Exh. A at 2; Ardoin Affidavit, Am. Pet., Exh. B at 2. Mr. Ardoin drafted a proffer and presented it to Mr. Felcman. According to Mr. Ardoin, Mr. Felcman then rejected the proffer because it did not contain any expressions of remorse. Ardoin Affidavit, Am. Pet., Exh. B at 2.

Mr. Felcman acknowledges the chance encounter with Mr. Cogdell and Mr. Ardoin referenced in their affidavits. He admits that they discussed Mr. Whitaker's case, but he specifically denies making any offer to forego the death penalty if Mr. Whitaker confessed. Felcman Affidavit, Am. Pet., Exh. C at 3-4. Mr. Felcman's account is partially corroborated by his second chair, Jeffrey Strange, who states that neither he nor Mr. Felcman expected to receive a proffer from Mr. Whitaker, and that Mr. Felcman was "surprised" when it arrived. Strange Affidavit, Am. Pet., Exh. J at 3-4.

Although the circumstances which led to the drafting and submission of the proffer

to the district attorney's office are subject to disagreement, it is undisputed that Mr. Felcman and his second chair made use of the proffer at trial.  In doing so, Mr. Felcman treated the proffer as a "statement made in the course of plea discussions" covered by Rule 410 of the Texas Rules of Evidence.[1]  *See* 25 T.R. at 105 ("You know, of course, that proffer was absolutely inadmissible, and I could not have used it for any purposes.")[2]; *see also* Felcman Affidavit, Am. Pet., Exh. C at 4 (referencing, in context of Mr. Whitaker's proffered statement, the "general rule" in Texas that "'plea negotiations' are not admissible," including "any statements made in the course of").

The trial court credited Mr. Felcman's version of events.  It found that Mr. Felcman was "credible" and had "submitted a truthful affidavit."  4 SH at 749 (FF 76).[3]  It also found that Mr. Whitaker had "fail[ed] to prove by a preponderance of the evidence that First Assistant Felcman offered to remove the death penalty as a possible option if [Mr. Whitaker] were to tender a detailed proffer of his involvement with the offenses and avoid statements of remorse and contrition."  *Id*. at 749, 755-56 (FF 83, CL 18, CL 22).  Similarly, the trial court endorsed the State's proposed findings that there was no plea offer, and that negotiations for a possible plea agreement of life did not begin until after the prosecution

---

[1] Texas Rule of Evidence 410(4) provides that "any statement made in the course of plea discussions with an attorney for the prosecuting authority that does not result in a plea of guilty or a plea of *nolo contendere*" is "not admissible against the defendant who . . . was a participant in the plea discussions."

[2] "Tr." refers to the transcript of Mr. Whitaker's trial.

[3] "SH" refers to the transcript of Whitaker's state habeas corpus proceeding.

8

announced that it would seek the death penalty. *Id*. at 749-50 (FF 80, FF 86).  With the exception of the trial court's initial finding that Mr. Felcman was credible and had submitted a truthful affidavit, the TCCA did not adopt any of these recommended findings of fact and conclusions of law regarding the plea negotiations process. *Ex Parte Whitaker*, 2010 WL 2617806, at *1.

The parties disagree as to the legal import of the TCCA's decision not to adopt the State's proposed findings regarding the origin of the proffer.  The State argues that the TCCA's departure with the trial court's recommendations is equivalent to a nullity, and that no negative factual inference can be drawn from its summary decision.  Doc. No. 6 ("MSJ"), at 45-47.  Mr. Whitaker, however, suggests that the Court can view the TCCA's "non-finding" as an endorsement, by negative implication, of Mr. Whitaker's version of events.  Am. Pet. at 12-13.

The Court is wary of reading too much into the TCCA's unexplained decision to depart from the trial court's recommendations.  Nonetheless, it cannot evaluate the merits of Mr. Whitaker's claim without some understanding of how the proffer came into existence. When the state habeas court makes an express or implied finding of fact, this Court is bound by its determination unless contradicted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  In the absence of an express or implied finding of fact, however, this Court is not so constrained.

Here, the TCCA made no express finding of fact.  Nor did it make an implied finding

of fact, as the State argues. *See* MSJ at 47. While the TCCA adopted the trial court's findings that the State "never offered a plea agreement for life sentences" and "never took the death penalty off the table," these findings can be harmonized with Mr. Whitaker's version of events. *See* Cogdell Affidavit, Am. Pet, Exh. A at 2 ("[Mr.] Felcman stated that he would *consider* removing the death penalty as a possible option only if we would submit a 'proffer' of evidence . . .") (emphasis added); Ardoin Affidavit, Am. Pet., Exh. B at 2 ("Mr. Felcman . . . stated that he would *consider* removing the death penalty as a possible option only if we would submit an acceptable 'proffer of evidence' . . .") (emphasis added). In other words, the TCCA could have credited Mr. Cogdell's and Mr. Ardoin's allegations regarding the chance encounter with Mr. Felcman, and nonetheless have found that the State never offered to remove the death penalty as an option. Because the TCCA expressly declined to adopt findings of fact which contradicted Mr. Whitaker's version of how the proffer came into existence, and because on summary judgment the Court must construe the facts in the light most favorable to the non-moving party, the Court will consider the legal merits of Mr. Whitaker's first claim for relief in light of the facts alleged in Mr. Cogdell's and Mr. Ardoin's affidavits.

### 2.    Use of the Proffer at Trial

The proffer was discussed in front of the jury at least three times during the course of Mr. Whitaker's trial. First, Mr. Whitaker contends that Mr. Felcman baited his father, Kent Whitaker ("K. Whitaker"), into mentioning the proffer during the guilt-innocence phase by

asking him to confirm that Mr. Whitaker never confessed to the murders.  25 Tr. at 104-05.

When Mr. K. Whitaker brought up the proffer in his answer, Mr. Felcman proceeded to

characterize the proffer as "legal maneuvering on your son's part" that did not express

"repentance."  *Id*. at 104-06.

Second, Mr. Felcman used the proffer to cross-examine Mr. Whitaker during the

penalty phase.  After Mr. Felcman handed the proffer to Mr. Whitaker and asked him if it

was true, the following exchange took place:

> A.      I did not write that.

> Q:      You didn't write it?

> A.      No. I – I wanted to write the proffer.   That was some
> confusion between me and Mr. Cogdell at the time when initially – I
> guess it was your office that suggested that if we wrote the proffer,
> we could all end this.  It was my impression that I would write this
> admission of guilt.

> Q.      It wasn't my suggestion.

> A.      I'm sorry.

> Q.      Your father poured his heart out to me, and I saw no remorse
> on your part.

> A.      I didn't actually write that.  The one that I wrote was in my
> cell, and it did have remorse.  It was really how I felt at the time, and
> I didn't – I was under the impression that I was going to be giving
> that copy to Mr. Cogdell, and then I find out – I guess I didn't see
> him for a few weeks.  I found out the next time that I talked to him
> that a proffer had been rejected.  I was very confused, because it was
> my understanding that I would be writing it myself.

> Q.      The proffer that presented – that you didn't even have
> anything to do with.   You understand how insulting that is to

11

somebody that has to listen to the father plea, and I see no remorse
on the Defendant?

A.      Yes, extremely insulting.  I knew it would be, if it had been
done that way.  I wouldn't have agreed to that at all.  I was very
upset about that.

31 T.R. at 257-58.

Third, Mr. Felcman's second chair, Mr. Strange, invoked the proffer during the
State's closing in the penalty phase.  Mr. Strange argued to the jury that Mr. Whitaker's
actions throughout the case and trial—including the proffer—were "manipulation" and
"gamemanship."  32 T.R. at 31-32.

### 3.      Legal Arguments

Mr. Whitaker initially argues that *Santobello v. New York*, 404 U.S. 257 (1971), lays
out legal principles requiring relief on his first claim of relief, and that the TCCA
unreasonably refused to extend *Santobello* to the facts of his case.  *See* Am. Pet. at 18-19.
The Court finds that *Santobello* is not controlling, and that the TCCA's refusal to "extend"
*Santobello* to the circumstances of Mr. Whitaker's case was not unreasonable.[4]

In *Santobello*, the defendant agreed to plead guilty, and the prosecutor agreed to
make no recommendation on a sentence.  404 U.S. at 258.  Following a series of delays, a

---

[4] Moreover, the premise of Mr. Whitaker's argument is problematic.  The Supreme Court
recently made clear that a state court's refusal to extend Supreme Court precedent is not
grounds for federal habeas corpus relief. *See White v. Woodall*, 134 S. Ct. 1697, 1706
(2014) ("Section 2254(d)(1) provides a remedy for instances in which a state court
unreasonably *applies* this Court's precedent; it does not require state courts to *extend* that
precedent or license federal courts to treat the failure to do so as error.") (emphasis
original).

new prosecutor appeared at the defendant's sentencing hearing and recommended imposition of the maximum sentence.  Defense counsel requested a continuance to obtain proof of the original prosecutor's promise, but the trial judge refused.  Stating that he was not influenced by the prosecutor's sentencing recommendation, the judge nonetheless imposed the maximum sentence.  *Id*. at 259-60.  Observing that "petitioner 'bargained' and negotiated for a particular plea in order to secure dismissal of more serious charges, but also on condition that no sentence recommendation would be made by the prosecutor," the Supreme Court held that the breach of the agreement was material and necessitated either resentencing or the dissolution of the plea.  *Id*. at 262-63.

There are critical distinctions between this case and *Santobello*.  In *Santobello*, the defendant pled guilty, thereby waiving all of his trial rights, including any opportunity to contest his guilt.  He did so in exchange for a promise that the prosecutor would make no sentencing recommendation.  When the prosecutor breached that agreement, the defendant was entitled either to specific performance or to be returned to his original position.

In this case, Mr. Whitaker was not induced to waive his trial rights.  He made a proffer of evidence in exchange for the prosecutor's promise to *consider* not seeking the death penalty.[5]  When the prosecutor decided to pursue the death penalty, Mr. Whitaker received a full trial on the question of his guilt—though he made a strategic decision not to

---

[5] The inchoate nature of Mr. Felcman's alleged promise is another stumbling block to federal habeas relief under the auspices of *Santobello*.  Even if this Court were to agree with Mr. Whitaker that he fulfilled his side of the alleged bargain—which would require

contest his guilt—and a hearing on the issue of punishment.  Because Mr. Felcman's offer did not induce Mr. Whitaker to plead guilty, *Santobello* provides no basis for habeas relief. *See U.S. v. Rourke*, 74 F.3d 802, 806 (7th Cir. 1996) ("We have made our position clear, however, that the '*Santobello* Court did not hold that the government must fulfill every agreement or offer it makes.  Rather, as we have consistently recognized, the Court was concerned with enforcing governmental promises that had induced the defendant to plead guilty.").

Mr. Whitaker's next argument is more colorable.  He contends that the State's use of the proffer at trial "was repugnant to basic principles of fundamental fairness" and that the TCCA's refusal to find that his due process rights were violated was unreasonable.  Am. Pet. at 19-21.  The Court shares Mr. Whitaker's concerns about the State's decision to use the proffer at trial.  Texas Rule of Evidence 410—like its federal counterpart—assures all criminal defendants that they may enter into plea discussions without fear of supplying evidence that later may be used against them.  As recognized by Judge Wiseman, "[t]he government's conduct of telling a prospective defendant that it wants to discuss 'cooperation' with him . . . and then using the defendant's part of the discussion against him . . . is so fundamentally unfair that it probably constitutes a violation of Fifth Amendment substantive due process."  *U.S. v. Sikora*, 635 F.2d 1175, 1178 (6th Cir. 1980) (concurring in part, dissenting in part).  The alleged facts here are particularly troubling, as Mr. Felcman

---

contravening findings of fact to the contrary by the TCCA—it is unclear what relief the Court could order.

purportedly directed that the proffered statement not include any expressions of remorse[6]—the very feature of the proffered statement which he and his co-counsel then highlighted at trial as evidence that Mr. Whitaker was unrepentant, manipulative, and deserving of the death penalty.  25 T.R. at 104-06; 31 T.R. at 257-58; 31 T.R. at 31-32.

The Court does not approach Mr. Whitaker's claim in the first instance, however.  Pursuant to AEDPA, it sits in deferential review of the TCCA's decision not to afford habeas relief to Mr. Whitaker.  The TCCA found that the State's alleged solicitation and use of the proffer at trial did not violate Mr. Whitaker's due process rights.  The Court may not countermand this decision unless it "was contrary to, or involved an unreasonable application of, *clearly established federal law*, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1) (emphasis added).

Mr. Whitaker has not identified "clearly established federal law" with which the TCCA's decision conflicts.  He cites only two Supreme Court decisions in support of his "fundamental fairness" argument.  *Town of Newton v. Rumery* concerns the propriety of prosecutor-instigated "release-dismissal agreements"[7]—an issue not present in or invoked by Mr. Whitaker's case.  *See* 480 U.S. 386 (1987).  *United States v. Mezzanatto* resolves that the protections of Federal Rule of Evidence 410 are waivable, *see* 513 U.S. 196 (1995), but sheds no light on the constitutional implications of prosecutorial use of evidence

---

[6] The Court emphasizes that these facts are, at present, unresolved and disputed.

[7] In a "release-dismissal agreement," a criminal defendant releases his right to file a civil rights action in return for dismissal of pending criminal charges.

covered by the rule in the absence of waiver.  Indeed, of the three district court and appellate court cases cited by Mr. Whitaker, only one involves a fact pattern similar to his own.  And in that case, the Sixth Circuit ruled against the criminal defendant; the language supporting Mr. Whitaker's claim of relief—quoted by this Court, above—is drawn from a concurrence and dissent.  *See Sikora*, 635 F.2d at 1178.

"As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011).  Mr. Whitaker has not shown how the TCCA disregarded well-established federal law when it found no due process violation from the prosecutors' alleged solicitation and use of the proffered statement.[8]  He is not entitled to relief on his

---

[8] The Court does not interpret Mr. Whitaker's petition to argue that the State's use of the proffer at trial was a violation of due process simply because Texas Rule of Evidence 410 placed it off limits.  If such an argument were made, however, the Court would reject it. The State's use of the proffer at trial may not have violated Rule 410.  *See* Tex. Rule of Evidence 410 (providing for the admission of a statement made in the course of plea discussions when another statement made during the same plea discussions has been introduced and "in fairness" the statements ought to be considered "contemporaneously"); *see also Whitaker v. State*, 286 S.W.3d 355, 362 (Tex. Crim. App. 2009) ("Appellant's complaint about the testimony referring to the proffer and to the plea negotiations is difficult to understand since it appears that this information formed a significant part of his mitigation case.").  More importantly, violations of state law are not generally cognizable on habeas review unless the error renders the trial as a whole fundamentally unfair.  *See Fuller v. Johnson*, 158 F.3d 903, 908 (5th Cir. 1998) (citing *Engle v. Isaac*, 456 U.S. 107, 135, 102 S. Ct. 1558, 1575 (1982)).  The State's use of the proffer at trial did not render Mr. Whitaker's trial fundamentally unfair.  The evidence of his guilt was overwhelming. Although Mr. Felcman used the proffer to portray Mr. Whitaker as remorseless, Mr.

16

prosecutorial misconduct claim.

### B.     Ineffective Assistance of Counsel

Mr. Whitaker raises several claims of ineffective assistance of counsel.  To prevail on a claim of ineffective assistance of counsel, Petitioner

> must show that . . . counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Second, the [petitioner] must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In order to prevail on the first prong of the *Strickland* test, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness.  *Id*. at 687-88.  Reasonableness is measured against prevailing professional norms, and must be viewed under the totality of the circumstances.  *Id*. at 688.  Review of counsel's performance is deferential.  *Id*. at 689.

In the context of a capital sentencing hearing, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Strickland*, 466 U.S. at 695.   "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*. at 694.

---

Whitaker had the opportunity to testify on his own behalf and explain that he did not personally write or approve the proffer, and to express his own feelings about his crime. Moreover, Mr. Whitaker had the opportunity to call other witnesses to testify to any expressions of remorse he made in the aftermath of the murders.

For a claim adjudicated on the merits in a state habeas corpus proceeding, the petitioner bears an extraordinarily high burden.

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' [*Strickland*, 466 U.S.] at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S. Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*], 556 U.S. [111, 123], 129 S. Ct. [1411,] 1420 [(2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. [*Knowles*,] 556 U.S. [at 124], 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 131 S. Ct. at 788.

### 1.     Failure to Investigate

In his first claim of ineffective assistance of counsel, Mr. Whitaker argues that his counsel failed to investigate mitigating evidence and, as a result, "failed to comprehend that Thomas Whitaker suffered from an Axis I mental illness that included delusional thinking with serious symptoms of emotional disturbance." Am. Pet. at 26. Mr. Whitaker argues that without the information a mitigation investigation would have yielded, his trial counsel was "unable to muster a good faith argument against the State's misinformed psychological caricature of his client." *Id*. at 38.

### a.    Deficient Performance

Mr. Whitaker contends that "[t]rial counsel admits that he 'deliberately determined' not to investigate mitigating evidence of any sort, including evidence of mental illness and emotional problems." *Id*. (citing McDonald Affidavit, Am. Pet., Exh. E).  Mr. Whitaker misrepresents counsel's affidavit.  In his affidavit, trial counsel Randy McDonald notes that he took over the case from Dan Cogdell before trial.  He discovered that Mr. Cogdell had hired an investigator but that "no information was obtained that would be helpful to the defense" of Mr. Whitaker.  Am. Pet. Exh. E at 3.  Mr. McDonald decided not to hire a second investigator because he "did not see any useful information that an investigator could supply."  *Id*.

Mr. McDonald also interviewed the Petitioner and his father, Kent Whitaker. In these conversations, Mr. McDonald was "never able to obtain any information that would make [Mr. Whitaker] any less blame worthy [sic] of committing this offense." *Id*. at 4. Mr. McDonald also spoke with Dr. O'Rourke, a psychologist who performed a psychological evaluation of Mr. Whitaker in 1997.  31 Tr. at 25.   The State had subpoenaed Dr. O'Rourke's report, *see* Am. Pet., Exh. I, and provided Mr. McDonald with a copy.  Am. Pet., Exh. J at 2.  The State also provided Mr. McDonald with the records of Educational Counselor Lynn Ayres, who also evaluated Mr. Whitaker before the murders.  *Id*.  Ayres stated that she was disturbed by Mr. Whitaker and found him narcissistic.  31 Tr. at 74-76.

Based on his conversations with Mr. Whitaker, his father, and Dr. O'Rourke, as well

as his review of the evidence described above, Mr. McDonald concluded that Mr. Whitaker had an antisocial and narcissistic personality and that such qualities might convince the jury to find that Mr. Whitaker posed a future danger.  Am. Pet., Exh. E. at 4.  Mr. McDonald concluded that testimony from a psychologist would be harmful to his client and would allow the State to "bring forth evidence attempting to show that Bart Whitaker did not have a conscious [sic], was narcissistic, and therefore, could not be remorseful for the acts that he committed."  *Id.*  Mr. McDonald's trial strategy was to convince the jury that Mr. Whitaker would not pose a threat of future violence if sentenced to life imprisonment.  He planned to focus on Mr. Whitaker's obsession with his family, and argue that he had no violent propensities toward anyone else.  He also planned to try to find sympathetic jurors, and argue that it was unfair for the State to seek the death penalty for Mr. Whitaker when the shooter and getaway car driver did not face the death penalty.  *Id.* at 4, 6.

Mr. Whitaker contends that counsel's failure to pursue a psychological investigation, based on concerns that psychological testimony would be harmful, resulted from a failure to understand the difference between consulting and testifying experts.  He cites Texas law for the proposition that the State cannot present adverse psychological evidence if a defendant elects not to present psychological testimony.  Mr. Whitaker therefore argues that there was no risk in seeking a psychological evaluation.  He maintains that an evaluation would have revealed to counsel that Mr. Whitaker suffers from delusional thinking and emotional disturbance, but not narcissistic or antisocial personality disorder.

Mr. Whitaker argues that the State's subpoena of Dr. O'Rourke's files from her treatment of Mr. Whitaker should have put Mr. McDonald on notice that the State was aware of Dr. O'Rourke's opinions and planned to use psychological evidence.  Mr. Whitaker acknowledges in passing, however, that Mr. McDonald successfully excluded Dr. O'Rourke's report from evidence.  More detailed discussion with Dr. O'Rourke would also have informed counsel, according to Mr. Whitaker, that he was not diagnosed with either narcissistic or antisocial personality disorder as Dr. O'Rourke notes that such diagnoses cannot be made in juveniles.  He also claims that pursuing psychological evidence would have helped counsel rebut testimony by Lynn Ayres, an educational counselor, who testified that she conducted an interview with Mr. Whitaker which she found "disturbing," and that she thought he was narcissistic.  32 Tr. at 75.

In connection with Mr. Whitaker's state habeas corpus proceedings, Dr. Kit Harrison conducted a psychological evaluation of Mr. Whitaker.  Harrison Report, Am. Pet., Exh. H. She administered tests, and interviewed Mr. Whitaker, his former fiancée, and his father. She concluded that Mr. Whitaker suffers from several clinical problems dating back to his childhood.  These include

> a tormented irrational self-concept and personal self-identity dating back to early childhood.  Likely demonstrating early manifestations of social impairments most resembling several features suggestive of early Asperger's Disorder, Thomas was bright intellectually but absorbed in excessive reading (hyperlexia) and had very thin boundaries between fantasy and reality, a problem which exists to this day.

21

*Id.* at 2.  She also found that he was alienated from the suburban culture in which he was raised, experienced "intolerable pressure, both internally and externally, to be something he was not," and was "out of touch with reality, paranoid, and delusional."  *Id.* at 2-3.  She concluded that, at the time of the murders, Mr. Whitaker's global assessment of functioning ("GAF") score was 25 out of 100.  *Id.* at 6.  Citing the Diagnostic and Statistical Manual of Mental Disorders IV ("DSM IV"), Mr. Whitaker notes that his GAF score shows a person whose was significantly impaired.  *See* Am. Pet. at 33.

Mr. Whitaker argues that Dr. Harrison would have rebutted the State's efforts to paint him as narcissistic and manipulative, and the State's argument that Mr. Whitaker murdered his family to collect his inheritance.  Rather than having an inflated self-image, Dr. Harrison paints a picture of a young man grappling with "self-loathing, and increasingly desperate attempts to appear normal."  Am. Pet., Exh. H at 3.  He further argues that, lacking evidence to rebut the State's characterization, counsel was reduced to accepting it and arguing that Mr. Whitaker would be unable to manipulate others in prison because he would lack money or other means with which to do so.  The State, in turn, argued that he was such a skilled manipulator that he did not need money, noting that he offered his co-defendants little or nothing to help him kill his family.

The state habeas court found that counsel reviewed evidence produced by the State and investigated Mr. Whitaker's home life through conversations with Mr. Whitaker and his father.  4 SH at 741 (FF 29, FF 30).  Counsel also spoke to Dr. O'Rourke and "determined

there was no evidence of retardation or psychological problems other than an indication that [Mr. Whitaker] had an antisocial and narcissistic personality." *Id*. (FF 32, FF 33).  Counsel made a judgment that Mr. Whitaker's personality traits would be harmful.  *Id*. at 742 (FF 34, FF 35).  Counsel thus decided not to pursue a mental health mitigation case, and the TCCA found this decision reasonable.  *Id*. at 743-44 (FF 45, FF 50, FF 51).

Respondent points out that counsel conducted at least some investigation into Mr. Whitaker's mental health, interviewing Mr. Whitaker and his father, and talking to Dr. O'Rourke.  In addition to concluding that there was little helpful mental health evidence, counsel decided that presenting a mental health mitigation case would conflict with his strategy of showing that Mr. Whitaker was remorseful for his crime, that Mr. Whitaker's family forgave him and did not want a death sentence, and that Mr. Whitaker was not a future danger.  3 SH at 611.

"[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (internal quotation marks and alteration omitted) (quoting *Strickland*, 466 U.S. at 690-91).  When assessing the reasonableness of an attorney's investigation, a court must "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."  *Id*. at 527.  To establish that an attorney was ineffective for failure to investigate, a petitioner must allege with specificity what the

investigation would have revealed and how it would have changed the outcome of the trial. *See United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).

Mr. Whitaker makes two arguments about trial counsel's limited investigation into a possible mental health mitigation strategy:   first, that counsel misunderstood the law governing compulsory psychological examinations by State experts, Am. Pet. at 27; and second, that in the face of what information about Mr. Whitaker's mental health counsel *did* possess, counsel made an unreasonable professional judgment not to conduct further investigation.  Mr. Whitaker's claim is strongest with regard to the test administered by Dr. O'Rourke in 1997, the Millon Multi-Axial Clinical Inventory, referred to in Dr. O'Rourke's testimony as the Millon test.  31 Tr. at 12; Am. Pet., Exh. C.  Without analyzing the contents of the report generated from the Millon test, the Court notes that the report's introductory paragraphs warn:

> To avoid its misconstrual or misuse, the report should be evaluated by mental health clinicians trained in recognizing its strengths and limitations of psychological test data.  Given its limited data base and pathologic focus, the report should not be shown to patients or their relatives.

Am. Pet., Exh. C at 2.  Such a warning might reasonably indicate to counsel that further investigation is necessary, at least to the point of consulting with a trained mental health clinician who may assist in interpreting the report.

Mr. Whitaker argues that trial counsel did not understand the TCCA's line of cases regarding compulsory psychological examinations of criminal defendants and, as a result of

24

his misunderstanding of the law, counsel unreasonably failed to investigate Mr. Whitaker's mental health for possible mitigation evidence. Am. Pet. at 27. Mr. Whitaker cites to *Lagrone v. State*, 942 S.W.2d 602 (Tex. Crim. App. 1997) as providing "that if the defense ultimately decides not to sponsor psychological testimony, the State cannot put on adverse psychological findings" and is instead "limited to rebutting the defense's theory." Am. Pet. at 27.

The question at the heart of *Lagrone* and its predecessor *Soria v. State*, 933 S.W.2d 46 (Tex. Cr. App. 1996), was how best to protect a criminal defendant's Fifth Amendment right against self-incrimination in the face of "the interest of the other party [the State] and the function of the courts of justice to ascertain the truth," *Lagrone*, 942 S.W.2d at 611 (citing *U.S. v. Byers*, 740 F.2d 1104, 1114 (D.C. Cir. 1984)). The *Lagrone* solution was two-fold: first, that "when the defense demonstrates the intent to put on future dangerousness expert testimony, trial courts may order defendants to submit to an independent, state-sponsored psychiatric exam prior to the actual presentation of the defense's expert testimony"; and second, a reaffirmance of the rule from *Soria* that the State's "rebuttal testimony is limited to the issues raised by the defense expert." *Id*. at 610-11; *see also Hernandez v. State*, 390 S.W.3d 310, 321-22 (Tex. Crim. App. 2012) (describing a "*Lagrone* examination" as occurring when "a defendant intends to present mental-health expert testimony, the State is entitled to compel the defendant to undergo examination by the State's expert for rebuttal purposes").

*Lagrone* announced a new rule allowing courts to "order criminal defendants to submit to a state-sponsored psychiatric exam on future dangerousness when the defense introduces, *or plans to introduce*, its own future dangerousness expert testimony." *Lagrone*, 942 S.W.2d at 611 (emphasis in the original).  Although *Soria* and *Lagrone* limit the State's presentation of evidence drawn from a *Lagrone* examination to rebuttal of the defendant's own presentation, those cases did not announce an accompanying rule preventing the State from obtaining the results of a court-ordered mental health examination until the defendant actually presents his expert testimony.  Such results might inform the State's prosecution, regardless of their eventual presentation at trial.  Recognizing this problem, the TCCA noted that:

> Because the defendant has not actually waived his Fifth Amendment protection prior to the presentation at trial of future dangerousness expert testimony, it is crucial for the trial court to protect the defendant's Fifth Amendment rights.  Indeed, in this case, the trial court deserves commendation for its efforts in ensuring that the defendant's Fifth Amendment rights were protected to the greatest possible extent. Other courts would do well in the future, in fact, to follow the guidelines adhered to by the trial court in this case.

*Id*. at 612 n.8.  The trial court's guidelines in *Lagrone* included that defendant's counsel be notified in advance of the examination and, while not present, that counsel may be consulted by defendant at any time during the interview; that the examiner would deliver his findings to the court for *in camera* inspection; and that the examiner's report was to be turned over to the State only if the defendant presented testimony of a mental health expert. *Id*. at 610 n.6.  Similarly, the TCCA noted a trial court's restrictions in *Lizcano v. State*, and

found that the order to submit to examination "did not violate the appellant's Fifth Amendment rights, particularly where the trial court adopted the prophylactic measures of ordering the experts not to disclose underlying facts or data to the attorneys without prior judicial authorization." *Lizcano v. State*, No. AP-75879, 2010 WL 1817772 (Tex. Crim. App. 2010).

The TCCA is right to praise trial courts that protect a defendant's Fifth Amendment rights by restricting the State's access to the results of a compelled mental health examination until the defense actually presents its own mental health testimony.  However, Mr. Whitaker's case may point to the need for more than mere praise.  Faced with a psychologist's report cautioning the reader that its interpretation required a trained clinician's eye, *see* Millon Report, Am. Pet., Exh. C at 2, trial counsel should have full confidence that the consultation required to understand such a report will not trigger the State's ability to advance its case against the defendant until the counsel decides to present evidence.

Nonetheless, trial counsel did not make an unreasonable assessment in this case.  In addition to his other investigations, he had a conversation with Dr. O'Rourke before determining not to pursue a mitigation defense.  Am. Pet., Exh. E at 4.  Although it is unclear whether Mr. McDonald discussed the Millon Report with Dr. O'Rourke in that conversation, he successfully prevented the report from being introduced into evidence or discussed at trial.  31 Tr. at 44.  Regardless of what counsel might have done if the

27

limitations on *Lagrone* examinations were clearer, his choice to pursue a strategy of excluding psychological testimony in favor of showing that Mr. Whitaker was remorseful was not unreasonable.

Mr. Whitaker may well be correct that helpful evidence might have been discovered had counsel retained a mental health expert.  Even if that assertion is true, however, it still does not mean that counsel's decision not to pursue further investigation into this area was unreasonable.   As respondent points out, prior mental health evaluations contained damaging evidence.  While Mr. Whitaker makes much of the fact that he was not clinically diagnosed with antisocial personality disorder or narcissistic personality, both counsel and Lynn Ayres observed that Mr. Whitaker displayed such traits in the common usage, if not in the clinical sense, of the words.  As such, psychological evidence was, at best, double-edged.  While it may have undercut the State's theory that Mr. Whitaker acted out of greed, it would also have painted a picture of a disturbed young man.  Such evidence could have strengthened the State's case for future dangerousness and weakened Mr. Whitaker's efforts to convince the jury that he was remorseful.  In light of the potential damage such evidence could cause to any efforts to portray Mr. Whitaker as remorseful, and to any effort to convince the jury that he was not a future danger, counsel's decision not to pursue further investigation was not unreasonable.  Nor was the TCCA's conclusion that counsel was not deficient an unreasonable one.  Thus, under the "doubly deferential" standard of AEDPA review of an ineffective assistance of counsel claim, Mr. Whitaker is not entitled to relief on

this claim.

Mr. Whitaker also presents reports by Drs. Jerome Brown and Diane Mosnik, and 2011 statements by Drs. O'Rourke and Harrison, in support of this claim. These reports and statements were not presented to the state habeas court and thus cannot be considered by this Court. *See, e.g.*, *Cullen v. Pinholster*, 131 S. Ct. 1388, 1399 (2011) ("Section 2254(b) requires that prisoners must ordinarily exhaust state remedies before filing for federal habeas relief. It would be contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively de novo.").

Mr. Whitaker argues that *Pinholster* is not a bar to his presenting new evidence because he requested an evidentiary hearing in state court, and the state habeas court denied that request. Mr. Whitaker's argument, however, glosses over the fact that he developed the new evidence he wishes to present here without a hearing, *i.e.*, he obtained the reports and statements and presents them on paper. He could have done the same in state court. Moreover, the new evidence does not alter the analysis. While Mr. Whitaker may make a compelling argument that there was more, possibly helpful, psychological evidence that counsel could have discovered, that is not the issue in this habeas corpus proceeding. The issue is whether counsel's decision not to conduct further investigation into psychological evidence was a reasonable one. For the reasons discussed above, and viewed under the highly deferential *Strickland* standard, this Court must conclude that counsel's investigation

29

was sufficient to lead to a reasonable decision not to pursue further psychological evidence. Therefore, counsel was not deficient.

### b.     Prejudice

While Mr. Whitaker might have been able to present some helpful evidence, *i.e.*, from Dr. Harrison, had counsel pursued additional psychological evidence, some of the additional evidence may also have been harmful and, in any event, would have been subject to rebuttal from the State.  To the extent that Mr. Whitaker's crime was presented as the result of mental illness, such evidence could also have strengthened the State's case for future dangerousness.  Mr. Whitaker's claim that Dr. Harrison could have undermined the State's theory that Mr. Whitaker killed out of selfish motives is also undercut by other evidence that Mr. Whitaker himself told his co-conspirators that he wanted to kill his family so he could get their money.  *See, e.g.*, 27 Tr. at 143; 28 Tr. 31, 148; 29 Tr. at 21.  This evidence was partially contradicted by evidence that Mr. Whitaker was motivated by hostility toward his family.  28 Tr. at 77, 192; 29 Tr. at 48; 31 Tr. at 180.  Even if Dr. Harrison's report or testimony would have tipped the scale toward a conclusion that Mr. Whitaker was primarily motivated by hatred of his family and only secondarily by money, it is hard to see how such evidence would have helped Mr. Whitaker.  The evidence portrayed a family that was loving and supportive of Mr. Whitaker.  Indeed, on the night of the murders, the family took Mr. Whitaker out to dinner to celebrate his supposed college graduation and presented him with an expensive watch as a graduation gift.  25 Tr. at 68-69.

Evidence of his hatred for this family, even if driven by delusions, was, at best, double-edged.  The TCCA's conclusion that there was no prejudice is also not unreasonable.

### 2.       Failure to Prepare Witnesses

In his next claim for relief, Mr. Whitaker contends that counsel failed to prepare his penalty phase witnesses to testify.  Counsel stated that he did not tell K. Whitaker what to say at trial because he did not want the testimony to sound rehearsed.  He also states that he read K. Whitaker's statements to the news media and spoke to K. Whitaker in his office.  Based on these statements and personal conversations, he believed that K. Whitaker wanted the jury to return a life sentence and would so testify.  *See* Am. Pet., Exh. E at 8-9.  Counsel also stated that he told Bo Bartlett, Mr. Whitaker's uncle, "to tell how [he] felt in front of the jury."  *Id*. at 9.  Mr. Whitaker argues that counsel failed to prepare these witnesses for potentially damaging cross examination, and failed to prepare K. Whitaker for questions regarding his views on the State's decision to seek the death penalty.

Mr. Whitaker argues that the strategy of showing his remorse and lack of future dangerousness depended on K. Whitaker testifying that he saw important changes in Mr. Whitaker's character since the murders.  When asked on cross examination whether he had "any evidence to contradict that your son is not going to be a continuing threat to society," K. Whitaker responded that "I can't read his heart. . . ."  31 Tr. at 168.  K. Whitaker also testified that he wanted the jury to spare Mr. Whitaker's life because he wanted a continuing relationship with his son, and because he wanted his son to have time to seek the Lord's

forgiveness if he had not yet done so, and to have time to "speak to others about the way that the Lord has forgiven him." *Id.* at 168-69. Mr. Whitaker argues that this played into the State's theory that he could deceive and manipulate his father. It should also be noted that K. Whitaker testified that he believed his son had changed, but that "I don't know that for sure . . . ." *Id.* at 168.

The state habeas court found that counsel believed K. Whitaker should "testify in his own words." 4 SH at 745 (FF 54). The court further found that counsel reasonably believed that K. Whitaker would testify consistently with his statements to reporters and to counsel and that counsel was surprised by some of K. Whitaker's testimony. 4 SH at 745 (FF 55, FF 56). The court noted that Mr. Whitaker, in the state habeas proceeding, did not specify what else counsel could have done regarding K. Whitaker's testimony, and that Mr. Whitaker had no complaint about Mr. Bartlett's testimony. The court found that counsel's strategy of having Mr. Whitaker personally ask forgiveness was sound, and that counsel adequately prepared Mr. Whitaker to testify. 4 SH at 745-46 (FF 57, FF, 58, FF 59, FF 60).

### a.    Procedural Default

Respondent argues that Mr. Whitaker did not present this claim in its current form to the state habeas court, and that the claim is therefore procedurally defaulted. In state court, Mr. Whitaker made a general claim that counsel did not prepare witnesses, but did not specify what counsel should have done differently.

AEDPA requires that a prisoner exhaust his available state remedies before raising a

claim in a federal habeas petition.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).  As the Fifth Circuit has explained, "absent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief."  *Orman v. Cain*, 228 F.3d 616, 619-20 (5th Cir. 2000).    This rule extends to the evidence establishing the factual allegations themselves.  *Knox v. Butler*, 884 F.2d 849, 852 n.7 (5th Cir. 1989) (citing 28 U.S.C. § 2254(b)); *see also Jones v. Jones*, 163 F.3d 285, 298 (5th Cir. 1998) (noting that "[s]ubsection (b)(1) [of AEDPA] is substantially identical to pre-AEDPA § 2254(b)").  A petitioner fulfills the exhaustion requirement if "all crucial factual allegations were before the state courts at the time they ruled on the merits" of the habeas petition.  *Dowthitt*, 230 F.3d at 746.  Here, Mr. Whitaker reiterates the claim he made in state court, and relies only on the evidence that was before the state court and the trial record.  While his argument as to why counsel's performance was deficient is more specific, that argument is not dependent on any evidence that was not before the state court.  Therefore, this claim was properly presented to the state habeas court, and is not procedurally defaulted.

### b.    Ineffective Assistance

While Mr. Whitaker argues that counsel's witness preparation amounted to

ineffective assistance, Respondent counters that counsel's strategy of discussing the witness' testimony in general, rather than specific, terms was a valid attempt to have the witnesses appear honest and open, and not rehearsed.  Contrary to Mr. Whitaker's framing, K. Whitaker clearly stated that he believed his son changed since the murders; his statement that he could not read Mr. Whitaker's heart seems self-evident, and any claim otherwise would likely have appeared naive or dishonest.  K. Whitaker also made very clear that he and his family disapproved of the State's decision to seek the death penalty and did not want a death sentence imposed on Mr. Whitaker.  *See, e.g.*, 31 Tr. at 135-36, 170-71. Because the testimony was honest and not particularly harmful to the defense theory, Mr. Whitaker cannot show *Strickland* prejudice, and the state habeas court's conclusion that he failed to show prejudice was not unreasonable.

### 3.    Failure to Object

Mr. Whitaker next claims that counsel rendered ineffective assistance by failing to object to the prosecutor's use of the proffer.  The prosecutor acknowledged that the proffer was inadmissible under Texas Rule of Evidence 410, but nonetheless referred to it during his cross examinations of both K. Whitaker and Mr. Whitaker.  Defense counsel did not object.  Mr. Whitaker argues that this could not have been a strategic decision because counsel did not know what caused plea negotiations to break down, how Mr. Felcman obtained the proffer, or the contents of the proffer.  Am. Pet. at 62-63.

Mr. Whitaker cannot demonstrate *Strickland* prejudice from counsel's failure to

34

object.[9]   As noted above in the discussion of Mr. Whitaker's due process claim, the references to the proffer were brief and limited in scope, and Mr. Whitaker was able to explain that the specific words of the proffer were not his.   When viewed against the aggravating evidence, including the facts of the crime itself, it cannot be said that there is a reasonable likelihood that the outcome of the penalty phase would have been different if counsel had objected.

Moreover, the state habeas court found that counsel had valid, reasonable strategic reasons for not objecting.   4 SH at 751 (FF 95, FF 96, FF 97, FF 98, FF 99).   In his affidavit, counsel made clear that his penalty phase defense rested largely on showing that Mr. Whitaker had accepted responsibility and wanted to avoid putting his family through the trauma of a trial by accepting life imprisonment, but that the State had rejected that offer.   3 SH at 608-19.   Counsel saw mention of the proffer as an opportunity "to get in [Mr. Whitaker's] plea bargain offers to the State as well as their plea bargain with the other individuals, namely, the shooter, when they were not seeking the death penalty."   *Id.* at 616.  In his opening statement at trial, counsel highlighted the fact that it was only necessary to have a trial because the State decided to seek the death penalty.   25 Tr. at 56.   He reiterated this point during his opening statement at the penalty phase, specifically informing the jury

---

[9] The Supreme Court has noted that the *Strickland* performance component "need not be addressed first." *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000); *see also Strickland v. Washington*, 466 U.S. 668, 670 (1984) ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course *should* be followed.") (emphasis added).
.

that Mr. Whitaker had offered to accept two life sentences, 31 Tr. at 53-54, a statement that was supported by the testimony of Bartlett, *id.* at 83-85, and K. Whitaker, *id.* at 142-43. Additionally, when the prosecutor attempted to characterize the proffer as lacking remorse, Mr. Whitaker was able to testify that he did not write the proffer.  31 Tr. at 257-58.  In denying a claim based on Texas Rule of Evidence 410 raised on direct appeal, the TCCA noted that the proffer "formed a significant part of [Mr. Whitaker's] mitigation case." *Whitaker*, 286 S.W.3d at 362.

Decisions about whether to object are matters of trial strategy.  *See*, *e.g.*, *Charles v. Thaler*, 629 F.3d 494, 502 (5th Cir. 2011).  Strategic decisions by counsel are "virtually unchallengeable." *Strickland*, 466 U.S. at 689-90.  The state habeas court's conclusion that counsel's decision not to object to mentions of the proffer was a valid strategic decision made in an effort to advance the defense strategy is not an unreasonable one.  Therefore, the state court's decision is entitled to deference under the AEDPA, and Mr. Whitaker is not entitled to relief on this claim.

### 4.     Failure to Develop a Coherent Trial Strategy

Mr. Whitaker next argues that it was incoherent for counsel to concede guilt, and focus on sentencing, while refusing to allow Mr. Whitaker to enter a plea of guilty. Because Mr. Whitaker did not plead, the trial court entered a not guilty plea for him.  Mr. Whitaker argues that this was incoherent because "[a] guilty plea is traditionally taken to be a public acceptance of responsibility and a demonstration of a willingness to accept the

consequences." Am. Pet. at 65.  He argues that counsel's decision deprived him "of this most important indication of remorse." *Id.*

In his state habeas affidavit, counsel explained that he wanted the trial bifurcated so that the facts of the crime were heard at a temporal distance from the punishment phase evidence.  3 SH at 614.  A guilty plea would have eliminated the need for a guilt-innocence phase of trial and caused the jury to hear all of the evidence about the crime immediately before deliberating on punishment.  Counsel, however, did not want Mr. Whitaker to say that he was not guilty when he clearly was.  *Id.*  To accomplish these conflicting objectives, counsel decided to have Mr. Whitaker decline to enter a plea.

The state habeas court found this to be reasonable strategy, and noted numerous other actions by counsel consistent with the strategy of contesting punishment, but not guilt.  *See* 4 SH at 746-48.  The court found no deficient performance and no prejudice.  *Id.* at 748 (FF 71, FF 72, FF 73).

Respondent points out the ramifications of the other choices available to counsel.  If Mr. Whitaker pled guilty, there would have been no guilt-innocence phase of the trial. Therefore, all evidence of the crime would have been presented in the penalty phase and would have been fresh in the jurors' minds when they deliberated over punishment.  If Mr. Whitaker pled not guilty, it would have weakened his defense of taking responsibility for the crime.  Instead, he entered no plea.

While Mr. Whitaker now criticizes counsel's choice, it is clear that there was a sound

strategic reason for that choice.  The fact that it was ultimately unsuccessful does not transform that decision into ineffective assistance of counsel.

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Strickland*, 466 U.S. at 689.  Mr. Whitaker has not demonstrated that counsel's decision to have him enter no plea was not sound trial strategy.  He therefore fails to demonstrate deficient performance.

### 5.    Cumulative Effect

In his final claim of ineffective assistance of counsel, Mr. Whitaker contends that the cumulative effect of the allegedly deficient performance deprived him of the effective assistance of counsel, even if none of the individual instances, standing alone, is constitutionally ineffective assistance.  He argues that the combined instances "had a devastatingly synergistic effect" which "deprived [him] of all of his defenses at the punishment phase."  Am. Pet. at 66-67.

As discussed above, and contrary to Mr. Whitaker's current claim, counsel presented a defense.  That defense consisted of Mr. Whitaker taking responsibility for his crime and expressing remorse, and having Mr. Whitaker's family express their preference for a life

sentence.   Counsel was not deficient in any of the specific instances alleged by Mr.

Whitaker.  "[I]neffective assistance of counsel cannot be created from an accumulation of

acceptable decisions and actions."  *United States v. Hall*, 455 F.3d 508, 520 (5th Cir. 2006).

### C.    Arbitrariness

In his next claim for relief, Mr. Whitaker contends that his death sentence is arbitrary

and excessive, in violation of the Eighth and Fourteenth Amendments, because it is based

on unreliable speculation about his future dangerousness.  He argues that juries are not

competent to make this determination, and that decades of evidence demonstrate the

inherent reliability of judgments on future dangerousness.

Mr. Whitaker further argues that Texas's 2005 enactment of life without parole as an

alternative sentence for capital murder differentiates the current Texas capital sentencing

scheme from that upheld by the Supreme Court in *Jurek v. Texas*, 428 U.S. 262 (1976).

Before 2005, Mr. Whitaker argues, juries made the future dangerousness determination

while considering the possibility that the defendant might eventually be released on parole

if not sentenced to death.  Since 2005, parole is no longer a possibility.[10]   Juries are

unqualified, Mr. Whitaker argues, to assess the risk, or lack thereof, presented by the

defendant in a high security prison environment.  Mr. Whitaker also argues that there is a

national consensus against the death penalty for "the type of crime Mr. Whitaker committed

---

[10] Because the killings were committed in 2003, before the life without parole option was
created, Mr. Whitaker was actually sentenced under the prior sentencing regime.  The jury
that sentenced Mr. Whitaker to the death penalty was instructed to consider the possibility

. . ." Am. Pet. at 83.

### 1.    Procedural Default

As noted above, the AEDPA requires that a prisoner exhaust his available state remedies before raising a claim in a federal habeas petition.  Because Petitioner did not present this claim to the Texas state courts, he has failed to properly exhaust the claim, and this Court may not consider it.  *Knox*, 884 F.2d at 852 n.7.

Ordinarily, a federal habeas petition that contains unexhausted claims is dismissed without prejudice, allowing the petitioner to return to the state forum to present his unexhausted claims.  *Rose v. Lundy*, 455 U.S. 509 (1982).  Such a result in this case, however, would be futile because Petitioner's unexhausted claim would be procedurally barred as an abuse of the writ under Texas law.  A procedural bar for federal habeas review occurs if the court to which a petitioner must present his claims to satisfy the exhaustion requirement would now find the unexhausted claims procedurally barred.  *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

Texas prohibits successive writs challenging the same conviction except in narrow circumstances.  TEX. CODE CRIM. PROC. ANN. art. 11.071 § 5(a) (Vernon Supp. 2002).  The Texas Court of Criminal Appeals will not consider the merits or grant relief on a subsequent habeas application unless the application contains sufficient specific facts establishing the following:

---

that he would be paroled.  *See* Court's Charge on Punishment, State Court Records, Doc. 26-1 at 46.

> (1) the current claims have not been and could not have been presented previously in an original application or in a previously considered application because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application; or
>
> (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt.

*Id.*  The Texas Court of Criminal Appeals applies its abuse of the writ doctrine regularly and strictly.  *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995) (per curiam).

Petitioner does not claim that he could not have presented the claim in his direct appeal or his state habeas petition because the factual basis for the claim did not exist, or that he is actually innocent.  Therefore, Petitioner's unexhausted claim does not fit within the exceptions to the successive writ statute and would be procedurally defaulted in the Texas courts.  *Coleman*, 501 U.S. at 735 n.1.  That bar precludes this Court from reviewing Petitioner's claim absent a showing of cause for the default and actual prejudice attributable to the default, or that this Court's refusal to review the claim will result in a fundamental miscarriage of justice.  *Id.* at 750.

A "miscarriage of justice" means actual innocence, either of the crime for which he was convicted or of the death penalty.  *Sawyer v. Whitley*, 505 U.S. 333, 335 (1992).  "Actual innocence of the death penalty" means that, but for a constitutional error, he would not have been legally eligible for a sentence of death.  *Id.*

To show actual innocence,

> [T]he prisoner must 'show a fair probability that, in light of all the

41

> evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after trial, the trier of the facts would have entertained a reasonable doubt of his guilt.

*Kuhlmann v. Wilson*, 477 U.S. 436, 455 n.17 (1986).  More succinctly, the petitioner must show that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" in light of the evidence now presented.  *Schlup v. Delo*, 513 U.S. 298, 327 (1995).  Petitioner has not established that he is actually innocent of either capital murder or the death penalty.

In his response to the motion for summary judgment, Mr. Whitaker argues that his default can be excused under the Supreme Court's recent decisions in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013).  In *Martinez*, the Supreme Court held that ineffective assistance of state habeas counsel could, in certain circumstances, constitute cause to excuse a procedural default of an ineffective assistance of trial counsel claim. In *Trevino*, the Supreme Court held that *Martinez* is applicable to the Texas capital postconviction process.

*Martinez,* by its own terms, applies only to underlying claims of ineffective assistance of trial counsel.

> [W]hen a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim . . . where appointed counsel in the initial-review collateral proceeding . . .was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 . . . (1984).  To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial

> counsel claim is a substantial one, which is to say that the prisoner
> must demonstrate that the claim has some merit.

*Martinez*, 132 S. Ct. at 1318-19.  Some judges, however, have suggested that the rationale

of *Martinez* is equally applicable to other types of habeas claims.  *See Martinez*, 132 S. Ct.

at 1321 (Scalia, J., dissenting); *Hunton v. Sinclair*, 732 F.3d 1124, 1127-1131 (9th Cir.

2013) (Fletcher, J., dissenting).

Here, the Court need not decide the precise limits of *Martinez* to conclude that Mr.

Whitaker's claim for relief is unavailing.  As discussed below, *Jurek* is controlling law.

That case holds that the Texas death penalty scheme is, on its face, constitutional.  Even if

*Martinez* applied, Whitaker could not demonstrate that state habeas counsel was ineffective

for failing to raise a claim that is directly contrary to controlling precedent.  Because Mr.

Whitaker fails to demonstrate deficient performance by his state habeas counsel, *Martinez*

cannot excuse Mr. Whitaker's default of this claim.

### 2.    Non-Retroactivity

In *Teague v. Lane*, 489 U.S. 288 (1989), the Supreme Court held that, except in very

limited circumstances, a federal habeas court cannot retroactively apply a new rule of

criminal procedure.  The Court explained that

> a case announces a new rule when it breaks new ground or imposes
> a new obligation on the States or the Federal Government.  To put it
> differently, a case announces a new rule if the result was not *dictated*
> by precedent existing at the time the defendant's conviction became
> final.

*Id.* at 301 (emphasis in original).  The AEDPA effectively codified the *Teague* non-

43

retroactivity rule "such that federal habeas courts must deny relief that is contingent upon a rule of law not clearly established at the time the conviction becomes final." *Peterson v. Cain*, 302 F.3d 508, 511 (5th Cir. 2002) (citing *Williams*, 529 U.S. at 380-81), *cert. denied*, 537 U.S. 1118 (2003).

Petitioner implicitly acknowledges, in his attempt to distinguish *Jurek*, that he now asks this Court to announce a new rule of criminal procedure, *i.e.*, that *Jurek* no longer applies and a death sentence based on a finding of future dangerousness is unconstitutional. *Teague* and the AEDPA do not permit this Court to do so.

### D.    Lethal Injection

In his final claim for relief, Mr. Whitaker contends that Texas's method of execution, lethal injection, constitutes cruel and unusual punishment in violation of the Eighth Amendment.  Mr. Whitaker objected to the three-drug protocol for lethal injection, which he asserts may allow an inmate to feel pain but be unable to express it.  *See* Pet. for Writ of Habeas Corpus, Doc. No. 1, at 69.  After Mr. Whitaker filed his petition for habeas corpus, Texas adopted a new, one-drug protocol for lethal injections, displacing the challenged three-drug protocol.  *See* MSJ at 205.  However, even if Mr. Whitaker had objected to the new one-drug protocol, it is likely that his claim would fail.  In previous challenges to the use of a three-drug lethal injection protocol, counsel for inmates have argued that the use of a one-drug protocol would be *more* humane.  *Baze v. Rees*, 553 U.S. 35, 51 (2008). Furthermore, the Fifth Circuit has recently suggested that Texas's new one-drug protocol

passes constitutional muster.  *See Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1789 (2014); *Thorson v. Epps*, 701 F.3d 444, 447 n.3 (5th Cir. 2012), *cert. denied*, 134 S. Ct. 53 (2013); *accord Cooey v. Strickland,* 589 F.3d 210, 221 (6th Cir. 2009).  Therefore, Mr. Whitaker's claim that his lethal injection would violate the Eighth Amendment fails.

## IV.   MOTION FOR EVIDENTIARY HEARING

Mr. Whitaker has also filed a motion for an evidentiary hearing (Doc. No. 19).  An evidentiary hearing is not required if there are "no relevant factual disputes that would require development in order to assess the claims." *Williams*, 529 U.S. at 436  (stating that it was "Congress' intent to avoid unneeded hearings in federal habeas corpus"); *Robison v. Johnson*, 151 F.3d 256, 268 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999). "If it appears that an evidentiary hearing is not required, the judge shall make such disposition of the petition as justice shall require."  Rules Governing Section 2254 Cases R. 8.  Each of Petitioner's claims can be resolved by reference to the state court record, the submissions of the parties, and relevant legal authority.  There is therefore no basis upon which to hold an evidentiary hearing on Mr. Whitaker's claims.

## V.   CERTIFICATE OF APPEALABILITY

A petitioner may obtain a certificate of appealability ("COA") either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a request.  *See Whitehead v. Johnson*, 157

F.3d 384, 388 (5th Cir. 1988); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997)

("[T]he district court should continue to review COA requests before the court of appeals

does."). "A plain reading of the AEDPA compels the conclusion that COAs are granted on

an issue-by-issue basis, thereby limiting appellate review to those issues alone." *Lackey v.*

*Johnson*, 116 F.3d 149, 151 (5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the

denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also United States v. Kimler*,

150 F.3d 429, 431 (5th Cir. 1998). A petitioner "makes a substantial showing when he

demonstrates that his application involves issues that are debatable among jurists of reason,

that another court could resolve the issues differently, or that the issues are suitable enough

to deserve encouragement to proceed further." *Hernandez v. Johnson*, 213 F.3d 243, 248

(5th Cir.), *cert. denied*, 531 U.S. 966 (2000). The Supreme Court has stated that

> Where a district court has rejected the constitutional claims on the
> merits, the showing required to satisfy § 2253(c) is straightforward:
> The petitioner must demonstrate that reasonable jurists would find
> the district court's assessment of the constitutional claims debatable
> or wrong. The issue becomes somewhat more complicated where
> . . . the district court dismisses the petition based on procedural
> grounds. We hold as follows: When the district court denies a
> habeas petition on procedural grounds without reaching the
> prisoner's underlying constitutional claim, a COA should issue when
> the prisoner shows, at least, that jurists of reason would find it
> debatable whether the petition states a valid claim of the denial of a
> constitutional right and that jurists of reason would find it debatable
> whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "[T]he determination of whether a COA

should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000), *cert. dismissed*, 531 U.S. 1134 (2001).

This court has carefully considered each of Petitioner's claims. While the issues raised by Petitioner regarding the effectiveness of his trial counsel, the arbitrariness of the death penalty punishment, and the cruelty of lethal injection are clearly important and deserving of the closest scrutiny, the Court finds that each of these claims is foreclosed by clear, binding precedent. Under such precedents, Petitioner has failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Additionally, as to the arbitrariness claim that has been dismissed on procedural grounds, this Court concludes that jurists of reason would not find it debatable whether the Petition states valid grounds for relief and would not find it debatable whether this Court is correct in its procedural determination. Petitioner is not entitled to a certificate of appealability on these claims.

The Court cannot close, however, without expressing its grave reservations as to the decision it is compelled to reach. Petitioner's conduct before and during his horrific crimes, and his conduct throughout the litigation that has followed, cannot be squared with the conduct of a rational, or even a sane, person. Still, Petitioner does not meet the well-established criteria for diminished capacity or incompetence, and Petitioner does not argue otherwise.

47

Further, the conduct of the prosecutors raises a distinct set of constitutional concerns. In particular, it appears likely that the prosecution deliberately sought to leave the jury with a manufactured impression that Petitioner felt no remorse for the murders. The prosecution's alleged conduct makes necessary a reference to perhaps the most famous Supreme Court passage on a prosecutor's duties. In *Berger v. United States*, 295 U.S. 78 (1935), in vacating a federal court conviction, the Court declared:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

295 U.S. 78, 88 (1935). What the Supreme Court said of a federal prosecutor's role in the criminal system is no less true of prosecutors who represent other sovereigns. What it said about conviction is no less true of punishment.

As noted above, the Court confronts the sharply limited contours of habeas review and is not at liberty to declare the prosecution's alleged conduct repugnant to due process. Neither can the Court say that the alleged conduct rendered the trial as a whole fundamentally unfair.

Although the Court cannot, consistent with its status in the federal system, offer

48

Petitioner any relief, a higher court may not feel equally constrained.  Accordingly, the Court grants Petitioner a certificate of appealability on the question of prosecutorial misconduct.

## VI.    ORDER

For the foregoing reasons, it is **ORDERED** as follows:

1.    Respondent William Stephens' Motion for Summary Judgment (Doc. No. 6) is **GRANTED**;

2.    Petitioner Thomas Bartlett Whitaker's Amended Petition For Writ Of Habeas Corpus (Doc. No. 2) is **DENIED**;

3.    Mr. Whitaker's Supplemental Motion for an Evidentiary Hearing (Doc. No. 19) is **DENIED**; and

4.    A Certificate of Appealability limited to the prosecutorial misconduct claim shall issue in this case.

The Clerk shall notify all parties and provide them with a true copy of this Order.

SIGNED at Houston, Texas, on this 17th day of March, 2015.

KEITH P. ELLISON
United States District Judge

49